**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| **BRIANNE DRESSEN**, **ERNEST RAMIREZ**, **SHAUN BARCAVAGE**, **SUZANNA NEWELL**, **NIKKI HOLLAND**, and **KRISTI DOBBS**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **ROB FLAHERTY**, White House Director of Digital Strategy, in his official capacity; **JOSEPH R. BIDEN, JR.**, President of the United States, in his official capacity; **KARINE JEAN-PIERRE**, White House Press Secretary, in her official capacity; **COURTNEY ROWE**, White House Covid-19 Director of Strategic  Communications and Engagement, in her official capacity; **CLARKE HUMPHREY**, White House Digital Director for the Covid-19 Response Team, in her official capacity; **DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **XAVIER BECERRA**, Secretary of the Department of Health and Human Services, in his official capacity; **VIVEK MURTHY**, United States Surgeon General, in his official capacity; **ERIC WALDO**, Chief Engagement Officer for the Surgeon General, in his official capacity; **CENTERS FOR DISEASE CONTROL AND PREVENTION**; **CAROL Y. CRAWFORD**, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC, in her official capacity; **DEPARTMENT OF HOMELAND SECURITY**; **ALEJANDRO MAYORKAS**, Secretary of the Department of Homeland Security, in his official capacity; **CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY**; **JEN EASTERLY**, Director of | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMANDED** <br><br><br> Case No. 3:23-cv-155 |

1

the Cybersecurity and Infrastructure Security
Agency, in her official capacity;
**THE STANFORD INTERNET
OBSERVATORY**; **ALEX STAMOS**,
Director of the Stanford Internet Observatory;
**RENEE DIRESTA**, Research Manager of the
Stanford Internet Observatory;

*Defendants*.

## INTRODUCTORY STATEMENT

It is axiomatic that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Nor may it coerce or induce a private entity to take action that the Constitution prohibits the government from doing directly. *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).

Indeed, it is essential to free government that the First Amendment be safeguarded "to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). As George Orwell put it, "[i]f liberty means anything at all, it means the right to tell people what they do not want to hear." It is not the government's role to curate, filter, or suppress disfavored speech before it reaches the eyes and ears of American citizens. Yet, that is precisely what transpired—and continues to occur—here.

This case challenges the government's mass-censorship program and the shocking role that it has played (and still plays) in ensuring that disfavored viewpoints deemed a threat to its agenda are suppressed. This sprawling censorship enterprise has involved the efforts of myriad federal agencies and government actors (including within the White House itself) to direct, coerce, and, ultimately, work in concert with social media platforms to censor, muffle, and flag as

"misinformation" speech that conflicts with the government's preferred narrative—including speech that the government explicitly acknowledges to be true.

Plaintiffs in this case—Brianne Dressen, Shaun Barcavage, Kristi Dobbs, Nikki Holland, Suzanna Newell, and Ernest Ramirez—all use social media and have or had accounts on several platforms, including Facebook, Instagram, YouTube, Twitter, TikTok, and GoFundMe.   All Plaintiffs except for Mr. Ramirez suffered—and continue to experience—serious and debilitating medical injuries within days (and, in many cases, hours) after taking one of the Covid vaccines. Mr. Ramirez's 16-year-old son Ernest Ramirez, Jr. died five days after taking his first dose of the Pfizer Covid vaccine.  All six Plaintiffs have relied on social media as a means of: sharing their personal experiences after they, or a loved one, were medically harmed after taking the vaccine; exchanging advice, medical research, and support with others who were injured after taking the vaccine; and engaging with other users in private support groups for vaccine-injured individuals and their loved ones.  Plaintiffs' use of social media in these ways has been met with heavy and ongoing censorship.

Plaintiffs' speech has repeatedly been flagged as misinformation or removed entirely, while their social media accounts are at constant risk of being frozen or disabled.  For example, in July of 2021, Facebook shut down a private support group for vaccine-injured individuals called "A Wee Sprinkle of Hope," of which Ms. Dressen was a member, after she posted an infographic that listed certain symptoms that people had experienced post-Covid vaccine, as well as a link to a press conference where she had recently spoken about her vaccine injuries.  Facebook informed her that the group was disabled for violating Facebook's "Community Standards on misinformation that could cause physical harm."

In August of 2021, after Mr. Ramirez's son died, he launched a GoFundMe page to help fundraise enough money for a trip to Washington, D.C. to speak about his son's story.  A week later, GoFundMe informed Mr. Ramirez that his account had been removed for violating the platform's terms of service for "Prohibited Conduct."  As a result, all the funds that Mr. Ramirez had raised were forfeited.  On November 11, 2021, which would have been his son's seventeenth birthday, Mr. Ramirez posted a photo on Facebook and Twitter of himself beside his son's casket at his funeral.  The caption of the photo read: "My good byes to my Baby Boy."  Facebook flagged the post with a warning box viewable to other users labeling it as "partly false information."  Twitter deleted the photo altogether and warned Mr. Ramirez: "Make sure you're sharing reliable information.  Visit the COVID-19 Information Center for reliable vaccine info and resources."

On multiple occasions, TikTok removed Ms. Holland's video posts in which she shared her personal experiences after taking the Covid vaccine, including her medical injuries and recovery process.  TikTok notified her that the videos violated "Community Guidelines" for posting "violent and graphic content" and for "integrity and authenticity" concerns.

In the summer of 2021, Mr. Barcavage created a private support group on Facebook for those who were suffering tinnitus post-vaccination.  Facebook frequently labeled posts within the group as "misinformation" or with a message redirecting viewers to "more accurate information" on the CDC website.  As the group administrator, Mr. Barcavage had to develop code words with the other members, such as "vee" for vaccines, to prevent posts, including links to news articles and medical journals, from being flagged as misinformation or removed entirely.

On June 28, 2021, Ms. Dobbs participated in a press conference held by U.S. Senator Ron Johnson, along with other vaccine-injured individuals, where they shared their post-vaccine experiences.  Within twenty-four hours of the press conference, one of Ms. Dobbs's private support

groups on Facebook was shut down, and member lists were eliminated entirely under the claim that the group had been spreading "misinformation."   A few days after the press conference, another Facebook support group to which Ms. Dobbs belonged was shut down for posting a link to the press conference and an infographic displaying symptoms that people had experienced post-vaccination.  As a result of Facebook's shutdown of the group, Ms. Dobbs lost contact with nearly two thousand other vaccine-injured individuals who had been members of the group.

On September 30, 2022, Ms. Newell posted a video entitled "Kindness" on YouTube in which she and a vaccine-injured friend discussed their difficult experiences and how "Team Humanity" and the kindness of others had allowed them to maintain hope.  They did not make any claims about the Covid vaccine.   YouTube removed the video for "misinformation" and for violating its Community Guidelines.

The vast majority of Plaintiffs' censored speech was deeply personal and frequently private.  For attempting simply to engage with others and to discuss their own pain, experiences, advice, and sources of hope, however, they have been met with censorship and accusations of spreading lies and "inciting violence."   Through this irrational and brutal censorship regime, Defendants have treated what is, in truth, personal and intimate speech as impermissible political dissent to the government's preferred policies.  Thus, what began as personal and intimate has been forcibly converted into political speech by government suppression.  Plaintiffs are innocent victims in the federal government's exhaustive crusade against any message that might threaten— or even question—its vaccination agenda.

Under the First Amendment, the federal government must play no role in policing private speech or picking winners and losers in the marketplace of ideas.  Indeed, the Constitution's text is explicit:  "Congress shall make no law … ***abridging*** the freedom of speech."  U.S. Const. Amend

I.  Hence, any law or policy that merely "abridges" or reduces the constitutionally protected sphere of speech violates the First Amendment.  Yet federal officials have been doing that and more here as they chip away at the First Amendment's guarantee of free speech and supplant it with what amounts to government-induced censorship.  Through threats, pressure, inducement, and coercion, Defendants now work in concert with social media companies to censor content the government deems "disinformation," "misinformation," and "malinformation"—a feat that the government could never lawfully accomplish alone.  Secretary Mayorkas of DHS commented that the government's efforts to police private speech on social media are occurring "across the federal enterprise."  It turns out that this statement is quite literally true.

Defendants' own words, documents from Twitter and the government itself, along with discovery produced in the lawsuit *Missouri v. Biden*, chronicle Defendants' extensive efforts in staggering detail.  Defendants are engaged in egregious violations of the First Amendment across numerous federal agencies—including the White House, the Office of the Surgeon General, the CDC, DHS, and CISA—as well as massive government/private joint censorship enterprises, including the Stanford Internet Observatory's "Virality Project," to target and suppress speech on the basis of content (*i.e.*, Covid vaccine-related speech) and viewpoint (*i.e.*, speech raising doubt or concern about Covid vaccines' safety and efficacy and the extent and severity of side effects).

As alleged further herein, numerous emails, as well as evidence of regular meetings, phone calls, and exchanges of information between Defendants and major social media platforms, unveiled in *Missouri v. Biden*, the Twitter Files, and Defendants' own public documents, reveal that Defendants have been directing social media censorship of constitutionally protected speech when it runs counter to the message that the government wishes to propagate.  One of the primary

objectives of Defendants' mass censorship program has been to chill and suppress speech related to the Covid vaccine and its—sometimes devastating—side effects.

As just one example, in an email exchange in March, 2021 between a Facebook executive and the White House Director of Digital Media, Rob Flaherty informed the Facebook executive: "We are gravely concerned that your service is one of the top drivers of vaccine hesitancy—period. … We want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game … this would all be a lot easier if you would just be straight with us."  In a clear attempt to appease the White House official, the Facebook executive replied about a week later, informing Flaherty that Facebook had made a number of policy changes, including the removal of "Groups, Pages and Accounts" containing, in the executive's words, "often-true content" that "can be framed as sensation, alarmist, or shocking."[1]

Among the Defendants is one private entity, the Stanford Internet Observatory (SIO), which describes itself as "a cross-disciplinary program of research, teaching and policy engagement for the study of abuse in current information technologies, with a focus on social media."  During the Covid-19 pandemic, SIO launched the Virality Project (or VP) as a means of tracking and censoring Covid-related speech on social media platforms.  According to the Virality Project's report, dated April 26, 2022, the VP targeted speech by "domestic actors" (*i.e.*, American citizens) that "questioned the safety, distribution, and effectiveness of the vaccines."[2]  According to VP, true medical injuries and adverse health effects from the Covid vaccine qualify as "misinformation" when "shared absent context."[3]  Similarly, VP categorized as misinformation

---

[1] *See* Jenin Younes & Aaron Kheriaty, *The White House Covid Censorship Machine*, The Wall Street Journal (Jan. 8, 2023), https://www.wsj.com/articles/white-house-covid-censorship-machine-social-media-facebook-meta-executive-rob-flaherty-free-speech-google-11673203704.
[2] Stanford Internet Observatory, *et al*., The Virality Project, "Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines" (Apr. 26, 2022), https://purl.stanford.edu/mx395xj8490.
[3] *Id.*

"[p]ersonal anecdotes," and it deemed "adverse event stories" objectionable because they are "employed to push back against vaccine mandates."[4]  According to VP's report, six major social media platforms censored content at VP's instigation:  Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest.  The report explains that such censorship was effective in "deplatforming" recurring actors, which "led to an apparent reduction in false or misleading content."[5]

In July, 2021, Ms. Dressen's activities were detailed in a report created by the Virality Project.  The purpose of VP's report was to cultivate "real-time detection, analysis, and response to COVID-19 anti-vaccine and mis- and disinformation" and to support "information exchange between public health officials, government, and social media platforms."[6]  Under the heading "Ongoing Themes and Tactics," the report singles out Ms. Dressen and expresses skepticism of her "claims [of] life-altering injuries," concluding that:  "An injury story that does not have a proven causal link to the vaccine nevertheless garnered high spread because it was picked up by a major anti-vaccine activist and by conservative politicians engaged in prior anti-vaccine activities."[7]  Notably, in June, 2021, Ms. Dressen visited the United States National Institutes of Health (NIH) as part of its "Investigation of persistent neurological symptoms following SARS-CoV2 vaccine."  NIH confirmed that she had suffered Covid vaccine-induced medical conditions.  This fact is not featured in VP's report.

Crucially, the Virality Project expressly admits that it works closely with federal government agencies and officials to carry out this joint censorship enterprise—and that it seeks

---

[4] *Id.*
[5] *Id.*
[6] Virality Project Weekly Briefing #31, July 20, 2021 – July 27, 2021,
https://static1.squarespace.com/static/60025974f9f7920e6b40885b/t/6100842926d6617b4ab85e36/1627423792279/
Virality+Project+-+0727+Weekly+Briefing.pdf.
[7] *Id.*

to develop even closer ties.  According to its report, among VP's key "stakeholders" are federal health agencies, including CDC and the Office of the Surgeon General, which are engaged in continuous, ongoing communication and close collaboration with VP to effect a "whole-of-society" effort to include an active role for the government in censoring disfavored, vaccine-related speech.[8]  As alleged in further detail herein, SIO has plainly worked in concert with the government Defendants to censor speech on social media regarding the Covid vaccine and its side effects.  SIO is thus sued as a *de facto* government agent.

The federal government has launched a war against purported mis-, dis-, and malinformation, which it claims must be suppressed *despite* the First Amendment, to protect American citizens from supposedly harmful or dangerous ideas.  Indeed, Defendants admit to suppressing truthful speech, including stories of vaccine side effects that it has expressly acknowledged to be true, but which the government nevertheless targets for censorship because such speech "could fuel vaccine hesitancy."[9]  Experience, however, "should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent."  *Olmstead v. United States*, 277 U.S. 438, 479 (1928).  The United States government was formed on the principle that it exists to protect the sovereign rights of each individual American citizen.  These unconstitutional actions not only censor, but they also seek to control what ideas Americans might have in the first place by, among other things, preventing them from reading about the harms caused by Covid vaccines.

Defendants' massive and ongoing censorship enterprise has silenced, suppressed, and chilled constitutionally protected speech on social media platforms—modern society's public

---

[8] Stanford Internet Observatory, *et al*., The Virality Project, "Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines" (Apr. 26, 2022), https://purl.stanford.edu/mx395xj8490.
[9] Twitter Files #19: *The Great Covid-19 Lie Machine: Stanford, the Virality Project, and the Censorship of "True Stories,"* at https://twitter.com/mtaibbi/status/1636729166631432195.

square.  These actions have directly impacted the Plaintiffs in this case, all of whom have been censored, flagged as "misinformants," shadow-banned, maligned, cast in a false light, and denied their rights to receive information and advice about Covid vaccine injuries and to freely associate with other members of the vaccine-injured community—even in private support groups closed to the public—as a result of Defendants' actions, which lack any conceivable statutory or constitutional authority.  Defendants' censorship operation continues unrepentant and unabated to this day, and it gravely threatens the rights of free speech and free association of not only the Plaintiffs, but of all Americans.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the federal law claims arise under the Constitution and laws of the United States.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiff Ernest Ramirez resides in this District.

3.      This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

## PARTIES

4.      Plaintiff Brianne Dressen was formerly a preschool teacher in Saratoga Springs, Utah.  Due to the debilitating medical injuries that she experienced after taking the AstraZeneca Covid vaccine as a part of a clinical trial, she has been unable to continue teaching.  She resides in Salt Lake City, Utah.

5.      Plaintiff Shaun R. Barcavage was formerly a research nurse practitioner at Weill Cornell Medicine.  Due to the debilitating medical injuries that he experienced after taking his first

dose of the Pfizer Covid vaccine, he is currently on disability leave.  He resides in Riegelsville, Pennsylvania.

6.      Plaintiff Kristi Dobbs is a dental hygienist.  Due to the debilitating medical injuries that she experienced after taking her first dose of the Pfizer Covid vaccine, she was unable to return to work until April, 2023, and she currently works one day a week.  She resides in Joplin, Missouri.

7.      Plaintiff Nikki Holland was formerly a full-time physical therapist.  Due to the debilitating medical injuries that she experienced after taking her second dose of the Moderna Covid vaccine, she has been unable to return to work and is currently on disability leave.  She resides in Henry, Tennessee.

8.      Plaintiff Suzanna Newell worked in financial services for over 25 years and served most recently as the Vice President of Corporate Social Responsibility at a large bank in Minneapolis.  Due to the debilitating medical injuries that she experienced after taking her second dose of the Pfizer Covid vaccine, she is currently on disability leave.  She resides in Saint Paul, Minnesota.

9.      Plaintiff Ernest Ramirez is a service technician for a carwash company.  His 16-year-old son Ernest Ramirez, Jr. died five days after taking his first dose of the Pfizer Covid vaccine.  Mr. Ramirez resides in Edinburg, Texas.

10.     Defendant Rob Flaherty is Deputy Assistant to the President and Director of Digital Strategy at the White House.  He is sued in his official capacity.

11.     Defendant Joseph R. Biden, Jr., is the President of the United States.  He is sued in his official capacity.

12.     Defendant Karine Jean-Pierre is the White House Press Secretary.  She is sued in her official capacity.  She is substituted for her predecessor, former White House Press Secretary Jennifer Psaki.

13.     Defendant Courtney Rowe is or was the White House Covid-19 Director of Strategic Communications and Engagement.  She is sued in her official capacity.

14.     Defendant Clarke Humphrey is the White House Digital Director for the Covid-19 Response Team.  She is sued in her official capacity.

15.     Defendant Department of Health and Human Services (HHS) is a cabinet-level executive agency within the government of the United States.

16.     Defendant Dr. Vivek Murthy is Surgeon General of the United States.  He is sued in his official capacity.

17.     Defendant Eric Waldo is Chief Engagement Officer for the Surgeon General.  He is sued in his official capacity.

18.     Defendant Xavier Becerra is Secretary of HHS.  He is sued in his official capacity.

19.     Defendant Centers for Disease Control and Prevention (CDC) is a federal agency under HHS.

20.     Defendant Carol Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within the CDC.  She is sued in her official capacity.

21.     Defendant Department of Homeland Security (DHS) is a cabinet-level executive agency within the Government of the United States.

22.     Defendant Alejandro Mayorkas is Secretary of DHS.  He is sued in his official capacity.

23.    Defendant Cybersecurity and Infrastructure Security Agency (CISA) is an agency within DHS that is charged with protecting the United States' cybersecurity and physical infrastructure.

