No. 23A-_____

_____
_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
APPLICANTS

v.

MISSOURI, ET AL.

_____


APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

_____


ELIZABETH B. PRELOGAR
  Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217


_____
_____

**PARTIES TO THE PROCEEDING**

Applicants (defendants-appellants below) are Surgeon General Vivek H. Murthy and Chief Engagement Officer for the Surgeon General, Katharine Dealy, along with their directors, administrators and employees; White House Press Secretary, Karine Jean-Pierre; Counsel to the President, Edward N. Siskel; White House Partnerships Manager, Aisha Shah; Special Assistant to the President, Sarah Beran; Administrator of the United States Digital Service within the Office of Management and Budget, Mina Hsiang; White House National Climate Advisor, Ali Zaidi; White House Senior COVID-19 Advisor, formerly Andrew Slavitt; Deputy Assistant to the President and Director of Digital Strategy, formerly Rob Flaherty; White House COVID-19 Director of Strategic Communications and Engagement, Dori Salcido; White House Digital Director for the COVID-19 Response Team, formerly Clarke Humphrey; Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team, formerly Benjamin Wakana; Deputy Director for Strategic Communications and External Engagement for the White House COVID-19 Response Team, formerly Subhan Cheema; White House COVID-19 Supply Coordinator, formerly Timothy W. Manning; and the Chief Medical Advisor to the President, formerly Dr. Anthony S. Fauci, along with their directors, administrators and employees; the Centers for Disease Control and Prevention (CDC), and specifically the following employees: Carol Y. Crawford, Chief of the

ii

Digital Media Branch of the CDC Division of Public Affairs; Jay Dempsey, Social-Media Team Leader, Digital Media Branch, CDC Division of Public Affairs; and Kate Galatas, CDC Deputy Communications Director; and the Federal Bureau of Investigation (FBI), and specifically the following employees:  Section Chief, FBI Foreign Influence Task Force, formerly Laura Dehmlow; and Elvis M. Chan, Supervisory Special Agent of Squad CY-1 in the FBI San Francisco Division.*

---

\*    All individual defendants were sued in their official capacities and their successors, if any, have automatically been substituted in their respective places.  See Sup. Ct. R. 35.3; Fed. R. App. P. 43(c)(2); Fed. R. Civ. P. 25(d).

The following defendants are not applicants here because the court of appeals reversed the entry of injunctive relief against them:  the Department of Health and Human Services (HHS); the National Institute of Allergy and Infectious Diseases (NIAID); Xavier Becerra, Secretary of HHS; Dr. Hugh Auchincloss, Director of NIAID; Yolanda Byrd, HHS Digital Engagement Team; Christy Choi, HHS Office of Communications; Ashley Morse, HHS Director of Digital Engagement; Joshua Peck, HHS Deputy Assistant Secretary, Deputy Digital Director of HHS (formerly Janell Muhammed); along with their secretaries, directors, administrators, and employees; United States Census Bureau, Jennifer Shopkorn, Census Bureau Senior Advisor for Communications, Division Chief for the Communications Directorate, and Deputy Director of the Census Bureau Office of Faith Based and Neighborhood Partnerships, along with their secretaries, directors, administrators and employees; the United States Department of Justice, along with its secretary, director, administrators, and employees; the Cybersecurity and Infrastructure Security Agency (CISA); Jen Easterly, Director of CISA; Kim Wyman, Senior Cybersecurity Advisor and Senior Election Security Leader; Lauren Protentis; Geoffrey Hale; Allison Snell; Brian Scully, officials of CISA; the United States Department of Homeland Security (DHS); Alejandro Mayorkas, Secretary of Homeland Security; Robert Silvers, Under-Secretary of the Office of Strategy, Policy and Plans; Samantha Vinograd, Senior Counselor for National Security in the Office of the Secretary for DHS, along with their secretary, directors, administrators, and employees; the United States Department of State (State Department); Leah Bray, Acting

iii

Respondents (plaintiffs-appellees below) are the State of Missouri; the State of Louisiana; Dr. Aaron Kheriaty; Dr. Martin Kulldorff; Jim Hoft; Dr. Jayanta Bhattacharya; and Jill Hines.

## RELATED PROCEEDINGS

United States District Court (W.D. La.):

Missouri v. Biden, No. 22-cv-1213 (July 4, 2023)

United States Court of Appeals (5th Cir.):

Missouri v. Biden, No. 22-30531 (Nov. 15, 2022)

In re Vivek H. Murthy, No. 22-30697 (Feb. 24, 2023)

Missouri v. Biden, No. 23-30445 (Sept. 8, 2023)

---

Coordinator of the State Department's Global Engagement Center (GEC); Alexis Frisbie, State Department Senior Technical Advisor and Member of the Technology Engagement Team at the GEC; Daniel Kimmage, Acting Coordinator of the GEC, along with their secretary, directors, administrators, and employees.

The following defendants are not applicants here because the district court did not enter injunctive relief against them: Joseph R. Biden, Jr., President of the United States; the Food and Drug Administration; the Department of the Treasury; the Department of Commerce; Erica Jefferson; Michael Murray; Wally Adeyamo; Steven Frid; Brad Kimberly; Kristen Muthig; the Disinformation Governance Board; and Nina Jankowicz.

IN THE SUPREME COURT OF THE UNITED STATES

————————————

No. 23A-_____

VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
APPLICANTS

v.

MISSOURI, ET AL.

————————————

APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

————————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants Vivek H. Murthy, U.S. Surgeon General, et al., respectfully applies for a stay of a preliminary injunction issued on July 4, 2023, by the United States District Court for the Western District of Louisiana (App., _infra_, 1a-162a, 176a), as modified by the Fifth Circuit (_id._ at 178a-252a), pending the filing and disposition of the government's forthcoming petition for a writ of certiorari and any further proceedings in this Court.  The government also respectfully requests an administrative stay while the Court considers this application.

This application concerns an unprecedented injunction installing the United States District Court for the Western District of Louisiana as the superintendent of the Executive Branch's communications with and about social-media platforms -- including

senior White House officials' speech addressing some of the most salient public issues of the day.  The lower courts held that federal officials had transformed the private platforms' content-moderation decisions into state action and violated the First Amendment by urging platforms to remove COVID-19 misinformation, highlighting the risk of disinformation from foreign actors, and responding to the platforms' inquiries about matters of public health.  The courts then entered a sweeping preliminary injunction governing thousands of federal officials' and employees' speech concerning any content posted on any social-media platform by any-yone.  That injunction flouts bedrock principles of Article III, the First Amendment, and equity.

