No. 23A243

# In the Supreme Court of the United States

VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
*Applicants*,

v.

STATE OF MISSOURI, ET AL., *Respondents*.

On Application for Stay of the Injunction Issued by the
United States District Court for the Western District of Louisiana

## RESPONSE TO APPLICATION FOR STAY OF INJUNCTION

JEFFREY M. LANDRY
*Attorney General of Louisiana*
ELIZABETH B. MURRILL
 *Solicitor General*
 *Counsel of Record*
TRACY SHORT
 *Assistant Attorney General*
D. JOHN SAUER
  *Special Ass't Attorney General*
Louisiana Dep't of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
(225) 326-6766
*Counsel for State of Louisiana*


JOHN J. VECCHIONE
JENIN YOUNES
ZHONETTE BROWN
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 918-6905
*Counsel for Respondents Dr.
Jayanta Bhattacharya, Dr.
Martin Kulldorff, Dr. Aaron
Kheriaty, and Jill Hines*

ANDREW BAILEY
*Attorney General of Missouri*
JOSHUA M. DIVINE
 *Solicitor General*
TODD A. SCOTT
 *Senior Counsel*
Office of the Attorney General
Supreme Court Building
207 W. High St.
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-8870
Fax: (573) 751-0774
*Counsel for State of Missouri*


JOHN C. BURNS
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
(314) 329-5040
*Counsel for Respondent Jim
Hoft*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS ............................................................................ 1

ARGUMENT ................................................................................................12

I.      This Court Is Unlikely To Reverse the Fifth Circuit's Injunction. ..............................13

        A.  All Plaintiffs Have Standing.................................................................13

            1.  The individual Plaintiffs have standing. ...................................13

            2.  The State Plaintiffs Have Standing. ......................................21

        B.  This Court Is Likely to Affirm if Certiorari Is Granted ......................................23

            1.  The lower courts correctly found unconstitutional coercion...........................23

            2.  The lower courts correctly found significant encouragement........................31

            3.  The Government's other arguments lack merit................................34

II.     The Injunction Is Not Overbroad.................................................................35

III.    The Equities Overwhelmingly Favor the Injunction. ...................................37

IV.     If the Court Grants the Government's Alternative Request To Grant Certiorari
        Now, It Should Add Respondents' Questions Presented.............................................40

CONCLUSION .............................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                            Page(s)

*Adickes v. S. H. Kress & Co.*,
  398 U.S. 144 (1970) ...................................................................................................31, 32

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985) ........................................................................................................ 2

*Application of Dow Jones & Co.*,
  842 F.2d 603 (2d Cir. 1988) ...........................................................................................15

*Backpage.com, LLC v. Dart* ,
  807 F.3d 229 (7th Cir. 2015) ...........................................................................26, 27, 28, 30

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ...........................................................................................28, 30, 32, 35

*Bland v. Roberts*,
  730 F.3d 368 (4th Cir. 2013) ........................................................................................... 5

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ...........................................................................................23, 38, 39

*Brnovich v. CDC*,
  2022 WL 1276141 (W.D. La. Apr. 27, 2022) ....................................................................36

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................................20

*Conkright v. Frommert*,
  556 U.S. 1401 (2009) .............................................................................................12, 13, 23

*Council for Periodical Distribs. Ass'n v. Evans*,
  642 F.Supp. 552 (M.D. Ala. 1986) ..................................................................................21

*Dombroski v. Pfister*,
  380 U.S. 479 (1965) ...................................................................................................32, 35

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................................................38

*Frazier v. Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir. 1985) .........................................................................................32

*Gallagher v. Neil Young Freedom Concert*,
  49 F.3d 1442 (10th Cir. 1995) .........................................................................................32

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ....................................................................................................35

*Graves v. Barnes,*
    405 U.S. 1201 (1972) ........................................................................12

*Kennedy v. Warren,*
    66 F.4th 1199 (9th Cir. 2023) .....................................................28, 29

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ........................................................................35

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................................20

*Louisiana v. Becerra,*
    577 F.Supp.3d 483 (W.D. La. 2022) ..............................................36

*Matal v. Tam,*
    582 U.S. 218 (2017) ........................................................................38

*McAllister v. United States,*
    348 U.S. 19 (1954) .......................................................................... 2

*N.J. Bankers Ass'n v. Att'y Gen.,*
    49 F.4th 849 (3d Cir. 2022) ............................................................35

*Norwood v. Harrison,*
    413 U.S. 455 (1973) ........................................................................28

*O'Handley v. Weber,*
    62 F.4th 1145 (9th Cir. 2023) .........................................................28

*Okwedy v. Molinari,*
    333 F.3d 339 (2d Cir. 2003) .....................................................27, 28

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ...............................................................1, 14, 37

*Penn. Family Inst. v. Black,*
    489 F.3d 156 (3d Cir. 2007) ...........................................................15

*Penthouse Int'l, Ltd. v. Meese,*
    939 F.2d 1011 (D.C. Cir. 1991) .....................................................28

*Rawson v. Recovery Innovations, Inc.,*
    975 F.3d 742 (9th Cir. 2020) .....................................................32, 33

*Robinson v. Hunt County,*
    921 F.3d 440 (5th Cir. 2019) .......................................................... 5

*Rumsfeld v. Foundation for Acad. & Institutional Rights,*
    547 U.S. 47 (2006) .....................................................................13, 14

*Skinner v. Ry. Lab. Executives' Ass'n*,
  489 U.S. 602 (1989) .................................................................................31

*Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard College*,
  143 S. Ct. 2141 (2023) .............................................................................32

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .................................................................................21

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949) ...............................................................................22, 35

*United States v. Alvarez*,
  567 U.S. 709 (2012) .................................................................................37

*Utah v. United States*,
  420 U.S. 304 (1975) .................................................................................36

*VDARE Foundation v. City of Colorado Springs*,
  11 F.4th 1151 (10th Cir. 2021) ...............................................................28

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ...........................................................................15, 16

*Warth v. Seldin*,
  422 U.S. 490 (1975) .................................................................................35

*X-Men Security, Inc. v. Pataki*,
  196 F.3d 56 (2d Cir. 1999) ......................................................................28

*Zieper v. Metzinger*,
  392 F. Supp. 2d 516 (S.D.N.Y. 2005) .....................................................31

iv

## INTRODUCTION

Senior Executive Branch officials—including senior White House officials—threaten, pressure, and coerce social-media platforms to silence the core political speech of millions of Americans.  They pressure the companies to censor disfavored viewpoints, and they also force the companies to rewrite their policies to ensure that future speech disfavored by the government will also be suppressed.  In doing so, they impose a nationwide, *de facto* prior restraint against expressing disfavored viewpoints on some of the greatest debates of our time.  Federal interference fundamentally transforms online discourse, rendering entire viewpoints virtually unspeakable on social media.  Social-media platforms once provided "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham* v. *North Carolina*, 582 U.S. 98, 107 (2017).  Under pressure of federal censorship, that is no longer true—a situation that is intolerable to the First Amendment.

The lower courts unanimously found egregious, systematic First Amendment violations.  The Fifth Circuit held that this Court "has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life."  Pet. Appx. 239a.[1]  The district court described Petitioners' conduct as "arguably … the most massive attack against free speech in United States' history."  Pet. Appx. 2a.  These conclusions rest on the district court's extensive, specific findings of fact, based on overwhelming evidence of federal interference—none of which the Government challenges here.  The Court should let the injunction take immediate effect.

## STATEMENT OF FACTS

The district court in this case issued 82 pages of factual findings supported by 591 citations of evidence in the record.  Pet. Appx. 4a-86a.  These facts are not clearly erroneous.

---

[1] Petitioners' Appendix is cited "Pet. Appx"; Respondents' Appendix is cited "Resp. Appx."

They are supported by overwhelming evidence, including almost 20,000 pages of federal communications with social-media platforms and six full-length depositions of senior federal officials with direct knowledge of federal censorship activities.  *See* Resp. Appx. 1070a-1443a (Plaintiffs' Proposed Findings of Fact, summarizing evidence).[2]  In its stay motion, the Government does not contend that a single finding of the district court is clearly erroneous.  Stay App. 1-40.  The Fifth Circuit did not hold any of these findings to be clearly erroneous; rather, it summarized and highlighted them.  *See, e.g.,* Pet. Appx. 180a-191a.  The district court's findings are thus established as fact in this proceeding.  *Anderson* v. *City of Bessemer City*, 470 U.S. 564, 577 (1985); *McAllister* v. *United States*, 348 U.S. 19, 20–21 (1954).

As relevant here, the district court's findings and the evidence establish an extensive campaign by federal officials in the White House, the Surgeon General's Office, the CDC, and the FBI to silence disfavored viewpoints on social media.  This campaign began in 2018, dramatically accelerated in 2021, and continues to the present day.

"Government officials began publicly threatening social-media companies with adverse legislation as early as 2018."  Pet. Appx. 131a.  At that time, senior federal officials began making public threats to amend or repeal Section 230 of the Communications Decency Act and impose other consequences on social-media platforms if they did not censor disfavored speech.  Resp. Appx. 1072a-1082a (cited at Pet. Appx. 131a).  Congressional committees began hauling the CEOs of major platforms into hearings to berate and threaten them with adverse legislation if they refuse to censor disfavored content.  Resp. Appx. 1074a-

---

[2] As the district court found, this evidence likely just scratches the surface of federal censorship activities.  Pet. Appx. 123a-124a.  For example, Facebook identified forty-five federal officials who communicate with them about misinformation and censorship, and Twitter identified eighty-three.  Resp. Appx. 1435a.  Those identified include at least *twenty* White House officials—from whom Plaintiffs received discovery from only one.  *See id.* at 131a-200a (Rob Flaherty emails).  Plaintiffs have received no discovery yet from most others.

1078a, 1311a-1312a; *id.* at 316a-318a (Chan Dep. 116:20-118:2). These hearings routinely include threats of adverse legislation explicitly linked to demands to censor disfavored viewpoints. *Id.* at 1074a-1078a (quoting examples).

