No. 23A243

_____

_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


VIVEK H. MURTHY, SURGEON GENERAL, ET AL., APPLICANTS

v.

MISSOURI, ET AL.

_____


REPLY IN SUPPORT OF APPLICATION FOR A STAY

_____


ELIZABETH B. PRELOGAR
Solicitor General
  Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

————————————

No. 23A243

VIVEK H. MURTHY, SURGEON GENERAL, ET AL., APPLICANTS

v.

MISSOURI, ET AL.

————————————

REPLY IN SUPPORT OF APPLICATION FOR A STAY

————————————

The Fifth Circuit affirmed a sweeping and unprecedented in-
junction based on sweeping and unprecedented understandings of
Article III standing, the state-action doctrine, and the proper
scope of equitable relief. Respondents' opposition underscores
the remarkable breadth of the decision below. Respondents insist
that <u>any</u> individual or entity can establish standing to challenge
<u>any</u> government action affecting speech by <u>any</u> third party merely
by asserting a generalized desire to hear that speech -- a propo-
sition that would effectively abolish Article III's limitations in
free-speech cases. Respondents acknowledge that the Fifth Cir-
cuit's decision transforms private social-media platforms' content
moderation into state action subject to the First Amendment -- and
thus subjects the platforms to suits compelling them to distribute
speech they would prefer not to host. And respondents do not deny
that the injunction installs the district court as the overseer of
the Executive Branch's communications with and about the plat-
forms, exposing thousands of government employees to the threat of

contempt should the court conclude that their statements run afoul of the Fifth Circuit's novel and vague definition of state action.

Respondents also offer little or no defense of the Fifth Circuit's key legal holdings, including its expansive understanding of the sort of "coercion" and "significant encouragement" that transform private conduct into government action. Instead, respondents repeatedly seek to plug the holes in the Fifth Circuit's legal analysis by invoking the district court's factual findings, which they insist must be deemed to be "established as fact." Opp. 2. But the government vigorously disputed those findings below and the Fifth Circuit declined to rely on many of them -- presumably because they are unsupported or demonstrably erroneous. Respondents' presentation to this Court paints a deeply distorted picture by pervasively relying on those debunked findings. And respondents' unwillingness to defend the Fifth Circuit's holdings that the findings it did credit are sufficient to establish coercion and significant encouragement only further confirms that those holdings are wrong.

Finally, respondents' opposition also confirms that the equities overwhelmingly favor staying the injunction pending this Court's review, just as it was stayed during proceedings in the Fifth Circuit. Respondents do not and could not contend that a sweeping injunction restricting the Executive Branch's communications with all social media platforms about all content posted by all users is necessary to prevent any direct injury to respondents

themselves.  Instead, they invoke purported harms to third parties who have not sought judicial relief and are not parties to this suit.  Those harms to non-parties are not a valid basis for injunctive relief at all; they certainly do not justify allowing a novel and profoundly disruptive injunction to take effect before this Court has the opportunity to review it.

## I.  THIS COURT WILL LIKELY GRANT CERTIORARI AND VACATE THE LOWER COURTS' INJUNCTION

Respondents do not and could not deny that this Court is likely to grant certiorari because the Fifth Circuit's decision conflicts with decisions of the Second, Ninth, Tenth, and D.C. Circuits; raises serious separation-of-powers concerns by embroiling the judiciary in the Executive Branch's communications with the public and with platforms; and marks a dramatic expansion of the state-action doctrine. Appl. 13-27; cf. Opp. 13. Respondents also have no persuasive response to our showing that if this Court grants certiorari, it will likely vacate the injunction because respondents lack Article III standing, their First Amendment claims lack merit, and the injunction is overbroad.

### A.  Respondents Lack Article III Standing

1.  The government explained (Appl. 18-20) that individual respondents lack Article III standing because they principally rely on past injuries that are not fairly traceable to the government's challenged conduct and have not shown any impending injury redressable by an injunction against the government.  Re-

spondents barely defend the Fifth Circuit's principal theory of standing -- that past content moderation attributable to the government is causing respondents to "self-censor," Appl. App. 196a-197a -- and concede (Opp. 20-21) that they must show "certainly impending" harm to rely on such a theory.  But respondents fail to demonstrate any such harm.

