**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| **BRIANNE DRESSEN, ERNEST RAMIREZ**, **SHAUN BARCAVAGE, SUZANNA NEWELL, NIKKI HOLLAND, and KRISTI DOBBS,**<br><br>*Plaintiffs*,<br><br>v.<br><br>**ROB FLAHERTY,** White House Director of Digital Strategy, in his official and individual capacities; **JOSEPH R. BIDEN, JR.**, President of the United States, in his official capacity; **KARINE JEAN-PIERRE**, White House  Press Secretary, in her official capacity; **ANDREW SLAVITT**, Senior Advisor to the Covid-19 Response Coordinator, in his official and individual capacities; **DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **XAVIER BECERRA**, Secretary of the Department of Health and Human Services, in his official and individual capacities; **VIVEK MURTHY**, United States Surgeon General, in his official and individual capacities; **CENTERS FOR DISEASE CONTROL AND PREVENTION**; **CAROL Y. CRAWFORD**, Chief of the Digital Media Branch of the Division of Public Affairs at the CDC, in her official and individual capacities; **DEPARTMENT OF HOMELAND SECURITY**; **ALEJANDRO MAYORKAS**, Secretary of the Department of Homeland Security, in his official and individual capacities; **CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY**; **JEN EASTERLY**, Director of the Cybersecurity and Infrastructure Security Agency, in her official and individual capacities; **THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY**; **THE LELAND** | **FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>Case No. 3:23-cv-155 |

1

**STANFORD JUNIOR UNIVERSITY;**
**ALEX STAMOS**, in his official and
individual capacities; **RENEE DIRESTA**, in
her official and individual capacities,

*Defendants*.

## INTRODUCTORY STATEMENT

It is axiomatic that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Nor may it coerce or induce a private entity to take action that the Constitution prohibits the government from doing directly. *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).

Indeed, it is essential to free government that the First Amendment be safeguarded "to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion." *Thornhill v. State of Alabama*, 310 U.S. 88, 95 (1940). As George Orwell put it, "[i]f liberty means anything at all, it means the right to tell people what they do not want to hear." It is not the government's role to curate, filter, or suppress disfavored speech before it reaches the eyes and ears of American citizens. Yet that is precisely what is going on here.

This case challenges the government's mass-censorship program and the shocking role that it has played (and continues to play) in ensuring that disfavored viewpoints deemed a threat to its agenda are suppressed. This sprawling censorship enterprise has involved the efforts of myriad federal agencies and government actors (including within the White House itself) to direct, coerce, and, ultimately, work in concert with social media platforms to censor, muffle, and flag as "misinformation" speech that conflicts with the government's preferred narrative—including speech that the government explicitly acknowledges to be true.

Plaintiffs in this case—Brianne Dressen, Shaun Barcavage, Kristi Dobbs, Nikki Holland, Suzanna Newell, and Ernest Ramirez—all use social media and have accounts on several platforms, including Facebook, Instagram, YouTube, Twitter, and TikTok.  All Plaintiffs except for Mr. Ramirez suffered—and continue to suffer from—serious and debilitating medical injuries within days (and, in many cases, hours) after taking the Covid vaccine.  Mr. Ramirez's 16-year-old son Ernest Ramirez Jr. died five days after taking his first dose of the Pfizer Covid vaccine.  All six Plaintiffs have relied on social media as a means of sharing their personal experiences after they, or a loved one, were medically harmed after taking the vaccine; of exchanging advice, medical research, and support with others who were injured after taking the vaccine; and of engaging with other users in private support groups for vaccine-injured individuals and their loved ones.  Plaintiffs' use of social media in these ways has been met with heavy and ongoing censorship.

In January of 2021, the Biden Administration took office.  Within the very first days of the new Administration, the White House commenced its efforts to ensure that speech critical of, or that even *questioned*, the Administration's Covid-related policy positions—including, namely, its position that every American get vaccinated, regardless of age or health—would be suppressed on social media.  As described in depth below, the social media companies were initially hesitant to sanction users and censor speech that did not violate any of the platforms' existing policies, and which was, in many cases, *true*—but might stoke vaccine hesitancy.  The White House, however, would not accept the platforms' refusal to censor, and, in coordination with numerous other federal agencies and officials, escalated its efforts to compel the social media platforms to meet the Administration's demands—or face the consequences.  And starting in March of 2021, the Administration began to see the fruits of its labor as the platforms began to change their moderation

3

policies and increasingly flag, suppress, or entirely remove users' speech that the Government deemed objectionable.

It was also not until *after* March of 2021—*after* the commencement of the Biden Administrations' censorship campaign—that Plaintiffs first noticed their speech being suppressed on the major social media platforms.  The censorship continued to escalate as the months progressed and as the Administration's pressure campaign intensified.  Indeed, for over three years now, Plaintiffs' speech—again, much of it private speech in social media support groups—has repeatedly been flagged as misinformation or removed entirely, while their social media accounts are at constant risk of being frozen or disabled.  For example, in July of 2021, Facebook shut down a private support group for vaccine-injured individuals called "A Wee Sprinkle of Hope," of which Ms. Dressen was a member, after she posted an infographic that listed certain symptoms that people had experienced post-Covid vaccine, as well as a link to a press conference where she had recently spoken about her vaccine injuries.  Facebook informed her that the group was disabled for violating Facebook's "Community Standards on misinformation that could cause physical harm."

 In August of 2021, after Mr. Ramirez's son died, he launched a GoFundMe page to help fundraise enough money for a trip to Washington, D.C. to speak about his son's story.  A week later, GoFundMe informed Mr. Ramirez that his account had been removed for violating the platform's terms of service for "Prohibited Conduct."  As a result, all of the funds that Mr. Ramirez had raised were forfeited.  On November 11, 2021, which would have been his son's seventeenth birthday, Mr. Ramirez posted a photo on Facebook and Twitter of himself beside his son's casket at his funeral.  The caption of the photo read: "My good byes to my Baby Boy."  Facebook flagged the post with a warning box viewable to other users labeling it as "partly false information."

Twitter deleted the photo altogether and warned Mr. Ramirez: "Make sure you're sharing reliable information. Visit the COVID-19 Information Center for reliable vaccine info and resources."

On multiple occasions, TikTok removed Ms. Holland's video posts in which she shared her personal experiences after taking the Covid vaccine, including her medical injuries and recovery process. TikTok notified her that the videos violated "Community Guidelines" for posting "violent and graphic content" and for "integrity and authenticity" concerns.

In the summer of 2021, Mr. Barcavage created a private support group on Facebook for those who were suffering tinnitus post-vaccination. Facebook frequently labeled posts within the group as "misinformation" or with a message redirecting viewers to "more accurate information" on the CDC website. As the group administrator, Mr. Barcavage had to develop code words with the other members, such as "vee" for vaccines, to prevent posts, including links to news articles and medical journals, from being flagged as misinformation or removed entirely.

On June 28, 2021, Ms. Dobbs participated in a press conference held by U.S. Senator Ron Johnson, along with other vaccine-injured individuals, where they shared their post-vaccine experiences. Within twenty-four hours of the press conference, one of Ms. Dobbs' private support groups on Facebook was shut down, and member lists were eliminated entirely under the auspices that the group had been spreading "misinformation." A few days after the press conference, another Facebook support group of which Ms. Dobbs was a member was shut down for posting a link to the press conference and an infographic displaying symptoms that people had experienced post-vaccination. As a result of Facebook's shutdown of the group, Ms. Dobbs lost contact with nearly two thousand other vaccine-injured individuals who had been members of the group.

On September 30, 2022, Ms. Newell posted a video titled "Kindness" on YouTube in which she and a vaccine-injured friend discussed their difficult experiences and how "Team Humanity"

and the kindness of others had allowed them to maintain hope.  They did not make any claims about the Covid vaccine. YouTube removed the video for "misinformation" and for violating its Community Guidelines.  As detailed herein, this censorship continues up to and including the present day.

The vast majority of Plaintiffs' censored speech is deeply personal and frequently private. For attempting simply to engage with others and to discuss their own pain, experiences, advice, and sources of hope, however, they have been met with censorship and accusations of spreading lies and "inciting violence."  Through its dogged censorship regime, Defendants have treated what is, in truth, personal and intimate speech as impermissible political dissent to the government's preferred policies.  Plaintiffs are innocent victims in the federal government's exhaustive crusade against any message that might threaten—or even question—its agenda.

Under the First Amendment, the federal government should play no role in policing private speech or picking winners and losers in the marketplace of ideas. But that is just what federal officials have been doing here as they chip away at the First Amendment's guarantee of free speech and replace it with what amounts to government-induced censorship.  Through threats, pressure, inducement, and coercion, Defendants now work in concert with social media companies to censor so-called "disinformation," "misinformation," and "malinformation"—a feat that the government could never lawfully accomplish alone.   Secretary Mayorkas of DHS commented that the government's efforts to police private speech on social media are occurring "across the federal enterprise."[1]  *See* Secretary Alejandro Mayorkas, Remarks at the Nat'l Ass'n of Secretaries of States 2022 Winter Conference (Mar. 1, 2022), *available at*

---

[1]

https://www.dhs.gov/news/2022/03/01/secretary-mayorkas-delivers-remarks-national-association-secretaries-state-nass.  It turns out that this statement is quite literally true.

Defendants' own words, documents from Twitter and the government itself, along with discovery produced in the lawsuit *Missouri v. Biden*, No. 3:22-cv-01213 (W.D. La.) (complaint filed Aug. 2, 2022), chronicle Defendants' efforts in staggering detail.  Defendants are engaged in egregious violations of the First Amendment across numerous federal agencies—including the White House, the Office of the Surgeon General, the CDC, DHS, and CISA—as well as massive government/private joint censorship enterprises, including the Stanford Internet Observatory's "Virality Project," to target and suppress speech on the basis of content (i.e., Covid vaccine-related speech) and viewpoint (i.e., speech that expresses doubt or concern about the safety and efficacy of Covid vaccines).

As alleged further herein, numerous emails, as well as evidence of regular meetings, phone calls, and exchanges of information between Defendants and major social media platforms, including Twitter (now known as X), Facebook (including Instagram), and YouTube unveiled by the discovery produced in *Missouri v. Biden*, the Twitter Files, and Defendants' own public documents reveal that Defendants have been directing social media censorship of constitutionally protected speech when it runs counter to the message that the government wishes to propagate. One of the primary objectives of Defendants' mass censorship program has been to chill and suppress speech related to the Covid vaccine and its—sometimes devastating—side effects.

As just one example, in an email exchange in March of 2021 between a Facebook executive and Rob Flaherty, White House director of digital media, Flaherty informed the Facebook executive: "We are gravely concerned that your service is one of the top drivers of vaccine hesitancy—period. … We want to know that you're trying, we want to know how we can help,

and we want to know that you're not playing a shell game … this would all be a lot easier if you would just be straight with us." In a clear attempt to appease the White House official, the Facebook executive replied about a week later, informing Flaherty that Facebook had made a number of policy changes, including the removal of "Groups, Pages and Accounts" containing, in the executive's words, "often-true content" that "can be framed as sensation, alarmist, or shocking."[2]  In other words, the type of content that Plaintiffs were posting, and were then censored for, *after* March of 2021.

Among the Defendants is Stanford University (Stanford), a private university, which operates the Stanford Internet Observatory (SIO), a self-described "a cross-disciplinary program of research, teaching and policy engagement for the study of abuse in current information technologies, with a focus on social media."  During the Covid-19 pandemic, SIO launched the Virality Project (or VP) as a means of tracking and censoring Covid-related speech on social media platforms.  According to the Virality Project's report, dated April 26, 2022, the VP targeted speech by "domestic actors" (i.e., American citizens) that "questioned the safety, distribution, and effectiveness of the vaccines."[3]  According to VP, true medical injuries and adverse health effects from the Covid vaccine qualify as "misinformation" when "shared absent context."[4]  Similarly, VP categorized as misinformation "[p]ersonal anecdotes," and it deemed "adverse event stories" objectionable because they are "employed to push back against vaccine mandates."[5]  According to VP's report, six major social media platforms censored content at VP's instigation: Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest.  The

---

[2] *See* Jenin Younes & Aaron Kheriaty, *The White House Covid Censorship Machine*, The Wall Street Journal (Jan. 8, 2023), https://www.wsj.com/articles/white-house-covid-censorship-machine-social-media-facebook-Facebook-executive-rob-flaherty-free-speech-google-11673203704.
[3] Stanford Internet Observatory, et al., The Virality Project, "Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines" (Apr. 26, 2022), https://purl.stanford.edu/mx395xj8490.
[4] *Id.*
[5] *Id*.

report explains that such censorship was effective in "deplatforming" recurring actors, which "led to an apparent reduction in false or misleading content."[6]

In July of 2021, Ms. Dressen's activities were detailed in a report created by the Virality Project.  The purpose of VP's report was to cultivate "real-time detection, analysis, and response to COVID-19 anti-vaccine and mis- and disinformation" and to support "information exchange between public health officials, government, and social media platforms."[7]  Under the heading "Ongoing Themes and Tactics," the report singles out Ms. Dressen and expresses skepticism of her "claims [of] life-altering injuries," concluding that: "An injury story that does not have a proven causal link to the vaccine nevertheless garnered high spread because it was picked up by a major anti-vaccine activist and by conservative politicians engaged in prior anti-vaccine activities."[8]  Notably, in June of 2021, Ms. Dressen visited the United States National Institutes of Health (NIH) as part of its "Investigation of persistent neurological symptoms following SARS-CoV2 vaccine."  The NIH confirmed that she had suffered Covid vaccine-induced medical conditions.  This information is not featured in VP's report.

Crucially, the Virality Project expressly admits that it works closely with federal, state, and local government agencies and officials to carry out this joint censorship enterprise—and that it seeks to develop even closer ties.  According to its report, the VP includes federal agencies, including the CDC and Office of the Surgeon General, and state and local officials as key "stakeholders," and which are engaged in continuous, ongoing communication and close collaboration with VP to effect a "whole-of-society" effort to include an active role for the

---

[6] *Id.*
[7] Virality Project Weekly Briefing #31, July 20, 2021 – July 27, 2021, https://static1.squarespace.com/static/60025974f9f7920e6b40885b/t/6100842926d6617b4ab85e36/1627423792279/Virality+Project+-+0727+Weekly+Briefing.pdf.
[8] *Id.*

government in censoring disfavored, vaccine-related speech.[9]  As alleged in further detail herein, SIO has plainly worked in concert with the government Defendants to censor speech on social media regarding the Covid vaccine and its side effects. SIO is thus sued as a *de facto* government agent.

The federal government has launched a war against purported mis-, dis-, and malinformation, which it claims must be suppressed *despite* the First Amendment in order to protect American citizens from supposedly harmful or dangerous ideas.  Indeed, Defendants admit to suppressing truthful speech, including stories of vaccine side effects that it has expressly acknowledged to be true, but which the government nevertheless targets for censorship because such speech "could fuel vaccine hesitancy."[10]  Experience, however, "should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." *Olmstead v. United States*, 277 U.S. 438, 479 (1928).  The United States government was formed on the principle that it exists to protect the sovereign rights of each individual American citizen. These unconstitutional actions not only censor, but seek to control what ideas Americans might have in the first place.

Defendants' massive and ongoing censorship enterprise has censored, suppressed, and chilled constitutionally protected speech on social media platforms—modern society's public square. These actions have directly impacted the Plaintiffs in this case, all of whom have been censored, flagged as "misinformants," shadow-banned, maligned, cast in a false light, and denied their right to freely associate with other members of the vaccine-injured community—even in private support groups closed to the public—as a result of Defendants' actions, which lack any

---

[9] Stanford Internet Observatory, et al., The Virality Project, "Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines" (Apr. 26, 2022), https://purl.stanford.edu/mx395xj8490.
[10] Twitter Files #19: *The Great Covid-19 Lie Machine: Stanford, the Virality Project, and the Censorship of "True Stories"*, *at* https://twitter.com/mtaibbi/status/1636729166631432195.

conceivable statutory or constitutional authority.  Defendants' censorship operation continues to this day and gravely threatens the fundamental rights of free speech and free association of not only the Plaintiffs, but of all Americans.

## JURISDICTION AND VENUE

1.     This action raises federal questions under the First Amendment of the United States Constitution, as well as 42. U.S.C. § 1985(3).

2.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because the federal law claims arise under the Constitution and laws of the United States.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff Ernest Ramirez resides in this District.

4.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.  This Court may award damages and equitable or other relief for the protection of civil rights pursuant to 28 U.S.C. § 1343.

## PARTIES

5.     Plaintiff Brianne Dressen was a preschool teacher in Saratoga Springs, Utah.  Due to the debilitating medical injuries that she experienced after taking the AstraZeneca Covid vaccine as a part of a clinical trial, she has been unable to continue teaching.  In November of 2021, Ms. Dressen founded the non-profit organization React19, which is dedicated to supporting those injured by the Covid vaccine.  She currently serves as the Co-Chairman of the organization.  Ms. Dressen resides in Salt Lake City, Utah.

6.     Plaintiff Shaun R. Barcavage was formerly a research nurse practitioner at Weill Cornell Medicine.  Due to the debilitating medical injuries that he experienced after taking his first

dose of the Pfizer Covid vaccine, he is currently on disability leave.  He resides in Rigelsville, Pennsylvania.

7.      Plaintiff Kristi Dobbs is a dental hygienist.  Due to the debilitating medical injuries that she experienced after taking her first dose of the Pfizer Covid vaccine, she was unable to return to work until April of 2023, and she currently works part-time.  She resides in Joplin, Missouri.

8.      Plaintiff Nikki Holland was formerly a full-time physical therapist.  Due to the debilitating medical injuries that she experienced after taking her second dose of the Moderna Covid vaccine, she has been unable to return to work and is currently on disability leave.  She resides in Henry, Tennessee.

9.      Plaintiff Suzanna Newell worked in financial services for over 25 years and served most recently as the Vice President of Corporate Social Responsibility at a large bank in Minneapolis.  Due to the debilitating medical injuries that she experienced after taking her second dose of the Pfizer Covid vaccine, she has been unable to return to work and was on paid disability leave until January of 2024, at which point Ms. Newell's disability support was cut off, despite several physicians' support and recommendations that she remain on leave due to her ongoing vaccine-related injuries.  She resides in Saint Paul, Minnesota.

10.     Plaintiff Ernest Ramirez is a service full-time patient advocate at The James Clinic.  His 16-year-old son Ernest Ramirez Jr. died five days after taking his first dose of the Pfizer Covid vaccine.  As a patient advocate, Mr. Ramirez meets with and offers support to individuals who were injured after taking one of the Covid vaccines.  Mr. Ramirez resides in Edinburg, Texas.

11.     Defendant Rob Flaherty, at times relevant to this Complaint and, on information and belief, until around June of 2023, served as Deputy Assistant to the President and Director of Digital Strategy at the White House.  Flaherty subsequently served as President Biden's deputy

12

campaign manager until July of 2024 when President Biden ended his campaign and dropped out of the race.  He currently serves as Vice President Kamala Harris's deputy campaign manager in advance of the 2024 presidential election.

12.     As deputy campaign manager for both presidential campaigns, one of Flaherty's primary objectives is and has been to "fight false narratives" and to "more aggressively push[] back on misinformation" on social media platforms. [11]   According to Flaherty, this means relying less on the social media companies' "willingness to police misinformation" and, instead, "filling some of the gaps these companies are leaving behind."[12] He is sued in his official and individual capacities.

13.     Defendant Joseph R. Biden, Jr., is the President of the United States.  He is sued in his official capacity.

14.     Defendant Karine Jean-Pierre is the White House Press Secretary.  She is sued in her official capacity.  She is substituted for her predecessor, former White House Press Secretary Jennifer Psaki.

15.     Defendant Andrew Slavitt served as the White House Senior Covid-19 Advisor at times relevant to this Complaint.  He is sued in his official and individual capacities.

16.     Defendant Department of Health and Human Services (HHS) is a cabinet-level agency within the government of the United States.

17.     Defendant Dr. Vivek Murthy is Surgeon General of the United States.  He is sued in his official and individual capacities.

---

[11] *See* Rebecca Kern, *Biden's campaign set to counterpunch on misinformation,* Politico (Sept. 20, 2023), *available at* https://www.politico.com/news/2023/09/19/bidens-social-media-misinfo-fight-00116721.

[12] *Id.*; *see also* "Full interview with Harris deputy campaign manager Rob Flaherty at DNC," POLITICO, at 13:35 to 14:49 (Aug. 20, 2024), *available at*  https://www.youtube.com/watch?v=B8d-4tK3BJc&ab_channel=POLITICO, at (Flaherty explaining the "explosion of misinformation" on social media and he and his campaign team's "really aggressive attempt" to push back and "fill the gap" left by the platforms to prevent "even more right-wing misinformation."

18.     Defendant Xavier Becerra is Secretary of HHS.  He is sued in his official and individual capacities.

19.     Defendant Centers for Disease Control and Prevention (CDC) is a federal agency under the Department of Health and Human Services.

20.     Defendant Carol Crawford is Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention.  She is sued in her official and individual capacities.

21.     Defendant Department of Homeland Security (DHS) is a cabinet-level executive agency within the Government of the United States.

22.     Defendant Alejandro Mayorkas is Secretary of DHS.  He is sued in his official and individual capacities.

23.     Defendant Cybersecurity and Infrastructure Security Agency (CISA) is an agency within DHS that is charged with protecting the United States' cybersecurity and physical infrastructure.

24.     Defendant Jen Easterly is the Director of CISA within DHS.  She is sued in her official and individual capacities.

25.     Hereinafter, Defendants Rob Flaherty, Joseph R. Biden, Jr., Karine Jean-Pierre, Andrew Slavitt, HHS, Dr. Vivek Murthy, Xavier Becerra, CDC, Carol Crawford, DHS, Alejandro Mayorkas, CISA, and Jen Easterly will be referred to jointly as the "Government Defendants."

26.     Hereinafter Defendants Rob Flaherty, Andrew Slavitt, Dr. Vivek Murthy, Xavier Becerra, Carol Crawford, Alejandro Mayorkas, and Jen Easterly will be referred to jointly as the "Individual Defendants."

27.     Defendant The Leland Stanford Junior University (Stanford University) is a private research university located in Stanford, California. On information and belief, Stanford University is legally and factually responsible for the activities of its "cross-disciplinary program," SIO, and of its director and staff.

28.     Defendant Board of Trustees of the Leland Stanford Junior University (Stanford Board) is the governing body of Stanford University.

29.     The Stanford Internet Observatory ("SIO") is "[a] program of [Stanford University's] Cyber Policy Center, a joint initiative of the Freeman Spogli Institute for International Studies and Stanford Law School." *See* Stanford Internet Observatory, Cyber Policy Center, *at* https://cyber.fsi.stanford.edu/io.  SIO describes itself as "a cross-disciplinary program of research, teaching and policy engagement for the study of abuse in current information technologies, with a focus on social media.  Under the program direction of computer security expert Alex Stamos, SIO "was created to learn about the abuse of the internet in real time, to develop a novel curriculum on trust and safety that is a first in computer science, and to translate our research discoveries into training and policy innovations for the public good." *See* About, Stanford Internet Observatory, Cyber Policy Center, *at* https://cyber.fsi.stanford.edu/io.

30.     In response to the Covid-19 pandemic, SIO launched the Virality Project, which is a "coalition of research entities focused on supporting real-time information exchange between the disinformation research community, public health officials, civil society organizations, government agencies, and social media platforms." *See* About, Virality Project, *at* https://www.viralityproject.org/news/about. Through the Virality Project, SIO contracts with the federal government agencies to censor Americans for expressing disfavored opinions about Covid-19.  SIO is sued as a *de facto* government agency.

31.     Defendant Alex Stamos served as the Director of SIO at times relevant to this Complaint.  He is sued in his individual capacity and in his official capacity as a *de facto* government actor.

32.     Defendant Renee DiResta served as the Research Manager at SIO at times relevant to this Complaint.  She is sued in her individual capacity and in her official capacity as a *de facto* government actor.

33.     On information and belief, the social media censorship activities of SIO alleged in this Complaint were conducted under the direction of Stamos and DiResta.

34.     Hereinafter, Defendants Stanford University, Stanford Board, Alex Stamos, and Renee DiResta will be referred to jointly as the "Stanford Defendants."

35.     The Stanford Defendants have represented to Plaintiffs that SIO lacks an independent legal identity separate from Stanford University and that Stanford University is the proper suable entity with responsibility for the actions of SIO and its personnel.

## BASIC PRINCIPLES

I.      **THE FIRST AMENDMENT PROTECTS AMERICANS' RIGHTS TO EXPRESS AND TO HEAR PERSPECTIVES THAT ARE CONTROVERSIAL, OUTSIDE THE MAINSTREAM, AND THAT DIFFER FROM THE GOVERNMENT'S MESSAGING**

36.     The First Amendment to the United States Constitution prohibits Congress from making laws "abridging the freedom of speech."  U.S. Const., amend. I.