24.    Defendant Jen Easterly is the Director of CISA within DHS.  She is sued in her official capacity.

25.    Hereinafter, Defendants Rob Flaherty, Joseph R. Biden, Jr., Karine Jean-Pierre, Courtney Rowe, Clarke Humphrey, HHS, Dr. Vivek Murthy, Eric Waldo, Xavier Becerra, CDC, Carol Crawford, DHS, Alejandro Mayorkas, CISA, and Jen Easterly will be referred to jointly as the "Government Defendants."

26.    Defendant Stanford Internet Observatory (SIO) is "[a] program of [Stanford University's] Cyber Policy Center, a joint initiative of the Freeman Spogli Institute for International Studies and Stanford Law School."  *See* Stanford Internet Observatory, Cyber Policy Center, *at* https://cyber.fsi.stanford.edu/io.  SIO describes itself as "a cross-disciplinary program of research, teaching and policy engagement for the study of abuse in current information technologies, with a focus on social media."

27.    In response to the Covid-19 pandemic, SIO launched the Virality Project, which is a "coalition of research entities focused on supporting real-time information exchange between the disinformation research community, public health officials, civil society organizations, government agencies, and social media platforms."  *See* About, Virality Project, *at* https://www.viralityproject.org/news/about.  Through the Virality Project SIO contracts with federal government agencies to censor Americans for expressing disfavored opinions about Covid-19.  SIO is sued as a *de facto* government agency.

28.     Defendant Alex Stamos is the Director of SIO.  He is sued in his official capacity as a *de facto* government actor.

29.     Defendant Renee DiResta is the Research Manager at SIO.  She is sued in her official capacity as a *de facto* government actor.

30.     On information and belief, the social media censorship activities of SIO alleged in this Complaint were conducted under the direction of Stamos and DiResta.

31.     Hereinafter, Defendants SIO, Alex Stamos, and Renee DiResta will be referred to jointly as the "De Facto Government Defendants."

## BASIC PRINCIPLES

**I.     THE FIRST AMENDMENT PROTECTS AMERICANS' RIGHTS TO EXPRESS, HEAR AND READ PERSPECTIVES THAT ARE CONTROVERSIAL, OUTSIDE THE MAINSTREAM, AND DIFFER FROM THE GOVERNMENT'S MESSAGING**

32.     The First Amendment to the United States Constitution prohibits Congress from making laws "abridging the freedom of speech."  U.S. Const., amend. I.

33.     "And the rights of free speech and free press are not confined to any field of human interest."  *Thomas v. Collins*, 323 U.S. 516, 531 (1945); *see also Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated on other grounds*, 141 S. Ct. 1220 (2021) ("As a general matter, social media is entitled to the same First Amendment protections as other forms of media.").

34.     The prohibition against restrictions on speech applies to all branches of government.  *See Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech[.]'"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (holding that Nixon Administration's attempt to prevent publication of classified information violated the First Amendment).

14

35.     The bedrock of the First Amendment is that government officials lack power to censor disfavored speakers and viewpoints.

36.     "Debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 270; *see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters[.]").

37.     "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes.  When they are so harmless to others or to the State … the price is not too great.  But freedom to differ is not limited to things that do not matter much.  That would be a mere shadow of freedom.  The test of its substance is the right to differ as to things that touch the heart of the existing order.  If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

38.     "[A]s a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002).

39.     Labeling    disfavored    speech    "disinformation,"    "misinformation,"    or "malinformation" does not strip it of First Amendment protection.

40.     Indeed, the Supreme Court has rejected the argument that "false statements, as a general rule, are beyond constitutional protection." *United States v. Alvarez*, 567 U.S. 709, 718 (2012).

41.    "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee."  *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

42.    "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *Id.* at 723 (citing G. ORWELL, NINETEEN EIGHTY-FOUR (1949) (Centennial ed. 2003)).

43.    "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.  The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id.* at 723.

44.    "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'"  *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

45.    "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates."  *Id.* at 728.

46.     The First Amendment also protects the right to receive information. *See Martin v. U.S. E.P.A.*, 271 F.Supp.2d 38 (2002) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976) ("where a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both.").

47.     The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982) (emphasis in original). *See also id.* (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.").

48.     As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S. Ct. 1730, 1735 (2017).

## II.   THE FIRST AMENDMENT SECURES AMERICANS' FREEDOM OF EXPRESSIVE ASSOCIATION, INCLUDING THE RIGHT TO FORM AND FREELY COMMUNICATE WITHIN PRIVATE GROUPS WITHOUT ABRIDGMENT BY GOVERNMENT

49.     "[T]he First Amendment's protection extends beyond the right to speak." *Rumsfeld v. Forum for Acad. & Inst'l Rts., Inc*., 547 U.S. 47, 68 (2006).  It also protects the "right to associate for the purpose of speaking." *Id*.

50.     The freedom of expressive association secures the right to associate for the purpose of engaging in those activities protected by the First Amendment, including the exercise

of free speech.  The Constitution guarantees freedom of association "as an indispensable means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

51.     As the Supreme Court has long recognized, "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, religious, and cultural ends.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts*, 468 U.S. at 622).

52.     The freedom of expressive association is "crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Id*. at 647-48.  Moreover, the freedom of speech "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622.

53.     "An association must merely engage in expressive activity that could be impaired in order to be entitled to [First Amendment] protection." *Id*. at 655.  Further, the First Amendment "does not require that every member of a group agree on every issue," nor does it require that a group "trumpet its views from the housetops" in order for the group to receive First Amendment protection for its expressive association. *Id*. at 655-56.

54.     "The right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld*, 547 U.S. at 68.  "If the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect." *Id*.

### III.   THE GOVERNMENT MAY NOT USE PRIVATE COMPANIES TO ACCOMPLISH WHAT IT CANNOT DO DIRECTLY

55.     It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

56.     Private action may be rendered state action by the government in many ways.

57.     The government can be held responsible for private action "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly.")

58.     Coercion includes "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (even where private party is "free" to ignore government's "advice" because its refusal would violate no law, it is still state action when government induces private party to suppress speech under thinly veiled threats of legal action).

59.     "[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (Posner, J.) (quoting *Am. Fam. Ass'n v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first amendment violation." *Id.* at 235 (quoting *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)).

60.     The censorship and suppression of speech that Defendants have coerced social media platforms to impose on disfavored speakers, content, and viewpoints constitute prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment.  "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

61.     In fact, "such compulsion so plainly violates the Constitution" that it is rarely necessary for courts to have to step in. *Janus v. AFSCME*, 138 S. Ct. 2448, 2464 (2018).

62.     "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F.Supp.3d 94, 115 (N.D.N.Y. 2018).

63.     Where the government encouraged and pressured private actors "into adopting" the government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting government action. *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

64.     The Government Defendants' actions readily satisfy the above tests.  As alleged herein, the Government Defendants have coerced, encouraged, conspired and worked in concert with private entities to carry out constitutionally forbidden actions, which have directly impacted the Plaintiffs in this case.  Further, the Government Defendants have used threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 of the Communications Decency Act (CDA) immunity to pressure private parties to increase censorship of free speech on their platforms.

65.     Ultimately, however, the text of the Constitution eliminates the need for a showing of government coercion or a showing that private entities were somehow transformed into government actors.   The First Amendment bars government from "abridging the freedom of speech." U.S. Const. Amend I.   Thus, at least in a claim against the government, the constitutional question is simply whether government has caused a reduction in the freedom of speech—for example, by pursuing policies of content or viewpoint discrimination—not whether the private partner has been sufficiently coerced into becoming a government actor.

66.     To be sure, *Blum v. Yaretsky* (described above) recites that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either over or covert, that the choice must in law be deemed to be that of the State."   But *Blum* and its progeny in the Supreme Court were lawsuits against private entities, seeking to hold them liable as governmental actors—not lawsuits against government actors.   (The sole exception was *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope*, 538 U.S. 188, 197 (2003), in which the Court cast aside the *Blum* analysis because "[n]ot only did the courts below not directly address this theory of liability, but respondents also appear to have disavowed this claim at oral argument" and "never articulated a cognizable legal claim on these grounds.")   Thus, neither under the Constitution nor under Supreme Court precedent can the standard in *Blum* be considered the measure of when a government defendant may be held accountable for its conduct through private entities to violate constitutional rights.

67.     Regardless of the legal analysis applied to the facts of this case, Defendants' conduct in carrying out its mass censorship program through the actions of private entities has abridged free speech and is therefore unlawful.

## IV.    PRIVATE PARTIES MAY QUALIFY AS STATE ACTORS SUBJECT TO THE CONSTITUTION'S CONSTRAINTS

68.    There is no single test to identify state action on the part of a private entity.  *See, e.g.*, *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294 (2001). However, *Blum* and other Supreme Court precedents allow a private party to qualify as a state actor under certain circumstances.

69.    First, private parties may be held to constitutional standards as state actors if "there is a sufficiently close nexus between the State and the challenged action." *Blum*, 457 U.S. at 1004.

70.    Such a nexus exists when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert," that the action can be deemed that of the State.  *Id*.  This includes when the government "affirmatively commands" a private party to take action or "is responsible for" the challenged action.  *Id*. at 1005, 1011.

71.    Second, "a private party's joint participation with state officials" in unconstitutional conduct "is sufficient to characterize that party as a 'state actor.'"  *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 936 (1982); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("[A] private entity can qualify as a state actor … when the government acts jointly with the private entity.").  "It is enough that [the private actor] is a willful participant in joint activity with the State or its agents."  *Id*. at 941 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)); *see also Brentwood Acad.*, 531 U.S. at 294 (state action on the part of private party occurs when there is "a symbiotic relationship between the [government] and the [private party].")

72.    State action through joint engagement occurs when the government "knowingly accepts the benefits derived from unconstitutional behavior."  *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003).  Joint action may also be proven by showing that government officials and

private parties have acted in concert in effecting a particular deprivation of constitutional rights. *See, e.g.*, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

73.     Further, private acts may constitute joint state action if the private parties "have conspired with a state official." *Sims v. Jefferson Downs Racing Ass'n, Inc*., 778 F.2d 1068, 1076 (5th Cir. 1985).  To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id*. (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

74.     Third, private action may constitute state action when the private entity is "entwined with governmental policies" or when the government is entwined in the management or control of the private action.  *Brentwood Acad.*, 531 U.S. at 296 ("Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards").

75.     As alleged herein, the De Facto Government Defendants engaged with the federal government in its massive government/private joint censorship enterprise through SIO's "Virality Project," to target and suppress speech on the basis of content and viewpoint.

76.     Through the Virality Project, the De Facto Government Defendants built strong ties with several federal government agencies, most notably the Office of the Surgeon General and the CDC, and engaged in continuous, ongoing communication with government officials (which, on information and belief, continues to this day) to execute the government's censorship scheme.

77.     Through their willful and joint participation with the government in its unconstitutional censorship enterprise and the powerful nexus between the De Facto Government Defendants and the federal government—including many, if not all, of the Government

Defendants—the De Facto Government Defendants plainly qualify as state actors under Supreme Court precedent.  Therefore, they must be held accountable as *de facto* government actors.

## V.   AGENCIES ARE ONLY PERMITTED TO EXERCISE CONGRESSIONALLY DELEGATED AUTHORITY

78.     "[A]gency actions beyond delegated authority are *ultra vires* and should be invalidated." *Detroit Int'l Bridge Co, v. Gov. of Canada*, 192 F.Supp.3d 54 (D.D.C. 2016); *see NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (OSHA vaccine mandate "extends beyond the agency's legitimate reach" as evidenced by the "lack of historical precedent, coupled with the breadth of authority that the Secretary now claims") (internal citations and quotation marks omitted).

79.     Courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has exceeded its authority.  *See Tiger Lily LLC v. U.S. Dep't of Housing and Urban Development*, 525 F.Supp.3d 850, 861 (W.D. Tennessee), *aff'd*, 5 F.4th 666 (6th Cir. 2021) (determining that CDC eviction moratorium was unlawful, as "to hold otherwise would be to construe the statute so broadly as to grant this administrative agency unfettered power to prohibit or mandate anything, which would ignore the separation of powers and violate the non-delegation doctrine.").

80.     "A reviewing court owes no deference to the agency's pronouncement on a constitutional question and must make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Poett v. United States*, 657 F. Supp. 2d 230, 241 (D.D.C. 2009) (internal citations and quotation marks omitted).

81.     Under the APA, this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that it determines to be contrary to constitutional rights or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  *See* 5 U.S.C. §§ 706(2)(B), (C).

82.     Also under the APA, agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  *See* 5 U.S.C. § 704.

83.     Agency action is final if, first, it "marks the 'consummation' of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

84.     Second, the action must be one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

85.     The actions of Defendants, alleged herein, on information and belief, reflect and result from specific, discrete, and identifiable decisions of Defendants to adopt an unlawful social media censorship scheme.

VI.     **CONGRESS MAY NOT DELEGATE AUTHORITY COUNTER TO THE CONSTITUTION**

86.     "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written."  *Marbury v. Madison*, 1 Cranch 137, 176 (1803).  Indeed, "even under our modern, expansive interpretation of the Commerce Clause, Congress's regulatory authority is not without effective bounds."  *United States v. Morrison*, 529 U.S. 598, 608 (2000).

87.     Congressional enactments that exceed Congress's constitutional bounds are invalid.  *Id*. at 607; *see also United States v. Lopez*, 514 U.S. 549 (1995).

88.     Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution.  *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of

25

government, standing alone, will not save it if it is contrary to the Constitution") (citing *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

89.     Further, "[a]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

90.     Congress's authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. at 566; see also Const. Art. I, § 8.  Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce.  *See* James Wilson, State House Yard Speech (Oct. 6, 1787), *at*  https://csac.history.wisc.edu/wp-content/uploads/sites/281/2017/07/ James_Wilson.pdf ("a power similar to that which has been granted for the regulation of commerce" was not "granted to regulate literary publications," and thus "the proposed system possesses no influence whatever upon the press); *United States v. Lopez*, 514 U.S. at 557; *United States v. Morrison*, 529 U.S. at 617.

91.     Moreover, the text of the Constitution is explicit that: "Congress shall make no law … abridging the freedom of speech."  U.S. Const. Amend I.  Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

92.     Therefore, even if (contrary to what is alleged herein) Defendants' censorship enterprise were within the bounds of the statutory authority delegated by Congress (it is not), Defendants' conduct would still, and does, remain *ultra vires* in violation of any conceivable

constitutional authority.   Congress is not constitutionally authorized to confer upon federal agencies any power, purpose, or authority beyond the Constitution's enumerated powers or that violates the First Amendment.

## FACTS OF THE CASE

### I.   SOCIAL MEDIA COMPANIES IN THE TWENTY-FIRST CENTURY

93.     Social media is widely understood to be "the modern public square." *Packingham*, 137 S. Ct. at 1737 (2017).   Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

94.     "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors.   Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties." *Knight First Amend. Inst.*, 141 S. Ct. at 1221.   This concentrated control enables government control.

95.     On information and belief, Facebook has close to 3 billion registered users worldwide, and over 180 million users throughout the United States.

96.     According to a Pew Research study, 66 percent of adults report using Facebook, and 31 percent of U.S. adults say they regularly obtain information about current events from the site.[10]

97.     On information and belief, Twitter has more than 340 million users worldwide, including approximately 70 million users in the United States.[11]   Around 500 million tweets are posted on Twitter every day, and they are accessible to non-Twitter users on the internet.

---

[10] *See* Mason Walker & Katerina Eva Matsa. *News Consumption Across Social Media in 2021*, Pew Res. Ctr. (Sept. 20, 2021), *available at* https://www.pewresearch.org/journalism/2021/09/20/news-consumption-across-social-media-in-2021/.

[11] Adam Hughes & Stefan Wojcick, *10 Facts about Americans and Twitter*, Pew Res. Ctr. (Aug. 2, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/.

98.     Twenty-seven percent of U.S. adults say that they use Twitter, and 14 percent of U.S. adults say they regularly get news on Twitter.[12]

99.     Forty-one percent of U.S. adults say they use Instagram,[13] and 13 percent of U.S. adults say that they regularly get news from the site.[14]

100.    On information and belief, TikTok has more than one billion users worldwide, including over 150 million users in the United States.

101.    According to a Pew Research study, 21 percent of U.S. adults say that they use TikTok,[15] and 10 percent of U.S. adults say that they regularly get news from the site.[16]

102.    On information and belief, YouTube has more than 4 billion hours of video views every month.  Videos on YouTube channels are visible to both YouTube users and to the general public on the internet.  An estimated 500 hours of video content are uploaded to YouTube every minute.

103.    Eighty-two percent of U.S. adults say that they use YouTube, and 25 percent of U.S. adults say that they regularly get news on YouTube.[17]

104.    Many social media platforms, including both Facebook and Twitter, permit formation of private groups where users can join and communicate with each other.  Posts in private groups are visible only to other group members.

105.    Social media platforms can suppress or censor speech by means other than removal or suspension of accounts.  Some of these methods are immediately known to an account's owner

---

[12] Jacob Liedke & Katerina Eva Matsa, *Social Media and News Fact Sheet*, Pew Res. Ctr. (Sept. 20, 2022), *at* https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/.
[13] Adam Hughes & Stefan Wojcick, *supra* note 11.
[14] Liedke & Matsa, *supra* note 12.
[15] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Res. Ctr. (Apr. 7, 2021), *at* https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-20 21/.
[16] Liedke & Matsa, *supra* note 12.
[17] *Id.*

and his or her audience, and some are not.  These methods include, but are not limited to, imposing warnings or strikes against accounts to chill disfavored speech, "shadow banning" disfavored posts and accounts by making them less visible to other users or not at all, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, placing warning labels on content, promoting negative comments on disfavored content, and requiring additional clicks to access content.

106.    All these methods ultimately serve to chill and suppress speech.  Fearing the loss of their valuable accounts, limits on the visibility and reach of their speech on the platforms, the loss of connections with other users or members of social media groups, and/or the damage to their credibility or standing to express their views, users self-censor to avoid making statements that might be deemed to violate the social media companies' rules for censoring and flagging speech as "misinformation."