First, respondents lack Article III standing.  Respondents are five individual social-media users and two States.  The Fifth Circuit held that they have standing because their posts have been moderated by social-media platforms.  But respondents failed to show that those actions were fairly traceable to the government or redressable by injunctive relief.  To the contrary, respondents' asserted instances of moderation largely occurred <u>before</u> the al-legedly unlawful government actions.  The Fifth Circuit also held that the state respondents have standing because they have a "right to listen" to their citizens on social media.  App., <u>infra</u>, 204a. But the court cited no precedent for that boundless theory, which would allow any state or local government to challenge any alleged violation of any constituent's right to speak.

Second, the Fifth Circuit's decision contradicts fundamental First Amendment principles.  It is axiomatic that the government is entitled to provide the public with information and to "advocate and defend its own policies."  Board of Regents v. Southworth, 529 U.S. 217, 229 (2000).  A central dimension of presidential power is the use of the Office's bully pulpit to seek to persuade Americans -- and American companies -- to act in ways that the President believes would advance the public interest.  President Kennedy famously persuaded steel companies to rescind a price increase by accusing them of "ruthless[ly] disregard[ing]" their "public responsibilities."  John F. Kennedy Presidential Library & Museum, News Conference 30 (Apr. 11, 1962), perma.cc/M7DL-LZ7N.  President Bush decried "irresponsible" subprime lenders that shirked their "responsibility to help" distressed homeowners.  The White House, President Bush Discusses Homeownership Financing (Aug. 31, 2007), perma.cc/DQ8B-JWN4.  And every President has engaged with the press to promote his policies and shape coverage of his Administration.  See, e.g., Graham J. White, FDR and the Press (1979).

Of course, the government cannot punish people for expressing different views.  Nor can it threaten to punish the media or other intermediaries for disseminating disfavored speech.  But there is a fundamental distinction between persuasion and coercion.  And courts must take care to maintain that distinction because of the drastic consequences resulting from a finding of coercion:  If the

4

government coerces a private party to act, that party is a state actor subject "to the constraints of the First Amendment." Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1933 (2019). And this Court has warned against expansive theories of state action that would "eviscerate" private entities' "rights to exercise editorial control over speech and speakers on their properties or platforms."  Id. at 1932.

The Fifth Circuit ignored those principles.  It held that officials from the White House, the Surgeon General's office, and the FBI coerced social-media platforms to remove content despite the absence of even a single instance in which an official paired a request to remove content with a threat of adverse action -- and despite the fact that the platforms declined the officials' requests routinely and without consequence.  Indeed, the Fifth Circuit suggested that any request from the FBI is inherently coercive merely because the FBI is a powerful law enforcement agency.  And the court held that the White House, the FBI, and the CDC "significantly encouraged" the platforms' content-moderation decisions -- and thus transformed those decisions into state action -- on the theory that officials were "entangled" in the platforms' decisions.  App., infra, 235a.  The court did not define that novel standard, but found it satisfied primarily because platforms requested and relied upon CDC's guidance on matters of public health.

The implications of the Fifth Circuit's holdings are startling.  The court imposed unprecedented limits on the ability of

the President's closest aides to use the bully pulpit to address matters of public concern, on the FBI's ability to address threats to the Nation's security, and on the CDC's ability to relay public-health information at platforms' request.  And the Fifth Circuit's holding that platforms' content-moderation decisions are state action would subject those private actions to First Amendment constraints -- a radical extension of the state-action doctrine.

Third, the lower courts' injunction violates traditional equitable principles.  An injunction must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  _Califano_ v. _Yamasaki_, 442 U.S. 682, 702 (1979). Here, however, the injunction sweeps far beyond what is necessary to address any cognizable harm to respondents:  Although the district court declined to certify a class, the injunction covers the government's communications with _all_ social-media platforms (not just those used by respondents) regarding _all_ posts by _any person_ (not just respondents) on _all_ topics.  And it forces thousands of government officials and employees to choose between curtailing their interactions with (and public statements about) social-media platforms or risking contempt should the district court conclude that they ran afoul of the Fifth Circuit's novel and ill-defined concepts of coercion and significant encouragement.

The district court's injunction has been stayed during the Fifth Circuit proceedings, and the Fifth Circuit extended an administrative stay through Monday, September 18, to allow the gov-

ernment to seek relief from this Court.  If allowed to take effect, the injunction would impose grave and irreparable harms on the government and the public.  In contrast, a continued stay pending further proceedings in this Court would impose no cognizable harm on respondents.  The Court should therefore stay the injunction in full pending the filing and disposition of the government's forth-coming petition for a writ of certiorari.  At a minimum, the Court should stay the injunction insofar as it applies beyond any content posted by the individual respondents themselves.

To expedite further proceedings, the government intends to file a petition for a writ of certiorari by October 13, 2023.  If the Court wishes to expedite matters further, it could construe this application as a petition for a writ of certiorari and grant the petition without further briefing.  See, e.g., Harrington v. Purdue Pharma, L.P., No. 23A87 (Aug. 10, 2023).

**STATEMENT**

1.  Social-media platforms allow billions of people to share content instantaneously around the globe.  Cf. Twitter, Inc. v. Taamneh, 143 S. Ct. 1206, 1216 (2023).  The unprecedented scope and speed of social-media communications has obvious benefits. But it also carries significant hazards, including the use of social media platforms to recruit terrorists, harm children, and spread misinformation and disinformation.[1]

---

[1]  See, e.g., Radicalization:  Social Media and The Rise of Terrorism:  Hearing Before the Subcomm. on Nat'l Sec. of the H.

Social-media platforms have long sought to address those hazards -- and thereby preserve the value of their products -- by adopting and enforcing content-moderation policies.  C.A.  ROA 21,943-21,961.  In March 2020, for example, Twitter amended its content-moderation policies in response to the COVID-19 pandemic "to address content that goes directly against guidance from authoritative sources of global and local public health information."  Id. at 22,539.

The federal government also has sought to mitigate those hazards, including by calling attention to potentially harmful content so platforms can apply their content-moderation policies.  For example, the FBI routinely shares information with platforms about accounts that appear to be used by covert foreign malign actors to influence the American public or by foreign terrorist organizations to recruit supporters.  C.A.  ROA 23,859-23,860, 23,866.  And during the acute phase of the pandemic, the CDC alerted platforms to "COVID-19 misinformation narratives that CDC has identified" as "prevalent" online.  Id. at 23,097.

Senior government officials likewise have spoken publicly about the harms that can arise from the rapid spread of falsehoods through social media.  In May 2021, for example, the White House

---

Comm. on Oversight & Gov't Reform, 114th Cong., 1st Sess. (2015); Protecting Our Children Online:  Hearing Before the S. Comm. on the Judiciary, 118th Cong., 1st Sess. (2023); Disinformation Nation: Social Media's Role in Promoting Extremism & Misinformation:  Virtual Joint Hearing Before the Subcomm. on Consumer Prot. & Commerce of the H. Comm. on Energy & Commerce, 117th Cong., 1st Sess. (2021).