Federal executive officials promptly began leveraging this pressure to convince platforms to silence disfavored viewpoints and speakers on social media. In 2018, senior congressional staffers—coordinating directly with the FBI—began to conduct secret recurring meetings in Silicon Valley with the content-moderation officials of major social-media platforms to push for censorship of election-related speech. *Id.* at 315a-334a (Chan Dep. 115:18-134:5). During these meetings, the staffers showed the platforms potentially adverse legislation. *Id.* at 319a (Chan Dep. 119:4-14).

These actions by federal officials placed "intense pressure" on platforms to censor election-related speech. *Id.* at 327a (Chan Dep. 127:3-23). The platforms responded by adopting more restrictive moderation policies and engaging in thousands of "account takedowns" at the FBI's request. *Id.* at 328a-331a (Chan Dep. 128:20-131:10); *see also id.* at 1311a-1315a. The FBI began sending those platforms encrypted lists of "indicators"—*i.e.*, specific speakers, accounts, posts, and URLs—for the platforms to remove "one to five times per month." *Id.* at 296a-303a, 348a (Chan Dep. 96:17-103:9, 148:7-18). Due to "pressure," the FBI convinced platforms to become "far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles." Pet. Appx. 67a.

"Around this same time, Defendants began having extensive contact with social-media companies via emails, phone calls, and in-person meetings." *Id.* at 131a. Against the backdrop of "intense pressure" from other federal officials, the FBI began to conduct virtually endless meetings with platforms to push for greater content moderation of disfavored speech. Resp. Appx. 1287a-1292a. The FBI began hosting regular large-group meetings with the

Department of Justice, the Office of the Director of National Intelligence, the Department of Homeland Security, and seven major social-media platforms to discuss disinformation; these "USG-Industry" meetings "began in 2018 and continue to this day." Pet. Appx. 69a. The FBI also began conducting regular *bilateral* meetings with the content-moderation teams of seven major platforms to discuss censorship; these meetings continue to this day. *Id.* at 60a.

In addition, the FBI began submitting encrypted mass-censorship requests to platforms to remove as many as "hundreds" of accounts and URLs at a time—sometimes "a whole spreadsheet full of them"—"one to five times per month." *Id.* at 65a-66a; Resp. Appx. 300a-301a (Chan Dep. 100:13-101:14). The FBI routinely requested that platforms report back on actions they took in response to FBI requests. Resp. Appx. 302a-304a (Chan Dep. 102:18-104:10); Pet. Appx. 62a, 65a-66a. Before federal pressure began, the platforms removed little or no election-related speech; following the federal pressure campaign, the FBI now boasts a "50% success rate" in getting platforms to censor disfavored speech. Pet. Appx. 65a; *see also* Resp. Appx. 315a, 333a-334a (Chan Dep. 115:4-8, 133:24-134:5). But for the FBI's involvement, this speech would not be taken down. *Id.*

This censorship was initially justified as efforts to silence supposedly "foreign" disinformation, *see* Stay App. 2, but federal officials soon targeted domestic speech as well. Federal national-security officials routinely "forward[] reports of [mis]information to social-media platforms without determining whether they originated from foreign or domestic sources." Pet. Appx. 73a; Resp. Appx. 1330a. "'Domestic disinformation' was also flagged by the FBI for social-media platforms." Pet. Appx. 65a. Indeed, for much of the information it flags, "[t]he FBI made no attempt to distinguish whether those reports of election disinformation were American or foreign." *Id.* And, when it does try, the FBI's accuracy is

questionable at best.  For example, in a single incident, the FBI pushed platforms to remove "929,000 tweets [that] were political speech by American citizens." *Id.* at 66a.

Moreover, the FBI pushes platforms to remove "foreign" posts that thousands of Americans have intertwined with their own speech by liking, commenting, or reposting—such as a "Down With Hillary!" post with 763 reactions, a "Secured Borders" post that 134,943 people "liked," a pro-Second Amendment post that 96,678 people "liked," and a "Black Matters [*sic*]" post that 223,799 people "liked."  *Id.* at 64a; Resp. Appx. 639a, 642a (images of these posts).[3]  By convincing platforms to remove these "foreign" posts—all expressing core political messages—the FBI simultaneously silences the voices of thousands of ordinary Americans.  The FBI also targets ostensibly "foreign" websites on which American freelance journalists and speakers posted content.  Pet. Appx. 64a-65a; Resp. Appx. 671a, 1304a-1306a.

In addition, in 2020, the FBI orchestrated a deceptive campaign to induce platforms to censor the New York Post's October 14, 2020, story about Hunter Biden's laptop, just before the 2020 election.  *Id.* at 61a-64a, 107a-08a.  "[T]he FBI previously received Hunter Biden's laptop on December 9, 2019, and knew that the later-released story about Hunter Biden's laptop was not Russian disinformation.*"  Id.* at 63a, 107a.  Nevertheless, "[b]efore the Hunter Biden Laptop story br[oke] prior to the 2020 election on October 14, 2020, the FBI and other federal officials repeatedly warned industry participants to be alert for 'hack and dump' or 'hack and leak' operations."  *Id.* at 61a.  FBI officials repeated such warnings in the "USG-Industry" meetings and the FBI's bilateral meetings*, id.* at 62a; such warnings are featured

---

[3] By "liking" or re-posting content on social media, the user effectively adopts the message as her own and republishes it in her news feed to her followers.  *Bland* v. *Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) ("[C]licking the 'like' button literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement.").  These are acts protected by the First Amendment.  *See, e.g., id.* ("liking" a web page on Facebook is First Amendment-protected speech) *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (commenting on a Facebook page is First Amendment-protected activity).

on the agendas for such meetings, *id.* at 75a.  The FBI also pushed platforms to adopt policies for censoring "hacked materials" by repeatedly warning about hack-and-dump operations and inquiring whether such policies existed.  *Id.* at 62a.  The FBI had no investigative basis for these warnings.  Resp. Appx. 374a, 392a (Chan Depo. 174:7-13; 192:19-24).

Then, when the laptop story broke, the FBI—having deliberately misled the platforms to expect a Russian hack-and-dump attack—refused to confirm that the laptop was not a Russian hack, as they had long known: "Even after Facebook specifically asked whether the Hunter Biden laptop story was Russian disinformation, Dehmlow of the FBI refused to comment, resulting in the social-media companies' suppression of the story."  Pet. Appx. 107a. Both Mark Zuckerberg of Facebook and Yoel Roth of Twitter—in testimony shortly after the events—attributed their platforms' censorship to the FBI's influence.  *Id.* at 62a-63a.

The FBI's pervasive meeting and flagging activities with social-media platforms continue to this day.  *Id.* at 67a.  As the FBI states, "we've never stopped."  *Id.*

In early 2021, federal censorship activities escalated dramatically, expanding to include a sustained pressure campaign from the White House, the Surgeon General, and senior federal health officials, among many others.  On the Administration's third day in office, at 1:04 a.m., the White House emailed Twitter to demand the removal "ASAP" of an anti-vaccine post by Robert F. Kennedy, Jr., and asked that Twitter "keep an eye out" for similar tweets to censor.  Resp. Appx. 1083a-1084a.  Censorship requests from the White House came so rapidly—including from four staffers in one week in January 2021—that Twitter set up a special reporting channel for the White House.  Pet. Appx. 10a.

Senior White House staffers Rob Flaherty and Andrew Slavitt led a private pressure campaign to censor disfavored viewpoints on COVID-19 in a long series of emails and meetings with platforms.  Resp. Appx. 131a-200a.  Flaherty demanded the removal of parody accounts and "vaccine humor posts."  Pet. Appx. 9a, 10a, 25a.  He demanded that the

platforms provide detailed reports on censorship enforcement against "'dubious,' but not 'provably false,' claims," and repeat offenders.  *Id.* at 10a.  He badgered the platforms for more information about censorship policies and practices, always demanding greater censorship.  *Id.* at 11a-12a, 14a, 15a.  He and Slavitt repeatedly asked for ever-more-detailed "reports" of how platforms were censoring information targeted by White House, expanding their demands at every turn.  *Id.* at 14a, 16a-20a.  As the Fifth Circuit noted, "one official asked at least *twelve* times for detailed information on Facebook's moderation practices and activities."  *Id.* at 223a.

When they did not get their way, White House officials resorted to accusations, profanity, intimidation, and threats.  *Id.* at 13a-14a, 97a-99a.  They repeatedly accused Facebook of fomenting the January 6 riots and implied that Facebook was responsible for killing people by failing to censor disfavored viewpoints on vaccines.  *Id.* at 10a, 15a-17a ("Not for nothing but the last time we did this dance, it ended in an insurrection.").  They also made a series of ominous, implied threats.  *Id.* at 14a ("[I]nternally, we have been considering our options on what to do about it."); *id.* at 19a (stating that concerns come from "the highest (and I mean highest) levels of the WH"); *id.* at 20a (stating, regarding a policy brief on increased regulation, "this is circulating around the building and informing thinking").

The White House emphasized censoring *truthful* information and *individual speakers* whom the White House believed were the most effective critics of the White House and its policies.  Among others, Flaherty and Slavitt demanded that platforms censor Fox News hosts Tucker Carlson and Tomi Lahren, two of the most influential cable-news critics of the Administration, *id.* 16a-18a; former New York Times reporter and vaccine skeptic Alex Berenson, whom the White House viewed as "the epicenter of disinfo that radiated outwards to the persuadable public," *id.* at 19a; and Robert F. Kennedy Jr. and the rest of the

7

"Disinformation Dozen," *id.* at 17a—who are twelve specific speakers whom the White House viewed as "responsible for 73% of vaccine misinformation" on social-media, *id.* at 21a. Under White House pressure, "Facebook reported the Tucker Carlson content had not violated Facebook's policy, but Facebook gave the video a 50% demotion for seven days and stated that it would continue to demote the video." *Id.* at 18a.