Respondents first assert (Opp. 13) that they established past harm traceable to the government because "Bhattacharya's and Kulldorff's content was suppressed immediately after they were targeted by federal officials."  But that only underscores the problem:  The cited incidents of moderation occurred in 2020, before the conduct on which the Fifth Circuit focused.  See Appl. App. 127a-128a (citing D. Ct. Doc. 214-1 ¶¶ 787, 1368-1386 (C.A. ROA16,618, 16,753-16,758)); see Changizi v. HHS, No. 22-3573, 2023 WL 5965931, at *3 (6th Cir. Sept. 14, 2023) (rejecting a similar claim for lack of standing because "Twitter created and enforced its first COVID-19 policy long before the Biden Administration made any public statements and, in fact, before there was a Biden Administration").  Respondents seek to cure that chronological problem by asserting (Opp. 16) that they "challenge misconduct beginning in 2018 at the latest."  But respondents' challenge to pre-2021 content moderation rests primarily on a purported congressional pressure campaign.  See Opp. 2-3.  The Fifth Circuit declined to credit that theory, and with good reason:  Among other things, this is not a suit against Members of Congress.

Citing two declarations, respondents assert that they have suffered "acts of social-media censorship * * * occurring through April 2023."  Opp. 16 (citing Opp. App. 119a-130a); see Opp. 17 (same).  But none of those alleged acts is fairly traceable to the government.  Respondent Hines simply lists instances where Face-book has moderated her posts -- without providing any basis to link those actions to the government.  Opp. App. 120a-123a.  Re-spondent Hoft asserts not that the platforms are deleting or down-grading his posts, but that they are adding their own speech with which he disagrees.  Id. at 129a-130a.  And like Hines, Hoft offers nothing linking those actions to the government.  Ibid.

Respondents assert (Opp. 17-19) that they face imminent in-jury because the government continues to meet with platforms and supposedly conceded below that respondents' past injuries were likely to recur.  That is wrong.  That the government meets with the platforms does not establish that respondents are likely to suffer imminent harm, as even the Fifth Circuit seemed to recog-nize, Appl. App. 221a -- especially because respondents have never connected their past injuries to governmental action.  Appl. 19-20.  And the government's purported concession in the district court was simply a statement that the Executive Branch may continue to use the "bully pulpit" and to engage in "communications with social media companies" -- not that those actions have caused or will cause any cognizable injury to respondents.  5/26/23 Tr. 122.

Respondents also wrongly assert that the government coerced

6

the platforms into adopting "more restrictive content-moderation
policies," which are "still" enforced against respondents.  Opp.
19; see Opp. 17-20.  That assertion directly contradicts the Fifth
Circuit's decision:  The court emphasized that respondents "do <u>not</u>
challenge the social-media platforms' content-moderation poli-
cies," which the court regarded as private action not attributable
to the government.  Appl. App. 199a (emphasis added).  Respondents'
assertion also lacks record support.  For example, the claim that
"CDC officials requested and obtained 'changes to the platforms'
moderation policies,'" Opp. 19 (citation omitted), overlooks un-
rebutted testimony that "[CDC] did not discuss the development of
[Facebook's] policies, or the enforcement of their policies" and
instead merely provided "scientific information" that Facebook
"might use to do those things."  C.A. ROA 11,138.  Similarly,
respondents' claim that the platforms "updated their policies in
2020" with respect to "'hacked materials,'" such as "'the laptop
story,'" "after the FBI's 'impetus,'" Opp. 17, 19 (brackets and
citations omitted), cannot be squared with the platforms' own tes-
timony that their actions with respect to the "laptop story" were
based on policies adopted in 2018, C.A. ROA 18,498-18,499, 18,505.

In any event, even if the government influenced the platforms'
general policy choices in some way, that would not confer standing
on respondents absent a showing that a specific policy change
resulting from the government's action led to moderation of <u>re-</u>
<u>spondents</u>' posts that the relevant platform would not have under-

taken in the exercise of "its 'broad and legitimate discretion' as an independent company." <u>Changizi</u>, 2023 WL 5965931, at *3 (citation omitted); see Appl. 18-19.  Respondents' contrary view would effectively mean that the platforms' continued enforcement of their policies is forever tainted by prior discussions with the government, regardless of whether the platforms would have taken the same actions anyway.  Not only does that contravene basic principles of traceability, it also would improperly allow suit even when an injunction against the government could not prevent (<u>i.e.</u>, redress) any injury resulting from the platforms' independent content-moderation decisions.