37.     The aim of the First Amendment is to protect "an expressive realm in which the public has access to a wide range of views," which cannot be achieved by "licensing the government to stop *private actors* from speaking as they wish and preferring some views over others." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024) (emphasis in original).

38.     "The First Amendment gives freedom of mind the same security as freedom of conscience …. And the rights of free speech and free press are not confined to any field of human

interest." *Thomas v. Collins*, 323 U.S. 516, 531 (1945); *see also Knight First Amend. Inst.*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated on other grounds* 141 S. Ct. 1220 (2021) ("As a general matter, social media is entitled to the same First Amendment protections as other forms of media.").

39.     It is "critically important to have a well-functioning sphere of expression, in which citizens have access to information from many sources. That is the whole project of the First Amendment." *Moody*, 144 S. Ct. at 2402.

40.     The prohibition against restrictions on speech applies to all branches of government. *See Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech[.]'"); *Moody*, 144 S. Ct. at 2430 ("The First Amendment protects 'the freedom of speech,' and most of our cases interpreting this right have involved government efforts to forbid, restrict, or compel a party's own oral or written expression.") (Alito, J., concurring); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (holding that Nixon Administration's attempt to prevent publication of classified information violated the First Amendment).

41.     The bedrock of the First Amendment is that government officials lack power to censor disfavored speakers and viewpoints. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (Government officials may share their views and criticize particular beliefs, but they may never "use the power of the State to punish or suppress disfavored expression.").

42.     "Debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 270. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters[.]").

43.     "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

44.     "[A]s a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002).

45.     Labeling disfavored speech "disinformation," "misinformation," or "malinformation" does not strip it of First Amendment protection.

46.     Indeed, the Supreme Court has rejected the argument that "false statements, as a general rule, are beyond constitutional protection." *United States v. Alvarez*, 567 U.S. at 718 (2012).

47.      "Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements.  This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

48.     "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Id.* at 723 (citing G. ORWELL, NINETEEN EIGHTY-FOUR (1949) (Centennial ed. 2003)).

49.     "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech … it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.  The mere potential for the exercise of that

power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.* at 723.

50.      "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id.* at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

51.      "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.* at 728.

52.      The First Amendment also protects the right to receive information.  *See Martin v. U.S. E.P.A.*, 271 F.Supp.2d 38 (2002) (quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756 (1976) ("where a speaker exists …, the protection afforded is to the communication, to its source and to its recipients both.").

53.      There is a "First Amendment right to receive information and ideas" "where the listener has a concrete, specific connection to the speaker." *Murthy v. Missouri*, 144 S. Ct. 1972, at 1996 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).

54.      Although often presented as distinct from speakers' rights, the rights of readers and listeners are an essential element of the right to free speech. *See* Philip Hamburger, *Courting Censorship*, J. Free Speech L., 268 (2024) ("People cannot develop their views with any sophistication unless they can read other views that challenge, enlarge, moderate, or otherwise refine their own. So, when government demands the suppression of some speech and chills even

more, it reduces the diversity, value, and moderation of opinion—thereby diminishing the opportunity for each individual to develop and express his own considered views.").

55.     The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them." *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982) (emphasis in original). *See also id.* (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.").

56.     As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

## II.    THE FIRST AMENDMENT SECURES AMERICANS' FREEDOM OF EXPRESSIVE ASSOCIATION, INCLUDING THE RIGHT TO FORM AND FREELY COMMUNICATE WITHIN PRIVATE GROUPS WITHOUT ABRIDGMENT BY GOVERNMENT

57.     "[T]he First Amendment's protection extends beyond the right to speak." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc*., 547 U.S. 47, 68 (2006).  It also protects the "right to associate for the purpose of speaking." *Id*; *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("The First Amendment protects acts of expressive association.").

58.     The freedom of expressive association secures the right to associate for the purpose of engaging in those activities protected by the First Amendment, including the exercise of free speech.  The Constitution guarantees freedom of association "as an indispensable means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

59.     As the Supreme Court has long recognized, "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, religious, and cultural ends.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts*, 468 U.S. at 622).

60.     The freedom of expressive association is "crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Id*. at 647-48.  Moreover, the freedom of speech "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622.

61.     "An association must merely engage in expressive activity that could be impaired in order to be entitled to [First Amendment] protection." *Boys Scouts of Am.*, 530 U.S. at 655.  Further, the First Amendment "does not require that every member of a group agree on every issue," nor does it require that a group "trumpet its views from the housetops" in order for the group to receive First Amendment protection for its expressive association. *Id*. at 655-56.

62.     "The right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld*, 547 U.S. at 68.  "If the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect." *Id*.

## III.   THE GOVERNMENT MAY NOT USE PRIVATE COMPANIES TO ACCOMPLISH WHAT IT CANNOT DO DIRECTLY

63.     It is "axiomatic" that the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish."  *Norwood v. Harrison*, 413 U.S. 455, 465 (1973); *see also Vullo*, 602 U.S. at 190 ("A government official

cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf.").

64.     Regardless of whether the government carries out censorship itself or uses a private party to do so, government efforts to "dictat[e] the subjects about which persons may speak," *First Nat. Bank of Boston v. Bellotti*, 435 U. S. 765, 784–785 (1978), or to suppress protected speech are "'presumptively unconstitutional,'" *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 830 (1995) (citation omitted).

65.     Private action may be rendered state action by the government in multiple ways.

66.     First, the government can be held responsible for private action "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Biden v. Knight First Amend, Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly.")

67.     Coercion includes "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (even where private party is "free" to ignore government's "advice" because its refusal would violate no law, it is still state action when government induces private party to suppress speech under thinly-veiled threats of legal action).

68.     "[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (Posner, J.) (quoting *Am. Fam. Ass'n v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

"Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first amendment violation." *Id*. at 235 (quoting *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)).

69.     The censorship and suppression of speech that Defendants have coerced social media platforms to impose on disfavored speakers, content, and viewpoints constitute prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment. "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

70.     In fact, "such compulsion so plainly violates the Constitution" that it is rarely necessary for courts to have to step in. *Janus v. Am. Fed'n of State, Cnty.*, 138 S.Ct. 2448, 2464 (2018).

71.     "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am.*, 350 F.Supp.3d at 115.

72.     Where the government encouraged and pressured private actors "into adopting" the government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting government action. *Mathis c. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

73.     Second, private conduct may be deemed state action when private and government officials are jointly engaged to deprive an individual of his constitutional rights. *Dennis v. Sparks*, 449 U.S. 24 (1980).

74.     "[A] private entity can qualify as a state actor … when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 941–942 (1982)). "Private persons [who are] jointly engaged with state officials in the prohibited action, are acting 'under color' of law … It is enough that he is a willful participant in joint activity with the State or its agents." *Lugar*, 457 U.S. at 941 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970)).

75.     State action through joint engagement occurs when the government "knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003). Joint action may also be proven by showing that government officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights. *See, e.g.*, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

76.     Private acts may constitute state action if the private parties "have conspired with a state official." *Sims v. Jefferson Downs Racing Ass'n, Inc*., 778 F.2d 1068, 1076 (5th Cir. 1985). To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id*. (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

77.     Third, private action may constitute state action when the private entity is "entwined with governmental policies" or when the government is entwined in the management or control of the private action. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 302 (2001) ("Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards"). There is an especially compelling case for state action "where a federal statute has immunized private conduct" where features of the regulation show that the government "did more than adopt a passive position" toward the challenged private conduct. *Skinner v. Ry. Lab. Executives' Ass'*n, 489 U.S.

24

602, 615 (1989) ("The fact that the Government has not compelled a private party to perform [unconstitutional conduct] does not, by itself, establish that the [challenged action] is a private one.").

78.     Moreover, regardless of the presence of state action, 42 U.S.C. § 1985(3) prohibits government officials from conspiring with third parties to deprive American citizens of their rights, privileges, immunities, and equal protection of the laws.

79.     Indeed, there is "nothing inherent in [the text of section 1985(3)]" that requires state action.  *Griffin v. Breckenridge*, 403 U.S. 88, 97, (1971) (applying section 1985(3) to private parties).  Indeed, "the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in section 1985(3) of all deprivations of 'equal protection of the laws' and 'equal privileges and immunities under the laws,' *whatever their source*. *Id*. (emphasis added); *see also Ziglar v. Abbasi,* 582 U.S. 120, 154 (2017) (applying section 1985(3) to federal officials).

80.     Defendants' actions readily satisfy the above tests. As alleged herein, Defendants have coerced, encouraged, conspired and worked in concert with private entities to carry out constitutionally forbidden actions, which have directly impacted the Plaintiffs in this case.  Further, the Government Defendants have used threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity to pressure private parties to increase censorship of free speech on their platforms.

81.     Ultimately, however, the text of the Constitution eliminates the need for a showing that private entities were somehow transformed into government actors.  The First Amendment bars government from "abridging the freedom of speech." U.S. Const. Amend I.  Thus, at least in a claim against the government, the constitutional question is simply whether government has

caused a reduction in the freedom of speech—for example, by pursuing policies of content or viewpoint discrimination—not whether the private partner has been sufficiently coerced into becoming a government actor.

82.     Regardless of the legal analysis applied to the facts of this case, Defendants' conduct in carrying out their mass censorship program through the actions of, and conspiracy with, private entities has clearly resulted in the abridgment of free speech and is therefore unlawful.

## IV.    PRIVATE PARTIES MAY QUALIFY AS STATE ACTORS SUBJECT TO THE CONSTITUTION'S CONSTRAINTS

83.     There is no single test to identify state action on the part of a private entity. *See, e.g.*, *Brentwood Acad.*, 531 U.S. at 294. However, pursuant to Supreme Court precedent, a private party may qualify as a state actor under several circumstances.

84.     First, "a private party's joint participation with state officials" in unconstitutional conduct "is sufficient to characterize that party as a 'state actor.'" *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 941 (1982). "It is enough that [the private actor] is a willful participant in joint activity with the State or its agents." *Id*. (quoting *Adickes*, 398 U.S. at 152); *see also Brentwood Acad.*, 531 U.S. at 294 (state action on the part of private party occurs when there is "a symbiotic relationship between the [government] and the [private party].").

85.     Second, private action may constitute state action when the private entity is "entwined with governmental policies" or when the government is entwined in the management or control of the private action. *Brentwood Acad.*, 531 U.S. at 302 ("Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards").

86.     Third, private parties have been held liable for state action when involved in conspiracy with state or local officials. *See Adickes*, 398 U.S. at 152; *see also* 42 U.S.C. § 1985(3).

87.     As alleged herein, the Stanford Defendants collaborated closely with federal, state, and local government officials to moderate, target, and suppress disfavored viewpoints concerning the Covid vaccine through SIO's "Virality Project."

88.     Through the Virality Project, the Stanford Defendants built strong ties with government entities at all levels, including the Office of the Surgeon General and the CDC, as well as state and local public health officials and other government "stakeholders."

89.     The Stanford Defendants engaged in continuous, ongoing communication with government officials to execute the government's censorship scheme, and, on information and belief, remain pervasively intertwined with federal, state, and local government officials to this day.

90.     The Stanford Defendants willfully participated in joint activity with the government in its unconstitutional censorship enterprise, and conspired with a multitude of government officials for the purpose of depriving, either directly or indirectly, Plaintiffs of their First Amendment rights.  The Stanford Defendants plainly qualify as state actors under Supreme Court precedent, and must be held accountable as *de facto* government actors.

## V.     AGENCIES ARE ONLY PERMITTED TO EXERCISE CONGRESSIONALLY DELEGATED AUTHORITY

91.     "[A]gency actions beyond delegated authority are *ultra vires* and should be invalidated."  *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54 (D.D.C. 2016).  *See National Federation of Independent Business v. OSHA*, 595 U.S. 109, 119 (2022) (OSHA vaccine mandate "extends beyond the agency's legitimate reach" as evidenced by the "lack of historical precedent, coupled with the breadth of authority that the Secretary now claims") (cleaned up).

92.     Courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has exceeded its authority.  *See Tiger Lily LLC v. U.S. Dep't of Housing and Urban Development*, 525 F.Supp.3d 850, 861 (W.D. Tenn.), *aff'd*, 5 F.4th 666 (6th Cir. 2021) (determining that CDC eviction moratorium was unlawful, as "to hold otherwise would be to construe the statute so broadly as to grant this administrative agency unfettered power to prohibit or mandate anything, which would ignore the separation of powers and violate the non-delegation doctrine.").

93.     "A reviewing court owes no deference to the agency's pronouncement on a constitutional question and must make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Poett v. United States*, 657 F. Supp. 230, 241 (D.D.C. 2009) (internal citations and quotation marks omitted).

94.     Under the APA, this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that it determines to be contrary to constitutional rights or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  *See* 5 U.S.C. §§ 706(2)(B), (C).

95.     Also under the APA, agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  *See* 5 U.S.C. § 704.

96.     Agency action is final if first, it "marks the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

97.     Second, the action must be one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (quoting

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

98.     The actions of Defendants, alleged herein, on information and belief, reflect and result from specific, discrete, and identifiable decisions of Defendants to adopt an unlawful social media censorship scheme.

## VI.   CONGRESS MAY NOT DELEGATE AUTHORITY COUNTER TO THE CONSTITUTION

99.     "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison,* 1 Cranch 137, 176 (1803).   Indeed, "even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds." *United States v. Morrison*, 529 U.S. 598, 608 (2000).

100.    Congressional enactments that exceed Congress's constitutional bounds are invalid.  *Id*. at 607; *see also United States v. Lopez*, 514 U.S. 549 (1995).

101.    Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution. *See, e.g*., *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution") (citing *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

102.    Further, "[a]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

103.    "Explicit and unambiguous provisions of the Constitution prescribe and define the respective function[] of the Congress." *I.N.S. v. Chadha*, 462 U.S. at 945.  Congress's authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation."

*United States v. Lopez*, 514 U.S. at 566; *see also* Const. art. I, § 8. Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce. *See United States v. Lopez*, 514 U.S. at 557; *United States v. Morrison*, 529 U.S. at 617

104. Moreover, the text of the Constitution is explicit that: "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend I. Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

105. Therefore, even if (contrary to what is alleged herein) Defendants' censorship enterprise were within the bounds of the statutory authority delegated by Congress (it is not), Defendants' conduct would, and does, remain *ultra vires* in violation of any conceivable constitutional authority. Congress is not constitutionally authorized to confer upon federal agencies any power, purpose, or authority beyond the Constitution's enumerated powers or in violation of the First Amendment.

## FACTS OF THE CASE

### I.   SOCIAL MEDIA COMPANIES IN THE TWENTY-FIRST CENTURY

106. Social media is widely understood to be "the modern public square." *Packingham*, 582 U.S. at 107. Social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

107. "Today's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties." *Knight First Amendment Institute*, 141 S. Ct. at 1221 (Thomas, J., concurring).

108.     On information and belief, Facebook has close to 3 billion registered users worldwide, and over 180 million users throughout the United States.

109.     According to a Pew Research fact sheet, 68 percent of adults report using Facebook, and 30 percent of U.S. adults say they regularly obtain information about current events from the site.[13]

110.     On information and belief, Twitter has more than 251 million global daily active users worldwide as of second quarter 2024,[14] including approximately 59 million adult users in the United States as of November 2023.[15]  Most tweets are accessible to non-Twitter users on the internet.

111.     Twenty-three percent of U.S. adults say that they use Twitter, and 12 percent of U.S. adults say they regularly get news on Twitter.[16]

112.     Forty-six percent of U.S. adults say they use Instagram,[17] and 16 percent of U.S. adults say that they regularly get news from the site.[18]

113.     On information and belief, TikTok had more than one billion monthly users worldwide, as of 2021, and over 150 million monthly active users in the United States as of 2023.[19]

---

[13] *Social Media and News Fact Sheet*, Pew Res. Ctr. (Nov. 15, 2023), *available at* https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/.

[14] Matt Binder, *X / Twitter's user base has stopped growing under Elon Musk*, Mashable (July 9, 2024), *available at* https://mashable.com/article/x-twitter-global-daily-active-users-stall-under-elon-musk (also noting that Twitter user count has hovered around 250 million users for the past two years).

[15] *Social Media and News Fact Sheet*, *supra* note 12 (calculating number of users by multiplying proportion of American adults who use Twitter by number of American adults); *see also* Stella U. Ogunwole, Megan A. Rabe, Andrew W. Roberts, and Zoe Caplan, U.S. Adult Population Grew Faster Than Nation's Total Population From 2010 to 2020, U.S. Census Bureau (Aug. 12, 2021), available at https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html (stating that 2020 U.S. Census found the adult population in U.S. to be 258.3 million).

[16] *Social Media and News Fact Sheet, supra note 12.*

[17] *Id.*

[18] *Id.*

[19] *See* David Shepardson, *TikTok hits 150 mln U.S. monthly users, up from 100 million in 2020*, Reuters (Mar. 20, 2023), *available at* https://www.reuters.com/technology/tiktok-tell-congress-it-has-150-million-monthly-active-us-users-2023-03-20/#:~:text=TikTok%20hits%20150%20mln%20U.S.,100%20million%20in%202020%20%7C%20Reuters (quoting statements by TikTok).

114.    According to a Pew Research study, 31 percent of U.S. adults say that they use TikTok,[20] and 14 percent of U.S. adults say that they regularly get news from the site.[21]

115.    On information and belief, YouTube has been the number one streamer in America for twelve consecutive months with "1 billion hours … of YouTube content on … TVs every day."[22]  Videos on YouTube channels are visible to both YouTube users and to the general public on the internet.  An estimated 500 hours of video content are uploaded to YouTube every minute.[23]

116.    Eighty-two percent of U.S. adults say that they use YouTube, and 26 percent of U.S. adults say that they regularly get news on YouTube.[24]

117.    Many social media platforms, including both Facebook and Twitter, permit formation of private groups where users can join and communicate with each other.  Posts in private groups are visible only to other group members.

118.    Social media platforms can suppress or censor speech by means other than removal or suspension of accounts.  Some of these methods are immediately known to an account's owner and his or her audience, and some are not.  These methods include, but are not limited to, imposing warnings or strikes against accounts to chill disfavored speech, "shadow banning" disfavored posts and accounts by making them less visible to other users or not at all, demonetizing content, adjusting algorithms to suppress or de-emphasize speakers or messages, placing warning labels on content, promoting negative comments on disfavored content, and requiring additional clicks to access content.

---

[20] *Social Media and News Fact Sheet*, *supra* note 12.
[21] *Id.*
[22] *Nielsen crowns YouTube #1 Streamer in America 12 months straight!*, The YouTube Team (Feb. 20, 2024), *available at* https://blog.youtube/news-and-events/youtube-number-one-streamer-nielsen/.
[23] *YOUTUBE BY THE NUMBERS*, YouTube for Press Blog (last accessed Sept. 10, 2024), *available at* https://blog.youtube/press/.
[24] *Social Media and News Fact Sheet*, *supra* note 12.

119.     All of these methods ultimately serve to chill and suppress speech.  Fearing the loss of their accounts, limits on the visibility and reach of their speech on the platforms, the loss of connections with other users or members of social media groups, and/or the damage to their credibility or standing to express their views, users self-censor to avoid making statements that might be deemed to violate the social media companies' vague, ever-changing, often unknown to the public, and inconsistently enforced standards for censoring and suppressing speech.

## II.     THE WHITE HOUSE AND SURGEON GENERAL'S OFFICE COERCE, PRESSURE, AND ENCOURAGE SOCIAL MEDIA COMPANIES TO CENSOR DISFAVORED SPEECH ABOUT COVID-19

120.     On January 17, 2020, then-candidate and now-President Biden stated in an interview with the New York Times editorial board that Section 230 of the Communications Decency Act should be "revoked" because companies like Facebook did not adequately censor false information in the form of political ads criticizing him.[25]  In the same interview, Biden described Mark Zuckerberg, owner of Facebook (Facebook and Instagram,) as "a real problem" and advocated that he be held civilly liable for content that indirectly leads to harm, and possibly even held criminally responsible.

121.     During the presidential transition, on December 2, 2020, President Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that it was "long past time to hold the social media companies accountable for what's published on their platforms," referring to amendment or repeal of Section 230 of the Communications Decency Act.[26]

122.     On Saturday night, February 6, 2021 at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or imposter account linked to Finnegan Biden, the

---

[25] The Editorial Board, *Joe Biden Says Age Is Just a Number*, The New York Times (Jan. 17, 2020), *at* https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html.
[26] *Biden Tech Advisor: Hold Social Media Companies Accountable for What Their Users Post*, CNBC.com (Dec. 3, 2020), *at* https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html.

President's adult daughter ("Please remove this account immediately").[27]  He followed up by saying "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden."[28]

123.    Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over. We'll escalate for further review from here."[29]  Flaherty responded the same minute, "Cannot stress the degree to which this needs to be resolved immediately."  Within 45 minutes, Twitter informed Flaherty that it had suspended the account.[30]

124.    The following day, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's censorship demands.  Twitter offered to enroll White House officials in Twitter's Partner Support Portal for expedited review of flagging content for censorship, recommending that Flaherty "designate a list of authorized White House staff for Twitter's Partner Support Portal."[31]

125.    Twitter noted that it had been recently bombarded with such requests for censorship from the White House: "we would prefer to have a streamlined process strictly with your team as the internal liaison. That is the most efficient and effective way to ensure we are prioritizing requests. In a given day last week for example, we had more than four different people within the White House reaching out for issues."

***The Largest Worldwide Campaign—of Censorship***

126.    The next day, February 8, 2021, Facebook emailed Rob Flaherty, Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently expanded its Covid-19

---

[27] Plaintiffs' Proposed Findings of Fact at 13, *Missouri v. Biden*, 576 F. Supp.3d 622 (E.D. Mo. 2021) (ECF No. 212-3).
[28] *Id*.
[29] *Id*.
[30] *Id.*
[31] *Id.*

censorship policies. Facebook stated: "We wanted to make sure you saw our announcements today about running the largest worldwide campaign to promote authoritative Covid-19 vaccine information and expanding our efforts to remove false claims on Facebook and Instagram about Covid-19, Covid-19 vaccines and vaccines in general during the pandemic."

127.     Under the heading, "Combating Vaccine Misinformation," Facebook provided a detailed list of expanded censorship policies: "We are expanding our efforts to remove false claims on Facebook and Instagram about Covid-19, Covid-19 vaccines and vaccines in general during the pandemic. Since December [i.e. during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. …. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated…."[32]

128.     Within 19 minutes of receiving this email, Flaherty responded, displeased and urging Facebook for more information about how strict the new policies would be. Quoting Facebook's email in italics, he wrote: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether*. Can you share more about your framework here? May, of course, is very different than 'will.' Is there a strike policy, ala Youtube? Does the severity of the claims matter?"  He also asked for specific data on the application of the censorship policies:

---

[32] *Id.* at 15.

"And as far as your removal of claims, do you have data on the actual number of claims - related posts you've removed? Do you have a sense of how many are being flagged versus how many are being removed? Are there actions (downranking, etc) that sit before removal? How are you handling things that are dubious, but not provably false?"[33]

### Posts Cause "Political Violence"—Target Civic and Health Related Groups

129.    The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation that Facebook's failure to censor speech on its platforms causes "political violence": "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.' I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further? Are there other growth vectors you are controlling for?"  Flaherty suggested an oral meeting to discuss: "Happy to put time on the calendar to discuss further."[34]

130.    Facebook responded on February 9, 2021 with a detailed answer to each of Flaherty's questions about the enforcement of its new policies and an offer to discuss further.

### Flag and Suppress "Wrongthink"

131.    Among other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case of repeat violations; that it "will begin enforcing this policy immediately," that for vaccine-skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution and add strong warning labels with more context, so fewer people see the post," and that Facebook was working to censor content that does not violate its policies in other ways by "prevent[ing] posts discouraging vaccines from going viral on our

---

[33] *Id.*
[34] *Id.* at 16.

platforms; address[ing] content that experts believe dissuades people from getting the vaccine, but does not violate our misinformation policies, through the use of information labels; and prevent[ing] recommendations for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines."[35]

132.    Facebook also promised Flaherty that it would aggressively enforce the new censorship policies: "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks."[36]

133.    On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and identifying the following: "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19."[37]

### *Tell Us What Information You Are Not Censoring*

134.    Flaherty responded by requesting details about Facebook's actual enforcement practices and a report on misinformation that was not censored: "Can you give us a sense of volume on these, and some metrics around the scale of removal for each? Can you also give us a sense of misinformation that might be falling outside your removal policies? Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!"[38]

---

[35] *Id.*
[36] *Id.* at 17.
[37] *Id.*
[38] *Id.* at 17-18.