## II.    THE WHITE HOUSE AND SURGEON GENERAL'S OFFICE COERCE, PRESSURE, AND ENCOURAGE SOCIAL MEDIA COMPANIES TO CENSOR DISFAVORED SPEECH ABOUT COVID-19

107.    On January 17, 2020, then-candidate and now-President Biden stated in an interview with the New York Times editorial board that Section 230 of the Communications Decency Act should be "revoked" because companies like Facebook did not adequately censor false information in the form of political ads criticizing him.[18]   In the same interview, Biden described Mark Zuckerberg, owner of Meta (Facebook and Instagram,) as "a real problem" and advocated that he be held civilly liable for content that indirectly leads to harm, and possibly even held criminally responsible.

---

[18] The Editorial Board, *Joe Biden Says Age Is Just a Number*, The New York Times (Jan. 17, 2020), *at* https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html.

108.     During the presidential transition, on December 2, 2020, President Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that it was "long past time to hold the social media companies accountable for what's published on their platforms," referring to amendment or repeal of Section 230 of the Communications Decency Act.[19]

109.     On Saturday night, February 6, 2021 at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or imposter account linked to Finnegan Biden, the President's adult daughter ("Please remove this account immediately").[20]  He followed up by saying "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden."[21]

110.     Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over. We'll escalate for further review from here."[22]  Flaherty responded the same minute, "Cannot stress the degree to which this needs to be resolved immediately."  Within 45 minutes, Twitter informed Flaherty that it had suspended the account.[23]

111.     The following day, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's censorship demands.  Twitter offered to enroll White House officials in Twitter's Partner Support Portal for expedited review of flagging content for censorship, recommending that Flaherty "designate a list of authorized White House staff for Twitter's Partner Support Portal."[24]

---

[19] *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC.com (Dec. 3, 2020), *at* https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.
[20] Plaintiffs' Proposed Findings of Fact at 13, *Missouri v. Biden*, 576 F. Supp. 622 (E.D. Mo. 2023) (ECF No. 212-3).
[21] *Id*.
[22] *Id*.
[23] *Id.*
[24] *Id.*

112.    Twitter noted that it had been recently bombarded with such requests for censorship from the White House:  "we would prefer to have a streamlined process strictly with your team as the internal liaison.  That is the most efficient and effective way to ensure we are prioritizing requests.  In a given day last week for example, we had more than four different people within the White House reaching out for issues."

### *The Largest Worldwide Campaign—of Censorship*

113.    The next day, February 8, 2021, Facebook emailed Rob Flaherty, Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently expanded its Covid-19 censorship policies.  Facebook stated:  "We wanted to make sure you saw our announcements today about running the largest worldwide campaign to promote authoritative Covid-19 vaccine information and expanding our efforts to remove false claims on Facebook and Instagram about Covid-19, Covid-19 vaccines and vaccines in general during the pandemic."

114.    Under the heading, "Combating Vaccine Misinformation," Facebook provided a detailed list of expanded censorship policies:  "We are expanding our efforts to remove false claims on Facebook and Instagram about Covid-19, Covid-19 vaccines and vaccines in general during the pandemic.  Since December [*i.e.*, during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … *Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether.*  We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. … On Instagram, in addition to surfacing authoritative results in Search,

in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated … ."[25]

115.    Within 19 minutes of receiving this email, Flaherty responded in a displeased tone, urging Facebook for more information about how strict the new policies would be.  Quoting Facebook's email in italics, he wrote:  "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*.  Can you share more about your framework here?  May, of course, is very different than 'will.'  Is there a strike policy, ala Youtube?  Does the severity of the claims matter?"  He also asked for specific data on the application of the censorship policies:  "And as far as your removal of claims, do you have data on the actual number of claims-related posts you've removed?  Do you have a sense of how many are being flagged versus how many are being removed?  Are there actions (downranking, etc.) that sit before removal?  How are you handling things that are dubious, but not provably false?"[26]

### *Posts Cause "Political Violence"—Target Civic and Health-Related Groups*

116.    The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation that Facebook's failure to censor speech on its platforms causes "political violence":  "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'  I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further?  Are there other growth vectors you are controlling for?"  Flaherty suggested an oral meeting to discuss:  "Happy to put time on the calendar to discuss further."[27]

---

[25] *Id.* at 15 (emphasis added).
[26] *Id.*
[27] *Id.* at 16.

117.    Facebook responded on February 9, 2021 with a detailed answer to each of Flaherty's questions about the enforcement of its new policies and an offer to discuss further.

### *Flag and Suppress "Wrongthink"*

118.    Among other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case of repeat violations; that it "will begin enforcing this policy immediately," that for vaccine-skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution and add strong warning labels with more context, so fewer people see the post," and that Facebook was working to censor content that does not violate its policies in other ways by "prevent[ing] posts discouraging vaccines from going viral on our platforms; address[ing] content that experts believe dissuades people from getting the vaccine, but does not violate our misinformation policies, through the use of information labels; and prevent[ing] recommendations for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines."[28]

119.    Facebook also promised Flaherty that it would aggressively enforce the new censorship policies:  "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks."[29]

120.    On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and

---

[28] *Id.*
[29] *Id.* at 17.

identifying the following: "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19."[30]

### Tell Us What Information You Are Not Censoring

121.    Flaherty responded by requesting details about Facebook's actual enforcement practices and a report on misinformation that was not censored: "Can you give us a sense of volume on these, and some metrics around the scale of removal for each?  Can you also give us a sense of misinformation that might be falling outside your removal policies?  Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!"[31]

122.    Facebook promised to discuss this at an upcoming oral meeting:  "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."[32]

123.    On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. After the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter:  "Thanks again for meeting with us today.  As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service."[33]

---

[30] *Id.*
[31] *Id.* at 17-18.
[32] *Id.* at 18.
[33] *Id.*

124.    On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake."[34]

125.    Facebook provided the White House with a detailed report and summary on the topic and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials:  "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable."[35]

126.    On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy, stating:  "I'm more interested in the data that was outlined in the Washington Post (https//www.washingtonpost.com/technology/202l/03/l4/facebook-vaccine-hesistancy-qanon) [a]nd what interventions you are testing/their effectiveness."[36]

127.    This would become a standard tactic of the White House:  linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

128.    The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook, copying White House COVID-19 official Andrew Slavitt, with no more text in the email and the subject line:  "You are hiding the ball."[37]

---

[34] *Id.* at 19.
[35] *Id.*
[36] *Id.*
[37] *Id.*

129.    The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening—I will call to clear up. Certainly not hiding the ball."[38]

### *Censorship Expands to True but Disfavored Information*

130.    Flaherty responded accusatorily, referring to a series of at least three previous conversations in which the White House had demanded more information from Facebook about its censorship policies.  He made clear that the White House was seeking more aggressive action on "borderline" content—*i.e.*, content that does not clearly violate Facebook's own censorship policies but which the White House demands action against anyway.  Flaherty wrote: "I don't think this is a misunderstanding … I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content—as you define it—is playing a role."

### *Accusations of Non-Compliance and Dishonesty*

131.    Flaherty followed with a series of accusations that Facebook was prevaricating with the White House about its "borderline" (*i.e.*, not violative) content:  "You said you would commit to us that you'd level with us.  I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities.  I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us."[39]

---

[38] *Id.*
[39] *Id.* at 20.

132.    He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts:  "I am not trying to play 'gotcha' with you.  We are gravely concerned that your service is one of the top drivers of vaccine hesitancy—period.  I will also be the first to acknowledge that borderline content offers no easy solutions.  But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on.  This would all be a lot easier if you would just be straight with us."[40]

### Facebook Bows in Submission and Contrition

133.    Facebook responded to Flaherty on March 15, 2021:  "We obviously have work to do to gain your trust.  You mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking to continued discussions.  We are also working to get you useful information that's on the level.  That's my job and I take it seriously—I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."[41]

134.    The same day, Andrew Slavitt (who had been copied on these exchanges between Facebook and Flaherty) weighed in, accusing Facebook of dishonesty in a series of oral meetings: "It would [be] nice to establish trust.  I do feel like relative to others, interactions with Facebook are not straightforward and the problems are worse—like you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to ask you precise questions and even then we get highly scrubbed party line answers.  We have urgency and don't sense it from you all.  100% of the questions I asked have never been answered and weeks have gone by."[42]

---

[40] *Id.* at 20-21.
[41] *Id.*
[42] *Id.*

135.     Slavitt then threatened unspecified Executive action against Facebook in retaliation for Facebook's perceived lack of cooperation with the White House's demands on censorship of "borderline" content:  "Internally we have been considering our options on what to do about it."

136.     On March 16, 2021, Facebook responded to Slavitt, respectfully explaining its position but also promising to share information about vaccine hesitancy in "real time":  "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out."  Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic:  "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible."  Facebook also offered to speak to Slavitt by phone at any time.

### The White House Makes Its Demands

137.     On Friday, March 19, 2021, Facebook had a meeting with White House officials, including Flaherty and Slavitt.

138.     Two days later, on Sunday, Facebook sent a follow-up summary of the meeting which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Meta platform WhatsApp.

139.     In a follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies:  "You also asked us about our levers for reducing virality of vaccine hesitancy content.  In addition to policies previously discussed, these include the additional changes that were approved late last week and that we'll be implementing over the coming weeks.  As you know, in

38

addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines *that does not contain actionable misinformation*. This is *often-true content ... but it can be framed as sensation, alarmist, or shocking. We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content*."[43] (emphasis added).

140.    On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action on "sensationalized" content on its platforms.  Flaherty noted that White House officials were demanding a plan from Facebook to censor non-violative content, *i.e.*, "looking out for your game plan on tackling vaccine hesitancy spread on your platform."

141.    In this email, Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content:  "If you're down ranking sensational stuff—great—but I want to know how effective you've seen that be from a market research perspective. And then, what interventions are being taken on 'skepticism?' ... [W]hat are you trying here, and again, how effective have you seen it be.  And *critically*, what amount of content is falling into all of these buckets?  Is there wider scale of skepticism than sensationalism? ... As I've said:  this is not to play gotcha.  It is to get a sense of what you are doing to manage this." (italics in original).

142.    Facebook then agreed to schedule a meeting that Wednesday at 4:00 pm to discuss these issues with Flaherty and Slavitt.

### *The Accusations Intensify*

143.    In an email on April 9, 2021, Flaherty accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, suggesting that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more

---

[43] *Id.* at 22-23.

online censorship here:  "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election.  This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools.  You only did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform.  And then you turned it back off.  I want some assurances, based in data, that you are not doing the same thing again here."[44]

144.    Facebook responded:  "Understood.  I thought we were doing a better job [of] responding to this—and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it."[45]

### *White House Demands Censorship of Prominent Media Figures*

145.    In an email to Facebook on April 14, 2021, Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren:  "Since we've been on the phone—the top post about vaccines today is [T]ucker Carlson saying they don't work.  Yesterday was Tomi Lehren [*sic*] saying she won't take one.  This is exactly why I want to know what 'Reduction' actually looks like—if 'reduction' means 'pumping our most vaccine hesitant audience with [T]ucker Carlson saying it doesn't work' then … I'm not sure it's reduction!"[46]

---

[44] *Id.* at 27-28.
[45] *Id*. at 28.
[46] *Id*.

40

146.    In an email chain to Flaherty and Courtney Rowe that same day, Facebook assured the White House that it was "running down the question on Tucker and working on getting you report by end of week."[47]

### Amplify the White House's Speech

147.    In an email on April 13, 2021, to Flaherty and Rowe, Facebook offered to cooperate closely with the White House to "amplify" its preferred messages.  Flaherty responded the same day with a series of detailed requests about how Facebook could do so, including:  "Some kind of thing that puts the news in context if folks have seen it (like your current 'COVID news' panel) that has 3-4 pieces of info (*e.g.*: Adverse events are very rare—6 cases out of nearly 7 million, the FDA and CDC are reviewing it so health care providers know how to treat any of the rare events, this does not affect pfzier [*sic*] or moderna, which vaccinate via a different mechanism)"; "CDC is working through an FAQ that we'd love to have amplified in whatever way possible—maybe through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable review reaches as many people as the pause, either through hard product interventions or algorithmic amplification."[48]

### Censorship of True, Political, Non-Violative Speech Through a "Spectrum of Levers"

148.    The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue.  Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day.[49]

149.    Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its

---

[47] *Id.*
[48] *Id.* at 29.
[49] *Id.* at 30.

relevant censorship enforcement policies:  "Courtney—as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy).  I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful."[50]

150.    Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor.[51]

151.    Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms.  First, as to "VACCINE HESITANCY" content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms.  Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (*e.g.*, "discussing choice to vaccinate in terms of personal and civil liberties"):  "The following examples of content are those that do not violate our Misinformation and Harm policy, but may contribute to vaccine hesitancy or present a barrier to vaccination.  This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, true but shocking claims or personal anecdotes, or discussing the choice to vaccinate in terms of personal and civil liberties or concerns related to mistrust in institutions or individuals."[52]

152.    Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers":  "We utilize a spectrum of levers for this kind of content

---

[50] *Id.* at 30.
[51] *Id.*
[52] *Id.* at 31.

… Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts."[53]

153.    On April 14, 2021, Andy Slavitt also emailed Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom Nick Clegg, with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson who remained trending:  "Number one of Facebook.  Sigh.  Big reveal call with FB and WH today.  No progress since we spoke.  Sigh."[54]

154.    Clegg promptly responded to Slavitt with an apology and promised to immediately address the censorship of Tucker Carlson.[55]

155.    At 10:51 p.m. the same day, Clegg provided Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's content did not violate Facebook policies, but assuring the White House that Facebook would censor it anyway.[56]

156.    Clegg denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of popularity, the Tucker Carlson video does not qualify for removal under our policies … That said, the video is being labeled with a pointer to authoritative COVID information, it's not being recommended to people, and it is being demoted."[57]

157.    Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report on its censorship practices in response to White House demands: "I'm v[ery] keen that we follow up as we'd agreed, and I can assure you the teams here are on it."

---

[53] *Id*. at 32.
[54] *Id*. at 32-33.
[55] *Id*. at 33.
[56] *Id*.
[57] *Id*.

158.    Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post to Rob Flaherty.

159.    Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded to Rice, demanding greater censorship and accusing Facebook of causing an "insurrection" by not censoring enough speech on its platforms:  "I guess this is a good example of your rules in practice then—and a chance to dive in on questions as they're applied.  How was this [*i.e.*, Tucker Carlson's post] not violative?  The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective.  It's not about just J&J.  What exactly is the rule for removal vs demoting?  Moreover:  you say reduced and demoted.  What does that mean?  There's 40,000 shares on the video.  Who is seeing it now?  How many?  How effective is that?  And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu—but on what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?"[58]

160.    On Tuesday, April 21, 2021, Facebook responded to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries, question-by-question.  Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false:  "The video received 50% demotion for seven days while in the queue to be fact checked, and will continue to be demoted even though it was not ultimately fact checked."[59]

---

[58] *Id*. at 33-34.
[59] *Id*. at 34.

161.    In the same time frame, the White House was exerting similar pressure on other major social-media platforms, including Twitter and YouTube.  On April 21, Rob Flaherty, Andy Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials.[60]

162.    The meeting's subject was "Twitter Vaccine Misinfo Briefing."  The meeting invite noted:  "White House Staff will be briefed by Twitter on vaccine misinfo.  Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work."[61]

### *Twitter Earns Mercy by Silencing Berenson Before Reaching a "Persuadable Public"*

163.    The next day, Twitter employees noted in internal communications that, during this meeting, the White House officials had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."[62]

164.    The Twitter employee noted that the White House's questions were "pointed" but "mercifully we had answers."  Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson.  Andy Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public."[63]

165.    Twitter permanently deplatformed Berenson.

---

[60] *Id.*
[61] *Id.* at 35-36.
[62] *Id.* at 212.
[63] *Id.* at 212-213.

*YouTube Meetings to Suppress "Borderline" Information*

166.    On April 21, 2021, Flaherty and Andy Slavitt of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited.[64]

167.    The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation. As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work."[65]

168.    Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Slavitt and Clarke Humphrey. He began by referring to the meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." Flaherty also referred to an earlier, "first conversation," indicating that there had been more than one meeting with YouTube.[66]

169.    Flaherty then noted that the White House had asked YouTube to monitor and report on the speech on its platforms, stating that the White House expected a report from them.[67]

170.    Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into hesitance and intensifying people's hesitancy … we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. This is a concern

---

[64] *Id*. at 36.
[65] *Id*.
[66] *Id*.
[67] *Id*. at 37.

that is shared at the highest (and I mean highest) levels of the WH, so we'd like to continue a good-faith dialogue about what is going on under the hood here."[68]

171.    Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in the first bullet point: "Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing."

172.    Flaherty also praised YouTube for reducing distribution of "borderline" content (*i.e.*, often-truthful content that does not violate platform policies but that the White House disfavors): "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." He then followed up with a long series of demands for more information.[69]

173.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content. And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation."[70]

### The Vaccine Misinformation Brief

174.    On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party.[71]

---

[68] *Id*.
[69] *Id*. at 38.
[70] *Id*. at 39.
[71] *Id*.

175.    The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread."  The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID19 misinformation should be cross-platform and enforced at the entity-level, not the account level."  It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement … ."  And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation would dissuade users from following links to off-platform misinformation and hurt the vaccine misinformation business model Facebook enables."[72]

### *The Greater the Degree of Public Interest, the More Cause to Suppress*

176.    On May 1, 2021, Nick Clegg of Facebook sent an email to Andy Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us … ."  Clegg apologized to the White House for not catching and censoring three pieces of vaccine content that went viral, even though the content did not violate Facebook's policies:  "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them.  Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process."[73]

---

[72] *Id*.
[73] *Id*. at 40.