Press Secretary expressed the President's view that social-media platforms have a "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."  The White House, Press Briefing (May 5, 2021), https://perma.cc/4ZGE-N9QL.  But she also emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address  * * *  disinformation" and "misinformation."  Ibid.

2.  Respondents' operative complaint names 67 federal entities and officials and characterizes their communications with and about social-media platforms as a "sprawling federal 'Censorship Enterprise.'"  C.A. ROA 25,119.  After allowing extensive discovery, the district court granted respondents' motion for a preliminary injunction.  App., infra, 1a-155a.

The district court concluded that seven groups of government defendants "coerced" or "significantly encouraged" social-media platforms to moderate speech on the companies' platforms, in violation of the First Amendment.  App., infra, 95a-116a.  The court enjoined those defendants, as well as hundreds of thousands of unnamed employees of the defendant agencies, from engaging in ten types of communications regarding content moderation, such as "communication of any kind with social-media companies urging, encouraging, pressuring, or inducing" the "removal, deletion, suppression, or reduction of content"; "urging" those companies "to

change their guidelines for removing" content; and "flagging content or posts" for potential removal. Id. at 159a-160a. The injunction also contained a series of carveouts that purported to permit the government to inform social-media companies of postings involving "criminal activity," "national security threats," and certain other categories of content. Id. at 160a-161a.

3. The government appealed and sought a stay pending appeal. The Fifth Circuit granted an administrative stay and expedited the appeal. App., infra, 177a-178a. After briefing and argument, the court vacated the preliminary injunction in part and modified the terms of what it left in place. Id. at 179a-252a.

a. The Fifth Circuit found that individual respondents have Article III standing on the theory that the platforms' past moderation of their posts and accounts caused respondents "ongoing harm" because they now "self-censor" their social-media activity. App., infra, 196a-197a. The court also found "a substantial risk" that the individual respondents' injuries "will reoccur" because platforms "continue[] to enforce a robust general misinformation policy" and the government "continue[s] to be in regular contact with" the platforms. Id. at 197a-198a. The court found that respondent States have standing, reasoning that the past removal of content posted by a state legislator, a state agency, and a county implicated the States' "'right' to speak," id. at 203a (citation omitted), and that the States have a right "to listen to their citizens" on social media, id. at 204a.

10

b.   On the merits, the Fifth Circuit held that the private platforms' decisions to moderate content constituted "state action" subject to the First Amendment.  App., <u>infra</u>, 206a-240a. The court explained that state action exists "when a private party is coerced or significantly encouraged by the government to such a degree that its 'choice'  * * *  'must in law be deemed to be that of the'" government.  <u>Id.</u> at 206a (citation omitted).

The Fifth Circuit stated that "coercion" means "the government compelled the decision by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply."  App., <u>infra</u>, 218a.  But the court held that even absent a threat of punishment, coercion may be found by an unspecified weighting of four factors:  "(1) word choice and tone"; "(2) the recipient's perception"; "(3) the presence of authority"; and "(4) whether the speaker refers to adverse consequences."  <u>Id.</u> at 218a-219a.  The court also stated that "significant encouragement" means the government "exercise[d] active, meaningful control over the private party's decision."  <u>Id.</u> at 218a.  But the court then held that such "control" could be established by mere "entanglement in a party's independent decision-making."  <u>Ibid.</u>[2]

Applying those standards, the Fifth Circuit found that officials from the White House and the Office of the Surgeon General

---

[2]   The Fifth Circuit also stated that "significant encouragement" could be established by "direct involvement in carrying out the decision," App., <u>infra</u>, 209a, but made no finding of such involvement on the facts here.

engaged in both coercion and significant encouragement.  App.,
infra, 220a-232a.  The court asserted that White House officials
made threats to social-media companies, though it did not cite any
communication threatening any specific action.  See id. at 221a-
222a.  The court also found that its four-factor test weighed in
favor of finding coercion, especially in light of officials' "tone"
and "demeanor."  Id. at 222a.  And the court found significant
encouragement because officials "entangled themselves in the plat-
forms' decision-making processes" by engaging in frequent commu-
nications and requests for information.  Id. at 230a.

The Fifth Circuit found the FBI's communications both coer-
cive and significantly encouraging even though it acknowledged
that the FBI did not "reference adverse consequences" in allegedly
"urg[ing] the platforms to take down content."  App., infra, 232a-
233a.  The court reasoned that the FBI has "inherent authority" as
a law-enforcement agency and that platforms must have "perceived
the FBI's messages as threats" because they sometimes removed the
relevant content.  Id. at 233a-234a.

As for the CDC, the Fifth Circuit acknowledged that its "re-
quests for removal were not coercive."  App., infra, 235a.  But
the court nonetheless found that CDC officials engaged in signif-
icant encouragement because they provided advice on COVID-related
misinformation, which the court characterized as making the
platforms "dependen[t]" on the CDC in applying their content-

moderation policies.  Id. at 236a.[3]

c.   On the equities, the Fifth Circuit found that respond-
ents likely will suffer irreparable harm because federal officials
continue to communicate with social-media companies.  App., infra,
241a-242a.  The court acknowledged that an injunction could impair
the government's legitimate interest "in engaging with social-
media companies, including on issues such as misinformation and
election interference," as well as "the Executive Branch's ability
to 'persuade' the American public."  Id. at 242a.  But the court
believed it could "address[]" those "legitimate concerns" by "mod-
ifying the scope of the injunction."  Id. at 243a.  The court did
not otherwise address or weigh harms to the public interest.

d.   The court of appeals acknowledged that the district
court's original injunction was both vague and overbroad, and ac-
cordingly vacated nine of the ten prohibitions and rewrote the
remaining prohibition to read:

> Defendants, and their employees and agents, shall take no
> actions, formal or informal, directly or indirectly, to co-
> erce or significantly encourage social-media companies to re-
> move, delete, suppress, or reduce, including through altering
> their algorithms, posted social-media content containing pro-
> tected free speech.  That includes, but is not limited to,
> compelling the platforms to act, such as by intimating that
> some form of punishment will follow a failure to comply with
> any request, or supervising, directing, or otherwise mean-
> ingfully controlling the social-media companies' decision-
> making processes.

---

[3]   The Fifth Circuit found that the remaining enjoined de-
fendants did not engage in coercion or significant encouragement,
and thus reversed the injunction as to them.  App., infra, 237a-
238a, 252a.

App., infra, 249a; see id. at 243a-247a.  The court rejected the government's request to limit any relief to conduct seeking the removal or suppression of the respondents' own content, holding that broader relief was appropriate because "[t]he harms that radiate from [the challenged] conduct extend far beyond just [respondents]; it impacts every social-media user."  Id. at 250a.