The White House repeatedly sought to suppress truthful content and core political speech—such as "vaccine-skeptical" content that did not violate Facebook's policies, *id.* at 11a; content "that does not contain actionable misinformation," *id.* at 14a, 16a-17a; and "true but shocking claims or personal anecdotes [and] discussing the choice to vaccinate in terms of personal or civil liberties," *id.* at 17a. To induce platforms to remove such content, White House officials resorted to a battery of harassing and menacing statements. *Id.* at 97a-99a.

Platforms responded to this pressure by assuring the White House that they were secretly de-boosting the viewpoints the White House opposed. *Id.* at 14a-18a, 20a-21a. This was not nearly enough for the White House. In early May 2021, Facebook politely declined the White House's demand to deplatform the "Disinformation Dozen," who had not violated their policies. *Id.* at 21a-22a. Just days later, on May 5, the White House responded with an overt, public threat from Press Secretary Jennifer Psaki, who raised the specter of a "robust anti-trust program" in direct connection to the White House's demands for censorship of disfavored viewpoints on COVID-19. She stated that the President "supports … a *robust anti-trust program*. So, his view is that *there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometime life-threatening information, is not going out to the American public*." *Id.* at 22a (emphases added). Flaherty followed with a private email the next day, again demanding more censorship and the deplatforming of the "Disinformation Dozen." *Id.* at 22a-23a.

8

"Things apparently became tense between the White House and Facebook after that, culminating in Flaherty's July 15, 2021 email to Facebook, in which Flaherty stated: 'Are you guys fucking serious? I want an answer on what happened here and I want it today.'" *Id.* at 23a. That same day, July 15, 2021, the White House launched a full-scale pressure campaign with a three-pronged public attack on platforms. First, Psaki and Surgeon General Murthy held a joint press conference to announce the Surgeon General's Health Advisory on Misinformation. At that conference, Psaki reinforced her threats of May 5 by demanding a long series of specific actions to increase censorship on platforms. *Id.* at 23a-24a (Psaki stating, "[w]e're flagging problematic posts for Facebook," and detailing four "asks," which include "tak[ing] faster action against harmful posts"); Resp. Appx. 1118a-1120a. She publicly demanded the banning of the "Disinformation Dozen" across platforms. *Id.* at 1120a. Surgeon General Murthy described health misinformation as "poison" and demanded that platforms increase censorship, in both his public statements and the Health Advisory. *Id.* at 1118a-1120a, 1150a-1158a; Pet. Appx. 33a-34a. Murthy repeatedly threatened to hold platforms "accountable" for health misinformation—a word which OSG concedes "carries with it the threat of consequences." Pet. Appx. 33a.

The next day, President Biden stated of the platforms that "[t]hey're killing people" by not censoring health misinformation. *Id.* at 24a. Psaki followed up these comments with a long series of additional demands for censorship from the platforms. Resp. Appx. 1121a-1122a. Four days later, White House Communications Director Kate Bedingfield publicly reinforced Psaki's threats, specifically threatening to amend Section 230 of the CDA and hold platforms "accountable" if they did not censor more speech. Pet. Appx. 24a.

As the district court found, "[t]he public and private pressure from the White House apparently had its intended effect. All twelve members of the 'Disinformation Dozen' were censored, and pages, groups, and accounts linked to the Disinformation Dozen were

9

removed." *Id.*  After months of resisting, on July 15 Twitter suspended Alex Berenson and banned him permanently soon thereafter.  *Id.* at 19a, 25a.  Facebook sent a pleading email asking to "get back into the White House's good graces," stated that "we are 100% on the same team," *id.*, and met with the Surgeon General "to better understand the scope of *what the White House expects of us on misinformation going forward.*"  *Id.* at 35a (emphasis added).

In a subsequent meetings and emails, Facebook acceded to virtually every demand the White House and Surgeon General made on censorship, including long-resisted demands like deplatforming the "Disinformation Dozen."  *Id.* at 35a-36a; Resp. Appx. 1162a-1169a.  Other platforms likewise provided detailed censorship reports to show compliance with White House demands.  Pet. Appx. at 36a-37a.  As the district court found, "[t]his seemingly unrelenting pressure by Defendants had the intended result of suppressing millions of protected free speech postings by American citizens."  *Id.* at 94a.

Even with the platforms cooperating, the White House pressure did not relent.  Psaki followed up with public statements reinforcing both the White House's demands for greater censorship, and its threats of adverse legal consequences if the platforms did not comply.  *Id.* at 26a.  In her public statements, Psaki "link[ed] these threats to social-media platforms' failure to censor misinformation and disinformation."  *Id.*  "At an April 25, 2022, White House press conference, … Psaki again mentioned the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation."  *Id.*  Likewise, the White House Climate Advisor "blamed social-media companies for allowing misinformation and disinformation about climate change to spread and explicitly tied these censorship demands with threats of adverse legislation regarding the Communications Decency Act."  *Id.*

10

During this time, the Surgeon General's office maintained a parallel pressure campaign against platforms to demand greater censorship. *Id.* at 28a-34a. OSG officials participated in many of the same phone calls, meetings, and emails as White House staff. "Considering their close cooperation and the ministerial ecosystem," the Fifth Circuit considered "the White House and Surgeon General's office together." *Id.* at 181a. "[O]fficials from both offices began communicating with social media companies … in early 2021." *Id.* at 3a-4a. The Surgeon General's office received most of the conciliatory communications from platforms after the July 2021 pressure campaign. *Id.* at 29a-32a. "After the meetings with social-media platforms, the platforms seemingly fell in line with the Office of Surgeon General's and White House's requests." *Id.* at 32a.

While the White House's pressure campaign was ongoing, the CDC launched its own multi-prong campaign to induce the platforms to censor COVID-related "misinformation." *Id.* at 38a-49a; Resp. Appx. 1182a-1220a. The CDC received biweekly reports of "misinformation" circulating on Facebook, Pet. Appx. 39a-40a, and held weekly meetings with Facebook and other platforms, where it requested reports about how they were censoring ostensible misinformation—as defined by the CDC. *Id.* at 40a, 41a-42a. The CDC repeatedly sent lists, slide decks, and tables of specific posts and claims that it sought to censor. *Id.* at 40a-42a, 46a-48a. It also organized "BOLO" ("Be On the Lookout") meetings with multiple platforms to flag specific posts and themes it wanted censored. *Id.* at 47a-48a. In the wake of White House pressure, "Facebook content-mediation officials would contact [the CDC] to determine whether statements made on Facebook were true or false," and "Facebook would remove and/or censor claims the CDC itself said were false." *Id.* at 43a-44a.

As a result of government pressure, platforms began treating the CDC as their *de facto* censorship office, with final authority to dictate what health-related claims Americans

11

could and could not post on their platforms. *Id.* at 43a-45a. For example, "Facebook began to rely on … the CDC to determine whether claims were true or false…. Facebook content-mediation officials would contact [the CDC] to determine whether statements made on Facebook were true or false. Because Facebook's content-moderation policy called for Facebook to remove claims that are false and can lead to harm, Facebook would remove and/or censor claims the CDC itself said were false." *Id.* at 44a-45a. In one typical exchange, Facebook's content-moderation officer emailed the CDC to report that, "as a result of our work together," Facebook updated its content-moderation policies to suppress claims criticizing COVID vaccine authorization for young children. Resp. Appx. 1202a-1203a. Thus, the CDC secretly became the final arbiter of what Americans can post on such issues as vaccine authorization for children and infants, the risk of COVID vaccine side effects, the meaning of VAERS data, and the impact of vaccines on pregnant and nursing women. Pet. Appx. 43a-45a.

As the district court found, federal pressure on platforms to censor disfavored viewpoints encompasses many topics of political debate, including "the origins of the COVID-19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the U.S. withdrawal from Afghanistan, and … U.S. support of Ukraine," as well as "gas prices, parody speech, calling the President a liar, climate change, gender, and abortion," among others. Pet Appx. 143a.

## ARGUMENT

"Stays pending appeal to this Court are granted only in extraordinary circumstances." *Graves* v. *Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in chambers). The applicant must demonstrate (1) "a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari"; (2) "a fair prospect that a majority of the Court will conclude that the decision below was erroneous"; and (3) "a likelihood that irreparable harm will result from the denial of a stay." *Conkright* v. *Frommert*, 556 U.S. 1401, 1402

(2009) (Ginsburg, J., in chambers). "[I]n a close case it may be appropriate to balance the equities, to assess the relative harms to the parties, as well as the interests of the public at large." *Id.* at 1402 (quotation omitted). The Government fails to satisfy these criteria.

**I.     This Court Is Unlikely To Reverse the Fifth Circuit's Injunction.**

Even if the Court grants certiorari here, it is highly unlikely that the Court will reverse the rulings of the Fifth Circuit challenged by the Government—especially because Defendants make no argument that the district court's findings are clearly erroneous.

**A.     All Plaintiffs Have Standing.**

 "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld* v. *Foundation for Acad. & Institutional Rights*, 547 U.S. 47, 53 (2006). Here, Plaintiffs submitted extensive, unrebutted evidence to support standing, Resp. Appx. 1a-130a (fourteen declarations establishing Plaintiffs' injuries); and the district court made extensive factual findings supporting Plaintiffs' standing, Pet. Appx. 125a, 127a-128a, 130a-134a. The Government ignores both this evidence and those findings.

**1.     The individual Plaintiffs have standing.**

Here, the individual Plaintiffs submitted evidence of multiple injuries caused by Defendants. Hines provides evidence of "past and ongoing censorship injuries," including ongoing restrictions of her accounts and groups, and "the evidence supplied in support of the preliminary injunction strongly implies, that these restrictions can be directly traced back to federal officials." *Id.* at 127a-128a. Bhattacharya's and Kulldorff's content was suppressed immediately after they were targeted by federal officials. *Id.* at 108a, 127a. Both world-renowned epidemiologists were censored on Twitter, LinkedIn, and YouTube for expressing opinions about Covid-19 mitigation measures that differed from the CDC's. The district court found that federal officials are "currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website." *Id.* at 127a. "Kheriaty

13

also affirms ongoing and anticipated future injuries, noting that the issue of 'shadow banning' his social-media posts has intensified since 2022." *Id.* "Each of the Private Plaintiffs alleges"—and provides declarations to prove—"a combination of past, ongoing, and anticipated future censorship injuries." *Id.* at 128a. Thus, Plaintiffs "provide evidence of ongoing harm and support the expectation of imminent future harm." *Id.* at 127a.