2.  As the government explained (Appl. 20-21), state respondents cannot establish standing based on the Fifth Circuit's "right to listen" theory because this Court has endorsed that derivative constitutional right only for plaintiffs who have a sufficient connection to the speaker.  Respondents assert (Opp. 15) that "the only 'connection' required" is that "the listener would otherwise hear the speaker's message."  Indeed, respondents invoke that theory not just for state respondents (Opp. 22), but for individual respondents as well (Opp. 15).  That breathtakingly broad view would give anyone (not just a government) standing to challenge any alleged abridgment of the First Amendment rights of any speaker whose speech she "would otherwise hear."  If taken seriously, that would mean that any interested individual would have standing to sue whenever a city council denied a parade per-

mit, a transit authority rejected a bus advertisement, or a district attorney's office prohibited an employee from writing an intemperate op-ed -- even if the plaintiff had no connection to the aggrieved party other than the desire to hear him. This Court has consistently rejected such "boundless theor[ies] of standing." Already, LLC v. Nike, Inc., 568 U.S. 85, 99 (2013).

## B.  Respondents' First Amendment Claims Lack Merit

The government explained (Appl. 21-34) that respondents are unlikely to succeed on the merits because the Fifth Circuit adopted an overly broad state-action theory of the sort that is "especially problematic in the speech context, because it could eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms." Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1932 (2019). Respondents embrace that breadth -- indeed, they "question[] whether platforms have a First Amendment right" to exercise such editorial control in the first place. Opp. 34. This Court has already granted the platforms' application for emergency relief from a different Fifth Circuit decision curtailing their right to control content they host and transmit to the public. See NetChoice, LLC v. Paxton, 142 S. Ct. 1715 (2022) (No. 21A720). A stay is warranted here as well: The Fifth Circuit's expansive understanding of state action not only subjects the platforms' private editorial choices to the constraints of the First Amendment, but also imposes novel and unjustified limits on the gov-

ernment's own speech.

1.   The Fifth Circuit erred in finding coercion by the White House, Surgeon General's office, and FBI because the court did not identify any threat, implicit or explicit, of adverse consequences for noncompliance.  Appl. 23-30.  Indeed, the Fifth Circuit adopted a definition of coercion so lax that it deemed the FBI's actions coercive simply because the FBI is a powerful law enforcement agency and the platforms sometimes (but not always) removed the content it flagged.  Appl. 25-26; see Appl. App. 232a-233a.  Respondents barely attempt to defend that loose understanding of coercion, which infected the Fifth Circuit's review of the challenged conduct by all defendants and which is incorporated into the injunction's terms.  Appl. App. 248a.[1]

Rather than defend the Fifth Circuit's understanding of the law, respondents seek (Opp. 24-25) to argue the facts.  But those factual arguments cannot cure the Fifth Circuit's legal errors.  And respondents' arguments are unpersuasive even on their own terms.  Indeed, they largely repeat the district court's unsupported findings that the government comprehensively refuted below and that the Fifth Circuit did not credit.  See generally D. Ct. Doc. 266-8 (C.A. ROA 24,383-25,104).

---

[1] Relatedly, the government explained (Appl. 23-24) that a plaintiff alleging state action must point to "specific conduct" that the government supposedly coerced, Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).  In response, respondents identify (Opp. 23-24) a series of alleged content-moderation decisions involving posts by other people who are not parties to this case.