135.    Facebook promised to discuss this at an upcoming oral meeting: "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy."[39]

136.    On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. After the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter: "Thanks again for meeting with us today. As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service."[40]

137.    On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake."[41]

138.    Facebook provided the White House with a detailed report and summary on the topic and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials: "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable."[42]

139.    On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy, stating: "I'm more interested in the data that was outlined

---

[39] *Id.* at 18.
[40] *Id.*
[41] *Id.* at 19.
[42] *Id.*

in the Washington Post (https//www.washingtonpost.com/technology/202l/03/l4/facebook-vaccine-hesistancy-qanon) And what interventions you are testing/their effectiveness."[43]

140.    This would become a standard tactic of the White House: linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

141.    The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook, copying White House COVID-19 official Andrew Slavitt, with no more text in the email and the subject line: "You are hiding the ball."[44]

142.    The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening – I will call to clear up. Certainly not hiding the ball."[45]

### *Censorship Expands to True but Disfavored Information*

143.    Flaherty responded accusatorily, referring to a series of at least three previous conversations in which the White House had demanded more information from Facebook about its censorship policies.  He made clear that the White House was seeking more aggressive action on "borderline" content—i.e., content that does not clearly violate Facebook's own censorship policies but which the White House demands action against anyway. Flaherty wrote: "I don't think this is a misunderstanding…I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content--as you define it--is playing a role."

### *Accusations of Non-Compliance and Dishonesty*

---

[43] *Id.*
[44] *Id.*
[45] *Id.*

144.    Flaherty followed with a series of accusations that Facebook was prevaricating with the White House about its "borderline" (i.e. not violative) content: "You said you would commit to us that you'd level with us. I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities. I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us."[46]

145.    He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts: "I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us."[47]

### Facebook Bows in Submission and Contrition

146.    Facebook responded to Flaherty on March 15, 2021: "We obviously have work to do to gain your trust. You mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the level. That's my job and I take it seriously—I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."[48]

---

[46] *Id.* at 20.
[47] *Id.* at 20-21.
[48] *Id.*

147.     The same day, Andrew Slavitt (who had been copied on these exchanges between Facebook and Flaherty) weighed in, accusing Facebook of dishonesty in a series of oral meetings: "It would [be] nice to establish trust. I do feel like relative to others, interactions with Facebook are not straightforward and the problems are worse – like you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to ask you precise questions and even then we get highly scrubbed party line answers. We have urgency and don't sense it from you all. 100% of the questions I asked have never been answered and weeks have gone by."[49]

148.     Slavitt then threatened unspecified Executive action against Facebook in retaliation for Facebook's perceived lack of cooperation with the White House's demands on censorship of "borderline" content: "Internally we have been considering our options on what to do about it."

149.     On March 16, 2021, Facebook responded to Slavitt, respectfully explaining its position but also promising to share information about vaccine hesitancy in "real time": "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out." Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic: "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible." Facebook also offered to speak to Slavitt by phone at any time.

***The White House Makes Its Demands***

150.     On Friday, March 19, 2021, Facebook had a meeting with White House officials, including Flaherty and Slavitt.

---

[49] *Id.*

151.    Two days later, on Sunday, Facebook sent a follow-up summary of the meeting which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Facebook platform WhatsApp.

152.    In a follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies: "You also asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include the additional changes that were approved late last week and that we'll be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines **that does not contain actionable misinformation**. This is **often-true content** … **but it can be framed as sensation, alarmist, or shocking**. **We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content**."[50] (emphasis added).

153.    On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action on "sensationalized" content on its platforms. Flaherty noted that White House officials were demanding a plan from Facebook to censor non-violative content, i.e., "looking out for your game plan on tackling vaccine hesitancy spread on your platform."

154.    In this email, Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content: "If you're down ranking sensational stuff— great—but I want to know how effective you've seen that be from a market research perspective.

---

[50] *Id.* at 22-23.

And then, what interventions are being taken on 'skepticism?' … [W]hat are you trying here, and again, how effective have you seen it be. And *critically,* what amount of content is falling into all of these buckets? Is there wider scale of skepticism than sensationalism? … As I've said: this is not to play gotcha. It is to get a sense of what you are doing to manage this." (italics in original).

155.    Facebook then agreed to schedule a meeting that Wednesday at 4:00 pm to discuss these issues with Flaherty and Slavitt.

### *The Accusations Intensify*

156.    In an email on April 9, 2021, Flaherty accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, suggesting that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more online censorship here: "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election. This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools. You only did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform. And then you turned it back off. I want some assurances, based in data, that you are not doing the same thing again here."[51]

157.    Facebook responded: "Understood. I thought we were doing a better job [of] responding to this – and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it."

158.    On April 27, 2021, a Facebook employee wrote to the top executives of the company, CEO Mark Zuckerberg and COO Sheryl Sandberg, to "seek guidance on whether to take

---

[51] *Id.* at 27-28.

more aggressive action against certain vaccine discouraging content," stating: "We are facing continued pressure from external stakeholders, including the White House … to *remove* more COVID-19 vaccine discouraging content.  For example, we recently shared with the White House a list of the <u>top 100 vaccine-related posts on [Facebook] in the U.S. for the week of 4/5-4/11.</u> <u>While authoritative information dominated the list, the White House was concerned that the #3</u> <u>post was a</u> vaccine discouraging humorous meme and they called on us to delete the meme."[52]

### *White House Demands Censorship of Prominent Media Figures*

159.    In an email to Facebook on April 14, 2021, Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren: "Since we've been on the phone – the top post about vaccines today is tucker Carlson saying they don't work. Yesterday was Tomi Lehren [sic] saying she won't take one. This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!"

160.    In an email chain to Flaherty and Courtney Rowe that same day, Facebook assured the White House that it was "running down the question on Tucker and working on getting you report by end of week."

### *Amplify the White House's Speech*

161.    In an email on April 13, 2021 to Flaherty and Rowe, Facebook offered to cooperate closely with the White House to "amplify" its preferred messages. Flaherty responded the same day with a series of detailed requests about how Facebook could do so, including: "Some kind of thing that puts the news in context if folks have seen it (like your current 'COVID news' panel)

---

[52] https://x.com/Jim_Jordan/status/1684595380770541568.

that has 3-4 pieces of info (eg: Adverse events are very rare – 6 cases out of nearly 7 million, the FDA and CDC are reviewing so it health care providers know how to treat any of the rare events, this does not affect pfzier or moderna, which vaccinate via a different mechanism)"; "CDC is working through an FAQ that we'd love to have amplified in whatever way possible – maybe through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable review reaches as many people as the pause, either through hard product interventions or algorithmic amplification."

*Censorship of True, Political, Non-Violative Speech Through a "Spectrum of Levers"*

162.    The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue. Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day.

163.    Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its relevant censorship enforcement policies: "Courtney – as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy). I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful."[53]

164.    Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor.

165.    Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms. First, as to "VACCINE HESITANCY"

---

[53] Plaintiffs' Proposed Findings of Fact at 30, *Missouri v. Biden*, 576 F. Supp.3d 622 (E.D. Mo. 2023) (ECF No. 212-3).

content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms. Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (e.g., "discussing choice to vaccinate in terms of personal and civil liberties"): "The following examples of content are those that do not violate our Misinformation and Harm policy, but may contribute to vaccine hesitancy or present a barrier to vaccination. This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, true but shocking claims or personal anecdotes, or discussing the choice to vaccinate in terms of personal and civil liberties or concerns related to mistrust in institutions or individuals."[54]

166.    Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers": "We utilize a spectrum of levers for this kind of content…. Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts."

167.    On April 14, 2021, Andy Slavitt also emailed Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom, Nick Clegg with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson who remained trending: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No progress since we spoke. Sigh."

168.    Clegg promptly responded to Slavitt with an apology and promised to immediately address the censorship of Tucker Carlson.

---

[54] *Id*. at 31.

169.     At 10:51 p.m. the same day, Clegg provided Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's content did not violate Facebook policies, but assuring the White House that Facebook would censor it anyway.

170.     Clegg denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of popularity, the Tucker Carlson video does not qualify for removal under our policies … That said, the video is being labeled with a pointer to authoritative COVID information, it's not being recommended to people, and it is being demoted."[55]

171.     Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report on its censorship practices in response to White House demands: "I'm v keen that we follow up as we'd agreed, and I can assure you the teams here are on it."

172.     Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post to Rob Flaherty.

173.     Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded to Rice, demanding greater censorship and accusing Facebook of causing an "insurrection" by not censoring enough speech on its platforms: "I guess this is a good example of your rules in practice then – and a chance to dive in on questions as they're applied. How was this [i.e. Tucker Carlson' post] not violative? The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective. It's not about just J&J. What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing it now? How many? How effective is that? And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu – but on

---

[55] *Id.* at 33.

what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?"

174.    On April 19, 2021, Clegg sent an email to his team at Facebook, informing them that he had just gotten off an "hour long call with Andy Slavitt" and that "[t]here are some pretty serious – and sensitive (see last point) – issues we need to address."[56]

175.    He explained that Slavitt was "appreciative of the data we went thru on Friday, and confirmed that Rob F had said that they had never received so much data from us before.  BUT:"[57]

176.    Clegg then explained that Slavitt was still far from content with Facebook and the measures that it had taken thus far to appease the White House's demands.  Specifically, Slavitt was displeased that "FB is a 'disinformation factory', and that [YouTube] has made significant advances to remove content leading to vaccine hesitancy whilst we have lagged behind."  Clegg explained that Slavitt considered his "principal focus" "reach[ing] the 'hardest to reach' people who have a propensity to consume vaccine hesitant related content" and "[o]ur systems feed vaccine hesitant related content to pockets of the population and that's the problem he wants our help to resolve."

177.    According to Clegg: Slavitt was "outraged – not too strong a word to describe his reaction – that we did not remove this post which was third most highly ranked post in the data set we sent to him."[58]

178.    The post in question was a meme of Leonardo DiCaprio, depicting a personal injury lawyer seeking compensation on behalf of victims of covid vaccine injuries.[59]

---

[56] https://x.com/Jim_Jordan/status/1684595382871785472.
[57] https://twitter.com/Jim_Jordan/status/1684595382871785472/photo/1.
[58] *Id*.
[59] https://twitter.com/Jim_Jordan/status/1684595385199734784/photo/1.

179.   Clegg recounted to his colleagues that he had retorted to Slavitt that "removing content like that would represent a significant incursion into traditional boundaries of free expression in the US" but Slavitt "replied that the post was directly comparing Covid vaccines to asbestos poisoning in a way which demonstrably inhibits confidence in Covid vaccines amongst those the Biden Administration is trying to reach."[60]

180.   On Tuesday, April 21, 2021, Facebook responded to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries, question-by-question. Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false: "The video received 50% demotion for seven days while in the queue to be fact checked, and will continue to be demoted even though it was not ultimately fact checked."

181.   In the same time frame, the White House was exerting similar pressure on other major social-media platforms, including Twitter and YouTube. On April 21, Rob Flaherty, Andy Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials.

182.   The meeting's subject was "Twitter Vaccine Misinfo Briefing." The meeting invite noted: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy

---

[60] https://twitter.com/Jim_Jordan/status/1684595387284303872/photo/1.

changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work."[61]

### *Twitter Earns Mercy by Silencing Berenson Before Reaching a "Persuadable Public"*

183.    The next day, Twitter employees noted in internal communications that, during this meeting, the White House officials had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."[62]

184.    Alex Berenson is an independent journalist and prominent critic of the Covid vaccine and related policies implemented during the pandemic.

185.    The Twitter employee noted that the White House's questions were "pointed" but "mercifully we had answers." Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson. Andy Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public."[63]

186.    Despite officially having left the White House on June 9, 2021,[64] Andrew Slavitt continued to serve as an intermediary for the White House's censorship efforts, and continued to collaborate with federal government officials and aggressively pressure the social media platforms to ensure that vaccine-related "misinformation" on social media would be suppressed.  Among his targets was speech like Mr. Berenson's—and Plaintiffs' in this matter.

187.    On July 18, 2021, two days after Berenson was first locked out of his Twitter account, Slavitt emailed Twitter employee Todd O'Boyle—a contact of Slavitt's from his time at the White House—to request an audience to speak about a "policy matter" with former FDA

---

[61] Plaintiffs' Proposed Findings of Fact at 35-36, *Missouri v. Biden*, 576 F. Supp.3d 622 (E.D. Mo. 2023) (ECF No. 212-3).
[62] First Amended Complaint, ECF 80-2 ¶ 117, *Berenson v. Biden* (S.D.N.Y. Sept. 4, 2024) (No. 1:23-cv-03048).
[63] *Id*. at ¶ 119.
[64] Maeve Sheehey, *Andy Slavitt stepping down from White House Covid-19 response role,* Politico (June 9, 2021), *available at* https://www.politico.com/news/2021/06/09/andy-slavitt-steps-down-covid-19-response-role-492572.

Commissioner Scott Gottlieb (copied on the email).[65]  In his email, Slavitt broadcast his connection to the White House, noting at the bottom: "For Government Email, Please Send to Andrew.M.Slavitt@who.eop.Gov."

188.   The next day, Gottlieb followed up, informing O'Boyle that he was "growing very concerned about a handful of accounts on Twitter that are fueling dangerous and false narratives on key public health issues related to the pandemic."[66]

189.   A week earlier, Berenson had spoken out publicly about the Covid vaccines at the Conservative Political Action Conference—remarks which Slavitt characterized as "garbage."[67]

190.   Within an hour of Gottlieb's email, O'Boyle responded, suggesting that "the three of us talk."  Demonstrating the urgency of the matter, O'Boyle promptly forwarded his response to Lauren Culbertson, Twitter's head of U.S. public policy, who forwarded it to her superior, Jessica Herrera-Flanigan, Twitter's Vice President of Public Policy for the Americas, with the urgent note: "Heads up that we **could be** next.   [O'Boyle] and I are triaging.   The other backchanneling suggests that we're on much better footing than [Facebook] but need to keep up the responsiveness.  I'll let you know if we think it's going to go sideways.  Hopefully, we can keep us in a good place."[68]

191.   In other words, Culbertson—the head of Twitter's public policy—made no distinction between the pressure that Slavitt and Gottlieb, both *non*-governmental officials, were applying and the overall pressure that the Biden Administration was imposing on social media companies.

---

[65] First Amended Complaint, ECF 80-2 ¶ 166, *Berenson v. Biden* (S.D.N.Y. Sept. 4, 2024) (No. 1:23-cv-03048).
[66] *Id*. at ¶ 167.
[67] *Fox News Contributing to Declining Vaccine Rates*, The Mehdi Hasan Show, July 12, 2021, *available at* https://youtu.be/MmSOzs8v8U8.
[68] First Amended Complaint, ECF 80-2 ¶ 170, *Berenson v. Biden* (S.D.N.Y. Sept. 4, 2024) (No. 1:23-cv-03048).

192.    In response, another Twitter employee wrote "[w]e're working through some potential statements / a scenario plan should we get called out directly," which Ms. Culbertson praised as a "worthwhile investment."

193.    Other upper-level Twitter executives at that time did not believe that Berenson's posts warranted disciplinary action or removal and, behind the scenes, questioned the White House's increasing pressure to sanction him.  On July 16, 2021, Twitter's then-chief executive Jack Dorsey questioned whether Twitter should be sanctioning Berenson for his posts, writing to Vijaya Gadde, Twitter's Head of Legal, Policy, and Trust: "Doesn't seem right to me.  These are queries."[69]

194.    On July 23, 2021, O'Boyle spoke with Rob Flaherty—afterward, reporting to Culbertson that he told Flaherty that Twitter would follow a "whole-of-society" approach to Covid misinformation.  In other words, Twitter would comply with the federal government's demands.

195.    In a podcast episode released July 28, 2021, Slavitt lauded the first vaccine mandates, stating that they were "something that I have been working on slowly and in the background over the last couple of weeks."  He went on to accuse those who criticized the vaccine mandates of "slavish devotion to individual liberties."[70]

196.    Notwithstanding Dorsey and Gadde's misgivings about sanctioning Berenson's account, Culbertson, O'Boyle, and other top Twitter officials were apparently more concerned with avoiding public and private pressure from the White House, Slavitt, and Gottlieb than in protecting the First Amendment rights of its users.

---

[69] *Id*. at ¶ 183.
[70] Andy Slavitt, *EXCLUSIVE: Pfizer CEO Albert Bourla on the Delta Variant, Boosters and Masks Indoors (Part 1)*, July 28, 2021, *available at* https://lemonadamedia.com/podcast/exclusive-pfizer-ceo-albert-bourla-on-the-delta-variantboosters-and-masks-indoors-part-1/.

197.    So, on July 30, 2021, Twitter issued a fourth strike against Berenson for a tweet criticizing the efficacy of Pfizer's Covid vaccine.[71]

198.    On July 31, 2021, Slavitt again wrote to Twitter, demanding that Berenson be banned from the platform entirely: "If he doesn't go permanently after this," referring to another of Berenson's tweets that criticized the Covid vaccine, "the outcry will be justified."[72]

199.    On August 23 and 24, 2021, Slavitt, Flaherty, and Gottlieb again made coordinated inquiries to Mr. O'Boyle.[73]  O'Boyle notified Culbertson of the contact, explaining that he wanted the "key players [to] know all the good work we are doing to elevate the conversation about covid and vaccines" and that his goal was "to keep the target off our back."[74]

200.    On August 28, 2021, Twitter permanently[75] deplatformed Berenson, shortly after he posted a Tweet, which read: "It doesn't stop infection.  Or transmission.  Don't think of it as a vaccine.  Think of it – at best a as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS.  And we want to mandate it?  Insanity."[76]

201.    A few months later, in December of 2021, after Slavitt's role in Berenson's ban from Twitter was publicized through discovery produced in Berenson's lawsuit against Twitter, Slavitt attempted to minimize his role, informing *The Atlantic* that he had "only passing

---

[71] First Amended Complaint, ECF 80-2 ¶¶ 180-81, *Berenson v. Biden* (S.D.N.Y. Sept. 4, 2024) (No. 1:23-cv-03048).
[72] *Id*. at ¶ 188.
[73] *Id*. at ¶ 193.
[74] *Id*.
[75] Berenson later appealed the ban and filed a lawsuit against Twitter.  However, it was not until resolution of the lawsuit that Twitter allowed Berenson to return to the platform. *Id*. ¶ 221.
[76] *Id*. ¶ 201-208.  Notably, the next day, Ms. Gadde emailed a senior Twitter manager to express that neither she nor Twitter CEO Jack Dorsey believed that they had made the right decision in banning Berenson, *Id*. ¶ 210 ("From the beginning, we have wanted to leave room for people to have discussion in this space, and certainly discussion around vaccine mandates feels like an area we should allow to happen"), yet Twitter took no action to restore Berenson's account.

familiarity" with Berenson.[77]  In the article, Slavitt stated: "I think his [Berenson's] name was in a magazine article" and that "I don't remember anything else about him."[78]

### *YouTube Meetings to Suppress "Borderline" Information*

202.   On April 21, 2021, Flaherty and Andy Slavitt of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited.

203.   The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation. As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work."[79]

204.   Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Slavitt and Clarke Humphrey. He began by referring to the meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." Flaherty also referred to an earlier, "first conversation," indicating that there had been more than one meeting with YouTube.

205.   Flaherty then noted that the White House had asked YouTube to monitor and report on the speech on its platforms, stating that the White House expected a report from them.

206.   Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into

---

[77] *Id*. at ¶ 215; Kaitlyn Tiffany, *A Prominent Vaccine Skeptic Returns to Twitter*, The Atlantic (Aug. 24, 2022), *available at* https://www.theatlantic.com/technology/archive/2022/08/alex-berenson-twitter-ban-lawsuit-covid-misinformation/671219/.
[78] *Id*.
[79] *Id*. at 36.

hesitance and intensifying people's hesitancy…. we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. This is a concern that is shared at the highest (and I mean highest) levels of the WH, so we'd like to continue a good-faith dialogue about what is going on under the hood here."[80]

207.    Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in the first bullet point: "Stanford has mentioned that it's recently [sic] Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you' re seeing."

208.    Flaherty also praised YouTube for reducing distribution of "borderline" content (i.e., often-truthful content that does not violate platform policies but that the White House disfavors): "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." He then followed up with a long series of demands for more information.[81]

209.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content. And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation."[82]

---

[80] *Id*. at 37.
[81] *Id*. at 38.
[82] *Id*. at 39.

### *The Vaccine Misinformation Brief*

210.   On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party.

211.   The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread."  The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID19 misinformation should be cross-platform and enforced at the entity-level, not the account level." It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement…." And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation would dissuade users from following links to off-platform misinformation and hurt the vaccine misinformation business model Facebook enables."[83]

### *The Greater the Degree of Public Interest, the More Cause to Suppress*

212.   On May 1, 2021, Nick Clegg of Facebook sent an email to Andy Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us…."  Clegg apologized to the White House for not catching and censoring three pieces of vaccine content that

---

[83] *Id.*

56

went viral, even though the content did not violate Facebook's policies: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process."

213.    Internal Facebook emails also show that the company succumbed to the White House's demands.  For example, on July 14, 2021, Clegg emailed several colleagues asking to be reminded why the company had censored the theory that Covid-19 originated in a lab.  The colleague responded, "*Because we were under pressure from the [Biden] administration and others to do more …. We shouldn't have done it.*"[84]

### Better Yet: Suppress the Speech in Real Time Before It Goes Viral

214.    Clegg promised to be more vigilant in censoring such non-violative content to prevent it from going viral in the future: "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people. I will be checking on this closely to make sure that these additional steps show results - the stronger demotions in particular should deliver real impact."

215.    Clegg then listed in bold the demands that the White House had made in its recent meeting, with a detailed response to each.

216.    First, the White House had demanded that Facebook address "Non-English mis/disinformation circulating without moderation." Facebook promised to take steps to do so.

---

[84] https://x.com/Jim_Jordan/status/1684957664265031681 (emphasis added).

217.    Second, the White House demanded of Facebook: "Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation." Facebook assured the White House that it was taking strong steps to censor such content and promised to increase its efforts to do so in the future: "Much of the research you shared called on us to ensure that our systems don't amplify vaccine hesitancy content and this is top of mind for us. In addition to the changes I mentioned above, we have already removed all health groups from our recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from our 'accounts you may follow feature.' We also remove accounts that may discourage vaccination from search features. We currently enforce on hash tags we know are shared to promote vaccine hesitancy content and are working to improve our automated systems here."

218.    Third, the White House had demanded that Facebook "Monitor[] events that host anti-vaccine and COVID disinformation." Facebook promised to monitor social media "events" on its platforms more closely and take more aggressive action to censor them.

219.    Fourth, the White House had demanded censorship of the so-called "Disinformation Dozen" in the private meeting with Facebook, raising the concern that "12 accounts are responsible for 73% of vaccine misinformation."

220.    Facebook responded that it was scrutinizing those speakers and censoring them whenever it could, but that most if their content did not violate Facebook's policies: "we continue to review accounts associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content. Our 'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and

pages that are dedicated to sharing vaccine discouraging content and we continue to review and enforce on these where we become aware of them."[85]

### *Facebook Expresses Doubt: Could Too Much Censorship Be Counterproductive?*

221.     Clegg noted that he realized the White House would not be satisfied with these answers: "I realise that our position on this continues to be a particular concern for you." Clegg then suggested that too much censorship might be counterproductive and might drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a cover-up."[86] Brian Rice also forwarded Nick Clegg's email to Rob Flaherty.

### *"Not to Sound Like a Broken Record, But Why Aren't You Censoring More?"*

222.     On May 5, 2021, White House Press Secretary Jen Psaki gave a press conference where she stated that:

> The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to Covid19 vaccinations …. He also supports better privacy protections and *a robust anti-trust program*. So, his view is that there's *more that needs to be done* to ensure that this type of misinformation, disinformation, damaging, sometimes life-threatening information, is not going out to the American public (emphasis added).[87]

---

[85] *Id*. at 42.

[86] *Id*.

[87] Press Briefing by Press Secretary Jen Psaki, THE WHITE HOUSE (May 5, 2021, 1:32 PM EDT), *at* https://www.whitehouse.gov/briefing-room/press-briefings/2021/05/05/press-briefing-by-press-secretary-jen-psaki-and-secretary-of-agriculture-tom-vilsack-may-5-2021/.

223.   The next day, May 6, 2021, Flaherty emailed Facebook, demanding more explanations about why it was not censoring more aggressively. Regarding Nick Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted: "For one, it's still up and seems to have gotten pretty far. And it's got 365k shares with four comments. We've talked about this in a different context, but how does something like that happen?" [88]

224.   Flaherty also demanded more information about Facebook's efforts to demote "borderline" content: "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?"[89]

### Suppress Vaccine-Related Speech at All Costs

225.   Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics: "Also, health groups: sure. But it seems more likely that anti-vax stuff is moving in groups that are not about health but are ... mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who ... do other things and are also vaccine hesitant."