***Better Yet: Suppress the Speech in Real Time Before It Goes Viral***

177.    Clegg promised to be more vigilant in censoring such non-violative content to prevent it from going viral in the future:  "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people.  I will be checking on this closely to make sure that these additional steps show results—the stronger demotions in particular should deliver real impact."[74]

178.    Clegg then listed in bold the demands that the White House had made in its recent meeting, with a detailed response to each.[75]

179.    First, the White House had demanded that Facebook address "Non-English mis/disinformation circulating without moderation."  Facebook promised to take steps to do so.[76]

180.    Second, the White House demanded of Facebook:  "Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation."  Facebook assured the White House that it was taking strong steps to censor such content and promised to increase its efforts to do so in the future: "Much of the research you shared called on us to ensure that our systems don't amplify vaccine hesitancy content and this is top of mind for us.  In addition to the changes I mentioned above, we have already removed all health groups from our recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from our 'accounts you may follow feature.'  We also

---

[74] *Id.*
[75] *Id.* at 41.
[76] *Id.*

remove accounts that may discourage vaccination from search features.  We currently enforce on hash tags we know are shared to promote vaccine hesitancy content and are working to improve our automated systems here."[77]

181.    Third, the White House had demanded that Facebook "Monitor[] events that host anti-vaccine and COVID disinformation."  Facebook promised to monitor social media "events" on its platforms more closely and take more aggressive action to censor them.[78]

182.    Fourth, the White House had demanded censorship of the so-called "Disinformation Dozen" in the private meeting with Facebook, raising the concern that "12 accounts are responsible for 73% of vaccine misinformation."[79]

183.    Facebook responded that it was scrutinizing those speakers and censoring them whenever it could, but that most if their content did not violate Facebook's policies:  "we continue to review accounts associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content.  Our 'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are dedicated to sharing vaccine discouraging content and we continue to review and enforce on these where we become aware of them."[80]

### Facebook Expresses Doubt: Could Too Much Censorship Be Counterproductive?

184.    Clegg noted that he realized the White House would not be satisfied with these answers:  "I realise that our position on this continues to be a particular concern for you."  Clegg then suggested that too much censorship might be counterproductive and might drive vaccine hesitancy:  "Among experts we have consulted, there is a general sense that deleting more

---

[77] *Id.*
[78] *Id.*
[79] *Id.* at 42.
[80] *Id.*

expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a cover-up."[81]  Brian Rice also forwarded Nick Clegg's email to Rob Flaherty.[82]

### *"Not to Sound Like a Broken Record, But Why Aren't You Censoring More?"*

185.    On May 5, 2021, White House Press Secretary Jen Psaki gave a press conference where she stated that:

> The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to Covid19 vaccinations … . He also supports better privacy protections and *a robust anti-trust program*.  So, his view is that there's *more that needs to be done* to ensure that this type of misinformation, disinformation, damaging, sometimes life-threatening information, is not going out to the American public (emphasis added).[83]

186.    The next day, May 6, 2021, Flaherty emailed Facebook, demanding more explanations about why it was not censoring more aggressively.  Regarding Nick Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted:  "For one, it's still up and seems to have gotten pretty far.  And it's got 365k shares with four comments.  We've talked about this in a different context, but how does something like that happen?"[84]

187.    Flaherty also demanded more information about Facebook's efforts to demote "borderline" content:  "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't

---

[81] *Id.*

[82] *Id.*

[83] Press Briefing by Press Secretary Jen Psaki, THE WHITE HOUSE (May 5, 2021, 1:32 PM EDT), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

[84] *Id.* at 43.

seem like you do either).  Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?"[85]

### *Suppress Vaccine-Related Speech at All Costs*

188.    Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics:  "Also, health groups: sure.  But it seems more likely that anti-vax stuff is moving in groups that are not about health but are … mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who … do other things and are also vaccine hesitant."

189.    On May 10, 2021, Facebook sent an email to Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms.

190.    The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating:  "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search."  He included a link to a news report about this topic on Twitter.[86]

191.    The next day, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports:  "Thanks Rob—both of the accounts featured in the tweet have been removed from Instagram entirely … .  We're looking into what happened."[87]

192.    Facebook assured Flaherty that it was working on processes to suppress disfavored speech from search results on its platforms and remove anti-vaccine accounts:  "We are continuing to develop technology to improve the quality of search results at scale across Instagram—this is a continual process built on new technology to address adversarial accounts … .  We also remove accounts that may discourage vaccination from search by developing and using this new

---

[85] *Id.*
[86] *Id.* at 44.
[87] *Id.*

technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether.  We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow, such as accounts you may like, and suggested accounts."[88]

193.    Facebook acknowledged that its censorship efforts were not enough and promised the White House they would increase them: "We clearly still have work to do to [*sic*], but wanted to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination."[89]

194.    The same day, Flaherty responded by accusing Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action.  If you're not getting that right, it raises even more questions about the higher bar stuff."  Flaherty continued, accusing Facebook of dishonesty:  "You say in your note that you remove accounts that discourage vaccination from appearing in recommendations (even though you're using 'primarily' to give yourself wiggle room).  You also said you don't promote those accounts in search.  Not sure what else there is to say."[90]

195.    On May 28, 2021, a senior executive of Meta sent an email to Slavitt and Surgeon General Murthy reporting that Facebook had expanded its censorship policies.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

---

[88] *Id*. at 45.
[89] *Id*.
[90] *Id*. at 45-46.

### *A Taste of the White House's Own Medicine*

196.    At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers.

197.    On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved … . you should start to see your numbers trend back upwards … .  Thanks for your patience as we investigated this."  The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?"[91]

198.    Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again."  The White House staffer then simply added Rob Flaherty to the email chain without further comment.

199.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook:  "Are you guys fucking serious?  I want an answer on what happened here and I want it today."[92]

200.    Facebook explained that the White House's account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts.

### *The Surgeon General's Misinformation Advisory*

201.    That day, July 15, 2021, the Surgeon General released an advisory (the July Advisory) aimed at censoring purported "misinformation" about COVID-19.[93]

---

[91] *Id*. at 46.
[92] *Id*. at 47.
[93] *See* U.S. Surgeon General's Advisory, Confronting Health Misinformation (July 15, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (COVID-19 Advisory).

202.    According to the Surgeon General's advisory, "[m]isinformation" has "caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing.  And use unproven treatments."[94]

203.    The advisory identifies social media platforms as major sources of "misinformation."

204.    That day, Press Secretary Jen Psaki gave a joint briefing along with the Surgeon General and DHS Secretary Alejandro Mayorkas to discuss the advisory.[95]

205.    Murthy acknowledged that:

> health misinformation didn't start with COVID-19. What's different now though is the speed and scale at which health misinformation is spreading.  *Modern technology companies have enabled misinformation to poison our information environment* with little accountability to their users. *They've allowed people who intentionally spread misinformation—what we call "disinformation"—to have extraordinary reach*.[96]

206.    In response to a reporter's question about whether the federal government had taken action to ensure cooperation of tech companies, Ms. Psaki stated:

> In terms of actions, Alex, that we have taken—or we're working to take, I should say—from the federal government:  *We've increased disinformation research and tracking within the Surgeon General's office.  We're flagging problematic posts for Facebook that spread disinformation* (emphasis added).

---

[94] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 85.
[95] Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, THE WHITE HOUSE (July 15, 2021, 1:05 PM EDT), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.
[96] *Id*. (emphasis added)

### *The President Accuses Social Media Platforms of Killing People*

207.     The next day, July 16, 2021, President Biden stated that Facebook and other social media platforms were "killing people" by failing to censor enough misinformation.[97]

208.     Subsequently, Facebook's senior executive Nick Clegg reached out to request "deescalat[ion]" and "work[ing] together."[98]

209.     Nick Clegg emailed Surgeon General Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us."  He then stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward."[99]

210.     On a follow-up call to the email, Murthy asked Clegg specific questions on requiring Facebook to share data with outside researchers about the scope and reach of misinformation on its platforms:  "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and—and helping us as a field understand the depth of the problem."[100]

211.     One such "external researcher" that the OSG had in mind was Renee DiResta, of the Stanford Internet Observatory, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day that the advisory was announced.[101]

---

[97] Zolan Kanno-Youngs & Cecilia Kang, *'They're Killing People': Biden Denounces Social Media for Virus Disinformation*, The New York Times (July 16, 2021), *at* https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html.
[98] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 92.
[99] *Id*.
[100] *Id*. at 67-68.
[101] *Id*. at 68.

212.    On July 16, 2021, a reporter asked Ms. Psaki to elaborate on the Government's role in flagging Facebook "disinformation."[102]

213.    Ms. Psaki responded:

> it shouldn't come as any surprise that we're in regular touch with social media platforms—just like we're in regular touch with all of you and your media outlets—about areas where we have concern, information that might be useful … so we are regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans … are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platforms.[103]

**Slake the White House's Censorship Thirst—or Face the Consequences**

214.    A reporter stated that "yesterday after the press briefing" Facebook said that it had removed 18 million pieces of COVID misinformation and asked whether the White House found that sufficient.[104]

215.    Ms.  Psaki responded, "[c]learly not, because we're talking about additional steps that *should* be taken." (emphasis added).  She also reiterated that "we are in regular touch with social media platforms."[105]

216.    On July 17, 2021, another Facebook official emailed Anita Dunn, the political strategist and Senior Advisor to the President in the White House, begging for assistance in getting back into the White House's good graces.[106]

217.    The Facebook official wrote: "Would love to connect with you on the President's comments on Covid misinfo and our work there.  Really could use your advice and counsel on

---

[102] Press Briefing by Press Secretary Jen Psaki, THE WHITE HOUSE (July 16, 2021, 1:20 PM EDT), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 54.

how we get back to a good place here. … As I hope you know, we've been doing a significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty heated, and I'd love to find a way to get back to pushing together on this—we are 100% on the same team here in fighting this and I could really use your advice."

218.    Facebook then wrote: "We had a conversation with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to continue to work to address concerns."

219.    On July 18, 2021, having received no response to his email requesting a meeting, the Facebook official texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved—as is the FB team, it's not great to be accused of killing people—but as I said by email I'm keen to find a way to deescalate and work together collaboratively.  I am available to meet/speak whenever suits."[107]

220.    Four days after President Biden's comments, USA Today reported that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms."[108]

221.    The report noted: "[r]elations are tense between the Biden administration and social media platforms," and that the government was "examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites."

---

[107] *Id*. at 92.
[108] Matthew Brown, *"They should be held accountable": White House reviews platforms' misinformation liability*, USA Today (July 20, 2021, updated 8:06 PM ET), https://www.usatoday.com/story/news/politics/2021/07/20/whitehouse-reviews-section-230-protections-covid-misinformation/8024210002/.

### *Social Media Platforms Strive to Show that They Are Obeying Orders*

222.    On July 20, 2021, Rob Flaherty emailed YouTube, linking to a Tweet of "borderline" content and stating, "I'm curious:  Saw this tweet.  [Linking the Tweet].  I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-vaccination content.  You were pretty emphatic that you are not.  This seems to indicate that you are.  What is going on here?"[109]

223.    YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies and that its goal was "to have views of nonsubscribed, recommended borderline content below 0.5%."

224.    On July 23, 2021, after meeting with Surgeon General Murthy, Nick Clegg of Facebook sent a follow-up email stating: "Dear Vivek, if I may, thanks again for taking the time to meet earlier today … .  I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen'…."[110]

225.    After the July 23 meeting, that same day, Clegg reported back to Murthy with a series of new censorship actions and policies, including that Facebook had amended its censorship policies to make them more restrictive:  "We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."[111]

226.    Clegg also committed to "do more" to censor misinformation in response to federal officials' demands:  "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic."[112]

---

[109] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 54-55.
[110] *Id*. at 93.
[111] *Id*.
[112] *Id*. at 94.

227.    Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project.

228.    Clegg also pledged to report back to Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation:  "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make sure to keep you informed of our work on each."[113]

229.    Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship:  "we will strive to do all we can to meet our shared goals."

230.    On a podcast, former White House Covid-19 Advisor Andy Slavitt reminisced about how, in the summer of 2021, while still working for the Biden Administration, he had warned Facebook Vice President of Global Affairs Nick Clegg that, "in eight weeks' time, Facebook will be the number 1 story of the pandemic."[114]  Slavitt also commented on how he had been in contact with Clegg about which pieces of misinformation to take down.

### *Facebook and YouTube Expand Censorship of Vaccine "Misinformation"*

231.    On August 18, 2021, Facebook emailed Rob Flaherty a post entitled, "How We're Taking Action Against Vaccine Misinformation Superspreaders."  The post detailed a long list of censorship actions taken against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts linked with them; imposing additional penalties on another two dozen pages, groups, and accounts linked with them; applying penalties to some of their website domains so

---

[113] *Id.*

[114] https://podcasts.apple.com/us/podcast/is-covid-misinformation-killing-people-facebooks-nick/id1504128553?i=1000529558554.

that third parties posting their content will be deamplified; and removing the remaining violating content.

232.    On August 20, 2021, Nick Clegg emailed Surgeon General Murthy and Eric Waldo of OSG, detailing Facebook's additional censorship actions that it had taken as a result of the Surgeon General's Health Advisory.  Clegg noted that Dr. Murthy had "asked for an update on existing and new steps that Facebook is taking."[115]

233.    Clegg explained that Facebook was taking new steps in response to the pressure from the White House and Surgeon General:  "In this update, we describe … further policy work to enable stronger action against persistent distributors of vaccine misinformation."[116]

234.    In a section headed "Limiting Potentially Harmful Misinformation," Clegg provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by Facebook taken in response to the Advisory.  These included, among others, "expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform."[117]

235.    On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation."  Google reported:  "We just announced that we will be introducing a new policy that prohibits content that

---

[115] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 97
[116] *Id*.
[117] *Id*.

includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines …" [118]

236.    On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo of OSG, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout" (approval of the vaccine for children in that age group).[119]

237.    On October 28, 2021, the same day as a Washington Post article about Facebook employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article.  The only text in the email was the subject line, which stated: "not even sure what to say at this point."[120]

### Take Responsibility and Censor More—Think of the Children

238.    On October 29, 2021, in response to this article, the Surgeon General tweeted from his *official* account (as opposed to his personal account), in a thread:

> We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past. We need transparency and accountability now.  The health of our country is at stake.[121]

239.    On November 4, 2021, Facebook followed up again with OSG and the White House with additional reports regarding its censorship of misinformation:  "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims.[122]

---

[118] *Id*. at 99.
[119] *Id*.
[120] *Id*. at 101.
[121] Dr. Vivek Murthy, U.S. Surgeon General (@Surgeon_General), Twitter (October 29, 2021, 4:19PM), https://twitter.com/Surgeon_General/status/1454181191494606854.
[122] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 103.

240.    Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time":  "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends."[123]

241.    On November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…."[124]

### *Parody Has No Place in a Decent, Censored Society*

242.    On November 30, 2021, a White House official emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?"

243.    He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them.[125]

244.    Twitter responded within six minutes:  "Happy to escalate with the team for further review from here."[126]

245.    That evening, Twitter emailed back, stating, "Update for you—The team was able to create this event page for more context and details."  The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect.[127]

---

[123] *Id*.
[124] *Id*. at 56.
[125] *Id*.
[126] *Id*.
[127] *See* "A video of first lady Jill Biden reading to children was manipulated to include profanity, according to fact-checkers," TWITTER (Nov. 30, 2021), https://twitter.com/i/events/1465769009073123330.

246.    The White House official promptly emailed back, asking that Twitter actually censor the comedic video, not just provide an event page explaining that it was comedic:  "Will you apply the 'Manipulated Media' disclaimer to the video asset itself?"[128]

247.    The next morning, the White House official emailed Twitter again, arguing that Twitter should apply a label to the video under its content-moderation policies.[129]

248.    Twitter responded that same morning, explaining that the parody video of Jill Biden was not subject to labeling under its policy:  "After escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic and manipulated media policy.  Although it has been significantly altered, the team has not found it to cause harm or impact public safety."[130]

249.    Later that day, the White House official responded, disputing Twitter's interpretation of its own content-moderation policy and looping in Michael DeRosa, the First Lady's press secretary.  DeRosa then emailed Twitter, disputing Twitter's application of its policy.

250.    The White House continued to press Twitter for further explanation and action on December 9, 13, and 17.[131]

251.    On December 17, 2021, Twitter provided a more detailed explanation of its decision.  The White House official emailed back the same day, again disputing Twitter's application of its own policy and pressing Twitter on the issue.

252.    He then added Rob Flaherty to the email chain.[132]

253.    Nine minutes later, on December 17, Flaherty emailed Twitter, angrily accusing it of dishonestly misapplying its own policies.[133]

---

[128] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 57.
[129] *Id*.
[130] *Id*.
[131] *Id*.
[132] *Id*. at 58.
[133] *Id*.

254.    A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone.  After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available.[134]

255.    On December 21, 2021, Surgeon General Murthy gave a podcast on the Omicron variant in which he publicly threatened to hold social media platforms "accountable" for not censoring misinformation:  "number one, we have to track down where this misinformation is coming from and understand how to hold platforms accountable, new technology platforms that are driving so much of the misinformation spread … .  [B]y allowing this misinformation to proliferate on their sites, they're subjecting people in the United States and around the world to extraordinary harm, and they're doing so with little accountability at this moment and really with very little transparency.  That can't be allowed to continue because it's putting everyone's health at risk."[135]

256.    In a January, 2022 interview on MSNBC, Murthy stated that social media "platforms still have not stepped up to do the right thing[,]" that the focus in stopping the spread of "misinformation" should be on these companies, and that "this is actually about what government can do.  This is about companies and individuals recognizing that the only way we get past misinformation is if we are careful about what we say and we use the power that we have to limit the spread of that misinformation."[136]

257.    In January, 2022, Facebook reported to White House officials Rowe, Flaherty, and Slavitt that it had "labeled and demoted" "vaccine humor posts whose content could discourage

---

[134] The link to the tweet, https://twitter.com/ArtValley818_/status/1465442266810486787?s=20, is no longer available.
[135] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 103-104.
[136] Tom Elliott (@tomselliott), Twitter (Jan. 25, 2022, 10:03 AM), bit.ly/3CGcncD.

vaccination."  It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."[137]

258.    On February 14, 2022, Surgeon General Murthy participated in a panel discussion hosted by the Rockefeller Foundation in which he stated that there is a role for government to set "safety standards" when it comes to misinformation, "particularly from platforms."[138]

### The OSG's Request for Information

259.    Less than a month later, on March 3, 2022, the OSG issued a formal Request for Information (RFI) seeking information from social media platforms and others about misinformation on social media.[139]

260.    According to the *New York Times*, Murthy "demanded" information about the major sources of COVID-19 misinformation by May 2, 2022.[140]

261.    The RFI webpage created to facilitate this reporting asks for information from technology platforms about "sources of COVID-19 misinformation" including "specific, public actors that are providing misinformation, as well as components of specific platforms that are driving exposure to information."[141]

262.    On information and belief, agencies typically issue RFIs as a first step in the process of implementing regulations on an industry.