4.   The court of appeals "extended the administrative stay for ten days following the date [of its decision] pending an application to" this Court.  App., infra, 252a.  Accordingly, the administrative stay will last through September 18, 2023.

**ARGUMENT**

The government respectfully requests that this Court stay the preliminary injunction, as modified by the court of appeals, pending the filing and disposition of the government's forthcoming petition for a writ of certiorari.  Such a stay is warranted if there is "(1) 'a reasonable probability' that this Court will grant certiorari, (2) 'a fair prospect' that the Court will then reverse the decision below, and (3) 'a likelihood that irreparable harm will result from the denial of a stay.'"  Maryland v. King, 567 U.S. 1301, 1302 (2012) (Roberts, C.J., in chambers) (brackets and citation omitted).  All of those requirements are met here.

**I.   THIS COURT WILL LIKELY GRANT CERTIORARI**

This Court will likely grant certiorari because the Fifth Circuit's decision adopts a novel and disruptive conception of the state-action doctrine, affirms an unprecedented injunction that

14

trenches on the separation of powers, and conflicts with the de-
cisions of other courts of appeals.

First, the Fifth Circuit held that federal officials' inter-
actions with private social-media platforms transformed a broad
swath of the platforms' content-moderation decisions into state
action subject to the First Amendment. That holding has signifi-
cant implications for officials at all levels of government, many
of whom routinely engage with or speak about social-media plat-
forms. It also has grave implications for the platforms them-
selves, which on the Fifth Circuit's logic are state actors subject
to suits for violating the First Amendment. This Court has re-
cently granted certiorari or emergency relief to address other
important questions about the application of the First Amendment
and the state-action doctrine to social-media platforms. See
Lindke v. Freed, 143 S. Ct. 1780 (No. 22-611); O'Connor-Ratcliff
v. Garnier, 143 S. Ct. 1779 (No. 22-324); NetChoice, LLC v. Paxton,
142 S. Ct. 1715 (2022) (No. 21A720). The same result is warranted
here.

Second, the Fifth Circuit relied on its novel view of the
state-action doctrine to affirm an injunction that raises serious
separation-of-powers concerns by installing a single district
judge as the overseer of the Executive Branch's communications
with and about social-media companies. Under the injunction, the
Surgeon General, the White House Press Secretary, and many other
senior presidential aides risk contempt if their public statements

on matters of policy cross the ill-defined lines drawn by the Fifth Circuit. CDC officials run the same risk if they accurately answer platforms' questions about public health. And FBI agents risk being haled into court if they flag content posted by terrorists or disinformation disseminated by covert malign foreign actors. That unprecedented injunction should not be permitted to take effect without this Court's review.

Third, the Fifth Circuit's decision conflicts with the decisions of other courts of appeals. At times, the Fifth Circuit purported to align itself with its sister circuits. See, e.g., App., infra, 214a-217a. And at a high level of generality, it is uncontroversial that a nominally private decision is state action if the government "has exercised coercive power or has provided such significant encouragement * * * that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). But the Fifth Circuit cited no prior decision finding state action, or a violation of the First Amendment, on remotely comparable facts. And its novel interpretations of coercion and significant encouragement squarely conflict with decisions of other courts of appeals.

For example, the Fifth Circuit acknowledged (App., infra, 228a) that this case is "strikingly similar" to O'Handley v. Weber, 62 F.4th 1145 (9th Cir. 2023), petition for cert. filed, No. 22-1199 (June 8, 2023). There, as here, the relevant government agency regularly collaborated with the platforms, had access to a

16

"partner support portal" whereby state officials could readily bring specific content to the platforms' attention, and frequently suggested removal of false or misleading content. Id. at 1153-1154. Yet O'Handley found no state action, reasoning that the fact that platforms "allegedly removed 98 percent of the posts flagged by the [State] does not suggest that the companies ceded control over their content-moderation decisions to the State and thereby became the government's private enforcers." Id. at 1156. Instead, the court explained, "[i]t merely shows that these private and state actors were generally aligned in their missions to limit the spread of misleading election information." Id. at 1156-1157.

That reasoning is irreconcilable with the holding below. O'Handley held that "coercion" requires "threat[s] to prosecute," "threat[s] [of] adverse action," or "equivalent threat[s]," 62 F.4th at 1157, whereas the Fifth Circuit held that "tone" and authority can be sufficient, App., infra, 229a. O'Handley further held that "significant encouragement" transforms private action into state action only when the government uses "positive incentives [to] overwhelm the private party and essentially compel the party to act in a certain way." 62 F.4th at 1158. Here, in contrast, the Fifth Circuit held that mere "entanglement" is sufficient. App., infra, 235a.

The Fifth Circuit's approach also cannot be squared with other appellate decisions. The D.C. Circuit, for example, held that the Attorney General and a Department of Justice commission did not

violate the First Amendment when they sent a letter to media distributors stating that they had "received testimony alleging that your company is involved in the sale or distribution of pornography" and offering an opportunity to respond before the commission drafted "its final report section on identified distributors." Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1013 (1991) (Silberman, J.), cert. denied, 503 U.S. 950 (1992).  The D.C. Circuit explained that government officials may "vigorously criticize a publication" and that "the government's criticism or effort to embarrass the distributor" does not implicate the First Amendment so long as "the government threatens no sanction."  Id. at 1015-1016.  The Second and Tenth Circuits have reached similar holdings. See, e.g., National Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 717 (2d Cir. 2022), petition for cert. filed, No. 22-842 (Feb. 7, 2023); VDARE Found. v. Colorado Springs, 11 F.4th 1151, 1157 (10th. Cir. 2021), cert. denied, 142 S. Ct. 1208 (2022); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 68-72 (2d Cir. 1999).

## II.  THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

If this Court grants certiorari, it will likely vacate the injunction because respondents lack Article III standing, their First Amendment claims lack merit, and the injunction is overbroad.

### A.  Respondents Lack Article III Standing

Federal courts are limited to resolving only "Cases" or "Controversies."  U.S. Const. Art. III, § 2.  "The doctrine of standing implements this requirement by insisting that a litigant 'prove

18

that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'"   Carney v. Adams, 141 S. Ct. 493, 498 (2020) (citation omitted).  Respondents cannot satisfy those requirements.

1.  As the Fifth Circuit recognized (App., infra, 194a-195a), the individual respondents largely assert injury based on platforms' past moderation of respondents' social-media activity. Those incidents cannot support standing for at least two reasons.