Moreover, federal censorship directly interferes with Jill Hines' ability to organize Louisianans to petition their government, which injures both Hines and Louisiana. Her grassroots organizations have been extensively censored and "are constantly at risk of being completely de-platformed." *Id.* at 128a. Federal censorship blocks Hines from being able to organize like-minded citizens to advocate their views to the government on matters of public concern. Resp. Appx. 95a-97a. Her Facebook groups "were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions." *Id.* at 97a. Censorship of Hines' efforts to petition Louisiana—on the very topics and viewpoints that federal officials pressure platforms to suppress—continues to this day. *Id*. at 119a-124a.

Further, the First Amendment protects the right to "speak and *listen*" on social media. *Packingham*, 582 U.S. at 104 (emphasis added). The individual Plaintiffs follow on social-media dozens of *other* speakers who are specifically targeted and silenced by federal officials. *See* Resp. Appx. 116a-117a (Hines identifying 86 such speakers, including Alex Berenson, Robert F. Kennedy Jr., and members of the "Disinformation Dozen"); *id*. at 104a (Bhattacharya follows Alex Berenson, Robert F. Kennedy Jr., and Tucker Carlson, among 25 such speakers); *id*. at 107a (Kulldorff, naming 10 such speakers); *id*. at 109a (Kheriaty: 24 such speakers); *id*. at 113a (Hoft: 24 such speakers). These include many speakers whom the district court specifically found federal officials silenced. *See, e.g.,* Pet. Appx. 17a (Robert F.

Kennedy Jr. and Children's Health Defense, who are part of the "Disinformation Dozen"); *id.* at 16a-18a, 129a (Tucker Carlson and Tomi Lahren); *id.* at 19a (Alex Berenson); *id.* at 24a (the "Disinformation Dozen"); *id.* at 63a-64a (the New York Post); *id.* at 84a-85a ("medical freedom" groups); *id.* at 85a-86a (several others).

The Government argues that the "right to listen" theory of standing is "meritless." Stay App. 20. Not so. Speaker and listener alike have an equal, "reciprocal" interest in freedom of speech. *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976). The First Amendment's "protection afforded is to the communication, to its source and to its recipients both." *Id.* The Court cited at least nine cases for this well-established proposition. *Id.* at 756-57. "Therefore, where one enjoys a right to speak, others hold a 'reciprocal right to receive' that speech, which 'may be asserted' in court." *Penn. Family Inst.* v. *Black*, 489 F.3d 156, 165 (3d Cir. 2007) (quoting *Va. State Bd. of Pharm.*, 425 U.S. at 756); *Application of Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir. 1988). "If there is a right to [speak], there is a reciprocal right to receive the [speech], and it may be asserted by these [respondents]." *Virginia State Board of Pharm.*, 425 U.S. at 757.

The Government argues that there must be some unspecified, additional "connection to the speaker" for the right to listen to apply. Stay App. 21. But the only "connection" required is the obvious one—that, but for government censorship, the listener would otherwise hear the speaker's message. *See Virginia State Board*, 425 U.S. at 756-57.

As both the district court and the Fifth Circuit held, these injuries are traceable and redressable. Pet. Appx. 128a-135a, 199a-202a. Again and again, Plaintiffs experience social-media censorship on the very *topics* and *viewpoints* that federal officials pressure the platforms to silence, often at the same time that federal pressure is occurring. Reviewing all the evidence, the district court found "a *clear connection* between Defendants' actions and

15

Plaintiffs injuries." *Id.* at 131a (emphasis added). "Plaintiffs' theory of but-for causation …
demonstrates a high likelihood of success as to establishing Article III traceability." *Id.* The
Fifth Circuit, likewise, held that "[t]he Individual Plaintiffs adduced extensive evidence that
social-media platforms have engaged in censorship of certain viewpoints on key issues and
that the government has engaged in a years-long pressure campaign designed to ensure that
the censorship aligned with the government's preferred viewpoints." *Id.* at 200a-201a. "The
district court did not clearly err in crediting the Individual Plaintiffs' theory that the social-
media platforms' censorship decisions were likely attributable at least in part to the
platforms' reluctance to risk the adverse legal or regulatory consequences that could result
from a refusal to adhere to the government's directives." *Id.* at 201a. "[T]he Individual
Plaintiffs presented extensive evidence of escalating threats—both public and private—by
government officials aimed at social-media companies concerning their content-moderation
decisions. The district court thus had a sound basis upon which to find a likelihood that,
faced with unrelenting pressure from the most powerful office in the world, social-media
platforms did, and would continue to, bend to the government's will." *Id.*

The Government makes two arguments against the individual Plaintiffs' standing.
First, it argues "most of those incidents" of social-media censorship "occurred in 2020 or early
2021, before much of the challenged conduct occurred." Stay App. 19. This is wrong for two
reasons. First, Plaintiffs challenge misconduct beginning in 2018 at the latest. *See supra*.
Second, the individual Plaintiffs submitted declarations identifying acts of social-media
censorship—on the very topics and viewpoints that federal officials pressured platforms to
censor—occurring through April 2023, right up until the preliminary-injunction hearing in
May 2023. Resp. Appx. 119a-130a. This latest censorship suppresses the same viewpoints
that Defendants urged platforms to silence. Censorship lasting through 2023 does not occur
"before" federal pressure campaigns that began in 2018 and escalated in early 2021.

The Government's traceability argument, moreover, does not grapple with the district court's extensive, repeated, specific findings—based on overwhelming evidence—that federal officials *caused* (and continue to cause) the very censorship of which Plaintiffs complain. *See, e.g.,* Pet. Appx. 18a (Facebook suppressing Tucker Carlson's content at White House's bidding), *id.* at 19a (Alex Berenson suspended and deplatformed due to federal pressure); *id.* at 24a ("Disinformation Dozen" deplatformed due to federal demands); *id.* at 32a ("platforms … fell in line" after meetings with federal officials); *id.* at 35a-36a (Facebook adopts a raft of new censorship policies after federal pressure); *id.* at 43a-44a ("Facebook would remove and/or censor claims that the CDC itself said were false"); *id.* at 101a ("Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied" with White House demands); *id.* at 107a ("As a result" of the FBI's conduct, "millions of U.S. citizens did not hear the [laptop] story prior to the November 3, 2020 election."); *id.* at 129a n.655 (citing several additional examples); *id.* at 129a-132a. These findings of causation are not clearly erroneous. Instead, "the instant case paints a full picture. A drastic increase in censorship, deboosting, shadow-banning, and account suspensions directly coincided with Defendants' public calls for censorship and private demands for censorship," and these directly affected Plaintiffs' speech. *Id.* at 130a-131a.

Next, the Government argues that Plaintiffs' past experience of censorship does not show any "real and immediate threat of repeated injury." Stay App. 19. This argument contradicts a mountain of evidence, the district court's specific factual findings, and the Government's own admissions at oral argument. First, Plaintiffs submitted declarations just before the district court's preliminary-injunction hearing in May 2023 attesting to ongoing censorship injuries. Resp. Appx. 119a-130a. Second, there is overwhelming evidence that Defendants' censorship pressure campaigns are continuing. For example, White House

officials continued to badger platforms on censorship throughout 2022, up until they produced documents in discovery. Pet. Appx. 26a. The White House continuously identifies new topics and viewpoints to censor—such as "climate change, gender discussions, abortion, and economic policy," *id.*, and "gas prices, parody speech, calling the President a liar, climate change, gender, and abortion," *id.* at 143a. The CDC's "regular biweekly meetings with Google" on disinformation "continue[] to the present day." *Id.* at 46a. The FBI's "USG-Industry" meetings on election-related disinformation are "continuing" and "will continue through the 2024 election cycle." *Id.* at 60a. The "bilateral meetings between FBI and [seven platforms] … are continuing" and "will increase to monthly and weekly nearer the elections." *Id.* "[T]he FBI is continuing its efforts to report disinformation to social-media companies to evaluate for suppression and/or censorship." *Id.* at 67a. The FBI says of its censorship of election-related speech: "Post-2020, we've never stopped …." *Id.*

Indeed, at oral argument before the district court, the Government stated, "*it is not the government's argument that … this … will never happen again*." May 26, 2023, Tr., at 122 (emphasis added). The district court did not err in taking the Government at its word: "[I]t is certainly not imaginary or speculative to predict that Defendants could use their power over millions of people to suppress alternative views or moderate content they do not agree with in the upcoming 2024 national election." Pet. Appx. 142a. Likewise, in the Fifth Circuit, Defendants' "attorney conceded at oral argument that they continue to be in regular contact with social-media platforms concerning content-moderation issues today." *Id.* at 198a. Thus, "there is no evidence to suggest that the government's meddling has ceased." *Id.*

Based on this evidence and admissions, the district court made specific factual findings that Plaintiffs' injuries are likely to recur during the case's pendency. *Id.* at 127a-128a. "Each of the Private Plaintiffs alleges," and has provided sworn declarations to prove,

"a combination of past, ongoing, and anticipated future censorship injuries. Their allegations go beyond mere complaints about past grievances.... The threat of future censorship is significant, and the history of past censorship provides strong evidence that the threat of further censorship is not illusory or speculative." *Id.* at 128a.  And, as the Fifth Circuit held, "the record shows, and counsel confirmed at oral argument, that the officials' challenged conduct has not stopped." *Id.* at 242a.