10

Take for example, the assertion that the "White House threat-
ened adverse legal action to hold platforms 'accountable' for not
censoring COVID speech."  Opp. 24 (citing Appl. App. 24a, in turn
citing D. Ct. Doc. 10-1, at 477-478 (C.A. ROA 733-734)).   That
refers to a news article stating that when asked on a television
program "whether [platforms] should be held liable for publishing
false information that causes people harm," a White House official
responded that "the administration is reviewing policies," which
"could include amending the Communications Decency Act, or Section
230," and said "'[w]e're reviewing that, and certainly they should
be held accountable.'"  C.A. ROA 734.  The whole point of Section
230 is to shield platforms from liability for hosting content that
causes harm, so the question naturally prompted a reference to the
Administration's position on the law.   The official's comments
were neither threatening nor connected in any way to any specific
content-moderation policy or decision.  And the fact that respond-
ents consider such a general comment about an important matter of
public policy to be evidence of coercion further underscores the
untenable implications of their position.

Another example:  Respondents repeat the district court's
assertion that a presidential memorandum "threatened social-media
platforms with adverse legal consequences if the platforms did not
censor aggressively enough."  Opp. 24 (quoting Appl. App. 27a, in
turn citing D. Ct. Doc. 214-16 (C.A. ROA 16,889-16,893)).  Nothing
in that memorandum -- which established the White House Task Force

11

to Address Online Harassment and Abuse -- contains any threat of adverse legal consequences.  It simply charges the task force with "examining existing Federal laws, regulations, and policies to evaluate the adequacy of the current legal framework to address technology-facilitated gender-based violence."  C.A. ROA 16,892.  Again, respondents' apparent view that the President cannot call for such a study without violating the First Amendment highlights the dangers of allowing the injunction to take effect:  If the President issued a similar directive in the future, would respondents move to hold the White House defendants in contempt?

Space does not permit a full refutation of each of respondents' citations purportedly demonstrating government threats (Opp. 7-9, 24-25), but they are all of a piece:  They quote conclusory legal assertions by the district court -- often lifted directly from respondents' own filings below -- that are unsupported by the record as a whole.  None contains anything resembling the type of coercive threat at issue in cases like Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963).[2]

_____

[2] The factual inaccuracies are not limited to the existence of threats.  For example, respondents repeatedly cite (Opp. 9, 29) an email from a White House official stating "I want an answer on what happened here and I want it today."  See C.A. ROA 9409.  But that email had nothing to do with any request for moderation of content by others; it was addressing a technical problem involving President Biden's own Instagram account.  Id. at 9410.

Another example:  Respondents claim that "in a single incident, the FBI pushed platforms to remove '929,000 tweets that were political speech by American citizens.'"  Opp. 5 (brackets and citation omitted); see D. Ct. Doc. 204-2, at 95 (C.A. ROA 10,630).

The same problem afflicts respondents' assertion (Opp. 25) that officials "repeatedly <u>tied</u> these threats to demands for greater censorship." For example, respondents echo the district court's statement that the Press Secretary "linked the threat of a 'robust anti-trust program' with the White House's censorship demand." <u>Ibid.</u> (quoting Appl. App. 22a, in turn citing D. Ct. Doc. 266-6, at 374 (C.A. ROA 23,778)). The citation refers to a May 2021 press conference at which the Press Secretary was asked, following the suspension of former President Trump's social-media accounts, to respond to Senator Ted Cruz's statement that "if the Big Tech oligarchs can muzzle the former President, what's to stop them from silencing you?" C.A. ROA 23,778. The Press Secretary made several points in response, including that the President "supports better privacy protections and a robust anti-trust program." <u>Ibid.</u> That was not a threat related to content moderation; the Press Secretary mentioned antitrust law -- which ensures that platforms compete with each other -- in response to Senator Cruz's concern that "Big Tech oligarchs" could monopolize the online marketplace of ideas.

---

The underlying document states that the 929,000 tweets were from "422 IRA-controlled accounts." C.A. ROA 10,630. "IRA" is the Internet Research Agency -- "a St. Petersburg-based organization" manned by "Russian operatives." <u>Id.</u> at 10,552. Respondents' improbable assertion that those accounts were actually tweeting "political speech by American citizens," Opp. 5 (citation omitted), appears to come from their own statement of facts below, C.A. ROA 16,657, which offered <u>no</u> citation. The district court adopted it all the same. Appl. App. 66a.

13

Respondents' reliance (Opp. 25-26) on references to Section 230, including in an April 2022 press conference, is likewise misplaced because none comes close to a coercive threat.  See Appl. 26-27.  And it is far-fetched to conclude, as respondents do, that some of the largest and wealthiest companies on the planet, represented by highly competent counsel, would be coerced by general answers to questions about potential legislative changes at press conferences or in cable-television interviews.