226.   On May 10, 2021, Facebook sent an email to Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms.

227.   The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating: "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search."  He included a link to a news report about this topic on Twitter.[90]

---

[88] *Id*. at 43.
[89] *Id*.
[90] *Id*. at 44.

228.    The next day, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports: "Thanks Rob - both of the accounts featured in the tweet have been removed from Instagram entirely…. We're looking into what happened."

229.    Facebook assured Flaherty that it was working on processes to suppress disfavored speech from search results on its platforms and remove anti-vaccine accounts: "We are continuing to develop technology to improve the quality of search results at scale across Instagram - this is a continual process built on new technology to address adversarial accounts…. We also remove accounts that may discourage vaccination from search by developing and using this new technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether. We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow, such as accounts you may like, and suggested accounts."[91]

230.    Facebook acknowledged that its censorship efforts were not enough and promised the White House they would increase them: "We clearly still have work to do to [sic], but wanted to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination."

231.    The same day, Flaherty responded by accusing Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action. If you're not getting that right, it raises even more questions about the higher bar stuff."  Flaherty continued, accusing Facebook of dishonesty: "You say in your note that you remove accounts that discourage vaccination from appearing in

_____

[91] *Id*. at 45.

recommendations (even though you're using 'primarily' to give yourself wiggle room). You also said you don't promote those accounts in search. Not sure what else there is to say."[92]

232.    On May 28, 2021, a senior executive of Facebook sent an email to Slavitt and Surgeon General Murthy reporting that Facebook had expanded its censorship policies.  The email stated that a "key point" was that "We're expanding penalties for individual Facebook accounts that share misinformation."

### A Taste of the White House's Own Medicine

233.     At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers.

234.    On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved…. you should start to see your numbers trend back upwards….Thanks for your patience as we investigated this." The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?"

235.    Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again." The White House staffer then simply added Rob Flaherty to the email chain without further comment.

236.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook: "Are you guys fucking serious? I want an answer on what happened here and I want it today."[93]

237.    Facebook explained that the White House's account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts.

---

[92] *Id*. at 45-46.
[93] *Id*. at 47.

### *The Surgeon General's Misinformation Advisory*

238.    That day, July 15, 2021, the Surgeon General released an advisory (the July Advisory) aimed at censoring purported "misinformation" about COVID-19.[94]

239.    According to the Surgeon General's advisory, "[m]isinformation" had "caused confusion and led people to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing. And use unproven treatments."

240.    The advisory identified social media platforms as major sources of "misinformation" and called on the platforms to "[p]rioritze early detection of misinformation 'super-spreaders' and repeat offenders," recommending that the companies "[i]mpose clear consequences for accounts that repeatedly violate platform policies."[95]

241.    That day, Press Secretary Jen Psaki gave a joint briefing along with the Surgeon General and DHS Secretary Alejandro Mayorkas to discuss the advisory.[96]

242.    Murthy acknowledged that:

> health misinformation didn't start with COVID-19. What's different now though is the speed and scale at which health misinformation is spreading. *Modern technology companies have enabled misinformation to poison our information environment* with little accountability to their users. *They've allowed people who intentionally spread misinformation—what we call "disinformation"—to have extraordinary reach*.[97]

243.    In response to a reporter's question about whether the federal government had taken action to ensure cooperation of tech companies, Ms. Psaki stated:

---

[94] *See* U.S. Surgeon General's Advisory, Confronting Health Misinformation (July 15, 2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (COVID-19 Advisory).
[95] *Id.*
[96] Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, THE WHITE HOUSE (July 15, 2021, 1:05 PM EDT), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/.
[97] *Id.* (emphasis added).

> In terms of actions, Alex, that we have taken—or we're working to take, I should say—from the federal government: *We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation* (emphasis added).

### The President Accuses Social Media Platforms of Killing People

244.    The next day, July 16, 2021, President Biden stated that Facebook and other social media platforms were "killing people" by failing to censor enough misinformation.[98]

245.    Subsequently, Facebook's senior executive Nick Clegg reached out to request "deescalat[ion]" and "work[ing] together."

246.    Nick Clegg emailed Surgeon General Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us." He then stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward."

247.    On a follow up call to the email, Murthy asked Clegg specific questions on requiring Facebook to share data with outside researchers about the scope and reach of misinformation on its platforms: "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and -- and helping us as a field understand the depth of the problem."[99]

---

[98] Zolan Kanno-Youngs & Cecilia Kang, *'They're Killing People': Biden Denounces Social Media for Virus Disinformation*, The New York Times (July 16, 2021), *at* https://www.nytimes.com/2021/07/16/us/politics/biden-facebook-social-media-covid.html.

[99] *Id.* at 67-68.

248.     One such "external researcher" that the OSG had in mind was Renee DiResta, of the Stanford Internet Observatory, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day that the advisory was announced.[100]

249.     On July 16, 2021, a reporter asked Ms. Psaki to elaborate on the Government's role in flagging Facebook "disinformation."[101]

250.     Ms. Psaki responded:

> it shouldn't come as any surprise that we're in regular touch with social media platforms—just like we're in regular touch with all of you and your media outlets—about areas where we have concern, information that might be useful … so we are regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans … are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platforms.[102]

251.     Meanwhile, internally, Facebook employees were indignant about the government's accusations.  One employee wrote to two colleagues: "There are so many untested assumptions in what the administration is saying recently—social media misinfo is increasing, it's leading to death, it has an impact different from misinfo in other places—not to mention how their definition of 'misinfo' is completely unclear.  As fair as it is to say we need to do better about reporting numbers that mean something, it also just seems like when the vaccination campaign isn't going as hoped, it's convenient for them to blame us…"[103]

252.     One of the email recipients responded, "This seems like a political battle that's not fully grounded in facts, and it's frustrating."

---

[100] *Id*. at 68.
[101] Press Briefing by Press Secretary Jen Psaki, THE WHITE HOUSE (July 16, 2021, 1:20 PM EDT), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/.
[102] *Id*.
[103] https://twitter.com/Jim_Jordan/status/1684957667863736321/photo/1.

253.    On a July 19, 2021 podcast episode entitled "Exposing the Biggest Vaccine Lies and Liars," accompanied by Surgeon General Vivek Murthy, former White House Covid-19 Advisor Andrew Slavitt analogized social media to a "nuclear arsenal that you can weaponize if you want to mislead the public," subsequently noting that "misinformation is a public health crisis."[104]   In the podcast, Slavitt stated that the "small number of loud voices" on social media who planted doubts in the minds of Americans about the Covid vaccine constituted "a legitimate killer."

254.    On a July 21, 2021 podcast episode entitled "Is COVID Misinformation Killing Us?," Slavitt reminisced about how, in February or March of 2021, while still working for the Biden Administration, he had warned Clegg that, "in eight weeks' time, Facebook will be the number one story of the pandemic."[105]   Slavitt also commented on how he had been in contact with Clegg about which pieces of misinformation to take down.

### *Slake the White House's Censorship Thirst—or Face the Consequences*

255.    A reporter stated that "yesterday after the press briefing" Facebook said that it had removed 18 million pieces of COVID misinformation and asked whether the White House found that sufficient.[106]

256.    Ms.  Psaki responded, "[c]learly not, because we're talking about additional steps that *should* be taken." (emphasis added).   She also reiterated that "we are in regular touch with social media platforms."[107]

---

[104] https://podcasts.apple.com/fr/podcast/exposing-the-biggest-vaccine-lies-and-liars/id1504128553?i=1000529313841.
[105] https://podcasts.apple.com/us/podcast/is-covid-misinformation-killing-people-facebooks-nick/id1504128553?i=1000529558554.
[106] *Id*.
[107] *Id*.

257.    On July 17, 2021, another Facebook official emailed Anita Dunn, the political strategist and Senior Advisor to the President in the White House, begging for assistance in getting back into the White House's good graces.[108]

258.    The Facebook official wrote: "Would love to connect with you on the President's comments on Covid misinfo and our work there. Really could use your advice and counsel on how we get back to a good place here. … As I hope you know, we've been doing a significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty heated, and I'd love to find a way to get back to pushing together on this - we are 100% on the same team here in fighting this and I could really use your advice."

259.    Facebook then wrote: "We had a conversation with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to continue to work to address concerns."

260.    On July 18, 2021, having received no response to his email requesting a meeting, the Facebook official texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved – as is the FB team, it's not great to be accused of killing people – but as I said by email I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits."[109]

261.    Four days after President Biden's comments, USA Today reported that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms."[110]

---

[108] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 54.
[109] *Id*. at 92.
[110] Matthew Brown, *"They should be held accountable": White House reviews platforms' misinformation liability*, USA Today (July 20, 2021, updated 8:06 PM ET), https://www.usatoday.com/story/news/politics/2021/07/20/whitehouse-reviews-section-230-protections-covid-misinformation/8024210002/.

262.    The report noted: "[r]elations are tense between the Biden administration and social media platforms," and that the government was "examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites."

263.    White House Communications Director Kate Bedingfield went even further, stating that social media companies should "certainly [] be held accountable" for allowing the publication of "Covid-19 vaccine misinformation" on their platforms.[111]  To hold the social media companies accountable, Bedingfield stated that the Administration was "reviewing policies," which "could include amending the Communications Decency Act, or Section 230 of the act." Bedingfield noted that President Biden had spoken "very aggressively" about holding the social media platforms accountable for Covid-related misinformation.

264.    Internally, Facebook employees were becoming increasingly concerned about the company's growing adversity with the White House.  Vice President of public policy Brian Rice observed on July 16, 2021 in an email to colleagues that the moment appeared to be "very much like a crossroads for us with the [Biden] White House in these early days."[112]

265.    Nick Clegg wrote "given what is at stake here, it would also be a good idea if we could regroup to take stock of where we are in our relations with the WH, and our internal methods too."[113]  In other words, Facebook was going to revamp its internal content moderation policies to avoid adversity with the White House.

---

[111] Jessica Bursztynsky, *White House says social media networks should be held accountable for spreading misinformation*, CNBC (July 20, 2021), *available at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.
[112] https://twitter.com/Jim_Jordan/status/1684595389133987840.
[113] https://twitter.com/Jim_Jordan/status/1684595390962642944.

266.    Not long after, Clegg explained that "Sheryl [Sandberg] is keen that we continue to explore some moves that we can make to show that we are trying to be responsive to the WH [White House]."

267.    He went on:  Facebook's "current course—in effect explaining ourselves more fully, but not shifting on where we draw the lines or on the data we provide" is "a recipe for protracted and increasing acrimony with the WH."

268.    He continued: "Given the bigger fish we have to fry with the Administration – data flows etc – that doesn't seem a great place for us to be, so grateful for any further creative thinking on how we can be responsive to their concerns."[114]

269.    Apparently, Clegg was referring to the European Union's demand that Facebook stop transferring data to places outside of Europe, which is antithetical to the company's business model.  Clegg understood that the company's survival depended on the Biden Administration siding with it against the European Union—and that the Administration would not do so unless Facebook censored in accordance with the government's demands.[115]

270.    Likewise, Facebook was unable to resist the White House's demands to remove satirical or humorous content that might stoke vaccine hesitancy, although, initially, the company attempted to do so.  For example, one Facebook employee's email, dated July 21, 2021, stated that the White House objected to "humorous or satirical content that suggests the vaccine isn't safe," but recommended against removing such content.[116]  The email also stated, "we can extrapolate that [the White House] would like us to remove content that provides any negative information on

---

[114] https://twitter.com/Jim_Jordan/status/1730669742891888854?s=20.
[115] *See* Michael Shellenberger, Alex Gutentag, and Leighton Woodhouse, *New Facebook Files Expose Biden Censorship-For-Spying Scheme*, Public (Aug. 7, 2023), https://www.public.news/p/new-facebook-files-expose-biden-censorship; *see also Murthy v. Missouri*, 144 S. Ct. 1972, 2011 (2024).
[116] https://twitter.com/Jim_Jordan/status/1684957671009419264/photo/1.

or opinions about the vaccine without concluding that the benefits of the vaccine outweigh that information or opinion." The Facebook employee also recommended against the removal of such content, in the interest of allowing "open discussion of vaccine safety and efficacy."

271.    Similarly, noting that the "Surgeon General wants us to remove true information about side effects if the user does not provide complete information about whether the side effect is rare and treatable," the Facebook employee stated: "We do not recommend pursuing this practice." However, the employee also noted: "We currently label all of this content and demote some of it. We could remove the content or increase the demotion strength" although this measure was also "not recommended."[117]

### *Social Media Platforms Strive to Show that They Are Obeying Orders*

272.    On July 20, 2021, Rob Flaherty emailed YouTube, linking to a Tweet of "borderline" content and stating, "I'm curious: Saw this tweet. [Linking the Tweet]. I think we had a pretty extensive back and forth about the degree to which you all are recommending anti-vaccination content. You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?"[118]

273.    YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies and that its goal was "to have views of nonsubscribed, recommended borderline content below 0.5%."

274.    On July 23, 2021, after meeting with Surgeon General Murthy, Nick Clegg of Facebook sent a follow-up email stating: "Dear Vivek, if I may, thanks again for taking the time to meet earlier today…. I wanted to make sure you saw the steps we took just this past week to

---

[117] https://twitter.com/Jim_Jordan/status/1684957672892715008.
[118] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 54-55.

adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen'...."[119]

275.    After the July 23 meeting, that same day, Clegg reported back to Murthy with a series of new censorship actions and policies, including that Facebook had amended its censorship policies to make them more restrictive: "We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."[120]

276.    Clegg also committed to "do more" to censor misinformation in response to federal officials' demands: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic."[121]

277.    Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project.

278.    Clegg also pledged to report back to Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation: "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make sure to keep you informed of our work on each."[122]

279.    Facebook continued to capitulate to the White House's censorship demands. On August 2, 2021, an employee wrote to team members: "Context:  Leadership asked Misinfo Policy and a couple of teams on Product Policy to brainstorm some additional policy levers we can pull to be more aggressive against Covid and vaccine misinformation.  This is stemming from the

---

[119] *Id*. at 93.
[120] *Id*.
[121] *Id*. at 94.
[122] *Id*.

continued criticism of our approach from the US administration and a desire to kick the tires further internally on creative options."[123]

280.    Facebook also apparently changed its content moderation policies in response to pressure from the Surgeon General's office.  In August of 2021, an employee emailed other team members: "This email provides a follow-up to our August 6th discussion regarding our response to the Surgeon General on Covid-19 misinformation.  During that discussion, we agreed to further explore four discreet [sic] policy options for reducing the prevalence of Covid-19 misinformation on our platforms.  Since then, teams have scoped the requirements for executing those options.  As discussed further below, we plan to roll out the first three options over the next coming weeks, and will roll-out the fourth option as an escalation only policy."[124]

281.    The employee stated that, absent any concerns raised by the following morning, Facebook would "provide an update to the Surgeon General and start executing against these tomorrow."

282.    The options included (i) ensuring that groups, pages, profiles, and accounts that had been removed for Covid misinformation violations in the past would not be recommended to users; (ii) more heavily "demoting COVID or vaccine misinformation rated Partly False; and (iii) counting "COVID or vaccine-related URLs that are rated Partly False or Missing Context" towards "Repeat Offender" status and penalizing all accounts from which the content was shared with a 90-day demotion.[125]  The employee described option (iv) as a "heavy lift," requiring the periodic, manual review of domains with a high number of third-party fact check ratings to see if enough of them were COVID- or vaccine-related, and noted that, because it would not "flow through the

---

[123] https://twitter.com/Jim_Jordan/status/1684595399808466944/photo/1.

[124] https://twitter.com/Jim_Jordan/status/1684595401863614464/photo/1.

[125] https://x.com/Jim_Jordan/status/1684595401863614464/photo/2.

normal repeat offender process," frequently, a domain would not receive notification of the demotion.

283.    Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship: "we will strive to do all we can to meet our shared goals."

### Facebook and YouTube Expand Censorship of Vaccine "Misinformation"

284.    On August 18, 2021, Facebook emailed Rob Flaherty a post entitled, "How We're Taking Action Against Vaccine Misinformation Superspreaders." The post detailed a long list of censorship actions taken against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts linked with them; imposing additional penalties on another two dozen pages, groups, and accounts linked with them; applying penalties to some of their website domains so that third parties posting their content will be deamplified; and removing the remaining violating content.

285.    On August 20, 2021, Nick Clegg emailed Surgeon General Murthy and Eric Waldo of OSG, detailing Facebook's additional censorship actions that it had taken as a result of the Surgeon General's Health Advisory.  Clegg noted that Dr. Murthy had "asked for an update on existing and new steps that Facebook is taking."

286.    Clegg explained that Facebook was taking new steps in response to the pressure from the White House and Surgeon General: "In this update, we describe … further policy work to enable stronger action against persistent distributors of vaccine misinformation."[126]

287.    In a section headed "Limiting Potentially Harmful Misinformation," Clegg provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by Facebook taken in response to the Advisory. These included, among others, " expanding our

---

[126] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 97.

COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform."[127]

288.     On August 21, 2021, a Facebook employee noted internally that "everyone is neck deep right now in [the White House] response."[128]

289.     On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation." Google reported: "We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines…" [129]

290.     On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo of OSG, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout" (approval of the vaccine for children in that age group).[130]

291.     On October 28, 2021, the same day as a Washington Post article about Facebook employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed

---

[127] *Id*.
[128] Interim Staff Rep. of the H. Comm. on the Judiciary, THE CENSORSHIP-INDUSTRIAL COMPLEX: HOW TOP BIDEN WHITE HOUSE OFFICIALS COERCED BIG TECH TO CENSOR AMERICANS, TRUE INFORMATION, AND CRITICS OF THE BIDEN ADMINISTRATION (May 1, 2024), at 50, *available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Biden-WH-Censorship-Report-final.pdf.
[129] *Id*. at 99.
[130] *Id*.

Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point."[131]

### Take Responsibility and Censor More—Think of the Children

292.     On October 29, 2021, in response to this article, the Surgeon General tweeted from his *official* account (as opposed to his personal account), in a thread:

> We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms.  The time for excuses and half measures is long past.  We need transparency and accountability now.  The health of our country is at stake.[132]

293.     On November 4, 2021, Facebook followed up again with OSG and the White House with additional reports regarding its censorship of misinformation: "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims.[133]

294.     Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends."[134]

295.     On November 4, 2021, Facebook reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children...."[135]

### Parody Has No Place in a Decent, Censored Society

---

[131] *Id*. at 101.
[132] Dr. Vivek Murthy, U.S. Surgeon General (@Surgeon_General), Twitter (October 29, 2021, 4:19PM), https://twitter.com/Surgeon_General/status/1454181191494606854.
[133] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 103.
[134] *Id*.
[135] *Id*. at 56.

296.     On November 30, 2021, a White House official emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?"

297.     He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them.[136]

298.     Twitter responded within six minutes: "Happy to escalate with the team for further review from here."[137]

299.     That evening, Twitter emailed back, stating, "Update for you - The team was able to create this event page for more context and details." The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect.[138]

300.     The White House official promptly emailed back, asking that Twitter actually censor the comedic video, not just provide an event page explaining that it was comedic: "Will you apply the 'Manipulated Media' disclaimer to the video asset itself?"

301.     The next morning, the White House official emailed Twitter again, arguing that Twitter should apply a label to the video under its content-moderation policies.[139]

302.     Twitter responded that same morning, explaining that the parody video of Jill Biden was not subject to labeling under its policy: "After escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic and manipulated media policy. Although it has

---

[136] *Id*.
[137] *Id*.
[138] *See* "A video of first lady Jill Biden reading to children was manipulated to include profanity, according to fact-checkers," TWITTER (Nov. 30, 2021), https://twitter.com/i/events/1465769009073123330.
[139] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 57.

been significantly altered, the team has not found it to cause harm or impact public safety. The team was able to create this Twitter Moment (here) and event page for more context and details."[140]

303.   Later that day, the White House official responded, disputing Twitter's interpretation of its own content-moderation policy and looping in Michael DeRosa, the First Lady's press secretary.  DeRosa then emailed Twitter, disputing Twitter's application of its policy.

304.   The White House continued to press Twitter for further explanation and action on December 9, 13, and 17.[141]

305.   On December 17, 2021, Twitter provided a more detailed explanation of its decision. The White House official emailed back the same day, again disputing Twitter's application of its own policy and pressing Twitter on the issue.

306.   He then added Rob Flaherty to the email chain.[142]

307.   Nine minutes later, on December 17, Flaherty emailed Twitter, angrily accusing it of dishonestly misapplying its own policies.[143]

308.   A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone. After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available.[144]

309.   On December 21, 2021, Surgeon General Murthy gave a podcast on the Omicron variant in which he publicly threatened to hold social media platforms "accountable" for not censoring misinformation: "number one, we have to track down where this misinformation is coming from and understand how to hold platforms accountable, new technology platforms that

---

[140] Id.
[141] Id.
[142] Id. at 58.
[143] Id.
[144] The link to the tweet, https://twitter.com/ArtValley818_/status/1465442266810486787?s=20, is no longer available.

are driving so much of the misinformation spread…. [B]y allowing this misinformation to proliferate on their sites, they're subjecting people in the United States and around the world to extraordinary harm, and they're doing so with little accountability at this moment and really with very little transparency. That can't be allowed to continue because it's putting everyone's health at risk."[145]

310.    In a January 2022 interview on MSNBC, Murthy stated that social media "platforms still have not stepped up to do the right thing[,]" that the focus in stopping the spread of "misinformation" should be on these companies, and that "this is not just about what government can do.  This is about companies and individuals recognizing that the only way we get past misinformation is if we are careful about what we say and we use the power that we have to limit the spread of that misinformation."[146]

311.    In January 2022, Facebook reported to White House officials Rowe, Flaherty, and Slavitt that it had "labeled and demoted" "vaccine humor posts whose content could discourage vaccination." It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine."[147]

312.    On February 14, 2022, Surgeon General Murthy participated in a panel discussion hosted by the Rockefeller Foundation in which he stated that there is a role for government to set "safety standards" when it comes to misinformation, "particularly from platforms."[148]

*The OSG's Request for Information*

---

[145] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 103-104.
[146] Tom Elliott (@tomselliott), Twitter (Jan. 25, 2022, 10:03 AM), bit.ly/3CGcncD.
[147] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 58.
[148] *Id*. at 105.

313.    Less than a month later, on March 3, 2022, the OSG issued a formal Request for Information (RFI) seeking information from social media platforms and others about misinformation on social media.[149]

314.    According to the *New York Times*, Murthy "demanded" information about the major sources of COVID-19 misinformation by May 2, 2022.[150]

315.    The RFI webpage created to facilitate this reporting asks for information from technology platforms about "sources of COVID-19 misinformation" including "specific, public actors that are providing misinformation, as well as components of specific platforms that are driving exposure to information."[151]

316.    On information and belief, agencies typically issue RFIs as a first step in the process of implementing regulations on an industry.

### The CISA Mis-, Dis-, and Malinformation Police

317.    On April 12, 2022, CISA announced that it was coordinating directly with social media platforms to police "Mis, Dis, Malinformation" (MDM).  The bulletin reported that CISA's "mission evolved" during the Biden Administration to address the new "information environment."[152]

318.    The bulletin also stated that the "MDM team supports the interagency and private sector partners' COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends."[153]

---

[149] *See* Davey Alba, *The surgeon general calls on Big Tech to turn over Covid-19 misinformation data*, The New York Times (Mar. 3, 2022), *at* https://www.nytimes.com/2022/03/03/technology/surgeon-general-covid-misinformation.html.

[150] *Id.*

[151] HHS Request for Information on March 7, 2022, *at*
https://www.federalregister.gov/documents/2022/03/07/2022-04777/impact-of-health-misinformation-in-the-digital-information-environment-in-the-united-states.

[152] CISA, *Mis, Dis, Malinformation*, *available at* https://www.cisa.gov/mdm (last visited May 18, 2022).

[153] *Id.*

*The White House's Threats: Censorship or Else*

319.     On April 25, 2022, White House Press Secretary Psaki was asked at a press briefing to respond to the news that Elon Musk would acquire Twitter.

320.     Psaki responded with the threat of adverse legal consequences for Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "the President has long been concerned about the power of large social media platforms …[and] has long argued that tech platforms must be held accountable for the harms they cause.  He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more."[154]

321.     In response to a question about whether Psaki was "concerned about the kind of purveyors of" "misinformation, disinformation, health falsehoods … having more of an opportunity to speak there on Twitter," she stated that the President had "long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."[155]

322.     She also affirmed that senior officials within the Biden Administration "engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue.  But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency.  And the President is encouraged by the bipartisan support for—or engagement in those efforts."[156]

---

[154] White House, Press Briefing by Press Secretary Jen Psaki (April 25, 2022) *available at* https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.
[155] *Id.*
[156] *Id.*

323.   On June 22, 2022, Facebook emailed Waldo of OSG, Rob Flaherty, and other White House officials with an update on Facebook's increased censorship.[157]

324.   In the email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates following the early childhood vaccine approvals. As of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older…."[158]

325.   Facebook indicated that it had again relied on the CDC to dictate what claims people can post on Facebook: "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children…."