---

[137] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 58.
[138] *Id*. at 105.
[139] *See* Davey Alba, *The surgeon general calls on Big Tech to turn over Covid-19 misinformation data*, The New York Times (Mar. 3, 2022), *at* https://www.nytimes.com/2022/03/03/technology/surgeon-general-covid-misinformation.html.
[140] *Id.*
[141] HHS Request for Information on March 7, 2022, *at* https://www.federalregister.gov/documents/2022/03/07/2022-04777/impact-of-health-misinformation-in-the-digital-information-environment-in-the-united-states.

### The CISA Mis-, Dis-, and Malinformation Police

263.    On April 12, 2022, CISA announced that it was coordinating directly with social media platforms to police "Mis, Dis, Malinformation" (MDM).  The bulletin reported that CISA's "mission evolved" during the Biden Administration to address the new "information environment."[142]

264.    The bulletin also stated that the "MDM team supports the interagency and private sector partners' COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends."[143]

### The White House's Threats: Censorship or Else

265.    On April 25, 2022, White House Press Secretary Psaki was asked at a press briefing to respond to the news that Elon Musk would acquire Twitter.

266.    Psaki responded with the threat of adverse legal consequences for Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal:  "the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more."[144]

267.    In response to a question about whether Psaki was "concerned about the kind of purveyors of" "misinformation, disinformation, health falsehoods … having more of an opportunity to speak there on Twitter," she stated that the President had "long talked about his

---

[142] CISA, *Mis, Dis, Malinformation*, *available at* https://www.cisa.gov/mdm (last visited May 18, 2022).
[143] *Id.*
[144] White House, Press Briefing by Press Secretary Jen Psaki (April 25, 2022) *available at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."[145]

268.    She also affirmed that senior officials within the Biden Administration "engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for—or engagement in those efforts."[146]

269.    On June 22, 2022, Facebook emailed Waldo of OSG, Rob Flaherty, and other White House officials with an update on Facebook's increased censorship.[147]

270.    In the email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates following the early childhood vaccine approvals.  As of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older … ."[148]

271.    Facebook indicated that it had again relied on the CDC to dictate what claims people can post on Facebook:  "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children … ."

272.    At the federal officials' request, Facebook continued to send to the White House and OSG bi-weekly "Covid Insights Reports" on COVID-19 related misinformation on its platforms.[149]

---

[145] *Id.*
[146] *Id.*
[147] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 110.
[148] *Id*.
[149] *Id*.

273.    Throughout the spring of 2022, Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of these reports, which it had been sending for over a year.[150]

274.    On June 13, 2022, Facebook notified the White House and OSG that "we will plan to discontinue these unless we hear from you that this information continues to be valuable."

275.    Rob Flaherty responded the same day, asking that Facebook continue to send the reports and further asking Facebook to report on how it would handle misinformation for early-childhood (under age 5) vaccines.[151]

276.    Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them.

277.    In September of 2022, the White House convened the "United We Stand" summit, at which the President again demanded that Congress reform Section 230 to punish tech companies for failing to adequately censor.[152]

## III.    THE BIDEN ADMINISTRATION'S "DISINFORMATION GOVERNANCE BOARD" WITHIN DHS

278.    On April 27, 2022, Secretary Mayorkas announced that DHS was creating a "Disinformation Governance Board" to combat "misinformation" and "disinformation."

279.    Documents declassified on June 7, 2022, establish that a whistleblower revealed that DHS, as of September 13, 2021 (if not earlier), had deemed "disinformation relating to the origins and effects of Covid-19 vaccines or the efficacy of masks" a "serious homeland security risk."[153]

---

[150] *Id.*
[151] *Id.*
[152] *Id.* at 11.
[153] https://www.grassley.senate.gov/imo/media/doc/grassley_hawley_to_deptofhomelandsecuritydisinformationgovernanceboard.pdf

280.     Among the declassified documents was a September 13, 2021, DHS memorandum, which detailed the significant and diverse efforts that DHS intended to take to combat such alleged misinformation, describing it as the Department's "mission."[154]

281.     The DHS memorandum expressly and repeatedly acknowledged that, in pursuit of its efforts to combat Covid-related "misinformation," the Department ran the risk of violating the First Amendment.[155]

282.     The memorandum emphasized the importance of "work[ing] closely" with "private sector partners" in order to successfully combat and otherwise prevent dissemination of so-called Covid-related misinformation.[156]

283.     The DHS memorandum also outlined the importance of sharing information, as the Department had done in the past, with "social media platform operators."[157]

284.     The documents outlining the creation of the DGB expressly acknowledged that the "component" governmental agencies tasked with combating misinformation, such as DHS, could "engage private sector services" and otherwise foster partnerships with "private sector entities [and] tech platforms" to help achieve the DHS mission of combating and suppressing so-called Covid-related misinformation.[158]

285.     The week of May 16, 2022, the Biden Administration announced that Jankowicz had resigned and that it was suspending operations of the Board, following unexpected public outcry.  However, the Board was not permanently dismantled, but instead "paused" while, in the

---

[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.*

meantime, DHS would continue its work "to address disinformation," according to the Biden Administration.[159]

286.    On August 24, 2022, following the recommendation from the Homeland Security Advisory Committee (HSAC), Mayorkas rescinded the DGB's charter.[160]

287.    In its press release announcing the DGB's dissolution following HSAC's recommendation, DHS also noted that HSAC had "concluded that countering disinformation that threatens the homeland, and providing the public with accurate information in response, is critical to fulfilling the Department's missions" and that DHS would "continue to address threat streams that undermine the security of our country."[161]

288.    On May 9, 2023, FOIA-obtained documents were released, revealing the agency's formation of a "governance board" to oversee DHS's "Campaign" against domestic terrorism.[162]

289.    Among the released documents is an internal DHS memo dated January 29, 2021 (just nine days after Biden was sworn in as President), which, under the heading "Characterizing the Threat" and subheading "Pandemic Impacts," describes how "the most acute terrorist threat inside the United States" stems from "DVEs" (domestic violent extremists).[163]  DHS describes these "violent extremists" as individuals or small groups who "exploit public fears associated with COVID-19 to incite violence, intimidate targets, and promote their violent extremist ideologies."[164]

---

[159] Theo Wayt, Mark Lungariello, & Samuel Chamberlain, *Biden puts disinfo 'Mary Poppins' on ice, scraps Orwellian DHS Board*, THE NEW YORK POST (May 18, 2022), *available at* https://nypost.com/2022/05/18/biden-admin-pauses-disinformation-governance-board-report/.
[160] *See Following HSAC Recommendation, DHS terminates Disinformation Governance Board*, Department of Homeland Security (Aug. 24, 2022), *at* https://www.dhs.gov/news/2022/08/24/following-hsac-recommendation-dhs-terminates-disinformation-governance-board.
[161] *Id.*
[162] https://aflegal.nyc3.digitaloceanspaces.com/wp-content/uploads/2023/05/09040902/2022-HQFO-00179-AFL.pdf.
[163] *Id.*
[164] *Id.*

290.     According to DHS, protests against "government restrictions imposed by the pandemic" qualifies as "domestic violent extremism."[165] The internal DHS memo also describes how accusations of government overreach and protests against pandemic-era government restrictions constitute "attempts to foment violence."[166]

291.     Under the heading "Accurately characterizing domestic terrorism can be challenging," the DHS memo explains that the distinction between domestic terrorism and other criminal behavior "comes down to an individual's ideology,"[167] lamenting that it can be "exceptionally difficult" to legally make the distinction due to "first amendment protections."[168]

292.     The DHS memo explains, however, that the intelligence community is only "*mostly* prohibited" from "reporting on *First Amendment protected activities*."[169]

## IV. THE SIO's "VIRALITY PROJECT" AND ITS COLLUSION WITH FEDERAL AGENCIES TO CENSOR SPEECH

293.     During the Covid-19 pandemic, the Stanford Internet Observatory launched the Virality Project as a means of tracking and censoring Covid-related speech on social media platforms. According to the Virality Project's report dated April 26, 2022, the VP targeted speech by "domestic actors" (i.e., American citizens) who "questioned the safety, distribution, and effectiveness of the vaccines."[170]

294.     According to VP's report, SIO's Research Manager Renee DiResta is the VP's Executive Editor and contributor.

---

[165] *Id*.
[166] *Id*.
[167] *Id*.
[168] *Id*.
[169] *Id*.
[170] Stanford Internet Observatory, *et al*., The Virality Project, *Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines* (Apr. 26, 2022), https://purl.stanford.edu/mx395xj8490.

295.     From the start, VP was overtly biased against "anti-vaccine" viewpoints:  "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." (bold in original).[171]

296.     On information and belief, the VP targets truthful speech for censorship and successfully induced social-media platforms to censor and suppress COVID-related speech that was not false and, in many cases, not even violative of platform policies.

297.     The VP report admits that "it was not always clear what was misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay,"[172] and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts."[173] Yet this did not stop the VP from targeting supposed "misinformation" that was admittedly true at the time, or that later turned out to be true.

298.     Most speech targeted by the VP was not false:  "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source."[174]  According to the VP report, "Hard-to-Verify Content" is content that is "difficult to fact-check or verify, such as personal anecdotes," and "Alleged Authoritative Sources" is content that points to "information from an alleged public health official, doctor, or other authoritative source."[175]

---

[171] *Id*. at 9.
[172] *Id*. at 7.
[173] *Id*. at 8.
[174] *Id*. at 34.
[175] *Id*. at 12.

299.    According to the VP, truthful "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation.[176]

300.    According to VP, it is also misinformation when true adverse health events from vaccines are "shared absent context," including "[r]are incidents documenting verified adverse health events."[177]

301.    The VP report explains that "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation.[178]  It notes that "adverse event stories" are objectionable because they are "employed to push back against vaccine mandates."[179]

302.    According to VP, connections made possible through social media platforms "enabled pathways for the spread of vaccine misinformation."[180]  Connections such as "connecting via Facebook Groups, have enabled users to share, view, and discuss first-person experiences of supposed vaccine side effects."[181]  VP explains that "the more organization occurs on social media, the more strongly people believe vaccines are unsafe."[182]

303.    On information and belief, VP successfully pushes platforms to adopt more aggressive censorship policies:  "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist."[183]

---

[176] *Id*. at 44.
[177] *Id*.
[178] *Id*. at 45.
[179] *Id*. at 45-46.
[180] *Id*. at 11.
[181] *Id*.
[182] *Id*.
[183] *Id*. at 3.

304.    Emails between Twitter and the Virality Project revealed through public reports show that VP successfully pushed Twitter to adopt more aggressive censorship practices and repeatedly flagged content for censorship under Twitter's policies.

305.    On March 3, 2021, former CISA intern Jack Cable of VP sent an email to senior Twitter officials, copying Renée DiResta, advising Twitter that VP was "beginning to ramp up our notification process to platforms," and providing "a list of actionable themes of vaccine misinformation we have recently observed."

306.    In this email, Cable indicated that VP would send "weekly briefing[s]" on misinformation that would be "targeted to the COVID-related policies we've identified on each platform."

307.    In an email to Twitter, on information and belief, VP flagged supposed "misinformation" concerning such topics as "the myocarditis situation, Senator Paul Rand's [*sic*] claims about natural immunity, and serious side effects (including a re-emerging concern about Guillain-Barre Syndrome)."

308.    On information and belief, VP flagged to Twitter "True content which might promote vaccine hesitancy," including "Viral posts of individuals expressing vaccine hesitancy, or stories of true vaccine side effects," and "often true posts which could fuel hesitancy, such as individual countries banning certain vaccines."[184]

---

[184] *See* Matt Taibbi, *Twitter Files #19: The Great Covid-19 Lie Machine: Stanford, the Virality Project, and the Censorship of "True Stories"*, *at* https://twitter.com/mtaibbi/status/1636729166631432195.

309.    VP admits that six social media platforms "acknowledge[ed] content flagged for review" by VP "and act[ed] on it in accordance with their policies"—in other words, censored it.[185]

310.    VP extensively monitored social media speech to detect disfavored content and viewpoints: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods …. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms."[186]

311.    VP's monitoring system tracked content with about 6.7 million engagements on social media per week, or over 200 million engagements over the seven months: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million."[187]

312.    This monitoring involved VP analysts reading and searching Americans' social media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope …, surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric."[188]

313.    This covert, mass surveillance of Americans' online speech was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ('vaccine,' 'jab') to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional

---

[185] Written Testimony of Renee DiResta Before the U.S. House of Representatives Regarding "A Growing Threat: Foreign and Domestic Sources of Disinformation," Stanford Internet Observatory (July 27, 2022), *at* https://ecf.lawd.uscourts.gov/doc1/08917303945.
[186] The Virality Project Report, *supra* note 123 at 15.
[187] *Id*. at 32.
[188] *Id*. at 15.

recurring narratives relevant to the four in-scope categories.  This included terms related to medical freedom under 'Vaccine Distribution,' or severe adverse effects and death under 'Vaccine Safety,' among others.  As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches."[189]

314.    VP states that social-media platforms censored content at VP's instigation: "Platforms were the final stakeholders in the VP effort.  Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—acknowledging content flagged for review and acting on it in accordance with their policies.  On occasion, platforms also provided information on the reach of narratives previously flagged by VP, which provided a feedback loop leveraged to inform the Project's understanding of policies and ongoing research."[190]

315.    The VP report offers a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube during 2021.[191]

316.    The VP report emphasizes the importance of both government officials and social-media platforms in its collaboration on censorship:  "As the effort progressed, input from these partners," including government officials and platforms, "was crucial in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and disinformation were being felt offline."[192]

317.    On information and belief, government officials provided "tips" to VP about misinformation on social media, and VP flagged such content to platforms for censorship.

---

[189] *Id*. at 16.
[190] *Id*. at 8.
[191] *Id*. at 126, fig. 5.1.
[192] *Id*.

318.    The VP report states that "federal health agencies" were among VP's stakeholders, which "provided tips, feedback and requests to assess specific incidents and narratives."[193]

319.    According to VP, "[a]n area that required ingenuity was creating a framework for facilitating the *intake* of tips from … government partners …. [T]heir tips are often highly valuable … ."[194] (emphasis in original).

320.    The VP report states that:  "Federal government agencies served as coordinators for national efforts.  The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives."[195]

321.    VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point.[196]

322.    VP engaged in continuous, ongoing communication with government officials, platforms, and other stakeholders:  "The Virality Project delivered 31 weekly briefings focused on increasing situational awareness and enabling the stakeholders working on countering vaccine mis- and disinformation to develop the most effective possible response."[197]

323.    The VP report states that it "provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services."[198]

---

[193] *Id.*
[194] *Id.* at 141.
[195] *Id.* at 17.
[196] DiResta Testimony, *supra* note 138 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default.files.surgeon.general-misinformation-advisory.pdf.
[197] The Virality Project Report, *supra* note 123 at 18.
[198] *Id.*

324.    Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation."[199]

325.    VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government" at CISA "with its *existing* mis- and disinformation team."[200] (emphasis added).

326.    On information and belief, VP's censorship activities are ongoing and continue beyond the period described in the VP report.

## V.    THE CDC'S PARALLEL CENSORSHIP CAMPAIGN

327.    On information and belief, social media companies have frequently and directly coordinated with CDC to monitor and suppress Covid-related speech.

328.    Working closely with the social media platforms, CDC flags supposed "misinformation" for censorship on the platforms (sometimes using the acronym "BOLO" for "Be on the Lookout") and dictates what health statements will be censored on social media.

329.    During 2021, Carol Crawford, CDC's Division Director of Digital Media, organized and ran "BOLO" meetings on Covid "misinformation" with representatives of social media platforms—including Twitter, Facebook, Instagram, and Google/YouTube—in which she and other federal officials colluded with those platforms about speech to monitor and target for suppression.[201]

---

[199] *Id*. at 20.
[200] *Id*. at 143.
[201] *Id*. at 139.

330.    These meetings included Crawford and other CDC officials who would flag specific social media posts for censorship or topics and provide examples of the types of posts to censor.

### *Facebook Censors "Misinformation" upon CDC's Command*

331.    Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which *public health experts have advised* us could lead to COVID-19 vaccine rejection."[202]

332.    CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor.

333.    For example, on November 4, 2021, in an email from Facebook to the OSG and the White House concerning the censorship of Covid-related "misinformation," Facebook made clear that CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time":  "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends."[203]

334.    On June 22, 2022, in an email from Facebook to the OSG, Rob Flaherty, and other White House officials, Facebook reported that it had updated the platform's censorship policy on "all COVID-19 vaccine related misinformation."[204]  According to Facebook, it had again relied on CDC to dictate what claims users could post on the platform: "We expanded these policies in

---

[202] Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/23076 4881494641 (emphasis added).
[203] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 103.
[204] *Id*. at 110.

coordination with the CDC and ensured that we also included false claims that might be connected to children…."[205]

335.    Facebook censors Covid-related information as "false," not based on actual truth or falsity, but based on whether the statement questions or challenges CDC pronouncements.

336.    On March 25, 2021, Crawford and other CDC officials met with Facebook to discuss Facebook's policies and approaches to Covid-related "misinformation."[206]

337.    CDC chose the "Misinformation Topics" to be discussed, which included: "misinformation about side effects," and "claims about vaccines leading to deaths."[207]

338.    For each topic, the slides provided sample posts from Facebook users as examples of the type of claim, along with a statement from CDC debunking the supposedly erroneous claim.[208]  This included debunking any claims that the Covid vaccines had side effects.[209]

339.    On March 30, 2021, Crawford inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths:  "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine. What's the approach for adding labels to those stories?"[210]

340.    On April 13, 2021, Facebook emailed Crawford and proposed to enroll CDC officials in a special misinformation reporting channel that would allow CDC to log onto Facebook as an administrator and flag problematic speech in a more expedited manner.[211]

341.    On November 2, 2021, Facebook's content-moderation official emailed Crawford and other CDC officials stating that, "as a result of our work together" with the CDC, Facebook

---

[205] *Id.*
[206] *Id.* at 117.
[207] *Id.*
[208] *Id.*
[209] *Id.*
[210] *Id.* at 121.
[211] *Id.* at 121-22.

had updated its content-moderation policies to increase censorship of vaccine-related claims in significant ways.[212]

342.   According to the Facebook official, the platform had "launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies."[213]

343.   On February 3, 2022, Facebook's content-moderation official emailed Crawford to share the following additional updates that Facebook had made to its misinformation policies "as a result of our work together":  (1) the removal of claims that Covid vaccines cause heart attacks; and (2) the reduction of the distribution of content that "likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human." [214]

### *Google/YouTube*

344.   On March 23, 2021, Crawford sent a calendar invite for a meeting with six Google/YouTube officials, along with other CDC and Census employees.  The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts."[215]

345.   At this time, CDC had recently executed an Interagency Agreement with the Census Bureau to assist CDC in addressing misinformation, pursuant to which, Census provided CDC with reports on "key themes" of misinformation seen on social media.[216]

346.   At the meeting, CDC and Census presented a slide deck similar to the one for the meeting with Facebook on March 25, 2021, discussed above.  The slide deck was entitled,

---

[212] *Id.*
[213] *Id.* at 131.
[214] *Id.*
[215] *Id.* at 136.
[216] *Id.* at 119.