First, most of those incidents are not traceable to the government because they occurred in 2020 or early 2021, before much of the challenged conduct occurred.  For example, respondents have focused on the "Great Barrington Declaration," App., infra, 195a, which was published in October 2020 and subject to content moderation beginning that same month.  C.A. ROA 1191.  The Fifth Circuit acknowledged that chronological problem, noting that the platforms adopted COVID-related "content-moderation policies in early 2020" without government involvement.  App., infra, 199a.  The court nonetheless held that respondents had shown that subsequent moderation decisions can be "traced to government-coerced enforcement of those policies."  Id. at 200a.  But the court relied solely on the district court's finding that the government's challenged actions affected the platforms' content-moderation activities as a general matter; the Fifth Circuit did not even purport to find that the government caused any platform to take action with respect

to any content posted by respondents that the platform would not otherwise have taken.

Second, even if respondents' past injuries were traceable to the government's actions, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"; a plaintiff must instead show a "real and immediate threat of repeated injury." O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974); see Los Angeles v. Lyons, 461 U.S. 95, 101-108 (1983).  Respondents were thus required to show that they face an immediate threat of content-moderation actions that the platforms would not take but for the government's challenged conduct.

The Fifth Circuit sought to avoid that requirement by holding that "prior censorship  * * *  has caused [respondents] to self-censor" today.  App., infra, 196a-197a.  But "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013).  The Fifth Circuit also stated that respondents' injuries "will reoccur," but that conclusion was based solely on the court's findings that (1) the platforms "continue[] to enforce a robust general misinformation policy," and (2) the government "continue[s] to be in regular contact with social-media platforms." App., infra, 197a-198a.  As the court recognized, the platforms' policies are not attributable to the government.  Id. at 199a. And neither the Fifth Circuit nor respondents even attempted to

connect the government's "regular contact" with any content that
respondents have posted or wish to post.  Respondents thus failed
to establish any "real and immediate threat of repeated injury"
that is fairly traceable to governmental action.  O'Shea, 414 U.S.
at 496.  Or, viewed another way, an injunction against the gov-
ernment will not redress any future injuries to respondents re-
sulting from the platforms' content moderation.

     2.   As for the state respondents, the Fifth Circuit relied
on a handful of past incidents involving the moderation of content
posted by state officials or entities, as well as on an injury to
the States' purported right "to listen to their citizens" on social
media.  App., infra, 204a.  Neither theory has merit.

     The first suffers from the same flaw as the individual re-
spondents' theory:  A handful of years-old injuries cannot confer
standing to seek sweeping forward-looking relief, given that the
States have not identified any "real and immediate threat of re-
peated injury."  O'Shea, 414 U.S. at 496.  Moreover, the Fifth
Circuit did not identify any evidence tying those past episodes to
any federal action or otherwise establishing that any injury was
fairly traceable to the federal government.

     The second theory -- based on the States' "right to listen"
to its residents on social media -- is equally meritless.  This
Court has sometimes "referred to a First Amendment right to 're-
ceive information and ideas.'"  Kleindienst v. Mandel, 408 U.S.
753, 762 (1972) (citation omitted).  But it has relied on that

right to authorize suits only by intended recipients with some connection to the speaker. See, e.g., Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-757 (1976) (prohibition on advertising the price of prescription drugs challenged by consumers); Mandel, 408 U.S. at 762 (plaintiff professors planned to "hear, speak, and debate with [the invited speaker] in person" at a university conference). Respondents have established no such relationship here, and the Fifth Circuit's theory, if accepted, would confer standing on any government official who expresses a desire to receive a constituent's speech. That is exactly the sort of "boundless theory of standing" that this Court has consistently rejected. Already, LLC v. Nike, Inc., 568 U.S. 85, 99 (2013).

## B. Respondents' First Amendment Claims Lack Merit

It is undisputed that the content-moderation decisions at issue in this case were made by private social-media companies, such as Facebook and YouTube. It likewise is undisputed that the First Amendment "can be violated only by conduct that may be fairly characterized as 'state action.'" Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982); see Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019). The critical premise of the Fifth Circuit's decision was thus that the government coerced or significantly encouraged the platforms' content-moderation decisions and thereby transformed those decisions into state action subject to the First Amendment. App., infra, 207a-219a, 239a.

22

The implications of that holding are startling.  If the platforms were state actors when they moderated respondents' content, respondents could have secured, on First Amendment grounds, injunctions compelling the platforms to restore content that they had chosen to delete.  Cf. Adickes v. S.H. Kress & Co., 398 U.S. 144, 171 (1970) (allowing claims against private party under 42 U.S.C. 1983 where the State "compelled" and "commanded" the private action).  This Court recently warned against state-action theories that would "eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms" by subjecting those choices "to the constraints of the First Amendment."  Halleck, 139 S. Ct. at 1932-1933.  And the Court has emphasized that "[c]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power."  Lugar, 457 U.S. at 936.  The Fifth Circuit's decision exceeds those limits by applying federal constitutional constraints to the decisions of private social-media companies regarding the content appearing on their own platforms.

As explained below, under a proper application of this Court's precedents, the content-moderation decisions at issue here are not state action.  The actions of a private party may "be fairly attributable to the [government]," Lugar, 457 U.S. at 937, when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert," over the pri-

23

vate decision "that the choice must in law be deemed to be that of the [government]," Blum, 457 U.S. at 1004. But neither coercion nor significant encouragement is present here. And respondents' First Amendment claims suffer from additional defects, including that the state respondents do not have First Amendment rights.

> **1. The Fifth Circuit erred in finding state action based on coercion**

a. This Court has explained that unconstitutional coercion with respect to speech requires, at a minimum, an actual "threat of invoking legal sanctions [or] other means of coercion, persuasion, and intimidation." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient." Blum, 457 U.S. at 1004. Generalized pressure likewise is insufficient; the government must compel "the specific conduct of which the plaintiff complains." Ibid. (emphasis added).

In Bantam Books, for example, the Court found coercion when a state agency identified certain publications as "objectionable" in notices to distributors; asked for their "'cooperation in removing the listed and other objectionable publications'"; emphasized the agency's "duty to recommend to the Attorney General prosecution of purveyors of obscenity"; assured distributors that "'[c]ooperative action will eliminate the necessity of our recommending prosecution'"; and followed up by having a police officer visit to assess compliance. 372 U.S. at 62-63 & n.5 (citation

24

omitted).

In Blum, by contrast, the Court found no state action when private nursing homes transferred certain Medicaid patients to facilities offering lower levels of care, even though the "nursing homes in [the State were] extensively regulated," 457 U.S. at 1004; those regulations placed pressure (backed by "a range of penal-ties") on nursing homes to discharge or transfer patients, see id. at 1009; and the State was obliged to review and "approve or disapprove continued payment of Medicaid benefits" following a transfer, id. at 1010.  Notwithstanding those general pressures, the Court explained that the nursing homes' specific "decision[s] to discharge or transfer particular patients" were not state action because they "ultimately turn[ed] on medical judgments made by private parties," id. at 1008.

b.  As applied here, the lessons of this Court's state-action precedents are clear:  In order for a platform's content-moderation decision to be deemed state action, the government must have compelled that "specific conduct," Blum, 457 U.S. at 1004 -- not simply sought to influence the platform's content-moderation activities in general.  And even when "government officials" spe-cifically "request that a private intermediary not carry a third party's speech," they do not violate the First Amendment "so long as the officials do not threaten adverse consequences if the in-termediary refuses to comply."  O'Handley, 62 F.4th at 1158.