The Government now contends that "the platforms' policies are not attributable to the government."  Stay App. 19.  This is incorrect.  As both the Fifth Circuit and district court found, Defendants induced the platforms to adopt more restrictive content-moderation policies on the very topics on which Plaintiffs routinely speak—and these government-induced policies were then (and still are) enforced against Plaintiffs' speech.  *See, e.g.,* Pet. Appx. 180a (noting that the platforms "complied" with federal demands by "chang[ing] their internal policies to capture more flagged content"); *id.* at 184a ("the officials—via meetings and emails—pressed the platforms to change their moderation policies," and "[t]he platforms apparently yielded … they also changed their moderation policies expressly in accordance with the officials' wishes"); *id.* at 188a ("the platforms changed their internal policies" after White House pressure); *id.* at 189a (CDC officials requested and obtained "changes to the platforms' moderation policies"); *id.* at 191a ("the FBI monitored the platforms' moderation policies," and "[t]he platforms apparently changed their moderation policies in response to the FBI's debriefs"); *see also id.* at 62a (finding that "[s]ocial-media platforms updated their policies in 2020 to provide that posting 'hacked materials' would violate their policies" after the FBI's "impetus"); *id.* at 67a (noting that federal "pressure … resulted in more aggressive censorship policies"); *id.* at 105a ("Various social-media platforms changed their content-moderation policies to require suppression of content that was deemed false by CDC and led

to vaccine hesitancy."); *id.* at 119a (finding that Defendants "used meetings, emails, phone calls, follow-up meetings, and the power of the government to pressure social-media platforms to change their policies and to suppress free speech").

The Government contends that Plaintiffs have not "even attempted to connect the government's 'regular contact' with any content that respondents have posted or wish to post." Stay App. 20. On the contrary, the district court found that the individual Plaintiffs' censorship injuries result directly from federal pressure on platforms. Pet. Appx. 131a. As noted above, Plaintiffs repeatedly experience censorship on the very topics and viewpoints that federal officials pressure platforms to censor, often just as that pressure is occurring. For example, the district court found that "the evidence supplied in support of the preliminary injunction strongly implies" that the ongoing "restrictions" on Hines' social-media accounts "can be directly traced back to federal officials." *Id.* at 128a. Based on this and "numerous" other examples, the district court found "a clear connection between Defendants' actions and Plaintiffs injuries." *Id.* at 131a.

As the Fifth Circuit noted, the individual Plaintiffs also engage in ongoing self-censorship to avoid deplatforming and other more severe consequences. *Id.* at 196a. "[T]his chilling of the Individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury." *Id.* (citing *Laird* v. *Tatum*, 408 U.S. 1, 11 (1972)). The Government dismisses this self-censorship as self-inflicted injury not necessary to avoid "certainly impending" harm. Stay App. 19. On the contrary, if the individual Plaintiffs do not self-censor, they are virtually certain to experience further penalties on social media, as their declarations attest. *See* Resp. Appx. 9a-10a, 17a, 25a-26a, 91a-92a, 96a-97a, 104a-105a, 107a, 109a-110a, 113a-114a, 117a. This self-censorship is necessary to avoid "future harm" that is "certainly impending," which satisfies Article III. *Clapper* v. *Amnesty Int'l USA*, 568

U.S. 398, 416 (2013); *see also Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014) (holding that a "substantial risk" of future injury supports standing).

The Government argues that "an injunction against <u>the government</u> will not redress any future injuries to respondents resulting from the platforms' content moderation."  Stay App. 20.  Not so.  The Fifth Circuit correctly emphasized that "what the Individual Plaintiffs are challenging is the government's *interference with* those social-media companies' independent application of their policies."  Pet. Appx. 198a, 202a.  Plaintiffs have the First Amendment right to deal with platforms on an even playing field, freed from the stifling hand of federal coercion.  *See Council for Periodical Distribs. Ass'n* v. *Evans*, 642 F.Supp. 552, 560 (M.D. Ala. 1986), *aff'd in relevant part*, 827 F.2d 1483 (11th Cir. 1987) (holding that "the decision whether to" publish private speech should "be made free of [government] coercion and without prior restraint").  Further, "past decisions to suppress speech result in ongoing injury as long as the speech remains suppressed, and the past censorship experienced by individual Plaintiffs continues to inhibit their speech in the present."  Pet. Appx. 134a.  "These injuries are also affecting the rights of the Plaintiffs' audience members … who have the First Amendment right to receive information free from Government interference."  *Id.*

### 2.    The State Plaintiffs Have Standing.

The State Plaintiffs have seen their own content censored, and they have lost the ability to hear the core political speech of their constituents on social media.  *Id.* at 202a-205a.  Both injuries satisfy Article III.  The States have sovereign interests in being able to speak freely on social media, and in having access to the uncensored thoughts and opinions of their constituents on social media.  *See id.*; Resp. Appx. 82a-86a, 97a-102a.

The Government contends that the States identified merely "a handful of years-old injuries."  Stay App. 20.  The Fifth Circuit correctly held the opposite: "Acts of this nature continue to this day."  Pet. Appx. 203a. Just weeks ago, "YouTube … removed a video of

[Louisiana's] counsel … criticizing the federal government's alleged unconstitutional censorship in this case." *Id.* And "other states' officials have offered evidence of numerous other instances where their posts were removed, restricted, or otherwise censored." *Id.* n.7.

Second, the Government argues that the States' "right to listen" theory is supposedly "boundless." Stay App. 21. But the Government ignores the undisputed testimony of the States' witnesses, attesting to the importance of hearing their citizens' voices on social media, and how that is frustrated by federal censorship. Pet. Appx. 204a; Resp. Appx. 82a-86a, 97a-102a. In fact, "the CDC's own witness explained that, if content were censored and removed from social-media platforms, government communicators would not 'have the full picture' of what their citizens' true concerns are." Pet. Appx. 205a; *see also id.* 49a; Resp. Appx. 788a, 789a, 792a, 810a, 186a (Crawford Dep. 53:10-12, 54:15-20, 57:24-58:3, 75:12-76:1, 81:10-13).

What is "boundless" here is the Government's misconduct, not the States' attempt to redress it. Here, federal censorship has fundamentally altered online discourse—rendering entire viewpoints on matters of great public concern virtually unspeakable on social media— and thus the States suffer a devastating injury to their sovereign interest in hearing from and communicating with their own citizens. Resp. Appx. 82a-86a, 97a-102a. As a result of federal action, state officials cannot read on social media whether their citizens are skeptical of COVID vaccines, oppose mask mandates, believe that COVID escaped from a lab, have doubts about the integrity of voting by mail—or know their views on many other topics. The federal government's conduct has not just abridged the speech of a few speakers; it has systematically suppressed free speech across an entire set of profound topics of immediate public importance. *See id.* This injures with the States' sovereign function as representative government of the people, because "it is only through free debate and free exchange of ideas that government remains responsive to the will of the people." *Terminiello* v. *City of Chicago*, 337 U.S. 1, 4 (1949).

### B.     This Court Is Likely to Affirm if Certiorari Is Granted

If this Court were to grant certiorari, there is no "fair prospect" that the Fifth Circuit's injunction would be reversed.  *Conkright*, 556 U.S. at 1402.

#### 1.     The lower courts correctly found unconstitutional coercion.

The Government's claims that finding state action here is "startling," and has "grave implications," are meritless.  Stay App. 14, 22.  There is nothing "startling" about the fact that government coercion or significant encouragement transforms private action into state action; that has been black-letter law for decades.  *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982).  The "startling" feature of this case is Defendants' unprecedented disregard for the First Amendment.  The district court found that the platforms were unwilling *victims* of federal coercion who were forced to comply with the Government's demands by "unrelenting pressure."  Pet. Appx. 98a-99a, 116a-117a.  The Government's argument that the injunction will "eviscerate [the platforms'] rights to exercise editorial control over speech and speakers on their … platforms," Stay App. 22, stands logic on its head.  An injunction stopping the federal government from *forcing* platforms to moderate content according to federal wishes does not "eviscerate" the platforms' "editorial control" over their platforms, *id.*; it restores it.

The Government also argues that "the government must compel 'the <u>specific</u> conduct of which the plaintiff complains.'"  Stay App. 23 (quoting *Blum*, 457 U.S. at 1004).  This distorts the holding of *Blum*.  Overt government threats to punish a newspaper if it does not stop running editorials criticizing the government violate the First Amendment, even if the threateners do not specify exactly *which* editorials they want suppressed.  But even if "<u>specific</u> conduct" were the relevant standard, *id.*, it is easily satisfied here.  Again and again, federal officials made highly specific, threat-backed demands targeting specifically identified speakers, content, and policies—down to the specific posts and URLs that they wanted to

block—to which the platforms succumbed.  For example (among many others), the White House demanded the covert debooosting of Tucker Carlson's and Tomi Lahren's videos, the deplatforming of the "Disinformation Dozen" and Alex Berenson (among many others).  *See supra.*  The FBI sends encrypted demands to remove lists of specific speakers, URLs, and content.  *Id.*  The CDC submits specific tables and lists of specific posts and content to remove, as well as identifying specific health-related claims that platforms must remove.  *Id.*  Officials also demanded—and obtained—specific *changes* to the content-moderation policies of the platforms to require them to crack down on viewpoints disfavored by the Government.  *Id.*  If this is not the compulsion of "specific conduct," Stay App. 23, nothing is.

As to coercion, the Government's main argument is that the record does not contain any threatening statements from the White House, the Surgeon General's Office, or the FBI.  Stay App. 24-27.  This is incorrect.  The district court made a long series of specific factual findings of threats of adverse consequences linked to demands for greater censorship, which the Fifth Circuit reaffirmed.  None of these findings is clearly erroneous.

"Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.  In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct."  Pet. Appx. at 131a.  The district court cited many specific examples of such threats.  *See, e.g., id.* at 14a (White House to Facebook: "internally, we are considering our options on what to do about" Facebook's lack of cooperation); *id.* at 19a (Flaherty's concerns are "shared by the highest (and I mean highest) levels of White House"); *id.* at 24a, 98a (White House threatened adverse legal action to hold platforms "accountable" for not censoring COVID speech); *id.* at 27a (White House task force "threatened social-media platforms with adverse legal consequences if the platforms did not censor aggressively enough"); *id.* at 33a (Murthy's threat to hold platforms "accountable" for

24

the so-called "poison" of misinformation "carries with it the threat of consequences"); *id.* at 131a n.658 (more "examples of Government officials threatening adverse legislation against social-media companies if they do not increase censorship efforts"). At one point, the district court cited 22 examples of threats and pressure from White House officials demanding censorship. *Id.* at 97a-99a. "These actions are just a few examples of the unrelenting pressure the Defendants exerted against social-media companies." *Id.* at 99a.

As the district court found, Defendants repeatedly *tied* these threats to demands for greater censorship. *See, e.g., id.* at 22a ("Psaki linked the threat of a 'robust anti-trust program' with the White House's censorship demand."); *id.* at 24a (White House Communications Director tying the threat of Section 230 repeal to the White House's demands on "misinformation"); *id.* at 26a (White House raised "the threat to social-media companies to amend Section 230," and "link[ed] these threats to social-media platforms' failure to censor misinformation"); *id.* (White House "explicitly tied these censorship demands with threats of adverse legislation"). The Fifth Circuit aptly summarized these: "[T]he officials threatened—both expressly and implicitly—to retaliate against inaction. Officials threw out the prospect of legal reforms and enforcement actions while subtly insinuating it would be in the platforms' best interests to comply." *Id.* at 266a. "When the officials' demands were not met, the platforms received promises of legal regime changes, enforcement actions, and other unspoken threats." *Id.* at 267a.

These threats had indisputable coercive power. Repealing Section 230 threatens "a hidden subsidy worth billions of dollars," and anti-trust enforcement poses an "existential threat" to the platforms. *Id.* at 9a; Resp. Appx. 1073a. One telling indicator of the threats' coercive force is their success in motivating the platforms—often against their clearly expressed wishes. For example, Twitter refused to deplatform Alex Berenson for months,

25

but it succumbed immediately after the full-court press of White House pressure and threats in mid-July 2021.  Pet. Appx. 19a, 25a.  Facebook refused to take action against the "Disinformation Dozen" for months until it buckled under the same pressure.  *Id.* at 24a.  The platforms' willingness to cooperate with the FBI's demands for "account takedowns" is due to "pressure from Congress," including threats of adverse legislation.  *Id.* at 67a.  Thus, "the victims in this case yielded to the threat[s]."  *Backpage.com*, 807 F.3d at 231.

The Government contends that there was no coercion because the platforms "routinely declined to remove content flagged by federal officials."  Stay App. 27.  This statement is, at best, highly misleading.  Though platforms did not accede to every federal demand, the evidence shows a clear pattern of White House pressure beginning in early 2021, which faced at least partial resistance from the platforms, especially Facebook.  Having encountered initial resistance, the White House ramped up pressure in both private and public until the three-pronged assault in threats and public pressure in mid-July 2021—after which the platforms succumbed to virtually every federal demand for censorship, both from the White House and lower-level agencies like the CDC.  As the Fifth Circuit found, after the federal pressure campaign reached its zenith in July 2021, "the platforms responded with total compliance."  Pet. Appx. 187a.  "[T]hey capitulated to the officials' allegations," they "changed their internal policies" to match federal demands, and they "began taking down content and deplatforming users they had not previously targeted."  *Id.* at 187a-188a.  "Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied."  *Id.* at 101a.  "This seemingly unrelenting pressure by Defendants had the intended result of suppressing millions of protected free speech postings by American citizens."  *Id.* at 94a.  Both that pressure campaign and its results continue to this day.

With respect to the FBI, the Government contends that "the platforms rejected <u>half</u> of the FBI's suggestions," Stay App. 27—which means that the platforms *capitulated* to half of

the FBI's demands.  The platforms' suppression of election-related speech disfavored by the FBI went from virtually zero in 2016 to 50 percent by 2020, due to "intense pressure" from federal officials.  *See supra*.  The FBI can thus boast a censorship batting average of 0.500, which any major-league slugger would envy.[4]  *Id.*  In any event, whether the threats succeed in every case is not determinative: "[S]uch a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent." *Backpage.com*, 807 F.3d at 231.

Moreover, "[e]xplicit threats are an obvious form of coercion, but not all coercion need be explicit."  Pet. Appx. 97a.  Implied threats suffused Defendants' pressure campaigns.  *See, e.g., id.* at 97a-99a.  Here, Defendants' incessant demands to platforms were conducted against the backdrop of a steady drumbeat of threats of adverse legal consequences from the White House, senior federal officials, members of Congress, and key congressional staffers— made over a period of at least five years.  All that is required is that "comments of a government official *can reasonably be interpreted* as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request."  *Okwedy* v. *Molinari*, 333 F.3d 339, 341-42 (2d Cir. 2003) (emphasis added).  Here, no reasonable listener could have construed them any other way.

The threatening conduct in this case easily clears the threshold for coercion set forth in this Court's cases.  Government threats that "induce, encourage," "promote," or "persuade"

---

[4] The Government also argues that "Twitter entirely ceased enforcement of its COVID-19 misinformation policy in November 2022, yet suffered no retaliation."  Stay App. 27.  Not so. Twitter's attempt to return its platform to principles of free speech under new ownership in 2022 immediately met a federal enforcement action from the FTC, which sought (among other things) Twitter's communications with journalists *reporting on the very federal pressure to censor disfavored viewpoints that is challenged in this case. See* Ryan Tracy, *FTC Twitter Investigation Sought Elon Musk's Internal Communications, Journalist Names*, WALL ST. J. (Mar. 8, 2023). Thus, when it sought to buck the federal pressure to censor, Twitter faced *exactly* the sort of federal retaliation that Defendants have threatened throughout this case.

companies to silence Americans' speech violate the First Amendment.  "It is … axiomatic that a state may not *induce, encourage or promote* private persons to accomplish what it is constitutionally forbidden to accomplish."  *Norwood* v. *Harrison*, 413 U.S. 455, 465 (1973) (emphasis added).  "[T]he threat of invoking legal sanctions and other means of coercion, *persuasion*, and intimidation" may violate the First Amendment.  *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 67 (1963) (emphasis added).  Here, Defendants did all these things.

The facts found by the district court bear no resemblance to the cases cited by the Government—all of which found no coercion at all.  *O'Handley* v. *Weber*, 62 F.4th 1145, 1157-58 (9th Cir. 2023) (the state flagged "one of [plaintiff's] tweets" without "threaten[ing] adverse action to coerce"); *VDARE Foundation* v. *City of Colorado Springs*, 11 F.4th 1151, 1164 (10th Cir. 2021) ("[N]othing in the City's Statement plausibly threatens the Resort with legal sanctions."); *Kennedy* v. *Warren*, 66 F.4th 1199, 1209-10 (9th Cir. 2023) (Senator's letter "was intended and received as nothing more than an attempt to persuade"); *X-Men Security, Inc.* v. *Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) (finding "advocacy without threats, intimidation, or coercion"); *Penthouse Int'l, Ltd.* v. *Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991) ("[T]he government threatens no sanction—criminal or otherwise").

In fact, the threats here are more coercive, prolonged, and explicit than in cases where coercion was found.  *Compare, e.g., Bantam Books*, 372 U.S. at 62-63 (government agency sent "notices" to distributor and sent a police officer to follow up "to learn what action had been taken"); *Okwedy*, 333 F.3d at 341-42 (borough president sent a letter criticizing a billboard and asking the billboard company for a contact person for his "legal counsel and Chair of [the] Anti-Bias Task Force"); *Backpage.com*, 807 F.3d at 231-32 (sheriff's letter to credit-card companies hinted that processing payments for website might violate federal law, which the sheriff had no authority to enforce, and requested a contact person for follow up).

The Government criticizes the Fifth Circuit's application of the four-factor test adopted by the Second, Fifth, and Ninth Circuits to discern coercion.  Stay App. 28-30.  The Fifth Circuit relied on the test in the alternative, noting that it was unnecessary because coercion is "readily apparent here."  Pet. Appx. 267a.  In any event, the four-factor test decisively confirms the finding of coercion.  First, as the Fifth Circuit held, the "tone," "word choice," and "demeanor" of Defendants' communications were highly menacing.  Pet. Appx. 222a-223a.  They included accusations of "killing people," spreading "poison," and fomenting "insurrection"; profanity ("Are you guys fucking serious?"); cutting and sarcastic demands ("Not to sound like a broken record…"); accusations of bad faith ("You are hiding the ball"); and veiled references to future retaliation ("the highest (and I mean highest) levels of the WH") ("internally, we have been considering our options on what to do about it").  *Id.* at 97a-99a.  Defendants repeatedly issued commands "phrased virtually as ordrs."  *Id.* at 223a; *see also id.* at 97a-99a ("Cannot stress the degree to which this needs to be resolved immediately." … "get moving on the process of having it removed ASAP").  Their demands reflected "[u]rgency" and were relentlessly persistent.  *Id.* at 223a; *see also id.*, at 97a-99a.  As the Fifth Circuit held, "[a]n interaction will tend to be more threatening if *the official refuses to take 'no' for an answer and pesters the recipient until it succumbs*."  *Id.* at 223a (quoting *Kennedy*, 66 F.4th at 1209) (emphasis added).  That applies here.

Second, the platforms' reaction to the threats underlines their coercive impact.  *Id.* at 224a.  The Fifth Circuit cited "just a few of many examples of the platforms changing—and acknowledging as much—their course as a direct result of the officials' messages."  *Id.*

Third, as the Fifth Circuit held, the White House "directs an army of federal agencies that create, modify, and enforce federal regulations," and is thus not "removed from the relevant levers of power."  *Id.* at 224a-225a. As the district court held, "[f]aced with

unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied." *Id.* at 101a. And fourth, as discussed in detail above, Defendants "raise[d] the threat of adverse consequences," both publicly and privately, and both explicitly and implicitly. *Id.* at 227a-228a.