The platforms' routine decisions not to remove content that the government had flagged further refutes any claim of coercion.  Appl. 27.  Respondents apparently view (Opp. 26-27) the FBI's 50-percent rate as evidence of coercion because "any major-league slugger would envy" a .500 batting average.  But this is not baseball; a coinflip's chance of convincing the platforms shows that the government was engaged in persuasion, not coercion.  See Appl. 27-28.  And respondents do not deny that the Fifth Circuit failed to identify even a single instance where the platforms' refusal to remove content flagged by the government resulted in any actual adverse action.[3]

---

[3] Respondents now assert (Opp. 27 n.4), for the first time in this litigation, that the FTC retaliated against Twitter for changing its content-moderation policies in 2022 by seeking its communications with journalists reporting on the challenged governmental actions in this case.  The FTC is not a defendant in this case, and it informs this Office that it did not seek Twitter's communications with journalists on any matter.  Instead, the FTC issued a single request for information relevant to whether the company was abiding by its data privacy and security obligations under a

14

Finally, lacking record evidence of coercive threats, respondents fall back (Opp. 29-31) on the Fifth Circuit's four-factor test. The government has explained (Appl. 28-30) why that test is misguided, at least as applied by the Fifth Circuit here. Respondents do not address those arguments, and instead simply replicate the Fifth Circuit's analysis.

2. The Fifth Circuit also erred in holding that "significant encouragement" can be established by mere "entanglement." See Appl. 30-33. Respondents attempt to defend that broad holding by analogizing it to "'joint activity with the State,'" which "constitutes state action." Opp. 32 (citation omitted). But the Fifth Circuit expressly held that its view of entanglement "differs from the 'joint action' test" and involves a much lower "level of integration." Appl. App. 209a n.11. Respondents have nothing to say about that improper watering down of this Court's joint-action test. See Appl. 31. Respondents again assert (Opp. 33-34) that the FBI, CDC, and White House regularly met (or continue to meet) with platforms -- but respondents do not cite anything to suggest the sort of positive incentives that could overwhelm the platforms'

---

2022 FTC consent order not to share consumers' personal information with third parties -- including journalists -- without appropriate protections. See D. Ct. Doc. 18-9, at 2-3, United States v. Twitter, Inc., No. 22-cv-3070 (N.D. Cal. July 13, 2023). Former company employees had testified about their concerns that granting third-party journalists broad access to Twitter's systems risked exposing nonpublic user information to outsiders in potential violation of the FTC order. See D. Ct. Doc. 41, at 13-14, Twitter, supra (No. 22-cv-3070).

15

own judgments about content moderation, as required to establish "significant encouragement." See Appl. 30-31.

Nor do respondents cite any precedent supporting their as-sertion that mere persuasion can convert private action into state action. In particular, they err in relying (Opp. 28) on Norwood v. Harrison, 413 U.S. 455 (1973). Norwood involved the question whether a state could, consistent with the Fourteenth Amendment, loan textbooks to students attending private schools that engaged in race discrimination. The Court's decision turned not on state-action doctrine in general (or coercion or significant encourage-ment in particular), but on substantive equal-protection princi-ples. Id. at 463-468.

Respondents also err in invoking (Opp. 31) Skinner v. Railway Labor Execs.' Ass'n, 489 U.S. 602 (1989). That case involved regulations that authorized railroads to require employees who violated certain safety rules to take breath and urine tests, prohibited railroads from collectively bargaining away that au-thority, required railroads to turn over certain samples and test results to the government, and expressly preempted any contrary state laws. The Court held, "in the context of [a] facial chal-lenge," that the regulations were state action subject to the Fourth Amendment because of "the degree of the Government's par-ticipation." Id. at 614. There are no such binding and preemptive regulations here, and this Court has in any event cautioned against broad state-action theories in the First Amendment context in par-

16

ticular.  See Halleck, 139 S. Ct. at 1932.