326.   At the federal officials' request, Facebook continued to send to the White House and OSG bi-weekly "Covid Insights Reports" on COVID-19 related misinformation on its platforms.[159]

327.   Throughout the spring of 2022, Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of these reports, which it had been sending for over a year.[160]

328.   On June 13, 2022, Facebook notified the White House and OSG that "we will plan to discontinue these unless we hear from you that this information continues to be valuable."

329.   Rob Flaherty responded the same day, asking that Facebook continue to send the reports and further asking Facebook to report on how it would handle misinformation for early-childhood (under age 5) vaccines.[161]

---

[157] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 110.
[158] *Id.*
[159] *Id.*
[160] *Id.*
[161] *Id.*

330.     Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them.

331.     In September of 2022, the White House convened the "United We Stand" summit, at which the President again demanded that Congress reform Section 230 to punish tech companies for failing to adequately censor.[162]

### *Facebook Confirms the Obvious: The Platform Caved to White House Pressure*

332.     On August 26, 2024, Facebook CEO Mark Zuckerberg conceded in a publicly available letter to the House Judiciary Committee that the government "repeatedly pressured our teams for months to censor certain Covid-19 content, including humor and satire, and expressed a lot of frustration with our teams when we didn't agree."[163]

333.     In the letter, Zuckerberg expressed regret for caving to government pressure: "I believe the government pressure was wrong, and I regret that we were not more outspoken about it.  I also think we made some choices that, with the benefit of hindsight and new information, we wouldn't make today."[164]

334.     Zuckerberg added, "Ultimately, it was our decision whether or not to take content down, and we own our decisions, including COVID-19-related changes we made to our enforcement in the wake of this pressure."

335.     Despite Zuckerberg's careful wording, presumably to avoid the risk of Meta being held liable as a state actor for censorship, the letter Facebook indicates the obvious: that Facebook suppressed speech as a result of pressure from the White House.

### III.   THE BIDEN ADMINISTRATION'S "DISINFORMATION GOVERNANCE BOARD" WITHIN DHS

---

[162] *Id*. at 11.
[163] https://x.com/JudiciaryGOP/status/1828201780544504064.
[164] *Id*.

336.   On April 27, 2022, Secretary Mayorkas announced that DHS was creating a "Disinformation Governance Board" to combat "misinformation" and "disinformation."

337.   Documents declassified on June 7, 2022 establish that a whistleblower revealed that DHS, as of September 13, 2021 (if not earlier), had deemed "disinformation relating to the origins and effects of Covid-19 vaccines or the efficacy of masks" a "serious homeland security risk."[165]

338.   Among the declassified documents was a September 13, 2021 DHS memorandum, which detailed the significant and diverse efforts that DHS intended to take to combat such alleged misinformation, describing it as the Department's "mission."[166]

339.   The DHS memorandum expressly and repeatedly acknowledged that, in pursuit of its efforts to combat Covid-related "misinformation," the Department ran the risk of violating the First Amendment.[167]

340.   The memorandum emphasized the importance of "work[ing] closely" with "private sector partners" in order to successfully combat and otherwise prevent dissemination of so-called Covid-related misinformation.[168]

341.   The DHS memorandum also outlined the importance of sharing information, as the Department had done in the past, with "social media platform operators."[169]

342.   The documents outlining the creation of the DGB expressly acknowledged that the "component" governmental agencies tasked with combating misinformation, such as DHS, could "engage private sector services" and otherwise foster partnerships with "private sector entities

---

[165] https://www.grassley.senate.gov/imo/media/doc/grassley_hawley_to_deptofhomelandsecuritydisinformationgovernanceboard.pdf.
[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] *Id.*

[and] tech platforms" to help achieve the DHS mission of combating and suppressing so-called Covid-related misinformation.[170]

343.    The week of May 16, 2022, the Biden Administration announced that Jankowicz had resigned and that it was suspending operations of the Board, following unexpected public outcry.  However, the Board was not permanently dismantled, but instead "paused" while, in the meantime, DHS would continue its work "to address disinformation," according to the Biden Administration.[171]

344.    On August 24, 2022, following the recommendation from the Homeland Security Advisory Committee (HSAC), Mayorkas rescinded the DGB's charter.[172]

345.    In its press release announcing the DGB's dissolution following HSAC's recommendation, DHS also noted that HSAC had "concluded that countering disinformation that threatens the homeland, and providing the public with accurate information in response, is critical to fulfilling the Department's missions" and that DHS would "continue to address threat streams that undermine the security of our country."[173]

346.    On May 9, 2023, FOIA-obtained documents were released, revealing the agency's formation of a "governance board" to oversee the DHS's "Campaign" against domestic terrorism.[174]

---

[170] *Id.*

[171] Theo Wayt, Mark Lungariello, & Samuel Chamberlain, *Biden puts disinfo 'Mary Poppins' on ice, scraps Orwellian DHS Board*, THE NEW YORK POST (May 18, 2022), *available at* https://nypost.com/2022/05/18/biden-admin-pauses-disinformation-governance-board-report/.

[172] *See Following HSAC Recommendation, DHS terminates Disinformation Governance Board*, Department of Homeland Security (Aug. 24, 2022), *at* https://www.dhs.gov/news/2022/08/24/following-hsac-recommendation-dhs-terminates-disinformation-governance-board.

[173] *Id*.

[174] https://aflegal.nyc3.digitaloceanspaces.com/wp-content/uploads/2023/05/09040902/2022-HQFO-00179-AFL.pdf.

347.    Among the released documents is an internal DHS memo dated January 29, 2021 (just nine days after Biden was sworn in as President), which, under the heading "Characterizing the Threat" and subheading "Pandemic Impacts," describes how "the most acute terrorist threat inside the United States" stems from "DVEs" (domestic violent extremists).[175]  The DHS describes these "violent extremists" as individuals or small groups who "exploit public fears associated with COVID-19 to incite violence, intimidate targets, and promote their violent extremist ideologies."[176]

348.    According to the DHS, protests against "government restrictions imposed by the pandemic" qualifies as "domestic violent extremism."[177] The internal DHS memo also describes how accusations of government overreach and protests against pandemic-era government restrictions constitute "attempts to foment violence."[178]

349.    Under the heading "Accurately characterizing domestic terrorism can be challenging," the DHS memo explains that the distinction between domestic terrorism and other criminal behavior "comes down to an individual's ideology,"[179] lamenting that it can be "exceptionally difficult" to legally make the distinction due to "first amendment protections."[180]

350.    The DHS memo explains, however, that the intelligence community is only "*mostly* prohibited" from "reporting on *First Amendment protected activities*."[181]

351.    On May 14, 2021, DHS included in its summary of current terrorism threats to the United States the amplification of "conspiracy theories concerning the origins of COVID-19 and

---

[175] *Id*.
[176] *Id*.
[177] *Id*.
[178] *Id*.
[179] *Id*.
[180] *Id*.
[181] *Id*.

effectiveness of vaccines."[182]   Under "How We Are Responding," DHS stated that it was "collaborating with industry partners to identify and respond to those individuals encouraging violence and attempting to radicalize others through spreading disinformation, conspiracy theories, and false narratives on social media and other online platforms."

## IV.    THE SIO'S "VIRALITY PROJECT" AND ITS COLLUSION WITH FEDERAL AGENCIES TO CENSOR SPEECH

352.    During the Covid-19 pandemic, the Stanford Internet Observatory (SIO) launched the Virality Project (VP) as a means of tracking and censoring Covid-related speech on social media platforms.  According to the Virality Project's report dated April 26, 2022, the VP targeted speech by "domestic actors" (i.e., American citizens) that "questioned the safety, distribution, and effectiveness of the vaccines."[183]

353.    According to VP's report, SIO's Research Manager Renee DiResta is the VP's Executive Editor and contributor.

354.    From the start, VP was overtly biased against "anti-vaccine" viewpoints: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." (bold in original).[184]

355.    On information and belief, the VP targets truthful speech for censorship and successfully induced social-media platforms to censor and suppress COVID-related speech that was not false and, in many cases, not even violative of platform policies.

---

[182] *Summary of Terrorism Threat to the U.S. Homeland Bulletin*, National Terrorism Advisory System, Department of Homeland Security (May 14, 2021), *available at* https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-may-14-2021.
[183] Stanford Internet Observatory, et al., The Virality Project, "Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines" (Apr. 26, 2022), https://purl.stanford.edu/mx395xj8490.
[184] *Id*. at 9.

356.     The VP report admits that "it was not always clear what was misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay,"[185] and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts."[186] Yet this did not stop the VP from targeting supposed "misinformation" that was admittedly true at the time, or that later turned out to be true.

357.     Most speech targeted by the VP was not false: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source."[187]  According to the VP report, "Hard-to-Verify Content" is content that is "difficult to fact-check or verify, such as personal anecdotes," and "Alleged Authoritative Sources" is content that points to "information from an alleged public health official, doctor, or other authoritative source."[188]

358.     According to the VP, truthful "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation.[189]

359.     According to VP, it is also misinformation when true adverse health events from vaccines are "shared absent context," including "[r]are incidents documenting verified adverse health events."[190]

360.     The VP reports explains that "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation.[191]  It

---

[185] *Id*. at 7.
[186] *Id*. at 8.
[187] *Id*. at 34.
[188] *Id*. at 12.
[189] *Id*. at 44.
[190] *Id*.
[191] *Id*. at 45.

notes that "adverse event stories" are objectionable because they are "employed to push back against vaccine mandates."[192]

361.    According to VP, connections made possible through social media platforms "enabled pathways for the spread of vaccine misinformation."[193]  Connections such as "connecting via Facebook Groups, have enabled users to share, view, and discuss first-person experiences of supposed vaccine side effects."[194]  VP explains that "the more organization occurs on social media, the more strongly people believe vaccines are unsafe."[195]

362.    On information and belief, VP successfully pushes platforms to adopt more aggressive censorship policies: "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist."[196]

363.    Emails between Twitter and the Virality Project revealed through public reports show that VP successfully pushed Twitter to adopt more aggressive censorship practices and repeatedly flagged content for censorship under Twitter's policies.

364.    On March 3, 2021, former CISA intern Jack Cable of VP sent an email to senior Twitter officials, copying Renée DiResta, advising Twitter that VP was "beginning to ramp up our notification process to platforms," and providing "a list of actionable themes of vaccine misinformation we have recently observed."

365.    In this email, Cable indicated that VP would send "weekly briefing[s]" on misinformation that would be "targeted to the COVID-related policies we've identified on each platform."

---

[192] *Id*. at 45-46.
[193] *Id*. at 11.
[194] *Id*.
[195] *Id*.
[196] *Id*. at 3.

366. In an email to Twitter, on information and belief, VP flagged supposed "misinformation" concerning such topics as "the myocarditis situation, Senator Paul Rand's [sic] claims about natural immunity, and serious side effects (including a re-emerging concern about Guillain-Barre Syndrome)."

367. On information and belief, VP flagged to Twitter "True content which might promote vaccine hesitancy," including "Viral posts of individuals expressing vaccine hesitancy, or stories of true vaccine side effects," and "often true posts which could fuel hesitancy, such as individual countries banning certain vaccines."[197]

368. VP admits that six social media platforms "acknowledge[ed] content flagged for review" by VP "and act[ed] on it in accordance with their policies"—in other words, censored it.[198]

369. VP extensively monitored social media speech to detect disfavored content and viewpoints: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms."[199]

370. VP's monitoring system tracked content with about 6.7 million engagements on social media per week, or over 200 million engagements over the seven months: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million."[200]

---

[197] *See* Matt Taibbi, *Twitter Files #19: The Great Covid-19 Lie Machine: Stanford, the Virality Project, and the Censorship of "True Stories"*, *at* https://twitter.com/mtaibbi/status/1636729166631432195.
[198] Written Testimony of Renee DiResta Before the U.S. House of Representatives Regarding "A Growing Threat: Foreign And Domestic Sources Of Disinformation," Stanford Internet Observatory (July 27, 2022), *at* https://ecf.lawd.uscourts.gov/doc1/08917303945.
[199] The Virality Project Report, *supra* note 182 at 15.
[200] *Id*. at 32.

371.     This monitoring involved VP analysts reading and searching Americans' social media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope …, surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric."[201]

372.     This covert, mass surveillance of Americans' online speech was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ('vaccine,' 'jab') to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under 'Vaccine Distribution,' or severe adverse effects and death under 'Vaccine Safety,' among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches."[202]

373.     VP states that social-media platforms censored content at VP's instigation: "Platforms were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—acknowledging content flagged for review and acting on it in accordance with their policies. On occasion, platforms also provided information on the reach of narratives previously flagged by VP, which provided a feedback loop leveraged to inform the Project's understanding of policies and ongoing research."[203]

---

[201] *Id*. at 15.
[202] *Id*. at 16.
[203] *Id*. at 8.

374.     The VP report offers a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube during 2021.[204]

375.     The VP report emphasizes the importance of both government officials and social-media platforms in its collaboration on censorship: "As the effort progressed, input from these partners," including government officials and platforms, "was crucial in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and disinformation were being felt offline."[205]

376.     The VP contends that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise."[206] This "whole-of-society" effort includes an active role for the government in censoring politically disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…"[207]

377.     On information and belief, government officials provided "tips" to VP about misinformation on social media, and VP flagged such content to platforms for censorship.

378.     The VP report includes federal agencies and state and local officials as key "stakeholders."[208]

---

[204] *Id*. at 126, fig. 5.1.
[205] *Id*.
[206] *Id*. at 140.
[207] *Id*.
[208] *Id*. at 126, fig. 5.1.

379.     The VP "established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials, social media platforms, and civil society organizations," which provided tips, feedback and requests to assess specific incidents and narratives, and each entity type."[209]

380.     According to VP, "[a]n area that required ingenuity was creating a framework for facilitating the *intake* of tips from … government partners…. [T]heir tips are often highly valuable…."[210]

381.     The VP report states that: "Federal government agencies served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives."[211]

382.     VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point.[212]

383.     VP engaged in continuous, ongoing communication with government officials, platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on increasing situational awareness and enabling the stakeholders working on countering vaccine mis- and disinformation to develop the most effective possible response."[213]

---

[209] *Id*. at 24.
[210] *Id*. at 141 (emphasis in original).
[211] *Id*. at 17.
[212] DiResta Testimony, *supra* note 197 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default.files.surgeon.general-misinformation-advisory.pdf.
[213] The Virality Project Report, *supra* note 182 at 18.

384.     The VP report states that it "provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services."[214]

385.     Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation."[215]

386.     According to the VP Report, collaboration with government officials should increase: "[M]ore can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation…."[216]  These include "real-time response" to vaccine-related misinformation.

387.     VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government" at CISA "with its *existing* mis- and disinformation team."[217] (emphasis added).

388.     On information and belief, VP's censorship activities are ongoing and continue beyond the period described in the VP report.

389.     According to VP, federal, state, and local officials need to better "position themselves" when "harmful misinformation goes viral"—and that "[t]his need extends *beyond COVID-19*."[218]  At the same time, the VP Report notes, "the government must recognize that it is not always the best messenger for countering misinformation within targeted communities."  VP insists that a "networked approach is needed," and suggests that federal, state, and local agencies collaborate with "trusted voices"—and "build those relationships before they are needed."

---

[214] *Id*.
[215] *Id*. at 20.
[216] *Id*. at 149-50.
[217] *Id*. at 143.
[218] *Id*. at 11 (emphasis added).

390.    In November 2023, Stamos left his position at the Stanford Internet Observatory.[219]

391.    In June of 2024, DiResta left her position at SIO, after her contract was not renewed.[220]

392.    While there are reports that the SIO has been dismantled, it is unclear precisely what that means, as the "remnants of SIO will be reconstituted under Jeff Hancock," the same person who had sponsored the lab.[221]  Hancock, a professor of communication at Stanford, also "runs a separate program known as the Stanford Social Media Lab."[222]

393.    Indeed, Stanford has "strongly disputed" that SIO is being shut down, and claims that its "important work" will "continue[] under new leadership."[223]  Stanford defends SIO's work and contends that lawsuits such as this one have "chill[ed] freedom of inquiry[.]"[224]

394.    To date, SIO's website appears to be active and continues to post articles, newsletters, and other publications. For example, on September 4, 2024, SIO posted an article on its website entitled "How Persuasive is AI-Generated Propaganda," which is co-authored by Defendant Alex Stamos.[225]

## V.    THE CDC'S PARALLEL CENSORSHIP CAMPAIGN

395.    On information and belief, social media companies have frequently and directly coordinated with the CDC to monitor and suppress Covid-related speech.

---

[219] Casey Newton and Zoe Schiffer, *The Stanford Internet Observatory is being dismantled,* PLATFORMER (June 13, 2024), https://www.platformer.news/stanford-internet-observatory-shutdown-stamos-diresta-sio/.
[220] *Id*.
[221] *Id*.
[222] *Id*.
[223] *Id*.
[224] *Id.  See also* Shannon Bond, *A major disinformation research team's future is uncertain after political attacks*, NATIONAL PUBLIC RADIO (June 14, 2024), https://www.npr.org/2024/06/14/g-s1-4570/a-major-disinformation-research-teams-future-is-uncertain-after-political-attacks.
[225] https://cyber.fsi.stanford.edu/io.

396.     Working closely with the social media platforms, the CDC flags supposed "misinformation" for censorship on the platforms (sometimes using the acronym "BOLO" for "Be On the Lookout") and dictates what health statements will be censored on social media.

397.     During 2021, Carol Crawford, the CDC's Division Director of Digital Media, organized and ran "BOLO" meetings on Covid "misinformation" with representatives of social media platforms—including Twitter, Facebook, Instagram, and Google/YouTube—in which she and other federal officials colluded with those platforms about speech to monitor and target for suppression.[226]

398.     These meetings included Crawford and other CDC officials who would flag specific social media posts for censorship or topics and provide examples of the types of posts to censor.

### Facebook Censors "Misinformation" Upon the CDC's Command

399.     Facebook's "COVID and Vaccine Policy" states that Facebook "does not allow false claims about the vaccines or vaccination programs which *public health experts have advised us could lead to COVID-19 vaccine rejection.*"[227]

400.     CDC officials are included among those "public health experts" who "advise[]" Facebook on what to censor.

401.     For example, on November 4, 2021, in an email from Facebook to the OSG and the White House concerning the censorship of Covid-related "misinformation," Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get

---

[226] Plaintiffs' Proposed Findings of Fact, *Missouri v. Biden*, 576 F. Supp.3d 622 (E.D. Mo. 2021) (ECF No. 212-3).
[227] Facebook, *COVID-19 and Vaccine Policy Updates & Protections*, https://www.facebook.com/help/23076 4881494641. (emphasis added).

95

these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends."[228]

402.    On June 22, 2022, in an email from Facebook to the OSG, Rob Flaherty, and other White House officials, Facebook reported that it had updated the platform's censorship policy on "all COVID-19 vaccine related misinformation."[229]  According to Facebook, it had again relied on the CDC to dictate what claims users could post on the platform: "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children…."[230]

403.    Facebook censors Covid-related information as "false," not based on actual truth or falsity, but based on whether the statement questions or challenges the pronouncements of the CDC.

404.    On March 25, 2021, Crawford and other CDC officials met with Facebook to discuss Facebook's policies and approaches to Covid-related "misinformation."[231]

405.    The CDC chose the "Misinformation Topics" to be discussed, which included: "misinformation about side effects," and "claims about vaccines leading to deaths."[232]

406.    For each topic, the slides provided sample posts from real Facebook users as examples of the type of claim, along with a statement from the CDC debunking the supposedly erroneous claim.[233]  This included debunking any claims that the Covid vaccines had side effects.[234]

---

[228] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 103.
[229] *Id*. at 110
[230] *Id*.
[231] *Id*. at 117.
[232] *Id*.
[233] *Id*.
[234] *Id*.

407.    On March 30, 2021, Crawford inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths: "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine. What's the approach for adding labels to those stories?"[235]

408.    On April 13, 2021, Facebook emailed Crawford and proposed to enroll CDC officials in a special misinformation reporting channel that would allow CDC to log onto Facebook as an administrator and flag problematic speech in a more expedited manner.[236]

409.    On November 2, 2021, Facebook's content-moderation official emailed Crawford and other CDC officials stating that, "as a result of our work together" with the CDC, Facebook had updated its content-moderation policies to increase censorship of vaccine-related claims in significant ways.[237]

410.    According to the Facebook official, the platform had "launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies."[238]

411.    On February 3, 2022, Facebook's content-moderation official emailed Crawford to share the following additional updates that Facebook had made to its misinformation policies "as a result of our work together": (1) the removal of claims that Covid vaccines cause heart attacks and (2) the reduction of the distribution of content that "likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human." [239]

---

[235] *Id*. at 121.
[236] *Id*. at 121-22.
[237] *Id*.
[238] *Id*. at 131.
[239] *Id*.

*Google/YouTube*

412.   On March 23, 2021, Crawford sent a calendar invite for a meeting with six Google/YouTube officials, along with other CDC and Census employees.  The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts."[240]

413.   At the meeting, CDC and Census presented a slide deck similar to the one that Census prepared for the meeting with Facebook on March 25, 2021, discussed above. The slide deck was titled, "COVID Vaccine Misinformation: Issue Overview." The deck's "Misinformation Topics" included "infertility, misinformation about side effects, and claims of vaccines leading to deaths."[241]

414.   For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC.[242]

415.   Regarding supposed misinformation about vaccine side effects, the deck stated: "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC.[243]

416.   Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a

---

[240] *Id*. at 136.
[241] *Id*.
[242] *Id*.
[243] *Id*.

putative refutation by the CDC: "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines."[244]

417.    According to Crawford, as of March 2023, she was still attending regular biweekly meetings with Google.[245]

418.    Crawford also has "similar regular meetings with … Facebook and Twitter."[246]

**Twitter**

419.    On April 8, 2021, Twitter emailed Crawford to request examples of misinformation from the CDC: "All examples of misinformation are helpful…." The subject line of this email was "Request for problem accounts."[247]

420.    Twitter's email was in response to Crawford's prior inquiry, "Is there a good way that we should start engaging on misinformation?"[248]

421.    On May 10, 2021, Twitter offered to enroll CDC officials in the platform's "Partner Support Portal"—a privileged channel that would allow for expedited review of content flagged by the CDC for censorship.[249]

**CrowdTangle and Other Social Media "Listening" Reports**

422.    According to Crawford's sworn deposition testimony in the case *Missouri v. Biden*, the CDC collaborated with Facebook to flag Covid-related speech for censorship using "CrowdTangle," which she describes as "a social media listening tool for Facebook properties," meaning Instagram and Facebook.[250]

---

[244] *Id*. at 137.
[245] *Id*. at 138.
[246] *Id*.
[247] *Id*. at 143.
[248] *Id*.
[249] *Id*. at 145.
[250] *Id*. at 114.

423.     Crawford confirmed that the CDC had privileged access to CrowdTangle starting in early 2020, and CDC officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media.[251]

424.     According to Facebook, "state health departments" were granted access to CrowdTangle to address "vaccine misinformation."[252]  Using CrowdTangle, when government health officials "flag potential vaccine misinformation on Facebook and Instagram, [Facebook] review[s] and remove[s] the content if it violates our policies."[253]

425.     The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts."[254]

426.     The CDC has also used other social media "listening tools" to monitor Americans' speech on social media, including "Meltwater reports," which are similar to CrowdTangle but can monitor all platforms.[255]

427.     On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content overall across Pages and Groups." The email emphasized in bold certain content in the report, including "Posts about alleged vaccine-related deaths" and "News and reports of severe vaccine side effects."[256]

428.     Facebook indicated that it was sending this report in response to a prior conversation with Crawford: "I am following up on our conversation several weeks ago about providing more detailed reporting from our CrowdTangle team."

---

[251] *Id*. at 114.
[252] Facebook, *Connecting People in the US With State COVID-19 Vaccine Information* (April 12, 2021), *at* https://about.fb.com/news/2021/04/state-covid-19-vaccine-information/.
[253] *Id*.
[254] Plaintiffs' Proposed Findings of Fact, *supra* note 26, at 115.
[255] *Id*.
[256] *Id*.

429.     Crawford responded that "the wide group of those looking at misinfo will want this."[257]

## VI.     THE PLAINTIFFS AND THE CENSORSHIP OF THEIR SOCIAL MEDIA ACCOUNTS

430.     All six Plaintiffs are social media users and have maintained accounts on several platforms, including Facebook, YouTube, Twitter, Instagram, and TikTok.

431.     Except for Mr. Ramirez, each of the Plaintiffs experienced serious and debilitating medical injuries within weeks (if not, in some cases, days) after taking a dose of the Covid-19 vaccine.