"COVID Vaccine Misinformation: Issue Overview." The deck's "Misinformation Topics" included "infertility, misinformation about side effects, and claims of vaccines leading to deaths."[217]

347.   For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC.[218]

348.   Regarding supposed misinformation about vaccine side effects, the deck stated: "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC.[219]

349.   Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a putative refutation by the CDC:  "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines."[220]

350.   According to Crawford, she still attends a regular biweekly meeting with Google, which continues to the present day.[221]

351.   Crawford also has "similar regular meetings with … Meta and Twitter."[222]

---

[217] *Id.*
[218] *Id.*
[219] *Id.*
[220] *Id.* at 137.
[221] *Id.* at 138.
[222] *Id.*

*Twitter*

352.    On April 8, 2021, Twitter emailed Crawford to request examples of misinformation from CDC: "All examples of misinformation are helpful … ."  The subject line of this email was "Request for problem accounts."[223]

353.    Twitter's email was in response to Crawford's prior inquiry, "Is there a good way that we should start engaging on misinformation?"[224]

354.    On May 10, 2021, Twitter offered to enroll CDC officials in the platform's "Partner Support Portal"—a privileged channel that would allow for expedited review of content CDC flagged for censorship.[225]

***CrowdTangle and Other Social Media "Listening" Reports***

355.    According to Crawford's sworn deposition testimony in the case *Missouri v. Biden*, CDC collaborated with Facebook to flag Covid-related speech for censorship using "CrowdTangle," which she describes as "a social media listening tool for Meta properties," meaning Instagram and Facebook.[226]

356.    Crawford confirmed that the CDC had privileged access to CrowdTangle starting in early 2020, and CDC officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media.[227]

357.    According to Facebook, "state health departments" were granted access to CrowdTangle to address "vaccine misinformation."[228]  Using CrowdTangle, when government

---

[223] *Id*. at 143.
[224] *Id*.
[225] *Id*. at 145.
[226] *Id*. at 114.
[227] *Id*. at 114.
[228] Facebook, *Connecting People in the US With State COVID-19 Vaccine Information* (April 12, 2021), *at* https://about.fb.com/news/2021/04/state-covid-19-vaccine-information/.

health officials "flag potential vaccine misinformation on Facebook and Instagram, [Facebook] review[s] and remove[s] the content if it violates our policies."[229]

358.    The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts."[230]

359.    CDC has also used other social media "listening tools" to monitor Americans' speech on social media, including "Meltwater reports," which are similar to CrowdTangle but can monitor all platforms.[231]

360.    On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content overall across Pages and Groups."  The email emphasized in bold certain content in the report, including "Posts about alleged vaccine-related deaths" and "News and reports of severe vaccine side effects."[232]

361.    Facebook indicated that it was sending this report in response to a prior conversation with Crawford:  "I am following up on our conversation several weeks ago about providing more detailed reporting from our CrowdTangle team."

362.    Crawford responded that "the wide group of those looking at misinfo will want this."[233]

**VI.    "THE PLAINTIFFS AND THE CENSORSHIP OF THEIR SOCIAL MEDIA ACCOUNTS**

363.    All six Plaintiffs are social media users and have maintained accounts on several platforms, including, but not limited to, Facebook, YouTube, Twitter, Instagram, and TikTok.

---

[229] *Id*.
[230] Plaintiffs' Proposed Findings of Fact, *supra* note 20, at 115.
[231] *Id*.
[232] *Id*.
[233] *Id*.

364.   Except for Mr. Ramirez, each of the Plaintiffs experienced serious and debilitating medical injuries within weeks (if not, in some cases, days) after taking a dose of the Covid-19 vaccine.

365.   Except for Mr. Ramirez, each of the Plaintiffs continues to experience serious and debilitating medical injuries.

366.   Mr. Ramirez's 16-year-old son Ernest Ramirez, Jr. died five days after taking his first dose of the Pfizer Covid vaccine.

367.   While the content that each creates is unique, all six Plaintiffs have regularly used their social media accounts to: (1) share their personal experiences during the pandemic, including their experiences after they, or a loved one, took the vaccine; (2) read about other users' experiences after taking the vaccine; (3) engage with other users in private support groups for individuals (and their loved ones) who experienced medical harm after taking the vaccine; and (4) exchange advice, support, and medical research with other users with respect to their vaccine injuries.

### a. Brianne Dressen

368.   On November 4, 2020, Ms. Dressen received her first dose of the AstraZeneca Covid vaccine as part of a voluntary clinical trial.

369.   Within an hour of receiving that dose, she experienced tingling down her arm and later that night had blurry and double vision, as well as distorted hearing.

370.   The following morning, Ms. Dressen's left leg was slumped and weak, causing her to walk with a modified gate.  In addition, she experienced extreme sensitivities to light and sound.

371.   Within two weeks of receiving the vaccine, Ms. Dressen suffered from autonomic dysfunction, gastrointestinal problems, irregular heart rate, painful paresthesia, heart and blood

pressure fluctuations, brain fog, and severe limb weakness and loss of bladder control.  Her symptoms became so severe that she was forced to isolate in her bedroom in darkness and silence for months, only to come out for rehabilitation to address her sensory deficits and her struggle to walk.

372.    On June 16, 2021, Ms. Dressen visited the United States National Institutes of Health (NIH) as part of its "Investigation of persistent neurological symptoms following SARS-CoV2 vaccine."  NIH confirmed that she had suffered Covid vaccine-induced medical conditions and diagnosed her with "postural orthostatic tachycardia syndrome (POTS)" and "post-vaccine neuropathy," as well as short-term memory loss.

373.    Today, over two years later, Ms. Dressen has been diagnosed with chronic inflammatory demyelinating neuropathy (CIDP), a permanent and debilitating condition.  She remains unable to work and, at times, relies on a wheelchair due to her chronic neuropathic condition.  Her severe reaction devastated both her own life and that of her young family.  At times, she believed that she could no longer go on living.

374.    In April 2021, however, Ms. Dressen discovered through social media that others around the world were experiencing similar medical reactions after taking the Covid vaccine. After making these connections, she helped launch support groups on social media platforms, primarily on Facebook, consisting of individuals across the globe sharing similar vaccine-related experiences.  Through the social media groups, Ms. Dressen's mental state began to improve, along with some of her physical ailments, as she was able to connect and share with others during a time at which she was too ill to venture outside of her home.

375.    The focus of the support groups was to share physical symptoms and conditions, offer emotional support, and discuss potential treatments.  Only individuals who had been injured

by the Covid vaccine were permitted to join, and a rigorous vetting process was conducted before any member was admitted.

376.    In May 2021, Ms. Dressen became the administrator of one of the Facebook groups that had been providing her with critical support.

377.    On June 28, 2021, Ms. Dressen spoke publicly for the first time about her experience.  She participated in a mainstream media press conference in Milwaukee, Wisconsin, facilitated by Senator Ron Johnson, along with other vaccine-injured individuals, during which they shared their experiences.

378.    Within twenty-four hours of the press conference, the Facebook group of which Ms. Dressen served as administrator was shut down, and member lists were eliminated entirely under the accusation that the group was spreading "misinformation," though the group was private and limited to discussions of members' personal experiences.  Facebook notified Ms. Dressen that the group had been disabled for having "content that goes against [Facebook's] Community Standards."

379.    A few days later, another of Ms. Dressen's Facebook groups, "A Wee Sprinkle of Hope," was shut down for posting an infographic that listed certain symptoms that people had experienced post-Covid vaccine, including brain fog, memory loss, fatigue, tinnitus, and paresthesia.  The infographic also included a link to the press conference at which she had recently spoken about her vaccine injuries.  As a result of Facebook's shutdown of the group, Ms. Dressen lost contact with nearly two thousand other vaccine-injured individuals who had been members of the group.

380.    It was around this time that Ms. Dressen became aware that she and other advocates for the vaccine-injured were being shadow banned on Facebook and other social media platforms,

meaning that her posts were no longer visible to other users.  After several of Ms. Dressen's posts in her private vaccine-injured support groups were removed, Facebook notified her that: "Multiple violations for false information will cause your group's posts to be moved lower in the News Feed."

381.    Around this time, Facebook also began to flag many of the posts in the support groups as "Partly false" or as "Missing Context," and sometimes Facebook would remove the posts entirely for going against Facebook's rules or "Community Standards."

382.    In July 2021, Ms. Dressen's activities were detailed in a report created by the Virality Project, a non-profit entity launched by SIO that was tasked primarily with combatting Covid-19 "misinformation."   Under the heading "Ongoing Themes and Tactics," the report expresses skepticism of Ms. Dressen's "claims [of] life-altering injuries" and concludes that:  "An injury story that **does not have a proven causal link to the vaccine** nevertheless garnered high spread because it was picked up by a major anti-vaccine activist and by conservative politicians engaged in prior anti-vaccine activities." (emphasis included)

383.    In July 2021, Ms. Dressen and several other group administrators launched a new support group on Facebook, "Covid Vaccine—Long Haul Support Group," in the hope of reconnecting with members who had been lost after Facebook shut down the support group called "A Wee Sprinkle of Hope."

384.    Fearful of being disabled again, Ms. Dressen and her fellow group administrators had to develop a code for members to describe their experiences.  Words such as "vaccine," "side effect," "symptoms," "Pfizer," and "Moderna" could not be used, as they often triggered (and continue to trigger) Facebook to remove the post or shut down the group entirely.  Facebook deemed such posts "misinformation that could cause physical harm."

385.    Facebook also claimed that certain of her posts containing words or topics relating to the Covid vaccine or its side effects violated Facebook's "standards on violence and incitement" and notified Ms. Dressen that the platform doesn't "allow content that leads to a genuine risk of physical harm or a direct threat to public safety."  Facebook provided the following examples of such content:  "Language that leads to serious violence," "Threats that could lead to death, violence or serious injury," and "Instructions on how to make or use weapons, if the goal is to seriously injure or kill people."

386.    On November 29, 2021, a group member posted that she had recently developed a mitral heart valve leak and mitral valve prolapse.  The post asked the group:  "Anyone else get this from the v?  Will it kill me?  They said I don't need treatment?  Why not?"  Facebook removed the post for violating "Community Standards on misinformation about vaccines."

387.    Currently, Ms. Dressen and other group administrators must continuously create new code words to avoid censorship of their posts as Facebook's search algorithms regularly adapt.

388.    Despite Ms. Dressen's efforts, numerous posts in the support groups have been, and continue to be, removed by Facebook, including posts with links to medical articles describing vaccine side effects and possible treatments.  Even posts that Facebook does not remove are often flagged as potential misinformation or labeled with a warning box directing viewers to visit CDC's website for "reliable, up-to-date information."  This includes Ms. Dressen's attempts to post links to news articles or podcasts, including features in Science and Newsweek, in which she shared her personal experience after taking the vaccine.

389.    As a result, Ms. Dressen's ability to assemble medical information, read about others' vaccine experiences and symptoms, share personal experiences, and both share and receive support within the vaccine-injured community has been drastically curtailed.

90

390.    Ms. Dressen has also experienced censorship and content removal on other social media platforms, including YouTube, TikTok, Vimeo, and Instagram.

391.    In September 2021, Ms. Dressen participated in and distributed an awareness video, titled "We Want to Be Heard," with other individuals who had suffered side effects from the Covid vaccine.   TikTok took down the video, notifying Ms. Dressen that it had been removed for "dangerous acts."

392.    Similarly, YouTube removed a video that Ms. Dressen had posted called "See Us. Hear Us. Believe Us." for "violating YouTube's Community Guidelines."

393.    In October 2021, Ms. Dressen's husband, a biochemist, testified before the Food and Drug Administration (FDA) regarding her NIH-confirmed vaccine injuries.   His testimony was covered by several members of the mainstream media, and Ms. Dressen's experience quickly went viral.   Initially, the story trended on Google with over 87 news stories featuring his testimony.

394.    When Ms. Dressen ran a search of the identical terms on Google four hours later, she discovered that only five stories appeared in the search results.   Although the stories remained on the news sites where they were published, Google prevented the story from trending by removing them from visibility on the Google search engine.

395.    In December 2021, a support group on Facebook on which Ms. Dressen served as an administrator, with over 12,000 members, including vaccine-injured individuals and supporting friends and family, was shut down after a group member posted a link to a news story featuring Ms. Dressen's experience after taking the vaccine, as well as a link to the government of Australia's website discussing adverse vaccine reactions.   According to Facebook, the post violated its "Community Standards on misinformation about vaccines."

396.    In November 2021, Ms. Dressen co-founded a non-profit organization called React19 to support the vaccine-injured community.  She, along with React19's other board members, serve as group page administrators on multiple social media platforms and have each experienced censorship similar to that which is described above.  This censorship has not only limited group members' access to medical information and support, but it has also dramatically limited React19's ability as a non-profit organization to fundraise.

397.    In January 2022, in her role as co-founder of React19, Ms. Dressen helped produce and circulate on multiple social media platforms a vaccine injury awareness video called "Silence," documenting only the personal experiences of those who experienced medical injuries after taking the vaccine.  The video was removed from both Vimeo and YouTube.

398.    YouTube notified Ms. Dressen that the video was removed for violating YouTube's "medical misinformation policy."

399.    Vimeo notified Ms. Dressen that the video violated its Guidelines because it made "false or misleading claims about (1) vaccination safety, or (2) health-related information that has a serious potential to cause public harm." Ms. Dressen appealed the removal.  Vimeo responded by permanently deleting React19's account from the platform.  Vimeo provided the explanation that the "claims of injury are not substantiated by the US Centers for Disease Control."

400.    In June 2022, React19 launched a new awareness campaign called "Can we talk about it?" which requested that participants post on social media a photo of their arm and share what symptoms they had experienced after taking the vaccine.

401.    After posting about the awareness campaign on Instagram, Ms. Dressen was notified that her post had been removed for "harmful false information."  Ms. Dressen's post stated the following:  "It's time to break the silence about v-injuries and deaths.  Mark your calendars

and join us on June 14th at 2 p.m. EST for the launch of the #CanWeTalkAboutIt worldwide campaign, which aims to: Create a safe space for C19 v-injured to share their stories. Create awareness among the general public that C19 v-injuries are real. Raise funds to support global organizations and initiatives working on projects related to research, health solutions, and lawful processes leading to compensations."

402.    After Ms. Dressen posted about the awareness campaign on Facebook, her account received a warning for posting "misinformation that could cause physical harm." Facebook also claimed that the post "may show graphic content" and that her account might be restricted if she were to violate again. Ms. Dressen's post stated the following: "Join us in solidarity Tuesday June 14th! Take a photo with your sleeve rolled up if inj. or take a photo of your hand over your heart." The post also included an infographic with event details and a link to the campaign website.

403.    In September 2022, React19 posted a story on Twitter focused on hope and the healing process of a vaccine-injured member of the non-profit organization. The post discussed her symptoms and progress toward recovery and was tagged #WednesdayWins. Twitter removed the post and locked React19's account. Twitter notified React19 that the account could only be unlocked if the account administrator clicked a checkbox admitting that the post was harmful and in violation of Twitter's rules. Once Ms. Dressen clicked the checkbox, the account was restored. She appealed the post's removal but, to date, has received no response.

404.    In March 2023, React19 posted a link to an article on Facebook regarding a scientist's findings on Covid vaccine injuries. In addition to the article link, the post stated: "Science has been slow to study vaccine injuries, but one British Columbia researcher has led the charge to determine the incidence of Guillain-Barré syndrome, VITT, TTS, and myocarditis/pericarditis strongly associated with COVID-19 vaccination." Facebook removed the

post, describing it as "misinformation that could cause physical harm." Facebook then froze React19's account for 24 hours and suspended for one month the private Facebook account of React19's social media manager who is also vaccine-injured. His private account had not been used for months but was nevertheless suspended for content posted by React19's official account.

405.    On May 4, 2023, YouTube notified Ms. Dressen that React19's account has been suspended for posting inappropriate video content.

406.    Due to the ongoing threat of censorship and penalties for posting on social media, Ms. Dressen and her fellow support group members often hesitate to share their personal stories on social media platforms or reach out for support from those with common experiences. Ms. Dressen has been limited in her ability to communicate and connect with those whom she perceives to be most in need of connection and support.

407.    In her role as social media group administrator for React19, as well as for three private support groups on Facebook, she has been compelled to dedicate more time determining how group members can communicate with one another without being censored than supporting the group members through the trauma of their injuries, which has always been her primary objective.

408.    Ms. Dressen currently serves in her personal capacity as administrator of three private Facebook groups with a combined membership of approximately 19,400 people.

409.    In her capacity as administrator for React19, she manages its accounts on Facebook, Twitter, YouTube, Odysee, and Instagram, with a combined following of over 48,000 people.

410.    Ms. Dressen is also a member and contributor of other support groups on social media platforms that, in total, include approximately 22,500 members of the vaccine-injured community.

### b. Shaun Barcavage

411.    On December 29, 2020, Mr. Barcavage received his first dose of the Pfizer vaccine. Before that time, he had been in good health with no medical concerns, spending his free time traveling the world and walking in the park with his partner and two dogs.

412.    Within hours of receiving the vaccine, he developed paresthesia (numbness, tingling, warm and cold sensations) along his injected right arm, which radiated into his upper back and armpit area.

413.    Mr. Barcavage's symptoms progressively worsened over the following days to include tingling on the right side of his face, stinging in his right eye, and a burning sensation on one ear.

414.    On January 4, 2021, he attended a primary care visit, after which his physician referred him to the neurology department.