The Fifth Circuit entirely failed to heed the first of those

lessons:  It conducted a wide-ranging audit of federal officials'
dealings with social-media platforms, but did not even purport to
conclude that those officials had coerced any of the specific
content-moderation decisions (including the adoption of any spe-
cific moderation policy) that injured respondents.  And the court
compounded that error by adopting a novel and unjustified inter-
pretation of the type of "coercion" that can justify a finding of
state action.  The court at times appeared to recognize that co-
ercion requires the government to at least "intimat[e] that some
form of punishment will follow a failure to comply."  App., <u>infra</u>,
218a.  Yet the court went on to adopt and apply a far looser
understanding that could be met even absent such threats.

The Fifth Circuit's treatment of the FBI makes that error
especially plain.  The court stated that the FBI "regularly met
with the platforms," "frequently alerted the social media compa-
nies to misinformation," and "urged the platforms to take down
content."  App., <u>infra</u>, 232a.  The court acknowledged that the
FBI's communications were not "threatening in tone or manner" and
did not "reference adverse consequences."  <u>Id.</u> at 232a-233a.  But
the court nonetheless held that the FBI engaged in impermissible
coercion -- converting the platforms' independent decisions into
state action -- simply because the FBI is a law-enforcement agency
with some unspecified "authority over the platforms" and because
the platforms sometimes complied with its requests.  <u>Id.</u> at 233a.
That reasoning would mean that the FBI -- and any other law-

26

enforcement agency -- could never ask <u>anyone</u> for <u>anything</u> without transforming the recipient of the request into a state actor.

The Fifth Circuit's conclusion that the White House's actions were coercive was equally flawed. The court cited White House "requests" to "remove posts 'ASAP' and accounts 'immediately,' and to 'slow down' or 'demote' content" in what the court viewed as a "persistent and angry" tone. App., <u>infra</u>, 221a (brackets omitted). Missing is any intimation that any sanction would follow a failure to act on those requests. The same is true of every one of the quoted follow-up communications. See <u>ibid.</u>

The Fifth Circuit believed that White House "[o]fficials threw out the prospect of legal reforms and enforcement actions" and made "promises of legal regime changes, enforcement actions, and other unspoken threats." App., <u>infra</u>, 221a-222a. The only statement cited in support of that assertion contains no such threats. See <u>id.</u> at 221a (referencing "low-bar things you guys can do to make people like me * * * think you're taking action") (brackets omitted). The court instead appeared to be referencing an April 25, 2022, press conference at which the Press Secretary, asked to comment on the sale of Twitter, responded that "[n]o matter who owns or runs Twitter, the President has long been con-cerned about the power of large social media platforms," "has long argued that tech platforms must be held accountable for the harms they cause," and "has been a strong supporter of fundamental re-forms to achieve that goal, including reforms to Section 230,

27

enacting antitrust reforms, requiring more transparency, and more." C.A. ROA 784-785; see App., _infra_, 188a-189a. Those statements cannot plausibly be characterized as a threat of adverse action tied to specific acts of content moderation. And the fact that those off-the-cuff, general statements were the Fifth Circuit's _strongest_ evidence of coercive threats only underscores that this case is nothing like _Bantam Books_.

What is more, the record shows that platforms routinely declined to remove content flagged by federal officials, yet neither respondents nor the Fifth Circuit suggested that any federal official imposed any sanction in retaliation for platforms' refusal to act as the government requested. See, _e.g._, C.A. ROA 23,234-23,235, 23,240-23,243, 23,245-23,256 (emails declining to remove flagged content). Indeed, the district court cited testimony that the platforms rejected _half_ of the FBI's suggestions. _Id._ at 26,561; see App., _infra_, 107a, 191a. And Twitter entirely ceased enforcement of its COVID-19 misinformation policy in November 2022, yet suffered no retaliation. C.A. ROA 22,536.

Rather than any pattern of coercive threats backed by sanctions, the record reflects a back-and-forth in which the government and platforms often shared goals and worked together, sometimes disagreed, and occasionally became frustrated with one another, as all parties articulated and pursued their own goals and interests during an unprecedented pandemic. Senior government officials -- including the President, the White House Press Secretary, and the

Surgeon General -- believed that the platforms were enabling the spread of misinformation that was causing preventable deaths. App., _infra_, 186a-187a.  They said so publicly, and in strong terms.  _Ibid._  And government officials sought to understand the platforms' efforts to fight misinformation and flag content that violated the platforms' own policies.  _Id._ at 182a-184a.  The platforms, in turn, sought to address officials' concerns and may well have been motivated by a desire to avoid public criticism. _Id._ at 184a-185a.  But that sort of successful use of the bully pulpit has never been regarded as violating the First Amendment or transforming private action into state action.  As Judge Silberman observed, "[w]e know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content."  _Penthouse_, 939 F.2d at 1016 (brackets and citation omitted).

c.   Lacking evidence of any threatened adverse action, the Fifth Circuit found coercion by applying a four-factor test developed by other circuits.  App., _infra_, 222a.  Whatever the value of those factors as a tool for identifying coercive threats, the Fifth Circuit badly erred by loosely applying those factors to find state action where no such threats occurred.

The Fifth Circuit first relied on the "tone" or "demeanor" of some of the White House statements.  App., _infra_, 222a.  But the strong language used to criticize the platforms and request action does not make those statements coercive.  The government is enti-

29

tled to forcefully "advocate and defend its own policies." Board of Regents v. Southworth, 529 U.S. 217, 229 (2000).  And government officials are entitled to express their views -- including their view that certain speech is false or harmful -- in strong terms. See Penthouse, 939 F.2d at 1015; see also, e.g., Presidential Proclamation No. 7725, Protection From Pornography Week, 2003, 68 Fed. Reg. 61,603, 61,603 (Oct. 28, 2003) ("Pornography can have debilitating effects on communities, marriages, families, and children.").

The Fifth Circuit next relied on the platforms' "perception" of the relevant government statements. App., infra, 222a.  But as the court elsewhere acknowledged, the coercion inquiry is an objective one that depends on whether a "reasonable person" would construe the government's conduct as a threat. Id. at 249a.  And even considering the platforms' perceptions, the court erred in finding coercion merely because "the platforms were influenced by the officials' demands." Id. at 224a.  Influence is also the natural result of successful persuasion, so the fact that the platforms often "complied with" the government's "removal requests" is "immaterial." O'Handley, 62 F.4th at 1159.  And the fact that the platforms frequently rebuffed the government, see p. 27, supra, further undermines any suggestion that the government was engaged in coercion rather than persuasion.