With respect to the FBI, the Government contends that the FBI did not "threaten adverse consequences." Stay App. 24, 25. This is unconvincing for several reasons. First, as this Court stated in *Bantam Books*, an overt threat of adverse consequences is not necessary for coercion, as coercion may occur through "*other means of coercion, persuasion, and intimidation.*" 372 U.S. at 67 (emphasis added). Coercion can arise from *implicit* pressure campaigns, not just explicit threats. Pet. Appx. 97a. Second, the FBI coordinated meetings between platforms' content-moderation officers and *other* senior, powerful federal officials who threatened platforms with adverse legislation if they did not censor disfavored speech. *See supra*. Third, like the CDC, the FBI answers to the White House, which itself engaged in a long campaign of pressure and threats. Coercion from the White House pressures platforms to comply with demands from the "army of federal agencies" that the White House oversees, Pet. Appx. 224a-225a—including the CDC and the FBI.

Fourth, as the Fifth Circuit emphasized, the FBI's status as "the lead law enforcement, investigatory, and domestic security agency for the executive branch," *id.* at 233a, greatly enhances the coercive impact of its demands. *See, e.g., Bantam Books*, 372 U.S. at 68 ("People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around …."); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("[C]ompanies don't like being threatened by a law-enforcement official that he will sic the feds on them…."). In *Backpage.com*, the Seventh Circuit found coercion where a sheriff suggested he might refer the company to federal law

enforcement; here, the FBI itself was making the demands.  The Government argues that this theory means that "any request from the FBI is inherently coercive merely because the FBI is a powerful law enforcement agency."  Stay App. 4. But the Fifth Circuit considered this factor along with the other factors and treated it as non-exhaustive.  Pet. Appx. 232a-234a.  But the FBI's status as the lead federal law enforcement agency is highly relevant; companies are unlikely to ignore a request from a "powerful law enforcement agency," Stay App. 4, that has "clear authority over the platforms."  Pet. Appx. 232a (citing *Zieper* v. *Metzinger*, 392 F. Supp. 2d 516, 531 (S.D.N.Y. 2005)).

### 2.     The lower courts correctly found significant encouragement.

In the alternative, the Fifth Circuit held that Defendants "significantly encouraged" platforms to suppress disfavored viewpoints.  *Id.* at 230a-232a, 234a-236a. So did the district court: "If there were ever a case where the 'significant encouragement' theory should apply, this is it."  *Id.* at 94a. This Court is unlikely to reverse this independent ground.

The Government argues that, to "significantly encourage" private conduct, the government must offer "positive incentives" that "overwhelm a private party's independent judgment" and "essentially compel" the party.  Stay App. 30-31. Thus, on the Government's view, the government could offer targeted tax breaks to private businesses to encourage racial discrimination, or pay financial bounties to private landlords to conduct warrantless searches, so long as those inducements were not quite so powerful as to "overwhelm" the private parties' "independent judgment" and "essentially compel" the private party. *Id.* Fortunately, that is not the law.  "The fact that the Government has not compelled a private party ... does not, by itself, establish that the [action] is a private one, and state action may be found where 'the Government did more than adopt a passive position toward the underlying private conduct.'"  *Skinner* v. *Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989); *see also, e.g., Adickes* v. *S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (holding that "a willful

31

participant in joint activity" is committing state action); *Frazier* v. *Bd. of Trustees of Nw. Mississippi Reg'l Med. Ctr.*, 765 F.2d 1278, 1286 (5th Cir. 1985) (holding that state action occurs when "the state has had some affirmative role" in private conduct, "albeit one of encouragement short of compulsion").[5]

Thus, the Fifth Circuit correctly recognized that state action occurs when the government becomes "entangle[d] in a [private] party's independent decision-making." Pet. Appx. 218a, 230a. Whether such entanglement is understood as "significant encouragement," *id.*, or as "joint activity with the State," *Adickes*, 398 U.S. at 152, it plainly constitutes state action. *See, e.g., id.*; *Rawson* v. *Recovery Innovations*, Inc., 975 F.3d 742, 753 (9th Cir. 2020) ("[P]rivate parties may act under color of state law when the state significantly involves itself in the private parties' actions and decisionmaking at issue."); *Frazier*, 765 F.2d at 1288 (state action where the government "plays some meaningful role in the mechanism leading to the disputed act"); *Gallagher* v. *Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) ("a substantial degree of cooperative action between state and private officials" or "overt and significant state participation" in private conduct may constitute state action) (citations omitted).

Here, the government has "insinuated itself" and become "heavily involved" in the platforms' content-moderation decisions. *Rawson*, 975 F.3d at 753, 754. The White House

---

[5] The Government, in effect, argues for a standard of state action that is less protective of First Amendment freedoms than other constitutional rights. Yet "[i]t is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments," and should be protected by "the most rigorous procedural safeguards," and "ringed about with adequate bulwarks." *Bantam Books*, 372 U.S. at 66; *see also Dombroski* v. *Pfister*, 380 U.S. 479, 486-87 (1965). No one doubts that a Fourth Amendment violation would occur if a police officer, lacking probable cause to search an apartment, paid a landlord $20 to do it for him—even though a $20 payment certainly would not "overwhelm" the private party's "independent judgment." "What cannot be done directly cannot be done indirectly." *Students for Fair Admissions, Inc.* v. *Pres. and Fellows of Harvard College*, 143 S. Ct. 2141, 2176 (2023) (citation omitted) (brackets accepted).

badgers platforms with offers to "partner" with them and "help" them remove disfavored viewpoints; as the district court noted, "[b]oth the White House and the social-media companies referred to themselves as 'partners' and 'on the same team' in their efforts to censor disinformation." Pet. Appx. 100a. The FBI meets incessantly with platforms about removal of disinformation, both one-on-one and in large groups with several other federal law-enforcement and national-security agencies. *See supra*. It routinely sends platforms removal requests "one to five times per month" and then follows up by inquiring whether (and why or why not) the platforms acted on its requests; and it has done so regularly for the last five years. *Id*. The CDC installed itself as the *de facto* censor of health claims, dictating to platforms precisely which health claims would be censored under the policies. *Id*.

The Government argues that the Fifth Circuit's standard is "vastly overbroad" because it led to a finding of state action against the FBI in this case. Stay App. 31-32. The Government overlooks the FBI's extensive involvement in the platforms' decisionmaking. "Beyond taking down posts, the platforms also changed their terms of service in concert with recommendations from the FBI." Pet. Appx. 234a. "Consequently, when the platforms subsequently moderated content that violated their newly modified terms of service, … they did not do so via independent standards," but made decisions "subject to commandeered moderation policies." *Id*. "In short, when the platforms acted, they did so in response to the FBI's inherent authority *and* based on internal policies influenced by FBI officials." *Id*.

The Government also disputes the Fifth Circuit's finding that the CDC was entangled in the platforms' content-moderation decisions. Stay App. 32. But in early 2021, the CDC began conducting regular meetings with social-media platforms about health "misinformation," Pet. Appx. 40a-41a, and soon "began to press [platforms] on removing and/or suppressing misinformation," *id*. at 42a, by pestering the platforms with requests to remove specific content and viewpoints, *id*. at 41a-49a. The CDC sent platforms slide decks

33

of specific posts to remove, *id.* at 41a, 46a, and tables and lists of "specific postings" to remove, *id.* at 43a, 48a; it established a "special misinformation reporting channel" with Facebook, *id.* at 42a, and a "Partner Support Portal" with Twitter for reporting misinformation, *id.* at 49a; it set up a "COVID Misinfo Project" with YouTube, *id.* at 46a; and it launched "BOLO" ("Be On the Lookout") meetings with major platforms to press for the censorship of specific health-related viewpoints, *id.* at 47a-48a.

As the White House's pressure campaign intensified, platforms like Facebook "began to rely on … the CDC to determine whether claims were true or false." *Id.* at 43a. "Because Facebook's content-moderation policy called for Facebook to remove claims that are false and can lead to harm, Facebook would remove and/or censor claims the CDC said were false." *Id.* at 43a-44a. Eventually, the CDC effectively dictated what Americans could and could not say on topics like the safety of COVID vaccines for children, how to interpret VAERS data, the influence of COVID vaccines on pregnant and nursing women, and the nature of COVID vaccines' side effects. *Id.* at 43a-46a.

Based on these facts, the Fifth Circuit found that "the platforms … adopted rule changes meant to implement the CDC's guidance," and "those adoptions led the platforms to make moderation decisions based entirely on the CDC's say-so." *Id.* at 236a. "That dependence, at times, was total." *Id.* As a result, "the platforms' decisions were not made by independent standards, but instead were marred by modification by CDC officials." *Id.*

### 3.   The Government's other arguments lack merit.

The Government argues that, even if it coerced platforms to remove disfavored viewpoints, that would only violate "the <u>platforms</u>' First Amendment rights," not those of the silenced speakers. Stay App. 33. It is highly questionable whether platforms have a First Amendment right to silence their users' speech. In any event, on the Government's view, if

the state coerced a private landlord to refuse to rent to racial minorities, that would only harm the landlord.  This is obviously wrong—it would harm the tenants, first and foremost.