      **C.   The Injunction Is Overbroad**

      The injunction covers thousands of government employees and applies to communications regarding content moderation with (and about) all social-media platforms (not just those used by respondents) with respect to all posts by any person (not just respondents) on all topics.  That sweeping relief flouts both the constitutional principle that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury," Gill v. Whitford, 138 S. Ct. 1916, 1934 (2018), and the equitable principle that injunctive relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," Califano v. Yamasaki, 442 U.S. 682, 702 (1979).  Appl. 34-36.

      Respondents do not defend the Fifth Circuit's unexplained suggestion that such sweeping relief was needed to provide full protection for respondents' own speech, or the court's apparent view that it had license to redress harms to "every social media user." Appl. App. 250a.  Instead, respondents defend the scope of the injunction based on their supposed "interest in hearing other speakers' voices on social media."  Opp. 35-36.  But that simply repeats their boundless theory of a purported "right to listen."

      Respondents also incorrectly state (Opp. 37) that the government "offers no narrower version of the injunction that would still grant effective relief to [respondents]."  To the contrary, the government has repeatedly asked that, at a minimum, the in-

junction be stayed to the extent it extends beyond actions spe-
cifically targeting content posted by individual respondents.
Appl. 6, 36, 40.

## II. THE EQUITIES FAVOR A STAY

The injunction would impose irreparable harms on the govern-
ment and the public by inserting the judiciary into core Executive
Branch communications and chilling the government from making its
views known to American citizens. Appl. 36-38. Respondents sug-
gest (Opp. 38) that the government suffers no harm because the
injunction simply requires "what the First Amendment already re-
quires." But that is part of the problem: by using _legal_ termi-
nology (instead of factual descriptions) to define its prohibi-
tions, the injunction incorporates the Fifth Circuit's novel and
poorly defined understandings of coercion and significant encour-
agement -- and then leaves thousands of enjoined government em-
ployees at risk of contempt if they guess wrong on a contested
legal question. Appl. 38.

Respondents' opposition vividly illustrates the problem:
They -- and the district court -- would treat as impermissible
coercion all manner of general, anodyne statements about Section
230, the antitrust laws, technology-facilitated crime, and other
issues of public concern. The Fifth Circuit likewise suggested
that _any_ flag of content by the FBI -- including content posted by
covert malign foreign actors engaged in disinformation operations
or content from hackers or spammers -- could be deemed coercive if

18

the platforms ultimately decide to take action against some un-
specified fraction of the flagged content.

At the same time, the government has explained (Appl. 39-40)
that the injunction is unnecessary to prevent any direct injury to
respondents.  Respondents say nothing to the contrary; instead,
they invoke (Opp. 39) alleged harm in the past to "millions" of
other people who are not parties to this case and who have not
sought judicial relief.  That neatly illustrates why this injunc-
tion should be stayed in its entirety during the relatively brief
period necessary to allow this Court to consider this case.  And
if the Court wishes to expedite matters further, it could construe
this application as a certiorari petition and grant the petition
at this time.[4]

---

[4] At the end of their opposition, respondents briefly assert
(Opp. 40) that they plan to file a petition for panel rehearing
seeking even broader relief from the Fifth Circuit and that this
Court should therefore either defer granting certiorari pending
the panel's action or add two questions to those set forth in the
government's application.  But respondents do not identify any
reason to believe that the panel erred in rejecting their claims
against other defendants, and they do not attempt to show that
those aspects of the Fifth Circuit's decision warrant this Court's
review.  Respondents' forthcoming petition for panel rehearing
thus provides no sound reason to delay a grant of review on the
important questions presented in the government's application.
But if the Court prefers to await the panel's disposition of the
rehearing petition before granting review, the delay caused by
respondents' rehearing petition provides still further reason to
enter a stay preventing the injunction from taking effect before
this Court has the opportunity to review it.

19

\*    \*    \*    \*    \*

For the reasons set forth above and in the government's ap-
plication for a stay, this Court should stay the preliminary in-
junction pending the disposition of the government's petition for
a writ of certiorari.  At a minimum, the Court should stay the
injunction to the extent it extends beyond actions specifically
targeting content posted by individual respondents.

Respectfully submitted.

ELIZABETH B. PRELOGAR
Solicitor General

SEPTEMBER 2023