432.     Except for Mr. Ramirez, each of the Plaintiffs continues to experience serious and debilitating medical injuries.

433.     Mr. Ramirez's 16-year-old son Ernest Ramirez Jr. died five days after taking his first dose of the Pfizer Covid vaccine.

434.      While the content of each is unique, all six Plaintiffs have regularly used their social media accounts to: (1) share their personal experiences during the pandemic, including their experiences after they, or a loved one, took the vaccine; (2) read about other users' experiences after taking the vaccine; (3) engage with other users in private support groups for individuals (and their loved ones) who experienced medical harm after taking the vaccine; and (4) exchange advice, support, and medical research with other users with respect to their vaccine injuries.

435.     Since Plaintiffs filed their initial Complaint (ECF No. 1) on May 22, 2023, they have continued to experience frequent and ongoing censorship of their speech on social media platforms, including within private support groups for the vaccine-injured community.  To date, Plaintiffs feel compelled to self-censor and/or to speak in code when using social media in the

---

[257] *Id.*

ways described above—or else risk having their accounts suspended, their private support groups frozen or shut down, their posts flagged as misinformation, shadow-banned, or removed entirely, and other sanctions.

436.   The physical and emotional harms that Plaintiffs have suffered as a result of the Covid vaccines are ongoing, as is their need to seek effective treatment, comfort, hope, and purpose.  Plaintiffs suffer ongoing harm because Defendants' actions have impeded—and continue to impede—them from obtaining the information and human support required to meet these needs.

437.   Given the chronology of events and the volume of Defendants' interactions with the social media platforms, state and local actors, and other third parties to ensure the suppression of voices like Plaintiffs', it is plain that the First Amendment injuries that Plaintiffs have suffered— and continue to suffer—are an egregious result of Defendants' relentless pressure, inducement, coercion, and collusion with the platforms.

438.   On information and belief, if Defendants were enjoined from conducting the unconstitutional conduct described herein, social media companies would reduce their suppression and strict content moderation of speech such as Plaintiffs' (and of others who might dare to question the government's policies)—as indicated by Mark Zuckerberg's recent expression of regret in his August 26, 2024 letter, *supra*, lamenting Facebook's compliance with the White House's orders to suppress speech that Facebook did not agree should be censored.

### a.  Brianne Dressen

439.   On November 4, 2020, Ms. Dressen received her first dose of the AstraZeneca Covid vaccine as part of a voluntary clinical trial.

440.   Within an hour of receiving that dose, she experienced tingling down her arm and later that night had blurry and double vision, as well as distorted hearing.

441.    The following morning, Ms. Dressen's left leg was slumped and weak, causing her to walk with a modified gate.  In addition, she experienced extreme sensitivities to light and sound.

442.    Within two weeks of receiving the vaccine, Ms. Dressen suffered from autotomic dysfunction, gastrointestinal problems, irregular heart rate, painful paresthesia, heart and blood pressure fluctuations, brain fog, and severe limb weakness and loss of bladder control.  Her symptoms became so severe that she was forced to isolate in her bedroom in darkness and silence for months, only to come out for rehabilitation to address her sensory deficits and her struggle to walk.

443.    On June 16, 2021, Ms. Dressen visited the United States National Institutes of Health (NIH) as part of its "Investigation of persistent neurological symptoms following SARS-CoV2 vaccine."  The NIH confirmed that she had suffered Covid vaccine-induced medical conditions and diagnosed her with "postural orthostatic tachycardia syndrome (POTS)" and "post-vaccine neuropathy," as well as short-term memory loss.

444.    Today, over three years later, Ms. Dressen has been diagnosed with chronic inflammatory demyelinating neuropathy (CIDP), a permanent and debilitating condition. She remains unable to work and, at times, relies on a wheelchair due to her chronic neuropathic condition.  Her severe reaction devastated both her own life and that of her young family.  At times, she believed that she could no longer go on living.

445.    In April of 2021, however, Ms. Dressen discovered through social media that others around the world were experiencing similar medical reactions after taking the Covid vaccine. After making these connections, she helped launch support groups on social media platforms, primarily on Facebook, consisting of individuals across the globe sharing similar vaccine-related experiences.  Through the social media groups, Ms. Dressen's mental state began to improve,

along with some of her physical ailments, as she was able to connect and share with others during a time at which she was too ill to venture outside of her home.

446.    The focus of the support groups was to share physical symptoms and conditions, offer emotional support, and discuss potential treatments.  Only individuals who had been injured by the Covid vaccine were permitted to join, and a rigorous vetting process was conducted before any member was admitted.

447.    In May of 2021, Ms. Dressen became the administrator of one of the Facebook groups that had been providing her with critical support.

448.    On June 28, 2021, Ms. Dressen spoke publicly for the first time about her experience. She participated in a mainstream media press conference in Milwaukee, Wisconsin, facilitated by Senator Ron Johnson, along with other vaccine-injured individuals, during which they shared their experiences.

449.    Within twenty-four hours of the press conference, the Facebook group of which Ms. Dressen served as administrator was shut down, and member lists were eliminated entirely under the auspices that the group was spreading "misinformation," though the group was private and limited to discussions of members' personal experiences.  Facebook notified Ms. Dressen that the group had been disabled for having "content that goes against [Facebook's] Community Standards."

450.    A few days later, another of Ms. Dressen's Facebook groups, "A Wee Sprinkle of Hope," was shut down for posting an infographic that listed certain symptoms that people had experienced post-Covid vaccine, including brain fog, memory loss, fatigue, tinnitus, and paresthesia.  The infographic also included a link to the press conference at which she had recently spoken about her vaccine injuries.  As a result of Facebook's shutdown of the group, Ms. Dressen

lost contact with nearly two thousand other vaccine-injured individuals who had been members of the group.

451.    It was around this time that Ms. Dressen became aware that she and other advocates for the vaccine-injured were being shadow banned on Facebook and other social media platforms, meaning that her posts were no longer visible to other users.  After several of Ms. Dressen's posts in her private vaccine-injured support groups were removed, Facebook notified her that: "Multiple violations for false information will cause your group's posts to be moved lower in the News Feed."

452.    It was also around this time, that Facebook began to flag many of the posts in the support groups as "Partly false" or as "Missing Context," and sometimes Facebook would remove the posts entirely for going against Facebook's rules or "Community Standards."

453.    In July of 2021, Ms. Dressen's activities were detailed in a report created by the Virality Project, a non-profit entity launched by SIO that was tasked primarily with combatting Covid-19 "misinformation."   Under the heading "Ongoing Themes and Tactics," the report expresses skepticism of Ms. Dressen's "claims [of] life-altering injuries" and concludes that: "An injury story that **does not have a proven causal link to the vaccine** nevertheless garnered high spread because it was picked up by a major anti-vaccine activist and by conservative politicians engaged in prior anti-vaccine activities." (emphasis included)

454.    In July of 2021, Ms. Dressen and several other group administrators launched a new support group on Facebook, "Covid Vaccine – Long Haul Support Group," in the hope of reconnecting with members who had been lost after Facebook shut down the support group "A Wee Sprinkle of Hope."

455.    Fearful of being disabled again, Ms. Dressen and her fellow group administrators had to develop a code for members to describe their experiences.  Words such as "vaccine," "side effect," "symptoms," "Pfizer," and "Moderna" could not be used, as they often triggered (and continue to trigger) Facebook to remove the post or shut down the group entirely.  Facebook deemed such posts "misinformation that could cause physical harm."

456.    Facebook also claimed that certain of her posts containing words or topics relating to the Covid vaccine or its side effects violated Facebook's "standards on violence and incitement" and notified Ms. Dressen that the platform doesn't "allow content that leads to a genuine risk of physical harm or a direct threat to public safety."  Facebook provided the following examples of such content: "Language that leads to serious violence," "Threats that could lead to death, violence or serious injury," and "Instructions on how to make or use weapons, if the goal is to seriously injure or kill people."

457.    On November 29, 2021, a group member posted that she had recently developed a mitral heart valve leak and mitral valve prolapse.  The post asked the group: "Anyone else get this from the v? Will it kill me? They said I don't need treatment? Why not?"  Facebook removed the post for violating "Community Standards on misinformation about vaccines."

458.    Currently, Ms. Dressen and other group administrators must continuously create new code words to avoid censorship of their posts as Facebook's search algorithms regularly adapt.

459.    Despite Ms. Dressen's efforts, numerous posts in the support groups have been, and continue to be, removed by Facebook, including posts with links to medical articles describing vaccine side effects and possible treatments.  Even posts that Facebook does not remove are often flagged as potential misinformation or labeled with a warning box directing viewers to visit the CDC's website for "reliable, up-to-date information."  This includes Ms. Dressen's attempts to

post links to news articles or podcasts, including features in Science and Newsweek, in which she shared her personal experience after taking the vaccine.

460.    As a result, Ms. Dressen's ability to assemble medical information, share personal experiences, and both share and receive support within the vaccine-injured community has been drastically curtailed.

461.    Ms. Dressen has also experienced censorship and content removal on other social media platforms, including YouTube, TikTok, Vimeo, and Instagram.

462.    In September of 2021, Ms. Dressen participated in and distributed an awareness video, titled "We Want to Be Heard," with other individuals who had suffered side effects from the Covid vaccine.  TikTok took down the video, notifying Ms. Dressen that it had been removed for "dangerous acts."

463.    Similarly, YouTube removed a video that Ms. Dressen had posted called "See Us. Hear Us. Believe Us." for "violating YouTube's Community Guidelines."

464.    In October of 2021, Ms. Dressen's husband, a biochemist, testified before the Food and Drug Administration (FDA) regarding her NIH-confirmed vaccine injuries.  His testimony was covered by several members of the mainstream media, and Ms. Dressen's experience quickly went viral. Initially, the story trended on Google with over 87 news stories featuring his testimony.

465.    When Ms. Dressen ran a search of the identical terms on Google four hours later, she discovered that only five stories appeared in the search results.  Although the stories remained on the news sites where they were published, Google prevented the story from trending by removing them from visibility on the Google search engine.

466.    In December of 2021, a support group on Facebook on which Ms. Dressen served as an administrator, with over 12,000 members, including vaccine-injured individuals and

supporting friends and family, was shut down after a group member posted a link to a news story featuring Ms. Dressen's experience after taking the vaccine, as well as a link to the government of Australia's website discussing adverse vaccine reactions.   According to Facebook, the post violated its "Community Standards on misinformation about vaccines."

467.    In November of 2021, Ms. Dressen co-founded a non-profit organization called React19 to support the vaccine-injured community.   She, along with React19's other board members, serve as group page administrators on multiple social media platforms and have each experienced censorship similar to that which is described above. This censorship has not only limited group members' access to medical information and support, but it has also dramatically limited React19's ability as a non-profit organization to fundraise.

468.    In January of 2022, in her role as co-founder of React19, Ms. Dressen helped produce and circulate on multiple social media platforms a vaccine injury awareness video called "Silence," documenting only the personal experiences of those who experienced medical injuries after taking the vaccine.   The video was removed from both Vimeo and YouTube.

469.    YouTube notified Ms. Dressen that the video was removed for violating YouTube's "medical misinformation policy."

470.    Vimeo notified Ms. Dressen that the video violated its Guidelines because it made "false or misleading claims about (1) vaccination safety, or (2) health-related information that has a serious potential to cause public harm." Ms. Dressen appealed the removal.   Vimeo responded by permanently deleting React19's account from the platform.   The only explanation that Vimeo provided was that the "claims of injury are not substantiated by the US Centers for Disease Control."

471.     In June of 2022, React19 launched a new awareness campaign called "Can we talk about it?" which requested that participants post on social media a photo of their arm and share what symptoms they had experienced after taking the vaccine.

472.     After posting about the awareness campaign on Instagram, Ms. Dressen was notified that her post had been removed for "harmful false information."  Ms. Dressen's post stated the following: "It's time to break the silence about v-injuries and deaths. Mark your calendars and join us on June 14th at 2 p.m. EST for the launch of the #CanWeTalkAboutIt worldwide campaign, which aims to: Create a safe space for C19 v-injured to share their stories. Create awareness among the general public that C19 v-injuries are real. Raise funds to support global organizations and initiatives working on projects related to research, health solutions, and lawful processes leading to compensations."

473.     After Ms. Dressen posted about the awareness campaign on Facebook, her account received a warning for posting "misinformation that could cause physical harm."  Facebook also claimed that the post "may show graphic content" and that her account might be restricted if she were to violate again.  Ms. Dressen's post stated the following: "Join us in solidarity Tuesday June 14th! Take a photo with your sleeve rolled up if inj. or take a photo of your hand over your heart." The post also included an infographic with the event details and a link to the campaign website.

474.     In September of 2022, React19 posted a story on Twitter focused on hope and the healing process of a vaccine-injured member of the non-profit organization.  The post discussed her symptoms and progress towards recovery, and was tagged #WednesdayWins.   Twitter removed the post and locked React19's account.  Twitter notified React19 that the account could only be unlocked if the account administrator clicked a checkbox admitting that the post was

harmful and in violation of Twitter's rules.  Once Ms. Dressen clicked the checkbox, the account was restored.  She appealed the post's removal but, to date, has received no response.

475.    In March of 2023, React19 posted a link to an article on Facebook regarding a scientist's findings on Covid vaccine injuries.  In addition to the article link, the post stated: "Science has been slow to study vaccine injuries, but one British Columbia researcher has led the charge to determine the incidence of Guillain-Barré syndrome, VITT, TTS, and myocarditis/pericarditis strongly associated with COVID-19 vaccination."  Facebook removed the post, describing it as "misinformation that could cause physical harm."  Facebook then froze React19's account for 24 hours and suspended for one month the private Facebook account of React19's social media manager who is also vaccine-injured.  His private account had not been used for months but was nevertheless suspended for content posted by React19's official account.

476.    On May 4, 2023, YouTube notified Ms. Dressen that React19's account has been suspended for posting inappropriate video content.

477.    Since Plaintiffs filed their initial Complaint, Ms. Dressen has continued to experience frequent and ongoing censorship of her personal posts on social media, as well those posted by her non-profit organization React19.  Additionally, in Ms. Dressen's private online support groups for the vaccine-injured, Ms. Dressen's posts, as well as those of other members, have been removed. These posts contained information that Ms. Dressen had an interest in reading, including effective forms of therapy, news articles and scientific studies concerning the Covid vaccine, and notice of events organized by, or in support of, the vaccine-injured.

478.    For example, in September of 2023, Ms. Dressen, along with other vaccine-injured individuals, attempted to discuss potential DNA concerns linked to the Covid vaccine in two private support groups on Facebook, called "Neuro V Long-Haulers" and "Covid Vaccine – Long

Haul Autoimmune Support."  Both support groups received warnings for hosting the discussion, and the posts were flagged as "Partly False."

479.    On May 19, 2023, the Epoch Times first released a documentary called "The Unseen Crisis," which examines the stories of individuals injured by the Covid vaccine, including Ms. Dressen, along with Mr. Ramirez and Ms. Holland. [258]  Throughout the summer of 2023, Ms. Dressen, along with other vaccine-injured group members, repeatedly attempted to share links to the film in private support groups on Facebook.  Facebook repeatedly removed the posts, citing the link to the documentary as a violation of its "Community Standards on Spam."

480.    In October of 2023, Ms. Dressen participated in a podcast episode, hosted by "Just Think: The Podcast" (Just Think), to spread awareness about a compensation reform bill authored by Congressional Representative Lloyd Doggett, which would update the federal Vaccine Injury Compensation Program to include the claims of those injured by one of the Covid-19 vaccines. The episode was entitled "The Silence is Deafening, So We Have To Get Louder."

481.    After Ms. Dressen attempted to share a link to the episode, tagging Just Think in her post, Instagram warned her against making the post, notifying her that Just Think's account "repeatedly posted false information" or "went against [Instagram's] Community Guidelines." Just Think is a podcast hosted by three American women with "a strong aversion to labels, political correctness, and censorship" who aim to "challenge [listeners] to think critically about the information [they] are given."[259]  Just Think had frequently invited guests on the podcast who questioned the efficacy of the Covid vaccine or who were critical of the Government's Covid-related policies.

---

[258] https://www.imdb.com/title/tt28490438/.
[259] https://rss.com/podcasts/justthinkthepodcast/.

482.    In January and February of 2024, Ms. Dressen posted in multiple private support groups on Facebook about an educational conference scheduled for February 2-4, 2024 called "Healthcare Revolution – Restoring the Doctor-Patient Relationship," which would be hosted by The Frontline COVID-19 Critical Care Alliance.   At the conference, participants would discuss Covid vaccine injuries and how to treat them.   Facebook removed Ms. Dressen's posts in each of her private support groups.   It also removed the posts of other group members who attempted to share about the event.

483.    On June 6, 2024, one of Ms. Dressen's co-administrators of a large, private support group on Facebook called "Covid Vaccine – Long Haul Autoimmune Support" posted a link to a news article describing how a senior Japanese official had apologized for deaths caused by the Covid vaccine.   In the post, he commented: "Anyone know if this is legit?"   Facebook removed the post and notified the support group's administrators, including Ms. Dressen, that sharing "false information in the group" would "reduce the group's distribution."   It later turned out that the news article had reported true information.

484.    Frequently, when others have attempted to share Ms. Dressen's or React19's posts, the post has been censored and/or the user sanctioned for attempting to circulate the post.   Even when other users have attempted to post *about* Ms. Dressen—in particular, about her vaccine injuries and her advocacy through React19—those posts have been censored and the user sanctioned.

485.    For example, on May 1, 2024, a Facebook friend of Ms. Dressen's posted: "Bri Dressen, founder of React19[,] was on trial for [AstraZeneca].   When she developed side effects, they dropped her from the trial to make it 'safe and effective.'   Damage is done."   On May 16, 2024, Facebook notified her that the post was "not available at the moment" and that it "may have

false information."  On June 7, 2024, Facebook informed her that "fact-checkers" had reviewed the post and confirmed that it was "false."  As a result, Facebook added a "notice" to the post and "moved it lower in Feed" (meaning that its visibility by other users was significantly reduced or, in other words, shadow-banned).  Facebook also warned her that if she repeatedly shared "false information," her other posts could be "moved lower in Feed, so other people are less likely to see them" (i.e., shadow-banned).

486.    On June 28, 2024, Facebook notified a member of React19 that her November 17, 2023 post, in which Ms. Dressen was tagged and which included a link to an interview discussing React19's mission to support the vaccine-injured, had been removed as potential "spam."

487.    On June 29, 2024, React19 posted a video on YouTube in which one of its members shared her true, first-hand experience with her vaccine injury, including her close encounter with death and the useful therapies that had helped revive her.  React19 shared the video to shine a light on one of its member's personal experiences and to relay to other vaccine-injured individuals crucial information concerning potentially effective forms of therapy.

488.    Later that same day, YouTube removed the video for posing "a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and the World Health Organization."

489.    On September 9, 2024, a friend of Ms. Dressen's and member of React19 attempted to share on Facebook an IRB-approved study conducted by React19 concerning Covid vaccine injuries.  Facebook removed the post for violating the platform's "Community Standards on spam."

490.     Further, since May of 2023, Ms. Dressen believes that the platforms' use of shadow-banning has increased over the last year, severely restricting the visibility of her posts, limiting the ability of React19 to raise funds and awareness, and preventing the vaccine-injured from connecting with one another.  She feels compelled to use code words and to avoid certain terms entirely in order to avoid censorship—whether that be the overt removal of a post or a post's dramatic reduction in visibility as a result of shadow-banning.

491.     Ms. Dressen has noticed that, over the course of the last year, more subtle forms of censorship, such as shadow-banning, have grown increasingly common on several social media platforms, such as Facebook and YouTube. She has also noted that, when a post relating to vaccine injuries starts to become popular and widely shared, it is far more likely to be removed (perhaps to prevent it from going viral).  For example, a post that receives one "like" on Facebook might be flagged as spam or misinformation, yet remain visible to other users—but if that same post is later "liked" and shared by many users, both the original post and any reposts will be removed.  Ms. Dressen has experienced this firsthand with her own posts, as well as the posts of React19.

492.     For example, on July 30, 2024, React19 posted a story on Facebook about an elite triathlete, Heiko Sepp, who suffered critical injuries, including heart inflammation, post-Covid vaccination.  The post included a link to a documentary detailing Sepp's journey following the sudden onset of debilitating health conditions.  The post quickly gained interest on Facebook, and, within hours, it had reached over 39,000 users.[260]

493.     In less than 24 hours, React19's administrators, including Ms. Dressen, learned from other users attempting to share the post that Facebook had inhibited the post from gaining

---

[260] Facebook offers professional accounts the ability to see certain metrics, including a post's "reach," or the number of separate users who viewed the post at least once.

114

further momentum by preventing users from continuing to share or, in some cases, by allowing users to share the post and subsequently removing the post without notice.

494.    On August 1, 2024, React19 posted a video about Maddie de Garay, a child who was severely injured after taking one of the Covid vaccines.  React19 posted the video to raise awareness about Maddie's ongoing struggle and to help her seek out effective medical treatment. Similar to the above, Ms. Dressen and React19's other administrators soon learned from other Facebook users that the post could not be reshared or that it would "disappear" shortly after it had been posted.

495.    On August 27, 2024, Chris Cuomo announced on NewsNation that TikTok banned his account and removed several Covid-related videos that Cuomo had posted, including a video about Ms. Dressen and her vaccine trial with AstraZeneca.[261]

496.    Due to the ongoing threat of censorship and penalties for posting on social media, Ms. Dressen and her fellow support group members often hesitate to share their personal stories on social media platforms or reach out for support from those with common experiences.  Ms. Dressen has been limited in her ability to communicate and connect with those who she perceives are in most need of connection and support.

497.    In her role as social media group administrator for React19, as well as for three private support groups on Facebook, she has been compelled to dedicate more time determining how group members can communicate with one another without being censored than supporting the group members through the trauma of their injuries, which has always been her primary objective.

---

[261] https://www.newsnationnow.com/entertainment-news/media/chris-cuomo-banned-tiktok/.

498.     Ms. Dressen currently serves in her personal capacity as administrator of three private Facebook groups with a combined membership of approximately 19,400 people.

499.     In her capacity as administrator for React19, she manages its accounts on Facebook, Twitter, YouTube, Odysee, and Instagram, with a combined following of over 48,000 people.

500.     Ms. Dressen is also a member and contributor of other support groups on social media platforms that, in total, include approximately 22,500 members of the vaccine-injured community.

### b. Shaun Barcavage

501.     On December 29, 2020, Mr. Barcavage received his first dose of the Pfizer vaccine. Before that time, he had been in good health with no medical concerns, spending his free time traveling the world and walking in the park with his partner and two dogs.

502.     Within hours of receiving the vaccine, he developed paresthesia (numbness, tingling, warm and cold sensations) along his injected right arm, which radiated into his upper back and armpit area.

503.     Mr. Barcavage's symptoms progressively worsened over the following days to include tingling on the right side of his face, stinging in his right eye, and a burning sensation on one ear.

504.     On January 4, 2021, he attended a primary care visit, after which his physician referred him to the neurology department.

505.     On January 11, 2021, Mr. Barcavage met with a neurologist at Weill Cornell Medicine who conducted an electromyography (EMG) test on his right arm and ran some general blood work tests.  He recommended that Mr. Barcavage proceed with the second dose of the Pfizer

vaccine.  Despite his misgivings, and under pressure from impending vaccine mandates, Mr. Barcavage proceeded with the second dose of the Pfizer vaccine on January 19, 2021.

506.     During the first three days, Mr. Barcavage experienced pain where he had been injected that radiated to his left neck and back.  By the fourth day, he awoke with ringing in the right ear (tinnitus), and the paresthesia in his right side had returned.  He also developed a prickling sensation in his throat.  Over the course of the next few days, the paresthesia in his right side escalated with more intensity.  He consulted his neurologist about these symptoms and was instructed to simply "wait it out."

507.     By January 30, 2021, Mr. Barcavage developed inappropriate sinus tachycardia, wildly fluctuating blood pressure, a severe headache on the right side, acute abdominal pain, worsening tinnitus, stinging sensations, muscle fasciculations and internal vibrations in his legs.

508.     On January 30, 2021, he sought emergency care in Pennsylvania where he received a CT scan, which showed that he had an inflamed mesentery.  The attending physician dismissed the possibility that Mr. Barcavage's symptoms were vaccine-related and sent him home with ibuprofen.

509.     As a medical professional, Mr. Barcavage felt certain that something was seriously wrong and consulted numerous doctors for help and answers.  However, none knew how to help, and some admitted to him that "this was all new" and that what was happening with the vaccine during the pandemic was still poorly understood.

510.     By March of 2021, Mr. Barcavage's symptoms had worsened, with the onset of autonomic dysfunction (positional tachycardia and severe insomnia), cardiac arrhythmias, and generalized, whole-body neuropathies that involved the mouth, throat, and eyes.