415.    On January 11, 2021, Mr. Barcavage met with a neurologist at Weill Cornell Medicine who conducted an electromyography (EMG) test on his right arm and ran some general blood work tests.  He recommended that Mr. Barcavage proceed with the second dose of the Pfizer vaccine.  Despite his misgivings, and under pressure from impending vaccine mandates, Mr. Barcavage proceeded with the second dose of the Pfizer vaccine on January 19, 2021.

416.    During the first three days, Mr. Barcavage experienced pain where he had been injected that radiated to his left neck and back.  By the fourth day, he awoke with ringing in the right ear (tinnitus), and the paresthesia in his right side had returned.  He also developed a prickling sensation in his throat.  Over the course of the next few days, the paresthesia in his right side escalated with more intensity.  He consulted his neurologist about these symptoms and was instructed to simply "wait it out."

417.    By January 30, 2021, Mr. Barcavage developed inappropriate sinus tachycardia, wildly fluctuating blood pressure, a severe headache on the right side, acute abdominal pain, worsening tinnitus, stinging sensations, muscle fasciculations and internal vibrations in his legs.

418.    On January 30, 2021, he sought emergency care in Pennsylvania where he received a CT scan, which showed that he had an inflamed mesentery.  The attending physician dismissed the possibility that Mr. Barcavage's symptoms were vaccine-related and sent him home with ibuprofen.

419.    As a medical professional, Mr. Barcavage felt certain that something was seriously wrong and consulted numerous doctors for help and answers.  However, none knew how to help, and some admitted to him that "this was all new" and that what was happening with the vaccine during the pandemic was still poorly understood.

420.    By March 2021, Mr. Barcavage's symptoms had worsened, with the onset of autonomic dysfunction (positional tachycardia and severe insomnia), cardiac arrhythmias, and generalized, whole-body neuropathies that involved the mouth, throat, and eyes.

421.    Since the adverse reaction to the vaccine, Mr. Barcavage has also been diagnosed with positional tachycardia, and a skin biopsy has indicated small fiber neuropathy.  His symptoms have continued to worsen and, most recently, he has developed chronic pain in both ears, worsening tinnitus, and sudden fluctuations in hearing.

422.    After receiving no answers about his symptoms from his doctors, Mr. Barcavage turned to the internet to search for others who might be experiencing similar reactions to the vaccine.

423.    In March 2021, Mr. Barcavage began posting on his Instagram account to share his experience with the vaccine and to raise awareness of the issue.  Instagram labeled the majority of

his posts with a message directing viewers to the CDC website "to obtain factual information about Covid." To Mr. Barcavage, this labeling suggested that his injuries qualified as misinformation, adding to his sense of alienation as he struggled to find support and connect with others who might be struggling with similar conditions.

424. In March 2021, Mr. Barcavage established one of the first online support groups on Facebook for those suffering tinnitus post-vaccination. Only individuals who had been injured by the Covid vaccine were permitted to join, and a vetting process was conducted before any member was admitted. Within months of creating the group, the group had over 3,500 members.

425. His private support group was frequently the target of censorship by Facebook. The group often received warning messages for posts that Facebook claimed violated its "Community Standards." Group member posts were also often labeled as "misinformation" or with a message that redirected viewers to "more accurate information" on the CDC website.

426. As an administrator of the support group, Mr. Barcavage struggled to find ways to enable members to communicate without the group being shut down. He had to develop code words with the other members, such as "vee" for vaccines, to prevent posts, including links to news articles and medical journals, from being flagged as misinformation or removed entirely.

427. In November 2021, Mr. Barcavage shared testimony about his vaccine injuries before the U.S. Senate. When his family and fellow vaccine-injured individuals attempted to share his testimony on Facebook, the posts were removed as "misinformation."

428. On December 15, 2021, Facebook disabled Mr. Barcavage's support group, claiming that the group had "content that goes against Facebook's Community Standards." Mr. Barcavage appealed Facebook's decision, and, without any further communication from Facebook, the group was restored on January 4, 2022.

429.     Mr. Barcavage must still self-censor or speak in code when posting on social media platforms to avoid warnings, removals, or account suspensions, and both he and members of his support groups have been limited in their ability to share their experiences, read about others' experiences and symptoms, seek advice, find answers, and support one another.

430.     Mr. Barcavage has been conducting research into the adverse effects of the Covid vaccine with the hope of spreading awareness and providing the vaccine-injured with further support and knowledge about their injuries.  His efforts to communicate freely, however, have been largely undercut by the suppression of his posts on social media platforms, as well as the negative, "anti-vaxxer" stigma that has accompanied the labels of "misinformation" on his posts.

### c.   Kristi Dobbs

431.     On January 18, 2021, Ms. Dobbs received her first dose of the Pfizer vaccine at her local hospital's vaccine clinic.

432.     Within five minutes of receiving the injection, as she waited in line to schedule her appointment for the second dose, Ms. Dobbs felt a strange tingling sensation, like freezing cold water, running down her left arm, which had just received the injection.  A few moments later, she experienced a pre-syncopal episode, during which she experienced heart palpitations, lightness of breath, increased pulse, and an abnormally high blood pressure reading that was worthy of stroke.

433.     She was monitored at the clinic for 45 minutes and then released.  The nurse at the clinic told her that she was either having a panic attack or a hot flash, and no further medical assistance was offered.  Ms. Dobbs was also told to file a "V-safe report," an informal mechanism to report to the CDC how one felt after taking the Covid vaccine.

434.     Three days later, Ms. Dobbs suddenly felt a stabbing pain in her left upper back, followed by tingling and numbness in her arms and involuntary tremors in both hands.

435.     Over the course of the next few weeks, she suffered additional symptoms, including the following: extreme fatigue, autonomic dysfunction, heart palpitations, blood pressure fluctuations, gastrointestinal problems, painful paresthesia and neuropathy, internal tremors, brain fog, muscle pain and weakness, inability to feel pin pricks on her legs, dizziness, stiff neck, intermittent tinnitus, headaches, temperature regulation issues, skin rashes, over-dilated eyes, sound sensitivity, heavy-thick clotted menstrual cycles, as well as nocturnal convulsions, or pseudo-seizures.

436.     Ms. Dobbs's symptoms became so severe that she spent weeks during which she could barely get out of bed, and she could only manage to get to the living room couch to help her kids with their schoolwork.  It was impossible for her to make it as far as the kitchen to cook dinner for her four young children.

437.     In March 2021, Ms. Dobbs was invited to participate in NIH's "investigation of persistent neurological symptoms following SARS-CoV2 vaccine."

438.     She was seen by NIH neuroimmunologist Farinaz Safavi, who requested a blood sample from Ms. Dobbs to test for autoantibodies post-Covid vaccination.  Ms. Dobbs regularly corresponded with Dr. Safavi throughout the month of March.

439.     In May 2021, without explanation, Dr. Safavi requested to speak with Ms. Dobbs' neurologist and informed Ms. Dobbs that NIH would no longer see her as a patient.

440.     Without explanation, Ms. Dobbs's neurologist also informed her that he would no longer treat her.  Ms. Dobbs was referred to a new neurologist who acknowledged that Ms. Dobbs had "developed multiple symptoms after covid vaccination," but was unable to treat her symptoms.

441.     During the initial days following the vaccine, Ms. Dobbs felt extremely alone and depressed.  She often contemplated suicide.

442.    Ms. Dobbs turned to the internet for answers and possibly to find others who were experiencing similar aftereffects of the Covid vaccine.

443.    In February 2021, she came across an article in Neurology Today with a comment at the bottom of the article from Dr. Danice Hertz, a retired gastroenterologist who had been injured by the vaccine.  Ms. Dobbs contacted Dr. Hertz by email, and they soon created an email thread, including others who had been injured by the vaccine.

444.    By March 2021, the email group had grown so large that Ms. Dobbs and a few others decided to create a support group for the vaccine-injured on Facebook.

445.    After about a week, Ms. Dobbs and the other group administrators decided to make the group private, so that members could be vetted before being allowed to join.  All applicants were required to submit details regarding their symptoms, as well as the date of the vaccine administration, brand of vaccine, treatment(s) attempted, and a description of their health status prior to vaccination.

446.    Ms. Dobbs is also a member of other vaccine-injured support groups, each of which is strictly nonpartisan and fully focused on allowing vaccine-injured individuals to share their experiences and discuss possible medical treatments.

447.    On June 28, 2021, Ms. Dobbs participated in a press conference held by Senator Ron Johnson, along with other vaccine-injured individuals, where they shared their experiences.

448.    Within twenty-four hours of the press conference, one of Ms. Dobbs's support groups on Facebook was shut down and member lists were eliminated entirely under the claim that the group had been spreading "misinformation."

449.    A few days after the press conference, another Facebook support group of which Ms. Dobbs was a member was shut down for posting a link to the press conference and an

infographic displaying certain symptoms that people had experienced post-Covid vaccine. As a result of Facebook's shutdown of the group, Ms. Dobbs lost contact with nearly two thousand other vaccine-injured individuals who had been members of the group.

450.    Around this time, Ms. Dobbs realized that she and other advocates for those injured by the vaccine were being shadow banned on Facebook.  This meant that her posts were no longer visible to other users and that she could no longer see and read posts from several members of her support groups.

451.    In hopes of reconnecting with the lost group members, Ms. Dobbs joined a few new vaccine-injured support groups.  In all the groups, Ms. Dobbs and the other members had to use code words to describe their experiences, symptoms, and medications because words such as "vaccine," "side effect," "symptoms," "Pfizer," and "Moderna" would result in a post being labeled as misinformation or removed.

452.    Despite Ms. Dobbs' efforts, many of her posts continue to be removed or flagged as false, misleading, or potentially false information.  The posts that are not removed are also often labeled with a warning box directing viewers to visit CDC's website for "reliable, up-to-date information."  On multiple occasions, after removing her posts, Facebook has notified Ms. Dobbs that the posts are "misinformation when public health authorities conclude that the information is false and likely to contribute to imminent violence or physical harm."

453.    In February 2022, Ms. Dobbs joined React19 and continues to serve as its secretary, a voluntary and unpaid position which she works from home.  Ms. Dobbs is also a part of React19's advocacy team.

454.     In June 2022, React19 launched a new awareness campaign called "Can we talk about it?" discussed above, which requested that participants post on social media a photo of their arm and share what symptoms they had experienced after taking the vaccine.

455.     Ms. Dobbs made a post about the awareness campaign in one of the vaccine-injured support groups on Facebook.  As a result, Facebook froze her account for three days and removed the post for "violence and incitement."

456.     Ms. Dobbs now hesitates to post about her personal experience, whether on her personal Facebook page or in one of her private support groups.  She frequently feels she must self-censor out of concern that her account will be frozen or the support groups will be shut down. Her ability to speak freely, even in a private group context, with other members of the vaccine-injured community about their symptoms, success stories, and possible medical treatments has been severely limited.

457.     Ms. Dobbs currently serves as the administrator of two Facebook support groups for those injured by the vaccine and is a member of eight others.

### d.  Nikki Holland

458.     On February 12, 2021, Ms. Holland received her second dose of the Moderna Covid vaccine, having had no symptoms following the first dose.

459.     Within 36 hours of receiving the injection, she began to experience nausea, vomiting, and extreme gastrointestinal discomfort.

460.     The next day, she began to experience shortness of breath, fatigue, and weakness.

461.     Five days after receiving the vaccine, her shortness of breath worsened to the point that she had to leave work to go to the emergency room where she was treated for respiratory failure.  She had to be placed on a ventilator three times for breathing assistance.  The third time,

due to the urgent need for more advanced medical care, she had to be flown, or "life-flighted," to a larger hospital.

462.    Ms. Holland soon also began to experience fluctuations of blood pressure and heart rate, leg pain, fatigue, paresthesia, and her gastrointestinal problems worsened.

463.    During the course of 2021, following Ms. Holland's second dose of the vaccine, she was hospitalized five times, life-flighted to a larger hospital five times, spent nearly 100 days in the hospital, and spent one month in an inpatient rehabilitation center to gain enough strength to return home.

464.    Since taking the second dose of the vaccine, Ms. Holland has been diagnosed with post-vaccination injury syndrome, chronic respiratory failure with hypoxia, laryngospasms, status post tracheostomy, vocal cord dysfunction, systemic inflammatory response syndrome, food intolerance, gastroparesis, abdominal distension, gastroesophageal reflux disease, dysphagia, neurogenic bladder, critical illness myopathy, deep vein thrombosis, hemoptysis, sepsis, anxiety, major depressive disorder, acute pain, lower extremity weakness, drop foot, gait abnormality, muscle spasms, ataxia and neurological disorder.  She became dependent on supplemental oxygen and required a tracheostomy, a suprapubic catheter implant and bladder InterStim implant to assist with urination, as well as a feeding tube for nutritional tolerance and support.  She must also rely on a wheelchair as an assistive device for mobility, along with multiple medications.

465.    Ms. Holland sought assistance from multiple doctors and specialists but has seen little improvement, and she continues to suffer on a daily basis.  Formerly an active single mother who worked full time and ran regularly, Ms. Holland now must rely on her three children for assistance with basic tasks and often can barely get out of bed.

466.    As her symptoms worsened in 2021, she began to search Google for medical help and social support.  However, most searches turned up only CDC reports about the vaccine and a sparse list of its known or acknowledged side effects.

467.    Unable to find support or treatment, Ms. Holland became depressed and, at multiple points, contemplated suicide.

468.    In the summer of 2021, however, she discovered support groups on social media platforms—primarily on Facebook—consisting of individuals around the world who had similar post-vaccine experiences and symptoms.  Ms. Holland's mental state subsequently began to improve, and her feelings of depression and alienation diminished.

469.    On Facebook, Ms. Holland noticed that her own and others' posts that contained Covid-related words, such as "Covid vaccine" would be flagged with a box stating that the Covid vaccine had been thoroughly tested "for safety and effectiveness" and providing a link to CDC's website, giving the impression that the posts were false or misleading.

470.    Ms. Holland also noticed that the vaccine-injured support groups did not appear in Facebook or Google searches.  She could only locate the groups by typing out the full group page address or by searching through her previous group connections.

471.    Ms. Holland and other members of the vaccine-injured support groups began using code words as substitutes for words including "vaccine," "side effect," "symptoms," "Pfizer," and "Moderna" in an effort to prevent the posts from being removed or the groups being shut down.

472.    Ms. Holland posted about her post-vaccine experience on Facebook, TikTok, and YouTube, and she received warnings on each of the three platforms that her posts were misleading, constituted misinformation, or violated the social media platforms' rules and standards.  At various points, her accounts on these platforms were restricted from posting or sharing content.

473.     On November 14, 2021, YouTube removed Ms. Holland's video in which she was giving a speech about her post-vaccine experience at an event in Los Angeles.  YouTube warned her that, if she violated YouTube's Community Guidelines again, her account would receive a strike, and she would be unable to post, upload, or livestream for one week.

474.     On February 24, 2022, YouTube removed a video in which Dr. Heather Melton interviewed Ms. Holland and other vaccine-injured individuals about their post-vaccine experiences.

475.     On March 19, 2022, Facebook removed a post that Ms. Holland made discussing data from HHS's Vaccine Adverse Event Reporting System (VAERS), which showed that the Moderna vaccine appeared to have produced 90% of recorded adverse Covid vaccine reactions. Ms. Holland appealed the removal, and eventually Facebook allowed the post back up on her personal page.

476.     On December 13, 2022, YouTube removed a documentary film called "Anecdotals," in which Ms. Holland shared her post-vaccine experience.  YouTube claimed that the film contained misinformation and violated Community Guidelines.

477.     On several occasions, including on February 26, 2022, August 1, 2022, October 21, 2022, and April 5, 2023, TikTok removed Ms. Holland's video posts about her vaccine injuries and recovery process, including personal speeches about her post-vaccine experience.  TikTok notified her that the videos violated "Community Guidelines."  According to TikTok, one of Ms. Holland's videos was removed for "Violent and graphic content."  Other videos were removed for "integrity and authenticity" concerns.

478.     Ms. Holland continues to believe that it is a risk to post on social media platforms about what happened to her after taking the vaccine and feels limited in her ability to seek advice,

support, and medical information from those who have had similar experiences.  Each time she posts about this subject matter, she fears that her post might be removed, her account frozen, or her support group shut down.

### e.  Suzanna Newell

479.    On April 13, 2021, Ms. Newell received her second dose of the Pfizer vaccine.

480.    Prior to taking the vaccine, she was very active, regularly biking and competing in triathlons.  She had no underlying health conditions.

481.    One day after receiving her second dose of the vaccine, Ms. Newell experienced extreme fatigue, brain fog, a swollen lymph node in the neck, a forehead rash, and joint pain.

482.    Over the next few weeks, her symptoms worsened, but she only spoke of her condition to her closest friends out of concern that she would scare others out of getting the vaccine.

483.    On May 21, 2021, Ms. Newell's condition had deteriorated to the point that she could no longer walk unassisted.

484.    On May 24, 2021, she went to the emergency room to seek treatment for her symptoms.  The doctor sent her home with a referral for an echocardiogram stress test.

485.    Two days later, her symptoms exponentially worsened to the point that she feared her body was shutting down and that she would die.

486.    She was hospitalized for three days.  Despite the numerous tests conducted, she left the hospital with no answer as to the cause of her symptoms.

487.    Ms. Newell continues to regularly see multiple neurologists, a rheumatologist, cardiologist, allergist, neuro occupational therapist, physical therapist, among other medical professionals.

488. Ms. Newell has been diagnosed with small fiber neuropathy, Sjogren's syndrome, cryoglobulinemia vasculitis, super ventricular tachycardia, mild cardiovagal and adrenergic dysfunction.

489. After two years, many of her symptoms have worsened, and she still frequently struggles to perform simple tasks.

490. Ms. Newell's primary doctor has attributed her symptoms to the Covid vaccine.

491. On September 30, 2022, Ms. Newell posted a video entitled "Kindness" on YouTube in which she and a vaccine-injured friend discussed their difficult experiences and how "Team Humanity" and the kindness of others had allowed them to maintain hope. They did not make any claims about the Covid vaccine. YouTube removed the video for "misinformation" and for violating its Community Guidelines.

492. In January 2023, Ms. Newell was interviewed about her post-vaccine experience by Children's Health Defense in Washington, D.C. After her husband shared the video of the interview on Facebook, the post was labeled with a warning that it could cause "physical harm." Facebook notified him that another violation could result in his account being restricted.