The Fifth Circuit's third factor was "the presence of authority." App., infra, 222a.  Such authority may be relevant when

there is an actual threat; if the speaker lacks authority to impose any adverse consequences, the threat cannot be coercive.  But "[a]gencies are permitted to communicate in a non-threatening manner with the entities they oversee without creating a constitutional violation."  O'Handley, 62 F.4th at 1163.

Finally, the Fifth Circuit's fourth factor -- "whether the speaker refers to adverse consequences," App., infra, 222a -- is at best a watered-down version of the correct inquiry:  whether the speaker actually threatened adverse consequences for noncompliance, either implicitly or explicitly.  And here the Fifth Circuit failed to identify any instance of such a threat.

### 2.  The Fifth Circuit erred in finding state action based on significant encouragement

The Fifth Circuit correctly recited (App., infra, 206a) this Court's statement in Blum that state action may exist when the government "has provided such significant encouragement" for a private decision "that the choice must in law be deemed to be that of the [government]," 457 U.S. at 1004.  But this Court did not make "significant encouragement" a lesser, far-easier-to-satisfy alternative to coercion.  Instead, it merely recognized that offers of positive incentives ("significant encouragement"), like threats of negative consequences ("coercive power"), may overwhelm a private party's independent judgment.  Ibid.; see O'Handley, 62 F.4th at 1157-1158.  As the Ninth Circuit recognized, therefore, "significant encouragement" does not exist merely because the govern-

ment urges a private party to act in a particular way -- even
repeatedly or in strong terms.  Instead, the sort of "significant
encouragement" sufficient to transform private conduct into state
action occurs only through "the State's use of positive incentives
to overwhelm the private party and essentially compel the party to
act in a certain way."  O'Handley, 62 F.4th at 1158.

     The Fifth Circuit did not find that anything like that oc-
curred here.  Instead, the court adopted a far broader definition
of state action, holding that "significant encouragement" can be
established merely by a government official's "entanglement in a
party's independent decision-making."  App., infra, 209a.  That
was error.

     As a threshold matter, the Fifth Circuit explained that its
conception of "entanglement" requires a much lower "level of in-
tegration" than required by this Court's "joint action test" for
state action.  App., infra, 209a n.11; cf. Lugar, 457 U.S. at 941.
At the same time, the Fifth Circuit did not identify any other
elements required to satisfy its conception of the "significant
encouragement" test.  If accepted, therefore, the court's formu-
lation would render the joint-action test entirely superfluous
because the watered-down "significant encouragement" test would
always be satisfied first.

     The Fifth Circuit's novel "entanglement" standard is also
vastly overbroad.  This case illustrates the point.  The court
found significant encouragement by the FBI based solely on the

32

court's view that the platforms accepted an FBI recommendation to change their terms of service "to capture 'hack-and-leak' content." App., <u>infra</u>, 234a; see <u>id.</u> at 191a. The Fifth Circuit's opinion thus threatens to transform any private entity that accepts a government recommendation into a state actor.

Similarly, the Fifth Circuit held that "the CDC was entangled in the platforms' decision-making processes" because "the platforms asked CDC officials to decide whether certain claims were misinformation," which led to a closer working relationship in which "the platforms came to <u>heavily rely</u> on the CDC" to provide public health information that informed the platforms' content-moderation decisions. App., <u>infra</u>, 235a-236a (brackets omitted). The Fifth Circuit cited no precedent for its conclusion that if private companies <u>choose</u> to follow advice from the government (including advice they solicited), the companies thereby become state actors. To the contrary, this Court has emphasized that "[a]ction taken by private entities with the mere approval or acquiescence of the [government] is not state action." <u>American Mfrs. Mut. Ins. Co.</u> v. <u>Sullivan</u>, 526 U.S. 40, 52 (1999).

Finally, the Fifth Circuit's finding of state action was misplaced even under its watered-down "entanglement" standard because the court did not find that the government had any involvement in "the <u>specific</u> conduct of which the plaintiff complains." <u>Blum</u>, 457 U.S. at 1004 (emphasis added). The court concluded that the relevant officials were entangled in the platforms' content-

moderation decisions in general, but it cited no evidence that the government had any role in any specific decision to moderate content posted by respondents.  Cf. App., _infra_, 230a-232a (White House and Surgeon General's office); _id._ at 234a (FBI); _id._ at 235a-236a (CDC).

### 3.   Respondents' First Amendment claims fail for additional reasons

From its erroneous premise that the private platforms' content-moderation decisions were "state actions," the Fifth Circuit concluded that the government "likely violated the First Amendment."  App., _infra_, 239a.  But a finding of state action means only that the action is subject to constitutional scrutiny -- not that there automatically was a constitutional violation.  Even if the platforms' content-moderation activities were deemed state action, therefore, respondents would also have to establish the elements of a substantive First Amendment claim.

Of course, if the government had actually coerced the platforms to suppress speech, that coercion would plainly violate the platforms' First Amendment rights.  Cf. _Miami Herald Publ'g Co._ v. _Tornillo_, 418 U.S. 241, 258 (1974).  But a conclusion that the platforms were state actors would not necessarily mean that the platforms' content-moderation decisions violated _respondents_' First Amendment rights; instead, that is a substantive question of First Amendment law and the answer could depend on the nature of the platform and the details of the particular decision.  Cf.

34

<u>Minnesota Voters Alliance</u> v. <u>Mansky</u>, 138 S. Ct. 1876, 1885-1886 (2018) (describing state actors' authority to limit speech depending on the type of forum).  The Fifth Circuit failed to analyze that question because it incorrectly assumed that a finding of state action alone established a First Amendment violation.

Finally, whatever the merits of the individual respondents' underlying First Amendment claims, the state respondents' claims fail for an additional, independent reason:  The States lack First Amendment rights.  "The Free Speech Clause of the First Amendment constrains governmental actors and protects private actors."  <u>Halleck</u>, 139 S. Ct. at 1926.  The States thus have no basis for asserting a First Amendment claim.  Cf. <u>United States</u> v. <u>American Library Ass'n</u>, 539 U.S. 194, 210-211 (2003) (plurality opinion) (noting this issue without resolving it).

**C.    The Injunction Is Overbroad**

Even if respondents had standing and some likelihood of success on the merits, the injunction entered by the lower courts is vastly overbroad.  Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  <u>Gill</u> v. <u>Whitford</u>, 138 S. Ct. 1916, 1933-1934 (2018).  Principles of equity reinforce that constitutional limit:  Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  <u>Califano</u> v. <u>Yamasaki</u>, 442 U.S. 682,

702 (1979); see United States v. Texas, 143 S. Ct. 1964, 1985-1986 (2023) (Gorsuch, J., concurring in the judgment).  Here, that means that any injunctive relief must be limited to government actions targeting respondents' social-media accounts and posts.