The Government also argues that the Plaintiff States lack First Amendment rights. Stay App. 34.  But the First Amendment limits federal power over speech for the benefit of all.  The States suffer injuries to their sovereign interests in both speaking and listening on social media.  *See supra*, Part I; *Terminiello*, 337 U.S. at 4.  Given those Article III injuries, they have third-party standing to assert the First Amendment rights of the silenced speakers to whom they wish to listen, and the audiences to whom they wish to speak.  Third-party standing requirements are "quite forgiving" "[w]ithin the context of the First Amendment." *Kowalski* v. *Tesmer*, 543 U.S. 125, 130 (2004).  The usual "close relationship" and "hindrance" are not required; instead, Article III injury is all that is required.  *See id.*; *Dombroski* v. *Pfister*, 380 U.S. 479, 486-87 (1965); *N.J. Bankers Ass'n* v. *Att'y Gen.*, 49 F.4th 849, 860 (3d Cir. 2022).  The Court applied this very reasoning to uphold third-party standing in *Bantam Books*.  372 U.S. at 64 n.6.  In addition, third-party standing applies "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."  *Kowalski*, 543 U.S. at 130 (quoting *Warth* v. *Seldin*, 422 U.S. 490, 510 (1975).  Here, the "challenged restriction," *id.*, is federal censorship of the States' speech, which violates the rights of those who would read the States' messages.

## II.   The Injunction Is Not Overbroad.

The Government argues that the injunction is not "tailored to redress the plaintiff's particular injury."  Stay App. 34 (quoting *Gill* v. *Whitford*, 138 S. Ct. 1916, 1933-1934 (2018)). This argument misapprehends both the nature of Plaintiffs' injuries and the interconnected nature of discourse on social media.  Because Plaintiffs assert an interest in hearing *other* speakers' voices on social media, an injunction that was "limited to government actions targeting respondents' social-media accounts and posts," *id.* at 35, would be insufficient.

35

The Government complains that the injunction "covers thousands of federal officers and employees" because it includes agency defendants, not just individual officers.   But entering an injunction against the agency when its senior leadership is acting unlawfully is common practice and necessary to prevent subversion of the injunction.  *See, e.g., Utah* v. *United States*, 420 U.S. 304-05 (1975) (enjoining "the United States of America, its departments and agencies"); *Louisiana* v. *Becerra*, 577 F.Supp.3d 483 (W.D. La. 2022); *Arizona by and through Brnovich* v. *CDC*, 2022 WL 1276141, at *1 (W.D. La. Apr. 27, 2022).

The Government complains that the injunction "applies to communications with and about all social-media platforms (not just those used by respondents)."  Stay App. 35.  But popular content—such as "viral" posts—are routinely re-posted by users across social-media platforms, such as posting a link to a YouTube video on both Facebook and Twitter.  Thus, when the federal government blocks a post on Hoft's website from going viral (as happens frequently, *see* Pet. Appx. 127a), it prevents Hoft's speech from being posted or reposted *across all platforms*—including those where Hoft himself may not have an account.  Moreover, the State Plaintiffs assert an interest in following their constituents' speech on matters like COVID-19, elections, and other social and political issues across *all* platforms, not just Twitter and Facebook.  Resp. Appx. 82a-86a, 97a-102a.

The Government complains that the injunction applies to "content moderation with respect to all posts by any person (not just respondents)."  Stay App. 35.  Again, this complaint overlooks Plaintiffs' interest as avid *audiences* and *readers* of social-media discourse—including on all the topics targeted by the Government.  *See* Resp. Appx. 103a-118a.  It also violates their rights as speakers because, in restricting what they can read, the government prevents them from refining and developing the opinions they express in their own speech.  The individual Plaintiffs follow dozens of speakers who have already been silenced by federal

censorship activity, and the State Plaintiffs follow their constituents' speech on all those social and political questions. *See id.* "Plaintiffs have put forth ample evidence regarding extensive federal censorship that restricts the free flow of information on social-media platforms used by millions of Missourians and Louisianans…." Pet. Appx. 123a. The interactive nature of social media renders it inevitable that the government's silencing of *entire viewpoints* on social or political topics will abridge free speech and injure Plaintiffs.

The Government presents a litany of complaints about the injunction's scope, but it offers no narrower version of the injunction that would still grant effective relief to Plaintiffs. Defendants' *misconduct* is sweeping. As the district court found, Defendants silenced entire viewpoints in social and political debates: "Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; … the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed." Pet. Appx. 154a. This government-induced distortion of some of the greatest debates of our time on social media abridges freedom of speech and inevitably injures Plaintiffs—both in their own social-media speech, and the speech that they view on social media. *See Packingham*, 582 U.S. at 104.[6]

## III.    The Equities Overwhelmingly Favor the Injunction.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976). Staying the injunction would permit Defendants to continue to pressure platforms to silence

---

[6] The Government complains that the Fifth Circuit did not specifically exempt "national security and criminal matters." Stay App. 35. But the Fifth Circuit's injunction covers "protected free speech." Pet. Appx. 248a. "[S]peech integral to criminal conduct"—including crimes threatening national security—is not protected by the First Amendment. *United States* v. *Alvarez*, 567 U.S. 709, 717 (2012).

disfavored speakers and viewpoints on social media, perpetuating "arguably … the most massive attack against free speech in United States' history."  Pet. Appx. 2a.

The Government argues that the injunction interferes with *the government's* ability to speak.  Stay App. 36-38.  The Government has a wide latitude to speak on matters of public concern, but it cannot stifle the protected speech of ordinary Americans.  As this Court observes, the government-speech doctrine is "susceptible to dangerous misuse," and must be employed with "great caution" to avoid allowing government to "silence or muffle the expression of disfavored viewpoints."  *Matal* v. *Tam*, 582 U.S. 218, 235 (2017).

In any event, the Government struggles to identify any cognizable harm to Defendants, because the Fifth Circuit's injunction closely matches what the First Amendment already requires them to do.  The injunction prohibits Defendants to "coerce or significantly encourage social-media companies" to censor First Amendment-protected speech.  Pet. Appx. 248a.  The First Amendment, likewise, prohibits them to "exercise[] coercive power" or provide "significant encouragement" to platforms to censor protected speech.  *Blum*, 457 U.S. at 1004.  Federal officials suffer no cognizable harm from being ordered to do what the Constitution already requires them to do.

The Government argues that the Fifth Circuit's injunction "raises serious separation-of-powers concerns by installing a single district judge as the overseer of the Executive Branch's communications with and about social-media companies."  Stay App. 14.  But the injunction merely commands federal officials not to "coerce" or "significantly encourage" social-media platforms to silence First Amendment-protected speech.  Pet. Appx. 248a.  Again, this requirement matches what this Court has long held that the First Amendment requires federal officials to do.  *Blum*, 457 U.S. at 1004.  For federal courts to order federal executive officials to comply with the basic precepts of the First Amendment does not violate the separation of powers—it is a core exercise of the Judicial Branch's authority.

38

When the government suppresses or chills the speech of a single American—let alone when it does this to millions—it impoverishes the national conversation. It thereby injures Plaintiffs in their reading and formulation of their own speech. Effective judicial redress requires an injunction against the suppression and chilling of such speech. This is especially true where, as here, the government imposes its suppression wholesale, often surreptitiously, against vast numbers of Americans by pressuring private companies.

The balancing of harms, therefore, decisively favors Plaintiffs. Based on overwhelming evidence and unrefuted findings of fact, the district court found that Defendants' conduct "had the intended result of suppressing *millions* of protected free speech postings by American citizens." Pet. Appx. 94a; *see also id.* at 107a, 123a. Against these "millions of free speech violations," *id.* at 145a, the Government offers a handful of speculative, hypothetical scenarios of possible interference with future government speech—none of which has ever occurred, nor does the Government argue that any is likely to occur during the pendency of this case. The Government's handful of hypotheticals does not outweigh the documented history of "millions" of *actual* free-speech violations. In any event, the Government's hypotheticals all have the same answer: Federal officials have wide latitude to express their views on any issue, but they may not coerce or significantly encourage platforms to silence ordinary Americans' constitutionally protected speech.

The Government argues that "a central dimension of presidential power is the use of the Office's bully pulpit to seek to persuade … American companies … to act in ways that the President believes would advance the public interest," and cites examples of Presidents urging American companies to lower steel prices and grant affordable mortgages to "distressed homeowners." Stay App. 3. But the bully pulpit is not a pulpit to bully. And these historical examples are inapt, because they do not involve the White House publicly demanding that "American companies" conduct actions that would, if performed by the

39

Government, egregiously violate individuals' constitutional rights.  Here, Defendants did not demand that private companies give Americans an economic break; they coerced private companies silence Americans' speech on the basis of viewpoint.  That is unconstitutional.

**IV.    If the Court Grants the Government's Alternative Request To Grant Certiorari Now, It Should Add Respondents' Questions Presented.**

The Government asks the Court in the alternative to "construe this application as a petition for writ of certiorari, grant the petition … and set the case for argument."  Stay App. 40.  This request is premature, because Plaintiffs plan to file a petition for panel rehearing in the Fifth Circuit on September 22, 2023.  But if the Court does grant this request, it should add Respondents' proposed Questions Presented: (1) Whether the Fifth Circuit erred in vacating the injunction as to the Cybersecurity and Infrastructure Security Agency (CISA) and related entities; and (2) Whether the Fifth Circuit's formulation of the standards for government action provide sufficient protection to fundamental First Amendment interests.

**CONCLUSION**

The Government's application for stay of injunction should be denied.

40

September 20, 2023

Respectfully submitted,

**JEFFREY M. LANDRY**
*Attorney General of Louisiana*
ELIZABETH B. MURRILL
 *Solicitor General*
 *Counsel of Record*
TRACY SHORT
 *Assistant Attorney General*
D. JOHN SAUER
 *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
(225) 326-6766
*Counsel for State of Louisiana*

JOHN J. VECCHIONE
JENIN YOUNES
ZHONETTE BROWN
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 918-6905
*Counsel for Respondents Dr. Jayanta*
*Bhattacharya, Dr. Martin Kulldorff,*
*Dr. Aaron Kheriaty, and Jill Hines*

**ANDREW BAILEY**
*Attorney General of Missouri*
JOSHUA M. DIVINE
 *Solicitor General*
TODD A. SCOTT
 *Senior Counsel*
Office of the Attorney General
Supreme Court Building
207 W. High St.
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-8870
Fax: (573) 751-0774
*Counsel for State of Missouri*

JOHN C. BURNS
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
(314) 329-5040
*Counsel for Respondent Jim Hoft*

41