511.    Since the adverse reaction to the vaccine, Mr. Barcavage has also been diagnosed with positional tachycardia, and a skin biopsy has indicated small fiber neuropathy. His symptoms have continued to worsen and, most recently, he has developed chronic pain in both ears, worsening tinnitus, and sudden fluctuations in hearing.

512.    After receiving no answers about his symptoms from his doctors, Mr. Barcavage turned to the internet to search for others who might be experiencing similar reactions to the vaccine.

513.    In March of 2021, Mr. Barcavage began posting on his Instagram account to share his experience with the vaccine and to raise awareness of the issue.  Instagram labeled the majority of his posts with a message directing viewers to the CDC website "to obtain factual information about Covid."  To Mr. Barcavage, this labeling suggested that his injuries qualified as misinformation, adding to his sense of alienation as he struggled to find support and connect with others who might be struggling with similar conditions.

514.    In March of 2021, Mr. Barcavage established one of the first online support groups on Facebook for those suffering tinnitus post-vaccination.  Only individuals who had been injured by the Covid vaccine were permitted to join, and a vetting process was conducted before any member was admitted.  Within months of creating the group, the group had over 3,500 members.

515.    His private support group was frequently the target of censorship by Facebook.  The group often received warning messages for posts that Facebook claimed violated its "Community Standards."  Group member posts were also often labeled as "misinformation" or with a message that redirected viewers to "more accurate information" on the CDC website.

516.    As an administrator of the support group, Mr. Barcavage struggled to find ways to enable members to communicate without the group being shut down.  He had to develop code

words with the other members, such as "vee" for vaccines, to prevent posts, including links to news articles and medical journals, from being flagged as misinformation or removed entirely.

517.    In November of 2021, Mr. Barcavage shared testimony about his vaccine injuries before the Senate.  When his family and fellow vaccine-injured individuals attempted to share his testimony on Facebook, the posts were removed as "misinformation."

518.    On December 15, 2021, Facebook disabled Mr. Barcavage's support group, claiming that the group contained "content that goes against Facebook's Community Standards." Mr. Barcavage appealed Facebook's decision, and, without any further communication from Facebook, the group was restored on January 4, 2022.

519.    Since Plaintiffs filed their initial Complaint, Mr. Barcavage has experienced ongoing censorship of his posts on social media, including the platforms' markedly increased use of shadow-banning, which significantly limits the visibility of his posts.

520.    For example, on May 3, 2024, the New York Times published an article entitled "Thousands Believe Covid Vaccines Harmed Them.  Is Anyone Listening?" featuring Mr. Barcavage and his struggle post-Covid vaccination.[262]  The article included viewpoints critical of both the Covid vaccine and the federal government's vaccine-related policies that were implemented during the pandemic.  When Mr. Barcavage and others attempted to share the article on Facebook, their posts would consistently receive little to no interaction from other users, and the post's visibility appeared to be significantly reduced.

521.    Additionally, over the last year, each time that Mr. Barcavage has posted a video on YouTube about his vaccine injuries, medical studies or developments concerning the vaccine, or advocacy efforts to support the vaccine-injured, the video has been flagged with a link directing

---

[262] https://www.nytimes.com/2024/05/03/health/covid-vaccines-side-effects.html.

viewers to the CDC's website for "the latest information" on the Covid vaccine, impliedly indicating the inaccuracy of his video content.

522.    Mr. Barcavage must still self-censor or speak in code when posting on social media platforms to avoid warnings, removals, or account suspensions, and both he and members of his support groups have been limited in their ability to share their experiences, seek advice, find answers, and support one another.

523.    Mr. Barcavage has been conducting research into the adverse effects of the Covid vaccine with the hope of spreading awareness and providing the vaccine-injured with further support and knowledge about their injuries.  His efforts to communicate freely, however, have been largely undercut by the suppression of his posts on social media platforms, as well as the negative, "anti-vaxxer" stigma that has accompanied the labels of "misinformation" on his posts.

### c.   Kristi Dobbs

524.    On January 18, 2021, Ms. Dobbs received her first dose of the Pfizer vaccine at her local hospital's vaccine clinic.

525.    Within five minutes of receiving the injection, as she waited in line to schedule her appointment for the second dose, Ms. Dobbs felt a strange tingling sensation, like freezing cold water, running down her left arm, which had just received the injection. A few moments later, she experienced a pre-syncopal episode, during which she experienced heart palpitations, lightness of breath, increased pulse, and an abnormally high blood pressure reading that was worthy of stroke.

526.    She was monitored at the clinic for 45 minutes and then released.  The nurse at the clinic told her that she was either having a panic attack or a hot flash, and no further medical assistance was offered.  Ms. Dobbs was also told to file a "V-safe report," an informal mechanism to report to the CDC how one felt after taking the Covid vaccine.

527.    Three days later, Ms. Dobbs suddenly felt a stabbing pain in her left upper back, followed by tingling and numbness in her arms and involuntary tremors in both hands.

528.    Over the course of the next few weeks, she suffered additional symptoms, including the following: extreme fatigue, autotomic dysfunction, heart palpitations, blood pressure fluctuations, gastrointestinal problems, painful paresthesia and neuropathy, internal tremors, brain fog, muscle pain and weakness, inability to feel pin pricks on her legs, dizziness, stiff neck, intermittent tinnitus, headaches, temperature regulation issues, skin rashes, over-dilated eyes, sound sensitivity, heavy-thick clotted menstrual cycles, as well as nocturnal convulsions, or pseudo-seizures.

529.    Ms. Dobbs' symptoms became so severe that she spent weeks during which she could barely get out of bed, and she could only manage to get to the living room couch to help her kids with their schoolwork.  It was impossible for her to make it as far as the kitchen to cook dinner for her four young children.

530.    In March of 2021, Ms. Dobbs was invited to participate in the NIH's "investigation of persistent neurological symptoms following SARS-CoV2 vaccine."

531.    She was seen by NIH neuroimmunologist Farinaz Safavi who requested a blood sample from Ms. Dobbs to test for autoantibodies post-Covid vaccination.  Ms. Dobbs regularly corresponded with Dr. Safavi throughout the month of March.

532.    In May of 2021, without explanation, Dr. Safavi requested to speak with Ms. Dobbs' neurologist and informed Ms. Dobbs that the NIH would no longer see her as a patient.

533.    Without explanation, Ms. Dobbs' neurologist also informed her that he would no longer treat her.  Ms. Dobbs was referred to a new neurologist who acknowledged that Ms. Dobbs had "developed multiple symptoms after covid vaccination," but was unable to treat her symptoms.

534.    During the initial days following the vaccine, Ms. Dobbs felt extremely alone and depressed.  She often contemplated suicide.

535.    Ms. Dobbs turned to the internet for answers and possibly to find others who were experiencing similar aftereffects of the Covid vaccine.

536.    In February of 2021, she came across an article in Neurology Today with a comment at the bottom of the article from Dr. Danice Hertz, a retired gastroenterologist who had been injured by the vaccine.  Ms. Dobbs contacted Dr. Hertz by email, and they soon created an email thread, including others who had been injured by the vaccine.

537.    By March of 2021, the email group had grown so large that Ms. Dobbs and a few others decided to create a support group for the vaccine-injured on Facebook.

538.    After about a week, Ms. Dobbs and the other group administrators decided to make the group private, so that members could be vetted before being allowed to join.  All applicants were required to submit details regarding their symptoms, as well as the date of the vaccine administration, brand of vaccine, treatment(s) attempted, and a description of their health status prior to vaccination.

539.    Ms. Dobbs is also a member of other vaccine-injured support groups, each of which is strictly nonpartisan and fully focused on allowing vaccine-injured individuals to share their experiences and discuss possible medical treatments.

540.    On June 28, 2021, Ms. Dobbs participated in a press conference held by Senator Ron Johnson, along with other vaccine-injured individuals, where they shared experiences.

541.    Within twenty-four hours of the press conference, one of Ms. Dobbs' support groups on Facebook was shut down and member lists were eliminated entirely under the auspices that the group had been spreading "misinformation."

542.     A few days after the press conference, another Facebook support group of which Ms. Dobbs was a member was shut down for posting a link to the press conference and an infographic displaying certain symptoms that people had experienced post-Covid vaccine. As a result of Facebook's shutdown of the group, Ms. Dobbs lost contact with nearly two thousand other vaccine-injured individuals who had been members of the group.

543.     Around this time, Ms. Dobbs realized that she and other advocates for those injured by the vaccine were being shadow banned on Facebook. This meant that her posts were no longer visible to other users and also that she could no longer see posts from several members of her support groups.

544.     In the hopes of reconnecting with the lost group members, Ms. Dobbs joined a few new vaccine-injured support groups.  In all of the groups, Ms. Dobbs and the other members had to use code words to describe their experiences, symptoms, and medications because words such as "vaccine," "side effect," "symptoms," "Pfizer," and "Moderna" would result in a post being labeled as misinformation or removed.

545.     Despite Ms. Dobbs' efforts, many of her posts continue to be removed or flagged as false, misleading, or potentially false information. The posts that are not removed are also often labeled with a warning box directing viewers to visit the CDC's website for "reliable, up-to-date information."  On multiple occasions, after removing her posts, Facebook has notified Ms. Dobbs that the posts are "misinformation when public health authorities conclude that the information is false and likely to contribute to imminent violence or physical harm."

546.     In February of 2022, Ms. Dobbs joined React19 and continues to serve as its secretary, a voluntary and unpaid position which she works from home.  Ms. Dobbs is also a part of React19's advocacy team.

547.     In June of 2022, React19 launched a new awareness campaign called "Can we talk about it?" discussed above, which requested that participants post on social media a photo of their arm and share what symptoms they had experienced after taking the vaccine.

548.     Ms. Dobbs made a post about the awareness campaign in one of the vaccine-injured support groups on Facebook.  As a result, Facebook froze her account for three days and removed the post for "violence and incitement."

549.     Ms. Dobbs still hesitates to post about her personal experience, whether on her personal Facebook page or in one of her private support groups, and frequently feels that she must self-censor out of concern that her account will be frozen or the support groups will be shut down. Her ability to speak freely, even in a private group context, with other members of the vaccine-injured about their symptoms, success stories, and possible medical treatments has been severely limited.

550.     Ms. Dobbs currently serves as the administrator of two Facebook support groups for those injured by the vaccine and is a member of eight others.  She continues to suffer from neuropathy, internal vibrations, tinnitus, brain fog, fatigue, and occasional dizziness caused by the Covid vaccine.

### d.  Nikki Holland

551.     On February 12, 2021, Ms. Holland received her second dose of the Moderna Covid vaccine, having had no symptoms following the first dose.

552.     Within 36 hours of receiving the injection, she began to experience nausea, vomiting, and extreme gastrointestinal discomfort.

553.     The next day, she began to experience shortness of breath, fatigue, and weakness.

124

554.     Five days after receiving the vaccine, her shortness of breath worsened to the point that she had to leave work to go to the emergency room where she was treated for respiratory failure.  She had to be placed on a ventilator three times for breathing assistance.  The third time, due to the urgent need for more advanced medical care, she had to be flown, or "life-flighted," to a larger hospital.

555.     Ms. Holland soon also began to experience fluctuations of blood pressure and heart rate, leg pain, fatigue, paresthesia, and her gastrointestinal problems worsened.

556.     During the course of 2021, following Ms. Holland's second dose of the vaccine, she was hospitalized five times, life-flighted to a larger hospital five times, spent nearly 100 days in the hospital, and spent one month in an inpatient rehabilitation center to gain enough strength to return home.

557.     Since taking the second dose of the vaccine, Ms. Holland has been diagnosed with post-vaccination injury syndrome, chronic respiratory failure with hypoxia, laryngospasms, status post tracheostomy, vocal cord dysfunction, systemic inflammatory response syndrome, food intolerance, gastroparesis, abdominal distension, gastroesophageal reflux disease, dysphagia, neurogenic bladder, critical illness myopathy, deep vein thrombosis, venous valve insufficiency, hemoptysis, sepsis, anxiety, major depressive disorder, acute pain, lower extremity weakness, drop foot, gait abnormality, muscle spasms, ataxia and, eventually, Chronic Inflammatory Demyelinating polyneuropathy (CIDP).  She became dependent on supplemental oxygen and required a tracheostomy, a suprapubic catheter implant and bladder InterStim device implant to assist with urination, as well as a feeding tube for nutritional tolerance and support.  She must also rely on a wheelchair or walker as an assistive device for mobility, along with multiple medications

and costly, specialized intravenous immunoglobulin (IVIG) infusions, which she receives each month in order to manage her ongoing injuries.

558.    Only recently, during the summer of 2024, was Ms. Holland able to remove her tracheostomy and feeding tube, and she can now tolerate food without the assistance of medication.

559.    Ms. Holland has recently regained enough endurance to participate in wheelchair basketball, but she continues to suffer pain, neuropathy, fatigue, weakness, mobility issues, among other symptoms of her diagnoses, on a daily basis.

560.    Ms. Holland sought assistance from multiple doctors and specialists but has seen only limited improvement, and she continues to suffer on a daily basis.  Formerly an active single mother who worked full time and ran regularly, Ms. Holland now must rely on her three children for assistance with basic tasks and often can barely get out of bed.

561.    As her symptoms worsened in 2021, she began to search Google for medical help and social support.  However, most searches turned up only CDC reports about the vaccine and a sparse list of its known or acknowledged side effects.

562.    Unable to find support or treatment, Ms. Holland became depressed and, at multiple points, contemplated suicide.

563.    In the summer of 2021, however, she discovered support groups on social media platforms—primarily on Facebook—consisting of individuals around the world who had similar post-vaccine experiences and symptoms.  Ms. Holland's mental state subsequently began to improve, and her feelings of depression and alienation diminished.

564.    On Facebook, Ms. Holland noticed that her own and others' posts that contained Covid-related words, such as "Covid vaccine" would be flagged with a box stating that the Covid

vaccine had been thoroughly tested "for safety and effectiveness" and providing a link to the CDC website, giving the impression that the posts were false or misleading.

565.    Ms. Holland also noticed that the vaccine-injured support groups did not appear in Facebook or Google searches.  She could only locate the groups by typing out the full group page address or by searching through her previous group connections.

566.    Ms. Holland and other members of the vaccine-injured support groups began using code words as substitutes for words including "vaccine," "side effect," "symptoms," "Pfizer," and "Moderna" in an effort to prevent the posts from being removed or the groups from being shut down.

567.    Ms. Holland posted about her post-vaccine experience on Facebook, TikTok, and YouTube, and she received warnings on each of the three platforms that her posts were misleading, constituted misinformation, or violated the social media platforms' rules and standards.  At various points, her accounts on these platforms were restricted from posting or sharing content.

568.    On November 14, 2021, YouTube removed Ms. Holland's video in which she was giving a speech about her post-vaccine experience at an event in Los Angeles.  YouTube warned her that, if she violated YouTube's Community Guidelines again, her account would receive a strike, and she would be unable to post, upload, or livestream for one week.

569.    On February 24, 2022, YouTube removed a video in which Ms. Holland and other vaccine-injured individuals were interviewed about their post-vaccine experiences by Dr. Heather Melton.

570.    On March 19, 2022, Facebook removed a post that Ms. Holland made discussing data from HHS's Vaccine Adverse Event Reporting System (VAERS), which showed that the Moderna vaccine appeared to have produced 90% of recorded adverse Covid vaccine reactions.

Ms. Holland appealed the removal, and eventually Facebook allowed the post back up on her personal page.

571.    On December 13, 2022, YouTube removed a documentary film called "Anecdotals," in which Ms. Holland shared her post-vaccine experience.  YouTube claimed that the film contained misinformation and violated Community Guidelines.

572.    On several occasions, including on February 26, 2022, August 1, 2022, October 21, 2022, and April 5, 2023, TikTok removed Ms. Holland's video posts about her vaccine injuries and recovery process, including personal speeches about her post-vaccine experience.  TikTok notified her that the videos violated "Community Guidelines."  According to TikTok, one of Ms. Holland's videos was removed for "Violent and graphic content."  Other videos were removed for "integrity and authenticity" concerns.

573.    On June 30, 2024, Facebook removed a post that Ms. Holland made, concerning "The Unseen Crisis," a documentary featuring Ms. Holland (as well as Ms. Dressen and Mr. Ramirez), which examines the stories of individuals injured by the Covid vaccine. Ms. Holland stated in her post: "The documentary they came out to my house to shoot some clips last year is being released this month."  She then included a link to the documentary.

574.    Facebook notified Ms. Holland that her post had been removed because: "It looks like you tried to get likes, follows, shares or video views in a misleading way," in violation of Facebook's "Community Standards on Spam."  Ms. Holland appealed the removal of her post, explaining that it was not spam, but Facebook denied her appeal, notifying her that: "We don't allow people to use misleading links or content to trick people to visit, or stay on, a website." Facebook then reassured Ms. Holland that it valued her "freedom of expression" and that it only removed speech, or restricted users, "to keep the community respectful and safe."

575.    Ms. Holland continues to believe that it is a risk to post on social media platforms about what happened to her after taking the vaccine and feels limited in her ability to seek advice, support, and medical information from those who have had similar experiences.  Each time she posts about this subject matter, she fears that her post might be removed, her account frozen, or her support group shutdown.

**e.  Suzanna Newell**

576.    On April 13, 2021, Ms. Newell received her second dose of the Pfizer vaccine.

577.    Prior to taking the vaccine, she was very active, regularly biking and competing in triathlons.  She had no underlying health conditions.

578.    One day after receiving her second dose of the vaccine, Ms. Newell experienced extreme fatigue, brain fog, a swollen lymph node in the neck, a forehead rash, and joint pain.

579.    Over the next few weeks, her symptoms worsened, but she only spoke of her condition to her closest friends out of concern that she would scare others out of getting the vaccine.

580.    On May 21, 2021, Ms. Newell's condition had deteriorated to the point that she could no longer walk unassisted.

581.    On May 24, 2021, she went to the emergency room to seek treatment for her symptoms. The doctor sent her home with a referral for an echocardiogram stress test.

582.    Two days later, her symptoms exponentially worsened to the point that she feared her body was shutting down and that she would die.

583.    She was hospitalized for three days.  Despite the numerous tests conducted, she left the hospital with no answer as to the cause of her symptoms.

584.   Ms. Newell continues to regularly see multiple neurologists, a rheumatologist, cardiologist, allergist, neuro occupational therapist, physical therapist, among other medical professionals.

585.   Ms. Newell has been diagnosed with small fiber neuropathy, Sjogren's syndrome, cryoglobulinemia vasculitis, super ventricular tachycardia, internal jugular vein compression, mild cardiovagal and adrenergic dysfunction.

586.   After three years, many of her symptoms have worsened, and she still frequently struggles to perform simple tasks.

587.   Ms. Newell's primary doctor has attributed her symptoms to the Covid vaccine.

588.   On September 30, 2022, Ms. Newell posted a video titled "Kindness" on YouTube in which she and a vaccine-injured friend discussed their difficult experiences and how "Team Humanity" and the kindness of others had allowed them to maintain hope.  They did not make any claims about the Covid vaccine. YouTube removed the video for "misinformation" and for violating its Community Guidelines.

589.   In January of 2023, Ms. Newell was interviewed about her post-vaccine experience by Children's Health Defense in Washington, D.C.  After her husband shared the video of the interview on Facebook, the post was labeled with a warning that it could cause "physical harm." Facebook notified him that another violation could result in his account being restricted.

590.   Eventually, Ms. Newell turned to Facebook as a means of connecting with others who had been injured after taking the vaccine, and as a way to spread hope and awareness.  She created a support group called Team Humanity, which focused on growing a supportive community of the vaccine-injured and their friends and family.

591.   To prevent the Team Humanity group from being shut down or its posts removed, Ms. Newell and the other group members had to communicate in code and avoid using any words related to Covid or the vaccine.

592.   After she created the support group, Ms. Newell became aware that she and other members were being shadow banned on Facebook. This meant that her posts were no longer visible to other users and also that she could no longer see posts from several members of her support groups.

593.   Ms. Newell currently writes weekly Substack articles for Team Humanity, which she shares with her followers on Facebook.  However, she has noticed that Facebook will shadow ban any post that contains a variant of the phrase "Covid vaccine injured."

594.   For example, on April 25, 2024, Ms. Newell posted a link to her article, entitled "Unintentionally Inconsiderate Comments to the COVID Vax Injured," which she co-authored with Mr. Barcavage.  She later discovered from her Facebook friends that her post was not visible to others, including when it was reposted by other Facebook users.

595.   On July 6, 2024, a Facebook friend informed Ms. Newell that, after trying to share Ms. Newell's April 25, 2024 article, Facebook removed the post for violating "Community Standards on Spam."

596.   On May 3, 2024, Ms. Newell tried to share on Facebook the *New York Times* article mentioned above entitled "Thousands Believe Covid Vaccines Harmed Them.  Is Anyone Listening?"[263]  Ms. Newell's first two attempts to share the article were unsuccessful after Facebook shadow-banned both posts, drastically reducing visibility to other users, without notice or explanation.

---

[263] https://www.nytimes.com/2024/05/03/health/covid-vaccines-side-effects.html.

597.    Ms. Newell succeeded on her third attempt only after removing the link to the article, itself, which contained the trigger words "Covid Vaccines."

598.    Currently, Ms. Newell rarely uses social media due to the ongoing threat of censorship and the difficulties in constantly having to communicate in code to avoid posts being labeled as "misinformation" or removed entirely.

599.    Until May of 2023, Ms. Newell served as a Board Member of React19 where she advocated for vaccine-injured individuals and tried to spread understanding of those who have experienced lasting effects of the Covid vaccine.  She is currently focusing her efforts on the vaccine-injured community in Minnesota and on bringing people together, both online and in person, through her support group Team Humanity.  Due to the censorship and related difficulties that she and other members of the vaccine-injured community have faced, efforts to collaborate and spread awareness and support have been, and continue to be, limited.

### e.  Ernest Ramirez

600.    Mr. Ramirez's son Ernest Ramirez, Jr., was born on November 11, 2004.  As a teenager, he was very active and a talented baseball player for his high school team. He had never had any health problems.

601.    Early in 2021, Mr. Ramirez received both doses of the Moderna vaccine.

602.    In April of 2021, the Pfizer vaccine had been recommended by the CDC as safe for teenagers, so Ernest, Jr., received his first dose on April 19, 2021.

603.    Five days later, on April 24, 2021, Ernest, Jr., collapsed while he was running in the park.  A police officer attempted to perform CPR, and he was taken by ambulance to the hospital.

604.     By the time Mr. Ramirez arrived to the hospital, he was informed that his sixteen-year-old son was dead.

605.     According to the autopsy report, Ernest, Jr., had died of an enlarged heart, myocarditis, and terminal cardiac arrhythmia.  Acute inflammatory cells were detected in his heart and liver.

606.     After losing his son, Mr. Ramirez reached the darkest point of his life and no longer wanted to go on living.

607.     In the summer of 2021, however, Mr. Ramirez found new purpose and a means of honoring his son's memory when he began traveling and speaking about what had happened to Ernest, Jr.

608.     At first, Mr. Ramirez only spoke locally in Texas to raise awareness and share his son's story.

609.     However, in August of 2021, he launched a GoFundMe page to help fundraise enough money for a trip to Washington, D.C. to share his son's story in the nation's capital.

610.     Approximately one week later, GoFundMe notified Mr. Ramirez that his GoFundMe account had been removed for violating the platform's terms of service for "Prohibited Conduct."  As a result, all of the funds that Mr. Ramirez had raised were forfeited.

611.     Subsequently, Mr. Ramirez created a fundraising page on LifeFunder to raise funds for Washington, D.C.

612.      Mr. Ramirez also turned to social media platforms, such as Facebook, Twitter, YouTube, and Instagram to share his son's story and to connect with others who had been impacted by vaccine injuries.

613.    In November of 2021, Mr. Ramirez discovered vaccine-injured support groups on social media.  Through the support groups, he was able to share his son's story, spread awareness, and connect with others who had experienced similar hardships.

614.    Frequently, Mr. Ramirez's posts on social media were removed or labeled as misleading or false.

615.    On November 11, 2021, Mr. Ramirez posted a photo of himself beside his son's casket at his funeral on Facebook and Twitter.  The caption of the photo read: "My good byes to my Baby Boy."

616.    Facebook flagged the post with a warning box viewable to other users labeling it as "partly false information" and stating: "The same information was checked in another post by independent fact-checkers."

617.    Twitter removed the photo altogether and warned Mr. Ramirez: "Make sure you're sharing reliable information. Visit the COVID-19 Information Center for reliable vaccine info and resources."

618.    On August 21, 2021, Facebook removed Mr. Ramirez's post in which he wrote: "Getting ready to speak on behalf of my Baby Boy!" and also restricted Mr. Ramirez's account.

619.    Facebook similarly removed Mr. Ramirez's post of a quote by Plato: "No one is more hated than he who speaks the truth."