493. Eventually, Ms. Newell turned to Facebook as a means of connecting with others who had been injured after taking the vaccine, and as a way to spread hope and awareness. She created a support group called Team Humanity, which focused on growing a supportive community of the vaccine-injured and their friends and family.

494. To prevent the Team Humanity group from being shut down or its posts removed, Ms. Newell and the other group members had to communicate in code and avoid using any words related to Covid or the vaccine.

495.     After she created the support group, Ms. Newell became aware that she and other members were being shadow banned on Facebook. This meant that her posts were no longer visible to other users and that she could no longer see posts from several members of her support groups.

496.     Currently, Ms. Newell rarely uses social media due to the ongoing threat of censorship and the difficulties in constantly having to communicate in code to avoid posts being labeled as "misinformation" or removed entirely.

497.     Ms. Newell is currently a Board Member of React19 where she advocates for vaccine-injured individuals and tries to spread understanding of those who have experienced lasting effects of the Covid vaccine.  Due to the censorship and related difficulties that she and other members of React19 have faced, efforts to collaborate and spread awareness and support have been, and continue to be, limited.

### e.  Ernest Ramirez

498.     Mr. Ramirez's son Ernest Ramirez, Jr., was born on November 11, 2004.  As a teenager, he was very active and a talented baseball player for his high school team.  He had never had any health problems.

499.     Early in 2021, Mr. Ramirez received both doses of the Moderna vaccine.

500.     In April 2021, the Pfizer vaccine had been recommended by CDC as safe for teenagers, so Ernest, Jr., received his first dose on April 19, 2021.

501.     Five days later, on April 24, 2021, Ernest, Jr., collapsed while he was running in the park.  A police officer attempted to perform CPR on him, and he was taken by ambulance to the hospital.

502.     By the time Mr. Ramirez arrived at the hospital, he was informed that his sixteen-year-old son was dead.

503.     According to the autopsy report, Ernest, Jr., had died of an enlarged heart, myocarditis, and terminal cardiac arrhythmia.  Acute inflammatory cells were detected in his heart and liver.

504.     After losing his son, Mr. Ramirez reached the darkest point of his life and no longer wanted to go on living.

505.     In the summer of 2021, however, Mr. Ramirez found new purpose and a means of honoring his son's memory when he began traveling and speaking about what had happened to Ernest, Jr.

506.     At first, Mr. Ramirez only spoke locally in Texas to raise awareness and share his son's story.

507.     However, in August 2021, he launched a GoFundMe page to help fundraise enough money for a trip to Washington, D.C. to share his son's story in the nation's capital.

508.     Approximately one week later, GoFundMe notified Mr. Ramirez that his GoFundMe account had been removed for violating the platform's terms of service for "Prohibited Conduct."  As a result, all the funds (approximately $2,000) that Mr. Ramirez had raised were forfeited.

509.     Subsequently, Mr. Ramirez created a fundraising page on LifeFunder to raise funds for Washington, D.C., and he was ultimately able to raise enough to make the trip.

510.     Mr. Ramirez also turned to social media platforms, such as Facebook, Twitter, YouTube, and Instagram to share his son's story and to connect with others who had been impacted by vaccine injuries.

511.    In November 2021, Mr. Ramirez discovered vaccine-injured support groups on social media.  Through the support groups, he was able to share his son's story, spread awareness, and connect with others who had experienced similar hardships.

512.    Frequently, Mr. Ramirez's posts on social media have been removed or labeled as misleading or false.

513.    On November 11, 2021, Mr. Ramirez posted a photo of himself beside his son's casket at his funeral on Facebook and Twitter.  The caption of the photo read:  "My good byes to my Baby Boy."

514.    Facebook flagged the post with a warning box viewable to other users labeling it as "partly false information" and stating:  "The same information was checked in another post by independent fact-checkers."

515.    Twitter removed the photo altogether and warned Mr. Ramirez:  "Make sure you're sharing reliable information.  Visit the COVID-19 Information Center for reliable vaccine info and resources."

516.    On August 21, 2021, Facebook removed Mr. Ramirez's post in which he wrote: "Getting ready to speak on behalf of my Baby Boy!" and restricted Mr. Ramirez's account.

517.    Facebook similarly removed Mr. Ramirez's post of a quote by Plato:  "No one is more hated than he who speaks the truth."

518.    On October 1, 2022, Facebook labeled Mr. Ramirez's post with a warning box as "Partly false information.  Checked by independent fact-checkers."

519.    On November 21, 2022, Twitter labeled Mr. Ramirez's post with a warning box stating that "it might have sensitive content."

520.    Mr. Ramirez has been suspended from Twitter and Facebook on multiple occasions.

110

521.    On November 29, 2021, YouTube labeled Mr. Ramirez's video post in which Dr. Peter McCullough discussed the death of Mr. Ramirez's son as "Missing context."  The warning label explained:  "Independent fact-checkers say this information could mislead people."

522.    On February 15, 2023, YouTube removed Mr. Ramirez's video post in which he participated in a roundtable discussion held by Senator Ron Johnson on November 3, 2021, to share his son's story.   YouTube informed him that the content "violates our medical misinformation policy," stating that "it's important to us that YouTube is a safe place for all."

523.    On April 4, 2023, YouTube notified Mr. Ramirez that it had removed two videos he had posted and that Mr. Ramirez's account had received "2 strikes" for posting content that violated YouTube's Community Guidelines.  The two videos that YouTube removed were (1) an interview in which Mr. Ramirez discussed his son's death; and (2) a video of Mr. Ramirez driving his son's truck down the street.

524.    Shortly after, YouTube restricted Mr. Ramirez's ability to post a video that he had received from a group of vaccine-injured individuals sharing their condolences on the anniversary of his son's death.

525.    On May 15, 2023, Facebook flagged as "partly false" a video that Mr. Ramirez posted earlier that day.  Facebook warned Mr. Ramirez that posts of "[p]eople who repeatedly share false information" are less likely to be visible to other users (i.e., shadow banned).  The video that Mr. Ramirez posted was a clip from an episode of the American television series "Conspiracy Theory with Jesse Ventura."

526.    Currently, Mr. Ramirez's YouTube account is suspended, and he is unable to make any posts.  YouTube has notified him that, if he receives a third strike, his account will be deleted permanently.

527.     Currently, Instagram prevents Mr. Ramirez from being tagged in any posts, including the posts of other users.  When a user attempts to tag Mr. Ramirez, Instagram notifies the user that Mr. Ramirez cannot be tagged because he "repeatedly posted content that goes against our Community Guidelines on false content about COVID-19 or vaccines."

528.     Mr. Ramirez's ability to share his son's story, spread awareness of his personal tragedy, and connect with others has been his primary lifeline since Ernest, Jr.'s death.  However, his ability to do so has been greatly limited by the ongoing censorship that Mr. Ramirez has faced.

529.     Each time that he communicates about his son's death on social media or any related experience, Mr. Ramirez fears that his speech will be removed or labeled as misinformation—or that his account will be frozen or removed entirely.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE FIRST AMENDMENT
### Against the Government Defendants

530.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

531.     Private action that violates constitutional rights may constitute state action that can be attributed to the government in multiple ways.

532.     As alleged herein, the Government Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

533.     As alleged further herein, as a result of threats, pressure, and inducements, the Government Defendants have colluded and worked in concert with social media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content

and speakers, and "flagging" disfavored content and speakers for censorship.  In doing so, the Government Defendants have deprived Plaintiffs of their constitutional rights under the First Amendment: namely, the freedom to both speak and receive speech, and the freedom of expressive association.

534.    Moreover, even absent threats, pressure, and inducements, the Defendants have abridged Plaintiffs' First Amendment rights by enabling the social media companies to coordinate and systematize Defendants' censorship program in relative uniformity across all of the platforms. Unless each of the social media platforms restricts more-or-less the same types of speech, they cannot effectively carry out Defendants' mass censorship scheme.  However, the social media companies cannot coordinate among one another without violating antitrust laws, so they thus depend upon government to supply the necessary coordination—to coordinate speech restrictions across the dominant social media platforms.  By supplying this coordination, Defendants have reduced and thus abridged the freedom of speech guaranteed by the First Amendment.

535.    The Government Defendants' conduct readily qualifies as state action for several independently sufficient reasons: (1) through the heavy and regular imposition of threats, pressure, and encouragement, the federal government fostered, encouraged, and empowered the creation of a small number of massive and dominant social media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (2) federal officials—including, most notably, the Government Defendants herein—have repeatedly and aggressively threatened to remove legal benefits (*i.e.*, Section 230 and the absence of antitrust enforcement) and impose other adverse consequences on social media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (3) the Government Defendants herein, conspiring and colluding both with each other and social media firms, have

directly coordinated with social media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media. These actions have drastically impacted Plaintiffs' First Amendment rights of free speech and freedom of expressive association.

536.    Defendants' actions have injured and continue to injure Plaintiffs by suppressing and chilling their exercise of free speech on social media platforms. Further, Defendants' censorship has violated Plaintiffs' First Amendment right to read and receive speech communicated by other users on social media platforms, thus depriving Plaintiffs of information, opinion, and companionship that could greatly benefit them in their adversity, that was and is essential for their personal well-being and their participation in public life, and that matters in all aspects of their lives. This injures not only Plaintiffs, but all social media users by reducing the availability of free speech in what is meant to be a free marketplace of ideas.

537.    The Government Defendants' conduct inflicts imminent, ongoing, and continuing irreparable injury on Plaintiffs, as further alleged herein.

538.    To the extent that Plaintiffs are still able to use social media and other tech platforms, they fear losing accounts and various other forms of reprisal, causing them to curtail expression accordingly. *Penny Saver Publications, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 154 (7th Cir. 1990) ("Constitutional violations may arise from the chilling effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

539.    In sum, the Government Defendants' censorship activities, targeting both content and viewpoints that threaten—or even question—the federal government's preferred narrative have violated, and continue to violate, Plaintiffs' First Amendment rights to free speech (including the freedom both to speak and to receive information), and free expressive association.

**COUNT TWO—VIOLATION OF THE FIRST AMENDMENT**
**Against the De Facto Government Defendants**

540.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

541.    As alleged herein, the De Facto Government Defendants engaged with the government in its massive government/private joint censorship enterprise through SIO's "Virality Project," to target and suppress speech on the basis of content and viewpoint.

542.    Through the Virality Project, the De Facto Government Defendants built strong ties with several federal government agencies, most notably the Office of the Surgeon General and the CDC, and engaged in continuous, ongoing communication with government officials (which, on information and belief, continues to this day) to execute the government's censorship scheme.

543.    The De Facto Government Defendants' actions, in conjunction with the Government Defendants, have injured and continue to injure Plaintiffs by suppressing and chilling their exercise of free speech on social media platforms.  As a result, Plaintiffs have been deprived of their First Amendment rights to freely associate in private social media groups, and to communicate and receive information, including from each other.

544.    Through their joint participation and powerful nexus with the government in its unconstitutional censorship enterprise, the De Facto Government Defendants plainly qualify as state actors under Supreme Court precedent and must be held accountable as *de facto* government actors.

**COUNT THREE—*ULTRA VIRES* ACTION BEYOND STATUTORY AUTHORITY**
**Against the Government Defendants**

545.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

546.   "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Agency actions that exceed the agency's statutory authority are *ultra vires* and must be invalidated.

547.   No federal statute authorizes any of the Government Defendants to engage in the course of conduct concerning the censorship and suppression of speech on social media, as alleged herein.

548.   No federal statute authorizes the Government Defendants to determine what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse on social media platforms; to direct, pressure, coerce, and encourage social media companies to censor and suppress such speech; and/or to demand that private companies turn over information about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

549.   The interpretation of any statute to purport to authorize such actions would constitute a plain violation of the non-delegation doctrine and the major questions doctrine.

550.   The Government Defendants and the federal officials acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted, and continue to act, without any lawful authority whatsoever.  No federal statute, regulation, constitutional provision, or other legal authority authorizes their social media censorship program, and it is wholly *ultra vires*.

551.   The Government Defendants' *ultra vires* actions inflict ongoing irreparable harm on Plaintiffs, as alleged herein.

116

### COUNT FOUR—*Ultra Vires* Action Beyond Constitutional Bounds
### Against the Government Defendants

552.   Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

553.   Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution.  *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution") (cite omitted).

554.   Further, "[a]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

555.   Congress's authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation."  *United States v. Lopez*, 514 U.S. 549 (1995); *see also* Const. Art. I, § 8.  Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce.  *See* James Wilson, State House Yard Speech (Oct. 6, 1787), *see* https://csac.history.wisc.edu/wp-content/uploads/sites/281/2017/07/James_Wilson.pdf ("a power similar to that which has been granted for the regulation of commerce" was not "granted to regulate literary publications," and thus "the proposed system possesses no influence whatever upon the press"); *United States v. Lopez*, 514 U.S. at 557; *United States v. Morrison*, 529 U.S. at 617.

556.     Moreover, the text of the Constitution is explicit that: "Congress shall make no law… ***abridging*** the freedom of speech."  U.S. Const. Amend I.  Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

557.     Therefore, even if (contrary to what is alleged above) the Government Defendants' censorship enterprise were within the bounds of the statutory authority delegated by Congress (it is not), the Government Defendants' conduct would, and does, remain *ultra vires* in violation of any conceivable constitutional authority.  Congress is not constitutionally authorized to confer upon federal agencies any power, purpose, or authority beyond the Constitution's enumerated powers or in violation of the First Amendment.

558.     In sum, no constitutional authority permits the Government Defendants' censorship activities, as alleged herein, which have violated and are continuing to violate Plaintiffs' First Amendment rights to free speech and free expressive association, so they are wholly *ultra vires*.

## COUNT FIVE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the HHS Defendants

559.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

560.     Defendants HHS, CDC, Murthy, Becerra, Crawford, and Waldo are referred to collectively herein as the "HHS Defendants."

561.     As set forth herein, the HHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

562.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance

118

of procedure required by law…." 5 U.S.C. § 706(2)(A)-(D).  The HHS Defendants' conduct violates all these prohibitions.

563.    In the Fifth Circuit, the "final agency action" requirement is a jurisdictional threshold, not a merits inquiry, and is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'"  *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Even agency advisory opinions can be deemed to have "consummated the Department's decisionmaking process."  *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022).  "The mere possibility that an agency might reconsider" its advisory "in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."  *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

564.    The HHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action by which "rights or obligations have been determined," and "from which legal consequences will flow."  *Id*. Defendants' campaign of pressuring, threatening, and colluding with social media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social media censorship program.

565.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

566.     The HHS Defendants' actions are arbitrary, capricious, and an abuse of discretion because they are being executed to favor the government's viewpoint while suppressing dissent therefrom.

567.     Further, the HHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs.  5 U.S.C. § 706(2)(B).

568.     The HHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

569.     The HHS Defendants' conduct is in excess of any statutory authority and thus unlawful under the APA.  *See* 5 U.S.C. §§ 706(2)(B), (C).

## COUNT SIX—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the DHS Defendants

570.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

571.     Defendants DHS, CISA, Mayorkas, and Easterly are referred to collectively herein as the "DHS Defendants."

572.     As set forth herein, the DHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

573.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…."  5 U.S.C. § 706(2)(A)-(D).  The DHS Defendants' conduct violates all these prohibitions.

574.    The DHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id*. Defendants' campaign of pressuring, threatening, and colluding with social media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  The actions of Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social media censorship program.

575.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706 (2)(A).

576.    The DHS Defendants' actions are arbitrary, capricious, and an abuse of discretion because they are being executed to favor the government's viewpoint while suppressing dissent therefrom.

577.    Further, the DHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs.  5 U.S.C. § 706(2)(B).

578.    The DHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to

obtain input from the public, before engaging in these unlawful agency policies.  5 U.S.C. § 706(2)(D).

579.    The DHS Defendants' conduct is in excess of any statutory authority and thus unlawful under the APA.  *See* 5 U.S.C. §§ 706(2)(B), (C).

## <u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.      A declaration that Defendants' conduct violates the First Amendment of the United States Constitution, including the rights to free speech (both to express and receive speech) and free expressive association;

B.      A declaration that Defendants' conduct constitutes *ultra vires* action lacking statutory and constitutional authority, and that Defendants' interpretation of its statutory authority in such a way as to authorize their conduct runs afoul of the nondelegation and major questions doctrines;

C.      A declaration that Defendants' conduct violates the Administrative Procedure Act and therefore is unlawful and invalid;

D.      Injunctive relief restraining and enjoining all Defendants, excluding Biden, as well as their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), from continuing to engage in unlawful conduct as alleged herein;

E.      Injunctive relief restraining and enjoining all Defendants, excluding Biden, as well as their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them from engaging in any act to

demand, urge, pressure, or otherwise induce any social media platform to censor, suppress, de-platform, suspend, shadow ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content, or viewpoint expressed on social media;

F.      A declaration that Twitter and other social media companies are under no obligation to censor content (especially content deemed COVID-19 misinformation) and will not be penalized if they do not engage in viewpoint-based censorship;

G.      Any equitable or remedial relief to which Plaintiffs are entitled, including but not limited to repayment of the funds that Mr. Ramirez raised on his GoFundMe account prior to his account being deleted, as alleged herein;

H.      Nominal damages of $1 each;

I.      Attorney's fees pursuant to 42 U.S.C. § 1988; and

J.      Any other relief that the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

May 22, 2023

                                    Respectfully submitted,

                                    /s/ Casey Norman
                                    Casey Norman*
                                    Litigation Counsel
                                    New York Bar # 5772199
                                    Casey.Norman@ncla.legal
                                    *Motion to Be Admitted as Attorney-in-Charge Forthcoming*

/s/ Margaret A. Little

Margaret A. Little
Senior Litigation Counsel
Connecticut Bar # 303494
Peggy.Little@ncla.legal
*Pro Hac Vice Admission Forthcoming*

NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238

\* Admitted only in New York and Ohio.  DC
practice limited to matters and proceedings
before United States courts and agencies.
Practicing under members of the District of
Columbia Bar.

/s/ S. Michael McColloch

S. MICHAEL MCCOLLOCH, PLLC
S. Michael McColloch
Texas Bar # 13431950
Telephone: (214) 643-6055
smm@mccolloch-law.com
KAREN COOK, PLLC
Karen L. Cook
Texas Bar # 12696860
Telephone: (214) 643-6054
karen@karencooklaw.com
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206

*Attorneys for Plaintiffs*