The injunction here flouts those principles.  It covers thousands of federal officers and employees, and it applies to communications with and about all social-media platforms (not just those used by respondents, see App., infra, 158a n.2) regarding content moderation with respect to all posts by any person (not just respondents) on all topics (including national security and criminal matters, which even the district court recognized were improper to include, see id. at 160a-161a).

The Fifth Circuit attempted to justify that sweeping relief on the ground that an injunction may incidentally benefit nonparties "if such breadth is necessary to give prevailing parties the relief to which they are entitled."  App., infra, 249a-250a (citation omitted).  But the court did not find -- and could not plausibly have found -- that the breadth of its injunction was needed to provide full relief to respondents.  Instead, the court reasoned that "[t]he harms that radiate from [the government's alleged] conduct extend far beyond just [respondents]" and affect "every social-media user."  Id. at 250a.  That is a non sequitur.  Whether a defendant's conduct also might have harmed other nonparties has no bearing on whether party-specific relief will fully redress the plaintiffs' injuries.

At a minimum, therefore, this Court should stay the injunction to the extent it extends beyond government action specifically targeting content posted by the individual respondents.  An injunction so limited would largely or entirely eliminate any harm that respondents might face without burdening a vast universe of government actions lacking any connection to respondents.

## III. THE EQUITIES OVERWHELMINGLY FAVOR A STAY

The government and public would suffer irreparable harm if the preliminary injunction took effect.  Respondents, in contrast, would suffer no cognizable injury -- much less irreparable harm -- if the current stay were extended.

### A.  The Injunction Would Irreparably Harm The Government And Undermine The Public Interest

If not stayed, the injunction would impose grave harms on the government and the public.  See Nken v. Holder, 556 U.S. 418, 435 (2009) (harms to government and public "merge").  One of the central duties and prerogatives of the President and the senior officials who serve as his proxies is to speak to the public on matters of public concern, and they must have the latitude to do so forcefully at times.  But the injunction subjects many such communications to a risk of contempt.

Consider, for example, a statement from the White House podium that the President urges platforms not to disseminate misinformation about a recent natural disaster circulating online -- and the platforms comply.  Cf. App., infra, 187a, 222a, 227a.  Or

37

suppose the Press Secretary says that the President condemns the role that social media has played in harming teenagers' mental health, calls on platforms to exercise greater responsibility, and mentions the possibility of legislative reforms. Cf. id. at 188a-189a. Those statements might be viewed as coercion or significant encouragement under the Fifth Circuit's novel understanding of those concepts. Even the potential for the injunction to be construed to limit the communication of the Administration's views on issues of public consequence could chill such communications. That "intrusion by a federal court into the workings of a coordinate branch of government" irreparably harms the Executive Branch and raises serious separation-of-powers concerns. INS v. Legalization Assistance Project, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

The injunction's effects on the other affected entities are likewise profoundly damaging. The Fifth Circuit's reasoning suggests that the CDC would risk contempt if it answered platforms' inquiries about scientific matters to allow the platforms to make informed content-moderation decisions. Cf. App., infra, 235a-236a. And given the court's suggestion that any request from a law-enforcement agency is inherently coercive, see id. at 232a-233a, the FBI would likewise need to tread carefully in its interactions with social-media companies, potentially eschewing communications that protect national security, public safety, or the security of federal elections. For example, particularly in the

early stages of an investigation, law-enforcement officials may be uncertain whether a social-media post involves unprotected criminal activity (such as a true threat).  But the injunction leaves them guessing what quantum of certainty they must possess before they can inform social-media companies about the post, potentially leading to disastrous delays.  This Court has observed that even the "fear of being sued" can "'dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.'"  Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) (brackets and citation omitted).  The fear of being held in contempt is no less damaging.

All of those harms are aggravated by the injunction's broad, general terms.  Cf. Fed. R. Civ. P. 65(d).  The injunction relies on contestable and indeterminate legal terminology to describe its prohibitions:  The government may not "coerce or significantly encourage" platforms with respect to "protected free speech." App., infra, 248a.  The legal meaning of "coercion" and "significant encouragement" in this context is at the very heart of the parties' dispute; and what constitutes "protected free speech" has been hotly disputed since the Founding.  Yet the Fifth Circuit's decision compels government officials -- including senior White House officials and FBI agents -- to parse those concepts and tailor their speech accordingly, on pain of contempt.

39

### B.   The Injunction Is Unnecessary To Prevent Irreparable Injury To Respondents

Although First Amendment injuries may be irreparable when they occur, Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion), a plaintiff seeking a preliminary injunction still must make "a clear showing," Winter, 555 U.S. at 22, that such injuries are "imminent," Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 74 (2020) (per curiam) (Kavanaugh, J., concurring). Neither the district court nor the Fifth Circuit substantiated any finding that respondents face ongoing or imminent irreparable injury.  The Fifth Circuit found that respondents "are likely to suffer an irreparable injury" because they "sufficiently demonstrated that their First Amendment interests are either threatened or impaired."  App., infra, 241a.  But that is circular, and the court did not cite anything in the record to support the conclusion that an injunction is necessary to prevent any imminent First Amendment injury to respondents.  The court stated (id. at 242a) that "the officials' challenged conduct has not stopped," but that is not a finding that these respondents are likely to suffer imminent harm.

That is particularly true given the relatively brief duration of a further stay, if granted.  To facilitate this Court's prompt resolution of this case, the government will file a petition for a writ of certiorari by October 13, 2023 -- nearly two months early, and in time to allow the Court to hear the case this Term

in the ordinary course.  And to the extent the Court wishes to further expedite matters, it could construe this application as a petition for a writ of certiorari, grant the petition and a stay, and set the case for argument.  See, e.g., Harrington v. Purdue Pharma, L.P., No. 23A87 (Aug. 10, 2023) (No. 23-124).  If the court takes that course, the government respectfully suggests the following questions presented:  (1) Whether respondents have Article III standing;  (2) Whether the government's challenged conduct transformed private social-media companies' content-moderation decisions into state action and violated respondents' First Amendment rights; and (3) Whether the terms and breadth of the preliminary injunction are proper.

**CONCLUSION**

This Court should stay the preliminary injunction pending the disposition of the government's petition for a writ of certiorari. At a minimum, the Court should stay the injunction to the extent it extends beyond actions specifically targeting content posted by individual respondents.

Respectfully submitted.

ELIZABETH B. PRELOGAR
Solicitor General

SEPTEMBER 2023