620.    On October 1, 2022, Facebook labeled Mr. Ramirez's post with a warning box as "Partly false information. Checked by independent fact-checkers."  His post stated: "Watch Plandemic before Plandemic 3 releases."

621.    On November 21, 2022, Twitter labeled Mr. Ramirez's post with a warning box stating that "it might have sensitive content."

622.    Mr. Ramirez has been suspended from Twitter and Facebook on multiple occasions.

623.    On November 29, 2021, YouTube labeled Mr. Ramirez's video post in which Dr. Peter McCullough discussed the death of Mr. Ramirez's son as "Missing context." The warning label explained: "Independent fact-checkers say this information could mislead people."

624.    On February 15, 2023, YouTube removed Mr. Ramirez's video post in which he participated in a roundtable discussion held by Senator Ron Johnson on November 3, 2021 to share his son's story. YouTube informed him that the content "violates our medical misinformation policy," stating that "it's important to us that YouTube is a safe place for all."

625.    On April 4, 2023, YouTube notified Mr. Ramirez that it had removed two videos he had posted and that Mr. Ramirez's account had received "2 strikes" for posting content that violated YouTube's Community Guidelines. The two videos that YouTube removed were (1) an interview in which Mr. Ramirez discussed his son's death and (2) a video of Mr. Ramirez driving his son's truck down the street.

626.    Shortly after, YouTube restricted Mr. Ramirez's ability to post a video that he had received from a group of vaccine-injured individuals sharing their condolences on the anniversary of his son's death.

627.    On May 15, 2023, Facebook flagged as "partly false" a video that Mr. Ramirez posted earlier that day. Facebook warned Mr. Ramirez that posts of "[p]eople who repeatedly share false information" are less likely to be visible to other users (i.e., shadow banned). The video that Mr. Ramirez posted was a clip from an episode of the American television series "Conspiracy Theory with Jesse Ventura."

628.    Since Plaintiffs filed their initial Complaint, Mr. Ramirez has continued to experience frequent and ongoing censorship on social media when he attempts to post about the

loss of his son, topics relating to vaccine injuries or advocacy for the rights of the vaccine-injured, or criticisms of the government.

629.     For example, on May 24, 2023—two days after this lawsuit was filed—Facebook notified Mr. Ramirez that it had removed his post from September 15, *2021*.  The post was a link to an interview in which Mr. Ramirez discussed the death of his son post-vaccination.

630.     Similarly, on June 5, 2023, YouTube notified Mr. Ramirez that a video that he had posted of an interview in which he discussed the loss of his son had been removed for violating YouTube's "medical misinformation policy."

631.     That same day, YouTube informed Mr. Ramirez that the platform had removed his channel for "severe or repeated violations of our Community Guidelines."

632.     On June 8, 2023, YouTube informed Mr. Ramirez that it had removed another one of Mr. Ramirez's videos for violating YouTube's "medical misinformation policy."  The video in question was a clip of actor Russell Brand discussing *this* lawsuit.

633.     On July 14, 2023, YouTube notified Mr. Ramirez that it had removed a video in which he and former member of the Pussycat Dolls Jessica Sutta (who was injured post-vaccination) discussed their painful personal experiences with the Covid vaccine.  According to YouTube, the video violated its "medical misinformation policy."

634.     On August 19, 2023, YouTube notified Mr. Ramirez that it had removed a video in which he and Ms. Dressen were interviewed on KHTS Radio, regarding their personal experiences with the Covid vaccine.  According to YouTube, this too violated the platform's "medical misinformation policy."

635.    On September 1, 2023, Mr. Ramirez posted a video on Facebook in which he discussed the loss of his son.  The next day, Facebook informed him that it had added a notice to the video, visible to other users, which warned that the post was "Partially False."

636.    On November 16, 2023, YouTube notified Mr. Ramirez that it had removed a video that he had posted, in which he was interviewed by Megyn Kelly about the death of his son. YouTube informed him that the video was removed for violating the platform's "medical misinformation policy."

637.    On February 13, 2024, YouTube notified Mr. Ramirez that it had removed Mr. Ramirez's video post about his son, entitled "Jrs story."  According to YouTube, the video violated its "medical misinformation policy."

638.    On February 29, 2024, YouTube notified Mr. Ramirez that it had removed a video post, in which he was interviewed about the loss of his son.  According to YouTube, the video also violated its "medical misinformation policy."

639.    On March 1, 2024, when Mr. Ramirez attempted to post a video of an interview in which he discussed the death of his son, YouTube notified Mr. Ramirez that his account had "Too many strikes," and he was thus prevented from posting the video.

640.    On May 15, 2024, GoFundMe notified Mr. Ramirez that $585, which he had raised to help fund his travels around the country to share his story about his son, had been removed from his account and returned to the donors.  GoFundMe provided Mr. Ramirez with no explanation for the refunds.

641.    On June 30, 2024, Facebook notified Mr. Ramirez that it had removed Mr. Ramirez's August 28, 2023 post, in which he shared a link to the documentary "The Unseen

Crisis," in which he, Ms. Dressen, and Ms. Holland are featured.  According to Facebook, the post violated the platform's "Community Standards on spam."

642.    On July 29, 2024, Facebook informed Mr. Ramirez that it had removed his post because: "It looks like you tried to gather sensitive information from others."  Mr. Ramirez's post simply stated: "Here at The James Clinic in Ellisville, Missouri stop by and say hello."  The James Clinic hired Mr. Ramirez in June of 2024 to serve as a patient advocate, who meets with and offers support to individuals who were injured after taking one of the Covid vaccines.

643.    Mr. Ramirez's ability to share his son's story, spread awareness of his personal tragedy, and connect with others has been his primary lifeline since Ernest, Jr.'s death.  However, his ability to do so has been greatly limited by the ongoing censorship that Mr. Ramirez has faced.

644.    Each time that he communicates about his son's death on social media or any related experience, Mr. Ramirez fears that his speech will be removed or labeled as misinformation—or that his account will be frozen or removed entirely.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE FIRST AMENDMENT
### Against the Government Defendants

645.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

646.    The First Amendment prohibits Congress from making laws "abridging the freedom of speech." U.S. CONST. amend. I. This prohibition applies to restrictions on speech by all branches of the federal government. *Matal v. Tam*, 582. U.S. 218, 234 (2017).

647.    Private action that violates constitutional rights may constitute state action that can be attributed to the government in multiple ways.

648.    First, the government may be held responsible for private action "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State." *Blum v. Yaretsky*, 457 U.S. 991 (1982); *see also Biden v. Knight First Amend, Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring) ("The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly.")

649.    Coercion includes "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (even where private party is "free" to ignore government's "advice" because its refusal would violate no law, it is still state action when government induces private party to suppress speech under thinly veiled threats of legal action).

650.    In fact, "such compulsion so plainly violates the Constitution" that it is rarely necessary for courts to have to step in. *Janus v. Am. Fed'n of State, Cnty.*, 585 U.S. 878, 892 (2018). Where the government encouraged and pressured private actors "into adopting" the government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting government action. *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

651.    As alleged herein, the Government Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

652.    Second, the government can be held accountable for the action of a private entity "when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 941–942

(1982)). "Private persons [who are] jointly engaged with state officials in the prohibited action, are acting 'under color' of law … It is enough that he is a willful participant in joint activity with the State or its agents." *Lugar*, 457 U.S. at 941.

653.   State action through joint engagement occurs when the government "knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003).  Joint action may also be proven by showing that government officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights. *See, e.g.*, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

654.   Private acts may constitute state action if the private parties "have conspired with a state official."  *Sims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985). To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id.* (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

655.   Third, private action may constitute state action when the private entity is "entwined with governmental policies" or when the government is entwined in the management or control of the private action.  *Brentwood Acad.*, 531 U.S. at 296 ("Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards").  There is an especially compelling case for state action "where a federal statute has immunized private conduct" where features of the regulation show that the government "did more than adopt a passive position" toward the challenged private conduct. *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989) ("The fact that the Government has not compelled a private party to perform [unconstitutional conduct] does not, by itself, establish that the [challenged action] is a private one.").

656.     As alleged further herein, as a result of threats, pressure, and inducements, the Government Defendants have colluded and worked in concert with social media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content and speakers, and "flagging" disfavored content and speakers for censorship.  The Government Defendants have thus engaged in joint action with private parties and acted in concert with private parties to deprive Plaintiffs of their constitutional rights under the First Amendment: namely, the freedom of speech and the freedom of expressive association.

657.     The Government Defendants' conduct readily satisfies the above test for state action for several independently sufficient reasons: (1) through the heavy and regular imposition of threats, pressure, and encouragement, the federal government fostered, encouraged, and empowered the creation of a small number of massive social media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (2) federal officials—including, most notably, the Government Defendants herein— have repeatedly and aggressively threatened to remove legal benefits (i.e., Section 230 and the absence of antitrust enforcement) and impose other adverse consequences on social media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (3) the Government Defendants herein, conspiring and colluding both with each other and social media firms, have directly coordinated with social media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media.  These actions have drastically impacted Plaintiffs' First Amendment rights of free speech and freedom of expressive association.

658.     Ultimately, however, the text of the Constitution eliminates the need for a showing that private entities were somehow transformed into government actors.  The First Amendment

bars government from "*abridging* the freedom of speech." U.S. Const. Amend I.   (emphasis added).   Thus, at least in a claim against the government, the constitutional question is simply whether government has caused a reduction in the freedom of speech—for example, by pursuing policies of content or viewpoint discrimination—not whether the private partner has been sufficiently coerced into becoming a government actor.

659.   Indeed, the First Amendment distinguishes "abridging" from "prohibiting." Whereas the First Amendment bars *prohibiting* the free exercise of religion, it denies government the power even to *abridge* the freedom of speech.[264]   Thus, when the federal government acts to reduce First Amendment-protected speech, to *any* extent, it violates the First Amendment, regardless of whether the government's actions constituted "coercion," "significant encouragement," or a direct prohibition of speech.[265]

660.   The First Amendment is not confined to the government's direct censorship, but can also apply to the government's censorship through private organizations, whether through, *inter alia*, overt or subtle threats, encouragement, voluntary cooperation or collusion, inducement, or through the provision of coordination[266] or assistance to the private entities.[267]

---

[264] Philip Hamburger, *Courting Censorship*, 4 J. FREE SPEECH L., 251-56 (2023).

[265] *Id*.

[266] The Government Defendants' provision of "coordination" to the major social media companies is a particularly insidious form of censorship and First Amendment violation:

> Even when imposing their own private censorship, the Platforms face a coordination problem. A Platform will sometimes be aiming merely to sanitize its own site by removing opinion it considers distasteful; but it still needs to limit the risk of losing users who seek the suppressed opinion elsewhere. It therefore must coordinate with the other Platforms to make sure they suppress the same sort of opinion…For that purpose, it needs to ensure that what it suppresses will not appear on another dominant Platform—at least not one nearly as large and with substantially overlapping users. Otherwise, its censorship will not effectively shape the public mind. Although the Platforms therefore often need to coordinate, they cannot do so by themselves without antitrust difficulties. The government solves this problem by offering them coordination—by supplying them with guidance as to what is worthy of suppression, thus allowing the Platforms to align their censorship.

*Id*. at 246-47.

[267] *Id*.

661.     As alleged at length herein, the Government Defendants' actions have repeatedly abridged Plaintiffs First Amendment rights, and in far more ways than one. Their unconstitutional actions have injured and continue to injure Plaintiffs by suppressing and chilling their exercise of free speech on social media platforms.  This injures not only Plaintiffs, but all social media users by reducing the availability of free speech in what is meant to be a free marketplace of ideas. Further, Plaintiffs have been deprived of their First Amendment rights to freely associate and to receive information, including from each other, due to the atmosphere of censorship created by the Government.

662.     The Government Defendants' conduct inflicts imminent, ongoing, and continuing irreparable injury on Plaintiffs, as further alleged herein.

663.     To the extent that Plaintiffs are still able to use social media and other tech platforms, they fear losing accounts and various other forms of reprisal, causing them to curtail expression accordingly.  *Penny Saver Publications, Inc. v. Vill of Hazel Crest*, 905 F.2d 150, 154 (7th Cir. 1990) ("Constitutional violations may arise from the chilling effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

664.     In sum, the Government Defendants' censorship activities, targeting both content and viewpoints counter to the federal government's preferred narrative have violated, and continue to violate, Plaintiffs' First Amendment rights to free speech and free expressive association, and to receive information.

### COUNT TWO – VIOLATION OF THE FIRST AMENDMENT
### (42 U.S.C. § 1985(3))
### Against the Individual Defendants and Stanford Defendants

665.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

666.     Section 1985(3) of Title 42, United States Code, provides:

> If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws … in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

667.    A plaintiff may establish a conspiracy under section 1985(3) if he can show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971), and (2) that the conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment."  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993). *See also Farber v. City of Paterson*, 440 F.3d 131, 138 (3rd Cir. 2006) (victims of discriminatory animus directed at women and at the mentally handicapped may state a 1985(3) claim); *Keating v. Carey*, 706 F.2d 377, 379 (2d Cir. 1983) (describing how Congress of 1871 viewed the protection offered by section 1985(3) broadly as applying "to conspiracies against a man 'because he was a Democrat, or a Catholic, or a Methodist, or a Vermonter.'") (citing *Cong.Globe,* 42nd Cong., 1st Sess. 567, col. 2 (1871) (remarks of Senator Edmunds of Vermont).

668.    There is "nothing inherent in [the text of section 1985(3)]" that requires state action. *Griffin v. Breckenridge*, 403 U.S. at 97 (applying section 1985(3) to private parties).  Indeed, "the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in section 1985(3) of all deprivations of 'equal protection of the laws' and 'equal privileges and immunities under the laws,' *whatever their source.  Id*. (emphasis added); *see also Ziglar v. Abbasi,* 582 U.S. 120, 154 (2017) (applying section 1985(3) to federal officials).

669.     Under the First Amendment, Plaintiffs enjoy the rights to freedom of speech, freedom of expression, freedom of association, and freedom to read and listen to the speech of others on social media and other online discourse, including freedom from content and viewpoint discrimination.

670.     These First Amendment rights are also fundamental privileges and immunities under the law, the strict protection and maintenance of which is necessary to ensure equal protection of the laws.

671.     Plaintiffs also enjoy rights to equal treatment under the law and to be free from invidious, class-based discrimination, under the First and Fourteenth Amendments of the U.S. Constitution and other provisions of law.

672.     The Individual Defendants and Stanford Defendants (jointly, the IS Defendants), along with those acting in concert with them, including the social media companies and other private parties, as well as various state, local, and other federal government officials, conspired for the purpose of depriving, either directly or indirectly, Plaintiffs of these rights to freedom of speech, freedom of expression, freedom of association, and freedom to read and listen to the speech of others—all on a discriminatory and invidious basis, and thus to deprive them of the equal protection of the laws, and of equal privileges and immunities under the laws.

673.     The IS Defendants acted on the basis of invidious, class-based discriminatory animus against an identifiable class of American citizens, including individuals injured by the Covid vaccines, who believe and express viewpoints that are not aligned with the government's political stance and preferred policies concerning the Covid vaccines.  Indeed, excluding Mr. Ramirez, Plaintiffs' physical status, alone, undercuts Defendants' preferred narrative concerning the highly politicized topic of Covid vaccination.

674.     As a direct result of the IS Defendants' conspiracy, Plaintiffs were deprived of their rights and privileges as citizens of the United States, including but not limited to the rights to freedom of speech, freedom of expression, freedom of association, freedom to read and listen to the speech of others on social media, and freedom from invidious class-based discrimination on the basis of belief or viewpoint, as guaranteed by the First Amendment of the U.S. Constitution. The physical and emotional harms that Plaintiffs have suffered as a result of the Covid vaccines is ongoing, as is their need to seek effective treatment, comfort, hope, and purpose.  Plaintiffs suffer ongoing harm because Defendants' discriminatory and collusive actions have impeded—and continue to impede—them from obtaining the information and human support required to meet these needs.

675.     The IS Defendants intentionally harmed Plaintiffs without just cause and acted with a deliberate, egregious, and flagrant disregard for the rights of Plaintiffs.  The IS Defendants' conduct was malicious, oppressive, and done in reckless disregard of Plaintiffs' clearly established rights.  As a result of the IS Defendants callous and unlawful conspiracy, Plaintiffs—who were only trying to do their part in getting vaccinated during the pandemic—have been maligned, suppressed, and even more gravely injured than they already were by the insidious machinations of their own government.

### COUNT THREE – *ULTRA VIRES* ACTION BEYOND STATUTORY AUTHORITY
### Against the Government Defendants (Excluding Biden)

676.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

677.     "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Agency actions that exceed the agency's statutory authority are *ultra vires* and must be invalidated.

678.    No federal statute authorizes any of the Government Defendants to engage in the course of conduct concerning the censorship and suppression of speech on social media, as alleged herein.

679.    No federal statute authorizes the Government Defendants to determine what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse on social media platforms; to direct, pressure, coerce, and encourage social media companies to censor and suppress such speech; and/or to demand that private companies turn over information about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

680.    The interpretation of any statute to authorize such actions would constitute a plain violation of the non-delegation doctrine and the major questions doctrine.

681.    The Government Defendants and the federal officials acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted, and continue to act, without any lawful authority whatsoever.  No federal statute, regulation, constitutional provision, or other legal authority authorizes their social media censorship program, and it is wholly *ultra vires*.

682.    The Government Defendants' *ultra vires* actions inflict ongoing irreparable harm on Plaintiffs, as alleged herein.

### COUNT FOUR – *ULTRA VIRES* ACTION BEYOND CONSTITUTIONAL BOUNDS Against the Government Defendants

683.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

684.    Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("the

fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution") (citing *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

685.    Further, "[a]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

686.    "Explicit and unambiguous provisions of the Constitution prescribe and define the respective function[] of the Congress." *I.N.S. v. Chadha*, 462 U.S. at 945.  Congress's authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549 (1995); *see also* Const. Art. I, § 8.  Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce. *See United States v. Lopez*, 514 U.S. at 557; *United States v. Morrison*, 529 U.S. at 617.

687.    Moreover, the text of the Constitution is explicit that: "Congress shall make no law… ***abridging*** the freedom of speech." U.S. Const. Amend I.  Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

688.    Therefore, even if (contrary to what is alleged above) the Government Defendants' censorship enterprise were within the bounds of the statutory authority delegated by Congress (it is not), the Government Defendants' conduct would, and does, remain *ultra vires* in violation of any conceivable constitutional authority.  Congress is not constitutionally authorized to confer

upon federal agencies any power, purpose, or authority beyond the Constitution's enumerated powers or in violation of the First Amendment.

689.    In sum, no constitutional authority permits the Government Defendants' censorship activities, as alleged herein, which have violated and are continuing to violate Plaintiffs' First Amendment rights to free speech and free expressive association, and is thus wholly *ultra vires*.

### COUNT FIVE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the HHS Defendants

690.    Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

691.    Defendants HHS, CDC, Murthy, Becerra, Crawford, and Waldo are referred to collectively herein as the "HHS Defendants."

692.    As set forth herein, the HHS Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

693.    The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…." 5 U.S.C. § 706(2)(A)-(D). The HHS Defendants' conduct violates all of these prohibitions.

694.    In the Fifth Circuit, the "final agency action" requirement is a jurisdictional threshold, not a merits inquiry, and is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Even agency advisory opinions can be deemed to have "consummated the Department's

decisionmaking process." *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022). "The mere possibility that an agency might reconsider" its advisory "in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

695.    The HHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id*. Defendants' campaign of pressuring, threatening, and colluding with social media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  The actions of the HHS Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of the HHS Defendants to adopt an unlawful social media censorship program.

696.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

697.    The HHS Defendants' actions are arbitrary, capricious, an abuse of discretion, and not in accordance with law because they are being executed to favor the government's viewpoint while suppressing dissent therefrom.

698.    Further, the HHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs. 5 U.S.C. § 706(2)(B).

699.     The HHS Defendants' conduct also violates Plaintiffs' contractual rights.  When Plaintiffs created their social media accounts, they entered into valid, ongoing contractual relationships with the respective social media companies and consented to terms of agreement, under which Plaintiffs validly expect to be able to speak, write, read, and listen freely on social media without unlawful or improper interference.  The HHS Defendants intentionally interfered with such contractual rights by unlawfully pressuring social media platforms to suppress speech (even "borderline," humorous, or true speech) that did not actually violate any of the companies' terms or policies.

700.     The HHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

701.     The HHS Defendants' conduct is in excess of any statutory authority and thus unlawful under the APA. *See* 5 U.S.C. §§ 706(2)(B), (C).

### COUNT SIX – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Against the DHS Defendants

702.     Plaintiffs incorporate by reference all of the preceding material as though fully set forth herein.

703.     Defendants DHS, CISA, Mayorkas, and Easterly are referred to collectively herein as the "DHS Defendants."

704.     As set forth herein, the DHS Defendants' conduct is unlawful, arbitrary and capricious, and in excess of statutory authority under the Administrative Procedure Act.

705.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…." 5 U.S.C. § 706(2)(A)-(D). The DHS Defendants' conduct violates all of these prohibitions.

706.     The DHS Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id*. Defendants' campaign of pressuring, threatening, and colluding with social media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  The actions of the DHS Defendants alleged herein, on information and belief, reflect and result from a specific, discrete, and identifiable decision of the DHS Defendants to adopt an unlawful social media censorship program.

707.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

708.     The DHS Defendants' actions are arbitrary, capricious, and an abuse of discretion because they are being executed to favor the government's viewpoint while suppressing dissent therefrom.

709.     Further, the DHS Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs. 5 U.S.C. § 706(2)(B).

710.     The DHS Defendants' conduct also violates Plaintiffs' contractual rights.  When Plaintiffs created their social media accounts, they entered into valid, ongoing contractual relationships with the respective social media companies and consented to terms of agreement, under which Plaintiffs validly expect to be able to speak, write, read, and listen freely on social media without unlawful or improper interference.  The DHS Defendants intentionally interfered with such contractual rights by unlawfully pressuring social media platforms to suppress speech (even "borderline," humorous, or true speech) that did not actually violate any of the companies' terms or policies.

711.     The DHS Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain input from the public, before engaging in these unlawful agency policies. 5 U.S.C. § 706(2)(D).

712.     The DHS Defendants' conduct is in excess of any statutory authority and thus unlawful under the APA. *See* 5 U.S.C. §§ 706(2)(B), (C).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.     A declaration that the Government Defendants' conduct violates the First Amendment of the United States Constitution;

B.     A declaration that the Government Defendants' entire conduct constitutes *ultra vires* action lacking statutory and constitutional authority, or that the Government Defendants' interpretation of its statutory authority runs afoul of the nondelegation and major questions doctrines;

C.     A declaration that the Government Defendants', excluding Biden, conduct violates the Administrative Procedure Act and therefore is unlawful and invalid;

D.     A declaration that the Individual Defendants' and Stanford Defendants' conduct violates 42 U.S.C. § 1985(3);

E.     Injunctive relief restraining and enjoining all Defendants, excluding Biden, as well as their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), from continuing to engage in unlawful conduct as alleged herein;

F.     Injunctive relief restraining and enjoining all Defendants, excluding Biden, as well as their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them from engaging in any act to demand, urge, pressure, coordinate or conspire with, or otherwise induce any social media platform to censor, suppress, de-platform, suspend, shadow ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content, or viewpoint expressed on social media;

G.     An award of compensatory damages appropriate to compensate Plaintiffs' non-economic injuries sustained as a result of Defendants' unlawful conduct;

H.     An award of punitive damages appropriate to punish and deter similar unlawful conduct by Defendants and others that are commensurate to the egregious,

intentional, and systematic violations of constitutional rights perpetrated by Defendants;

I.      A declaration that Twitter and other social media companies are under no obligation to censor content (especially content deemed COVID-19 misinformation) and will not be penalized if they do not engage in viewpoint-based censorship;

J.      Any equitable or remedial relief to which Plaintiffs are entitled, as the Court deems appropriate;

K.      Nominal damages of $1 each;

L.      Attorney's fees pursuant to 42 U.S.C. § 1988; and

M.      Any other relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

September 12, 2024

Respectfully submitted,

/s/ Casey Norman

Casey Norman
Litigation Counsel
NY Bar # 5772199
SDTX Federal # 3845489
Casey.Norman@ncla.legal
*Attorney-in-Charge*

/s/ Jenin Younes

Jenin Younes
Litigation Counsel
New York Bar # 5020847
Jenin.Younes@ncla.legal
*Pro Hac Vice Admission Forthcoming*

NEW CIVIL LIBERTIES ALLIANCE

4250 N. Fairfax Drive, Suite 300
Arlington, Virginia 22203
Telephone: (202) 869-5210

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 12, 2024, I electronically filed the foregoing document

with the United States District Clerk for the Southern District of Texas and electronically

served all counsel of record via the District Court's ECF system.

*<u>/s/ Casey B. Norman</u>*

156