United States District Court
Southern District of Texas
**ENTERED**
December 11, 2025
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| BRIANNE DRESSEN, *et al.*, | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:23-cv-00155 |
| | § | |
| ROB FLAHERTY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND RECOMMENDATION

Plaintiffs allege that Defendants violated their constitutional rights by pressuring social media companies to ban or limit their social media posts related to the COVID-19 vaccine. Defendants have filed, in total, five motions to dismiss. *See* Dkts. 85, 88, 89, 94, and 96. Having reviewed the First Amended Complaint, the briefing on the motions to dismiss, and the applicable law, I recommend that all five motions to dismiss be granted.

### BACKGROUND

Plaintiffs are six individuals: Breanne Dressen, Shaun Barcavage, Kristi Dobbs, Nikki Holland, Suzanna Newell, and Ernest Ramirez. All Plaintiffs, except Ramirez, allege suffering from serious and debilitating injuries that arose after receiving the COVID-19 vaccine. Ramirez alleges that his 16-year-old son died five days after taking the COVID-19 vaccine.

Defendants are federal agencies, federal officials sued in their official capacities, federal officials sued in their individual capacities, as well as private entities and persons affiliated with Stanford University. The federal agencies named as defendants are the Department of Health and Human Services, the Centers for Disease Control and Prevention, the Department of Homeland Security, and the Cybersecurity and Infrastructure Security Agency. The federal officials sued in their official capacities are President Donald J. Trump, Karoline

Levitt, Dr. Dorothy A. Fink, Rear Admiral Denise Hinton, Kristi Noem, Bridget Bean, and Robert F. Kennedy Jr.[1] For simplicity sake, I will refer to the federal agencies and the federal officials sued in their official capacities collectively as the "Federal Defendants." Seven former federal officials have also been sued in their individual capacities: Becerra, Crawford, Easterly, Flaherty, Mayorkas, Murthy, and Slavitt. I will refer to these individuals as the "Individual Defendants." The entities and persons associated with Stanford University that are named in the operative complaint are: the Board of Trustees of the Leland Stanford Junior University, the Leland Stanford Junior University, Alex Stamos, and Renee Diresta. These entities and individuals will be referred to collectively as the "Stanford Defendants."

In the First Amended Complaint, Plaintiffs provide specific instances, from March 2021 through September 2024, where social media platforms moderated Plaintiffs' COVID-19 related content. Focusing on actions allegedly taken by federal officials from early 2021 through 2022 (with the latest instance occurring in March 2023), Plaintiffs claim that federal officials persuaded social media companies to flag, label, or remove certain online content concerning the COVID-19 vaccines. According to Plaintiffs, White House officials asked social media platforms for information about their efforts to combat vaccine misinformation, and publicly and privately criticized the platforms for what the officials perceived

---

[1] Plaintiffs originally sued President Joseph R. Biden Jr., Karine Jean-Pierre, Dr. Vivek Murthy, Xavier Becerra, Carol Crawford, Alejandro Mayorkas, Jen Easterly, Rob Flaherty, and Andrew Slavitt in their official capacities. Pursuant to Rule 25(d), these individuals—except for Flaherty and Slavitt—were automatically substituted as new officials took their place with the change of presidential administrations.

The positions occupied by Flaherty (the White House Director of Digital Strategy) and Slavitt (the Senior Advisor to the COVID-19 Response Coordinator) are currently vacant. As a result, all claims brought against Flaherty and Slavitt in their official capacities are no longer justiciable. *See Am. Oversight v. Biden*, No. CV 20-00716, 2021 WL 4355576, at *5 (D.D.C. Sept. 24, 2021) (dismissing claims brought against Jared Kushner in his official capacity as Director of the White House Office of American Innovation after he left the position and no replacement was named). I thus recommend that Plaintiffs' official capacity claims against Flaherty and Slavitt be dismissed.

as a lack of transparency and a failure to abide by the platforms' commitments. Plaintiffs also allege that "[t]he Stanford Defendants collaborated closely with federal, state, and local government officials to moderate, target, and suppress disfavored viewpoints concerning the Covid vaccine." Dkt. 42 at 27. Plaintiffs characterize Defendants' efforts as "relentless pressure, inducement, coercion, and collusion" that resulted in the platforms censoring Plaintiffs in violation of the First Amendment. *Id.* at 102. Plaintiffs have not sued any of the social media platforms that allegedly censored their posts.

Against the Federal Defendants, Plaintiffs assert claims for violations of the First Amendment, ultra vires actions, and violations of the Administrative Procedure Act ("APA"). Against the Individual Defendants and Stanford Defendants, Plaintiffs allege a single claim: civil conspiracy under 42 U.S.C. § 1985(3). Plaintiffs seek injunctive and declaratory relief as well as monetary damages. Defendants have moved to dismiss Plaintiffs' claims under Rules 12(b)(1), 12(b)(2), 12(b)(3), 12(b)(6), and 25(c). For the reasons explained below, I need to address only the Rule 12(b)(1) and 12(b)(2) arguments.

## LEGAL STANDARD

### A.    RULE 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges a district court's subject matter jurisdiction. "Subject matter jurisdiction defines the court's authority to hear a given type of case; it represents the extent to which a court can rule on the conduct of persons or the status of things." *Carlsbad Tech., Inc., v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (cleaned up). "Standing is a component of subject matter jurisdiction." *Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 627 (5th Cir. 2021) (quotation omitted).

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." The "case or controversy" requirement is "'fundamental to the judiciary's proper role in our system of government.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 37 (1976)). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61 (cleaned up). The party asserting federal jurisdiction bears the burden of establishing these elements. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021).

In evaluating a Rule 12(b)(1) motion, I accept all well-pleaded facts as true, viewing them in the light most favorable to Plaintiffs. *See Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 287 (5th Cir. 2015). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## B.   RULE 12(b)(2)

Rule 12(b)(2) allows for dismissal when a court lacks personal jurisdiction over a defendant. When a district court rules on a Rule 12(b)(2) motion without an evidentiary hearing, as is the case here, "the plaintiff bears the burden of establishing only a *prima facie* case of personal jurisdiction." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "To determine whether the plaintiff has met this burden, the court can consider the assertions in the plaintiff's complaint, as well as the contents of the record at the time of the motion." *Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 336 (5th Cir.

2020) (cleaned up). The district court must accept all jurisdictional allegations as true and resolve factual disputes in favor of the plaintiffs. *See Ethridge v. Samsung SDI Co., Ltd.*, 137 F.4th 309, 313 (5th Cir. 2025). But the court "need not credit conclusory allegations, even if uncontroverted." *Id*. If plaintiffs make a prima facie case, the burden then shifts to the defendants to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985).

The Supreme Court has recognized two kinds of personal jurisdiction: general and specific. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017). General jurisdiction exists over a non-resident defendant when its "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). "That is a high bar." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 323 (5th Cir. 2021).

The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotation omitted). For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 564 U.S. at 919 (quotation omitted). Specific jurisdiction is proper when the plaintiffs allege a cause of action that arises out of or relates to a contact between the defendant and the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

The Fifth Circuit uses a three-step analysis for specific jurisdiction: (1) whether "the defendant purposefully availed itself of the privilege of conducting activities in the forum State," (2) whether "the plaintiff's claim arises out of or relates to those purposeful contacts with the forum," and (3) whether "the exercise of personal jurisdiction [is] fair and reasonable." *Ethridge*, 137 F.4th at 314. "Specific jurisdiction should be determined on a case-by-case basis under the facts

of each individual case." *Zoch v. Magna Seating (Germany) GmbH*, 810 F. App'x 285, 293 (5th Cir. 2020).

## ANALYSIS

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). At the same time, there is no mandatory "sequencing of jurisdictional issues." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). A federal court has leeway "to choose among threshold grounds for denying audience to a case on the merits." *Id.* at 585. Exercising my discretion, I will address subject matter jurisdiction before I turn to personal jurisdiction.

### A.    SUBJECT MATTER JURISDICTION

#### 1.    *Federal Defendants*

"Generally, a lawsuit against [a government agency or] an officer of the United States in his official capacity is considered a lawsuit against the United States." *Alexander v. Trump*, 753 F. App'x 201, 205 (5th Cir. 2018). "Because the United States is sovereign, it is generally immune from suit—and courts are without jurisdiction to hear a suit against the United States—unless it has waived its immunity." *Id.* The APA "waives the United States' sovereign immunity in suits against federal agencies requesting *nonmonetary relief*." *Id.* (emphasis added); *see* 5 U.S.C. § 702. Here, there is no waiver of sovereign immunity that would allow Plaintiffs to recover monetary relief, even nominally, against the Federal Defendants. Further, Plaintiffs admit that they only "seek compensatory and punitive damages against several defendants in their *individual capacities*." Dkt. 103 at 44 (emphasis added). Thus, the following analysis addresses solely Plaintiffs' request for injunctive and declaratory relief against the Federal Defendants, which is the only relief available to Plaintiffs absent a waiver of sovereign immunity.

My discussion of standing must begin with *Murthy v. Missouri*, 603 U.S. 43 (2024). In *Murthy*, the Supreme Court held that the plaintiffs—two states and five individuals—lacked standing to sue various federal government defendants for allegedly pressuring social media platforms to censor their posts. The high court explained that injunctive relief is warranted only when there is "a substantial risk" of harm "in the near future." *Id.* at 49. "To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the [Federal Defendants] and likely to be redressed by an injunction against them." *Id.* at 69. "To carry that burden, the plaintiffs must proffer evidence that the defendants' allegedly wrongful behavior would *likely* occur or continue." *Id.* (cleaned up). Thus, Plaintiffs "must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one [Federal] defendant." *Id.* at 58.

The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). When a plaintiff seeks forward-looking relief against government coercion of social media platforms based on past episodes of coercion, the plaintiff must show "a real and immediate threat of repeated injury" based on continued government pressure. *Murthy*, 603 U.S. at 58 (quotation omitted). Past injury alone is insufficient because "without proof of an ongoing pressure campaign, it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id.* at 69.

Plaintiffs have sufficiently alleged that certain Federal Defendants pressured social media platforms like Facebook to continually demote and remove posts even when the posts were not violative of the platforms' rules and guidelines. This alone, however, is insufficient to establish standing to seek prospective relief. While "past" conduct is not entirely irrelevant, it can establish standing to seek prospective equitable relief "only insofar as it is a launching pad for a showing of

imminent future injury." *Id.* at 59. Plaintiffs must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs' general concern that the government *may* repeat its prior conduct—without concrete factual allegations indicating a likelihood of recurrence—does not satisfy Article III.

Although Plaintiffs seek to enjoin the Federal Defendants from coercing or encouraging social media platforms to suppress Plaintiffs' protected COVID-19 related speech, they fail to plausibly assert that any *future* censorship directed at Plaintiffs is imminent or substantially likely to occur. Despite the length of their lawsuit (a whopping 156 pages), Plaintiffs describe only *past* interactions between the Federal Defendants and third-party social media platforms, most of which occurred from 2021–2022. As the Federal Defendants note: Plaintiffs "have not alleged a *single* instance of communication over the past *two years* between any Federal Defendant and any social-media platform regarding the moderation of any (let alone COVID-19) content." Dkt. 107 at 18. Moreover, Plaintiffs do not identify any ongoing or future actions targeting them or their speech.

If anything, Plaintiffs' own allegations suggest that social media platforms will make independent decisions and resist government pressure in the future. Indeed, Plaintiffs point out that Facebook Chief Executive Officer Mark Zuckerberg wrote in an August 2024 letter to the House Judiciary Committee: "I believe the government pressure was wrong, and I regret that we were not more outspoken about it. I also think we made some choices that, with the benefit of hindsight and new information, we wouldn't make today." Dkt. 42 at 82 (quotation omitted). Given this statement by the head of one of the largest and most influential social media platforms, it is speculative at best to suggest that social media platforms would again submit to alleged governmental pressure rather than implement their own platform policies and guidelines. Remember, it is Plaintiffs' burden to show "they are likely to face a risk of future censorship traceable to the [Federal Defendants]." *Murthy*, 603 U.S. at 73. Plaintiffs fail to clear this hurdle.

Setting aside the dearth of factual allegations indicating a substantial risk that Plaintiffs' speech will be restricted in the future, Plaintiffs face another formidable roadblock: an Executive Order issued by President Donald Trump on January 20, 2025, titled "Restoring Freedom of Speech and Ending Federal Censorship." *See* 90 Fed. Reg. 8243. According to President Trump, "[i]t is the policy of the United States to . . . ensure that no Federal Government officer, employee, or agent engages in or facilitates any conduct that would unconstitutionally abridge the free speech of any American citizen." *Id.* § 2(b). Moreover, "no taxpayer resources [may be] used to engage in or facilitate any conduct that would unconstitutionally abridge the free speech of any American citizen." *Id.* § 2(c). The Executive Order expressly denounced "coercive pressure [by the Federal Government] on third parties, such as social media companies, to moderate, deplatform, or otherwise suppress speech." *Id.* § 1. It is difficult to read that Executive Order and then claim, with a straight face, that there is a real threat that the Federal Defendants will, in the near future, pressure social media platforms to suppress protected speech in violation of the First Amendment.

Plaintiffs argue that "nothing (including the Executive Order) currently prevents federal officials from resuming the same unconstitutional tactics" and "[a]ll it takes is a change in administration or a shift in personnel for the Government to revert to the same conduct that unlawfully silenced Plaintiffs." Dkt. 103 at 43. That might technically be true, but fear that a future administration might reinstate a past directive is pure speculation that does not give rise to Article III standing. *See Mayor of Phila. v. Edu. Equal. League*, 415 U.S. 605, 622 (1974) ("[T]he issuance of prospective coercive relief against the successor to the office must rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor."); *Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023) ("[T]he mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." (quotation omitted)).

Were this not the case, litigants could flood the judicial system with lawsuits seeking to enjoin the conduct of past administrations without any evidence that such conduct is likely to reoccur. As the Supreme Court has explained, injunctive relief is warranted only when there is "a *substantial* risk" of future harm "in the *near* future." *Murthy*, 603 U.S. at 49–50 (emphases added).

Plaintiffs also contend that they face "ongoing harm stemming from the censorship . . . that persists under policies adopted in response to Defendants' unconstitutional pressure campaign." Dkt. 103 at 42. This argument is rooted in speculation and fails to consider the independent role of the third-party social media platforms. Absent "evidence of continued pressure from the [Federal Defendants], . . . the platforms remain free to enforce, or not to enforce, those policies—even those tainted by initial governmental coercion." *Murthy*, 603 U.S. at 73. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is generally lacking. *California v. Texas*, 593 U.S. 659, 675 (2021). Accordingly, Plaintiffs must allege more than just past governmental coercion; they must allege that future coercion will likely occur and that the platforms will likely acquiesce to such coercion. They have failed to do this.

Lastly, Plaintiffs' "assertion that [they] may again be subject to [content moderation on social media platforms caused by pressure from the Federal Defendants] does not create the actual controversy that must exist for a declaratory judgment to be entered." *City of Los Angeles v. Lyons*, 461 U.S. 95, 104 (1983). Declaratory relief "would amount to an advisory opinion without the possibility of any judicial relief." *California*, 593 U.S. at 673 (quotation omitted). Declaratory relief "cannot alone supply jurisdiction otherwise absent." *Id.* Because speculative fears of future injury do not confer standing, Plaintiffs' claims seeking injunctive and declaratory relief against the Federal Defendants should be dismissed without prejudice. *See Mitchell v. Bailey*, 982 F.3d 937, 944 (5th Cir. 2020) ("[A]ny dismissal predicated on Fed. R. Civ. P. 12(b)(1) must be without prejudice.").

### 2. *Stanford Defendants*

Against the Stanford Defendants, Plaintiffs seek injunctive relief, declaratory relief, and monetary damages.

The analysis in the preceding section as to why Plaintiffs' request for injunctive and declaratory relief against the Federal Defendants fails for a lack of standing applies with equal force to the Stanford Defendants. Accordingly, I recommend that all claims for injunctive and declaratory relief brought against the Stanford Defendants be dismissed for lack of standing.

Turning to the claim for monetary relief, the Stanford Defendants argue that "[t]he amended complaint does not remotely satisfy the standards set forth in *Murthy*—or even some lesser standard for alleging standing." Dkt. 85 at 24. The Supreme Court has explained that when, as here, Plaintiffs are "seeking compensatory relief, the traceability of [Plaintiffs'] past injuries [is] the whole ball game" as far as the standing analysis is concerned. *Murthy*, 603 U.S. at 59. To show traceability, Plaintiffs must "demonstrate[] that a particular . . . defendant was behind [their] past social-media restriction." *Id.* Plaintiffs cannot "treat[] the defendants, plaintiffs, and platforms each as a unified whole," but instead must offer facts establishing a causal relationship between actions by each "particular defendant," "particular platform," and "particular topic" involved in each alleged instance of content moderation. *Id.* at 61.

In connection with the Stanford Defendants, Plaintiffs complain about the Vitality Project ("VP"), a research project launched in 2021 by the Stanford Internet Observatory. According to Plaintiffs, the purpose of the VP was to provide "real-time detection, analysis, and response to COVID-19 anti-vaccine and mis- and disinformation and to support information exchange between public health officials, government, and social media platforms." Dkt. 42 at 9 (quotation omitted). Stanford University operated the Stanford Internet Observatory.

The First Amended Complaint fails to allege sufficient facts that, when construed in the light most favorable to Plaintiffs, allow the court to infer that

Plaintiffs' alleged injuries are traceable to the Stanford Defendants. Sure, Plaintiffs allege that "the Stanford Defendants collaborated closely with federal, state, and local government officials to moderate, target, and suppress disfavored viewpoints concerning the Covid vaccine through" the VP. *Id.* at 27. But there are no substantive allegations to support this naked assertion. As the Stanford Defendants note: "There is not a single allegation in the amended complaint that attempts to connect the specific content moderation Plaintiffs challenge to any *particular* conduct by any *particular* Stanford Defendant, or even the Stanford Defendants as a group." Dkt. 85 at 24. Indeed, "Plaintiffs do not allege that they were mentioned in the final VP report summarizing the project's operations and conclusions, that the VP flagged any of their posts to any social media company, or that any Stanford Defendant flagged any of their posts to any social media company." *Id.* at 13. Simply put, the operative complaint is devoid of any substantive allegations—plausible or otherwise—that the Stanford Defendants caused any social media platform to censor content in a manner inconsistent with the platform's misinformation policies.

Plaintiffs recount voluminous communications between the Federal Defendants, the Individual Defendants, and social media companies. But those communications have nothing to do with the Stanford Defendants, and *Murthy* expressly forbids lumping the Stanford Defendants in with other defendants and treating them as a "unified whole." *Murthy*, 603 U.S. at 61. What is plainly lacking in the First Amended Complaint are allegations that link any actions by the Stanford Defendants, as a group or individually, to any content moderation of Plaintiffs' social media posts.

Only one Plaintiff, Dressen, alleges any connection whatsoever to the Stanford Defendants. And those allegations do not come close to establishing standing. Dressen merely identifies a VP weekly briefing that allegedly "expresses skepticism of her claims of life-altering injuries," cites an article about her, "and concludes that: An injury story that does not have a proven causal link to the

vaccine nevertheless garnered high spread because it was picked up by a major anti-vaccine activist and by conservative politicians engaged in prior anti-vaccine activities." Dkt. 42 at 105 (cleaned up). Dressen does not, however, allege that the VP briefing encouraged or demanded any action be taken by platforms. She also does not allege that platforms took any adverse action against her based on the weekly briefing. In short, Dressen—and the other Plaintiffs—fail to trace any harm they suffered to the Stanford Defendants' actions. I thus recommend that the claims for monetary relief brought against the Stanford Defendants be dismissed without prejudice for lack of standing.

### 3. Individual Defendants

Turning to the Individual Defendants, only Flaherty and Slavitt contend that Plaintiffs' claims for monetary relief should be dismissed for a lack of standing.[2] Even so, the "court is obliged to raise the jurisdictional issue of standing sua sponte despite the parties' failure to raise it." *Henderson v. Stalder*, 287 F.3d 374, 379 (5th Cir. 2002). Thus, against *Murthy's* backdrop, I must evaluate Plaintiffs' claims for monetary damages as to each of the Individual Defendants.

### a. Becerra, Easterly, and Mayorkas

As already noted, "plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (quotation omitted). Plaintiffs fail to allege any actions taken by Becerra, Easterly, or Mayorkas to encourage or compel social media platforms to suppress content regarding the COVID-19 vaccine. Although Plaintiffs allege that each played some role in tracking COVID-19 vaccine-related content,

---

[2] The Individual Defendants all argue that Plaintiffs lack standing to seek injunctive relief against them. I agree with the Individual Defendants. Given that the Individual Defendants are all former government officials, Plaintiffs cannot "show a substantial risk, that in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one [Individual] defendant." *Murthy*, 603 U.S. at 58; *see id*. at 69 ("[W]ithout proof of an ongoing pressure campaign, it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants.").

Plaintiffs do not allege that Becerra, Easterly, or Mayorkas "pressured a particular platform to censor a particular topic." *Id*. In fact, Plaintiffs fail to allege that any of these defendants—Becerra, Easterly, and Mayorkas—ever communicated directly with any social media platforms regarding content moderation. Because there are no allegations tracing Plaintiffs' alleged harm to these defendants' actions, Plaintiffs lack standing to pursue relief against Becerra, Easterly, and Mayorkas. Plaintiffs' claims for monetary damages against Becerra, Easterly, and Mayorkas should be dismissed without prejudice for a lack of standing.

### b.    Murthy

Plaintiffs allege that Murthy, the former Surgeon General, pressured social media platforms to censor COVID-19 "misinformation" while in direct communication with platforms from 2021 through 2022. Plaintiffs allege that Murthy began coercing Facebook as early as May 2021 and in response, Facebook began expanding its censorship policies. On July 15, 2021, the Surgeon General released an advisory aimed at censoring certain COVID-19 content and called on platforms to "impose clear consequences for accounts that repeatedly violate platform policies" because platforms "have enabled misinformation to poison our information environment." Dkt 42 at 63. The next day, Facebook emailed Murthy to explain that Facebook understands "what the White House expects of us on misinformation going forward." *Id*. at 64. After Facebook executives met with Murthy on July 23, 2021, Facebook "amended its censorship policies to make them more restrictive," acknowledging that Facebook "hear[d] [Murthy's] call for [it] to do more." *Id*. at 71. On December 21, 2021, Murthy spoke on a podcast "in which he publicly threatened to hold social media platforms 'accountable' for not censoring misinformation" because such action "can't be allowed to continue." *Id*. at 77–78. Overall, Plaintiffs sufficiently allege that Murthy actively pressured Facebook to continually alter its guidelines and policies regarding

"misinformation." With one exception, Plaintiffs have standing to pursue monetary damage claims against Murthy.[3]

### c. Crawford

Plaintiffs allege that during 2021, "Crawford, the CDC's Division Director of Digital Media, organized and ran . . . meetings [regarding] COVID-19 misinformation with representatives of social media platforms . . . in which she and other federal officials colluded with [the] platforms about speech to monitor and target for suppression." Dkt. 42 at 95 (quotation omitted). In March 2021, Crawford met with Facebook to discuss Facebook's policies and approach to "misinformation" posted on its platform. *Id.* at 96. Through use of a "social media listening tool," Crawford could monitor posts made on Facebook and provided Facebook with a statement on behalf of the CDC to use when flagging content. *Id.* at 99. Crawford actively encouraged Facebook to censor content and requested updates on Facebook's plan to label or otherwise moderate certain content. Plaintiffs allege that such coercive tactics were also employed against Twitter and YouTube.

Taking these facts as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs have sufficiently alleged that Crawford's actions pressured platforms to enforce policies against alleged misinformation that the platforms may not have otherwise moderated. Thus, Plaintiffs have established standing to seek monetary relief from Crawford.

---

[3] One plaintiff, Barcavage, alleges that the first instance of censorship he faced occurred in March 2021, which is *before* Murthy allegedly began pressuring platforms to censor content in May 2021. *See* Dkt. 103 at 37 (Barcavage began posting on Facebook in March 2021 and was censored "almost immediately."). Because Barcavage alleges censorship before Murthy is alleged to have communicated with various platforms, Barcavage cannot establish that his alleged injuries from this first instance of censorship are traceable to Murthy's conduct. Other than Barcavage, the Plaintiffs have adequately traced the alleged harm arising from the censorship of their social media posts to Murthy's alleged coercion beginning in May 2021. Dressen faced censorship on Facebook "for the first time in June 2021"; Dobbs "was not censored [on Facebook] until June 28, 2021"; YouTube censored Newell's post for the first time in September 2022; and Holland and Ramirez allege that they began facing censorship on Facebook in the summer of 2021. *Id.* at 37–38.

#### d.    Flaherty and Slavitt

According to the First Amended Complaint, Flaherty and Slavitt communicated heavily with platforms, specifically Facebook, to encourage content moderation beginning in at least March 2021. To summarize the allegations, Flaherty and Slavitt pressured Facebook regarding its plans "for reducing virality of vaccine hesitancy content" and sought an active role in Facebook's "plan [for] tackling vaccine hesitancy spread on [the] platform." *Id.* at 42. Facebook reportedly stated in an email "that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies." *Id.* In April 2021, Flaherty even requested "assurances" regarding how Facebook was handling misinformation. *Id.* at 43. Facebook "provided Slavitt with a detailed report about [a] post, explaining that [the] content did not violate Facebook policies, but assuring the White House that Facebook would censor it anyway." *Id.* at 47. Similar allegations support Plaintiffs' claims that Flaherty and Slavitt pressured Twitter and YouTube to censor certain misinformation regardless of the platforms' independent policies on the topic. *See id.* at 49–50. Each Plaintiff alleges that their posts were censored on at least one of the three platforms that Flaherty and Slavitt were actively engaged with—Facebook, Twitter, and YouTube—after Flaherty and Slavitt's coercive communications began in the spring of 2021. At this stage, allegations that Plaintiffs' posts were removed at or near the time that Flaherty and Slavitt pressured platforms to censor such content sufficiently evinces a causal link between Flaherty's and Slavitt's actions, the platforms' censorship decisions, and Plaintiffs' harm to satisfy Article III standing. Because Plaintiffs have established Article III standing as to Flaherty and Slavitt, dismissal of Plaintiffs' claims against these two defendants for lack of subject matter jurisdiction would be inappropriate.

### B.    PERSONAL JURISDICTION

Having determined that this court possesses subject matter jurisdiction over Crawford, Flaherty, Murthy, and Slavitt, I will now focus on personal jurisdiction.

Crawford, Flaherty, Murthy, and Slavitt all argue that personal jurisdiction over them is lacking.

As mentioned above, a defendant's contacts with the forum can give rise to either general or specific jurisdiction. Plaintiffs assert no basis for general jurisdiction, arguing only that the court has specific personal jurisdiction over the Individual Defendants.

To establish specific jurisdiction, Plaintiffs must plausibly allege that the Individual Defendants "purposefully availed [themselves] of the benefits and protections of the forum state such that [they] should reasonably anticipate being haled into court there." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (cleaned up). This requirement ensures that the Individual Defendants will not be subjected to personal jurisdiction "solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (cleaned up). Each Plaintiff's claims must also "arise out of or relate to the defendant's contacts" with Texas. *Bristol-Myers*, 582 U.S. at 262 (cleaned up). Finally, "[e]ach defendant's contacts with the forum state must be assessed individually." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984).

Plaintiffs do not allege that any Individual Defendant has "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone" to Texas. *Walden*, 571 U.S. at 289. Plaintiffs also do not claim that any Individual Defendant directed that Plaintiffs' social media posts be flagged or taken down, or that the alleged censorship occurred in Texas. Instead, Plaintiffs argue that this court may exercise personal jurisdiction over the Individual Defendants because they all "engaged in intentional, forum-directed conduct that foreseeably caused harm in Texas, singling out Texas as a hotspot for 'misinformation,' monitoring Texas-based speech and speakers, and pressuring platforms to suppress content emanating from the State." Dkt. 103 at 10.

The only person identified in the First Amended Complaint—on Plaintiffs' side or Defendants' side—that has any direct connection to Texas is Ramirez, who resides in the Lone Star State.[4] The other five Plaintiffs reside outside of Texas,[5] as do all the Individual Defendants. Importantly, the five nonresident Plaintiffs fail to allege that any Individual Defendant purposefully directed conduct at Texas that gave rise or relates to their specific claims of censorship. Keep in mind that specific jurisdiction is claim and party specific. *See Bristol-Myers*, 582 U.S. at 262. In *Bristol-Myers*, though the defendant had sold Plavix, an antiplatelet medication, in California, the nonresident plaintiffs could not sue in California because they "were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 264. "The mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 265. This principle bars the claims brought by the five nonresident Plaintiffs in this case. As in *Bristol-Myers*, even if the Individual Defendants had sufficient contacts with Texas to support a claim by Ramirez (a Texas resident), that would "not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.*

Plaintiffs "appear to believe that their civil conspiracy claim is enough to establish personal jurisdiction over [the Individual Defendants]. There is no authority from [the Fifth Circuit] supporting [this] belief." *Chow v. United States*, No. 20-30503, 2021 WL 3438365, at *2 (5th Cir. Aug. 5, 2021). The Fifth Circuit has "implicitly recognized that personal jurisdiction over one defendant

---

[4] The First Amended Complaint mentions "Texas" only twice, noting that "Ramirez resides in Edinburg, Texas," Dkt. 42 at 12, and that he spoke "locally in Texas to raise awareness and share his son's story." *Id.* at 133.

[5] Dressen resides in Utah; Barcavage resides in Pennsylvania; Dobbs resides in Missouri; Holland resides in Tennessee; and Newell resides in Minnesota. *See id.* at 11–12.

conspirator is not sufficient to establish personal jurisdiction over a nonresident coconspirator." *Id.* (citing *Thomas v. Kadish*, 748 F.2d 276, 282 (5th Cir. 1984)). Personal jurisdiction must be based on each defendant's individual contacts with the forum "and not as part of the conspiracy." *Delta Brands, Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004); *see also Bar Grp., LLC v. Bus. Intel. Advisors, Inc.*, 215 F. Supp. 3d 524, 539 (S.D. Tex. 2017) ("Allegations of conspiracy will not establish a prima facie case of personal jurisdiction; a plaintiff must show that each defendant individually, and not as part of a conspiracy, purposely established minimum contacts with Texas that would satisfy due process."). "[B]are allegations of conspiracy without factual support do not suffice to establish minimum contacts for personal jurisdiction purposes." *Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 666 n.16 (5th Cir. 2004). Accordingly, to establish that this court has personal jurisdiction over the Individual Defendants, Plaintiffs must show that the alleged conspiracy was "related to or arose out of [the Individual Defendants'] contacts with Texas." *Delta Brands*, 99 F. App'x at 6; *see also Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433, 442 (5th Cir. 2025) (Given that "each defendant's contacts with the forum state must be assessed individually . . . , plaintiffs may not aggregate defendants' forum contacts and may not establish personal jurisdiction without specifying who did what.").

So, what are the alleged contacts the remaining Individual Defendants—Crawford, Flaherty, Murthy, and Slavitt—have with Texas? Let's look, defendant-by-defendant, at the contacts Plaintiffs allege in their response to Defendants' motion to dismiss.[6]

---

[6] Ordinarily, a motion to dismiss considers only the four corners of the operative complaint, any attachments thereto, and any documents in the record that are central to the complaint. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). When evaluating personal jurisdiction, however, the court "can consider the assertions in the plaintiff's complaint, as well as the contents of the record at the time of the motion." *Frank*, 947 F.3d at 336 (cleaned up).

**Crawford and Murthy:** As far as Crawford and Murthy are concerned, Plaintiffs fail to allege a single contact between them and Texas. Not one. Thus, Crawford and Murthy are not subject to personal jurisdiction in Texas.

**Slavitt:** Plaintiffs allege that Texas has specific personal jurisdiction over Slavitt because of the following five Twitter posts he made that mention Texas:

(1) On June 25, 2020, Slavitt wrote "HEY TEXAS: You're a COVID hot spot with 78% case growth in the last 2 weeks. Donald Trump filed papers to take coverage from 1,958,000 Texans today by repealing the ACA." Dkt. 103-2 at 2.

(2) On July 9, 2021, Slavitt wrote "In the case of Texas, they are going to flout CDC guidance." Dkt. 103-3 at 2.

(3) On July 22, 2021, Slavitt wrote "40% of COVID cases are coming from 3 states—Florida, Texas, and Missouri." Dkt. 103-4 at 2.

(4) On September 12, 2021, Slavitt shared a news story from NBC titled "Texas sues 6 school districts that defied governor's mask order" and wrote with it "[t]he virus has no better friends than these heavyweights." Dkt. 103-5 at 2.

(5) On October 11, 2021, Slavitt wrote that Texas Governor Greg "Abbott cares about his radical ideology, but nothing about Texans." Dkt. 103-6 at 2. In the same post, Slavitt shared a New York Times article titled "Gov. Greg Abbott Bars Vaccine Mandates in Texas." *Id.*

These social media posts in which Slavitt referred to the spread of COVID-19 in Texas and criticized COVID-19 policy in Texas do not amount to purposeful availment. Social media posts "are circulated to the public by virtue of their universal accessibility, which exists from their inception. That's why clicks, visits, and views from forum residents cannot alone show purposeful availment. They are not evidence that the *defendant* has formed a contact with the forum state." *Johnson*, 21 F.4th at 325 (quotation omitted). Further, the latter four posts are "not directed at Texas readers as distinguished from readers in other states." *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002). Even assuming that Slavitt's first Twitter post stating "HEY TEXAS" is purposefully directed at Texas, Plaintiffs fail to show how their claims against Slavitt for violating § 1985(3) arise out of or relate to this

post. *See Johnson*, 21 F.4th at 326 ("And even if those acts did target Texas, neither relates to Johnson's claim, so neither supports specific jurisdiction."). Slavitt publicly declaring that Texas is a COVID-19 hotspot on Twitter has nothing to do with *censoring* Texans' social media posts about COVID-19. "There must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers*, 582 U.S. at 262 (cleaned up). In short, Plaintiffs fail to allege that Slavitt has any contacts with Texas that would establish specific personal jurisdiction.[7]

**Flaherty:** Flaherty previously served as the Deputy Assistant to the President and Director of Digital Strategy. Plaintiffs allege that Flaherty has purposefully availed himself of jurisdiction in Texas based on one conversation with a Facebook representative in which Flaherty merely mentioned Texas. *See* Dkt. 103 at 19 ("Flaherty, in a conversation with Facebook officials on April 5, 2021, discussed the need to target and identify pockets of the country where vaccine hesitancy is more of a problem, pointing to Texas with no mask mandate as a prime example." (quotation omitted)).

This one alleged contact does not evince purposeful activity directed at Texas, nor does it have anything to do with Plaintiffs, their specific social media posts, or any content moderation that may be the basis of their claims for violations of their right to free speech. "The only relevant activities of the defendant are those that relate to the plaintiff's suit. That crucial link is missing here." *Johnson*, 21 F.4th at 325.

\* \* \*

---

[7] Plaintiffs have filed a motion to strike or disregard portions of Slavitt's reply brief that cites to—and attaches as an exhibit—a Wall Street Journal article to support Slavitt's argument that Plaintiffs' § 1985(3) conspiracy claim is time barred. *See* Dkt. 108. Plaintiffs' motion to strike is a non-dispositive pretrial matter on which a magistrate judge may rule. *See* 28 U.S.C. § 636(b)(1)(A). Because I have determined that Texas lacks personal jurisdiction over Slavitt, I need not even address Slavitt's statute of limitations argument. As such, I deny Slavitt's motion to strike as moot.

Plaintiffs fail to allege that their claims "arise out of or relate to" any defendants' alleged contacts with Texas, precluding the exercise of specific personal jurisdiction. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). Because I have determined that minimum contacts are lacking, I need not assess whether the exercise of personal jurisdiction over any Individual Defendant in Texas would be fair and reasonable. *See Johnson*, 21 F.4th at 323 (The element requiring that Plaintiffs' claims relate to or arise from Defendants' forum contacts "may preclude [the court's] power even when all other factors—the burden on the defendant, the forum state's interest in applying its own law, and the convenience of the forum—strongly favor [the court's] jurisdiction."); *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir. 1997) ("Only if the nonresident defendant has sufficient minimum contacts with the forum state will the fairness of the exercise of personal jurisdiction be evaluated."). I thus recommend that Plaintiffs' claims against the Individual Defendants be dismissed without prejudice because they are not subject to personal jurisdiction in Texas.[8]

---

[8] The Stanford Defendants, Becerra, Easterly, and Mayorkas argue that even if the court had subject matter jurisdiction, they are not subject to personal jurisdiction in Texas. I agree. Plaintiffs allege that the Stanford Defendants have contacts with Texas arising from their roles in COVID-19 misinformation initiatives, but Plaintiffs fail to allege a connection between these defendants' alleged contacts with Texas and Plaintiffs' § 1985(3) claim.

As far as Easterly, Becerra, and Mayorkas are concerned, personal jurisdiction is also lacking.

**Easterly:** According to Plaintiffs, Easterly's sole connection to Texas is that, in her role as the Director of the Cybersecurity and Infrastructure Security Agency, she appointed two Texans to the 23-member Cybersecurity Advisory Committee in December 2021. This purported connection to Texas is legally insufficient to support a finding of specific jurisdiction. To satisfy the specific jurisdiction inquiry, Easterly's contacts with Texas must be purposeful "and not merely fortuitous." *Walden*, 571 U.S. at 286. Moreover, Plaintiffs fail to explain how the alleged injuries they suffered—the censoring of their social media posts—arise out of the appointment of two Texans to an advisory committee.

**Becerra:** For Becerra, the former Secretary of Health and Human Services, the best Plaintiffs can muster is that he oversaw an agency that awarded four grants to third parties in Texas aimed at combating COVID-19 misinformation. These allegations likewise do not support specific personal jurisdiction. Personal jurisdiction does not exist

## PLAINTIFFS' REQUEST FOR LEAVE TO
## CONDUCT JURISDICTIONAL DISCOVERY

There is one final matter I must address. Plaintiffs ask this court for leave to conduct jurisdictional discovery. *See* Dkt. 103 at 30–32 (regarding personal jurisdiction), 44–45 (regarding subject matter jurisdiction). As a group, Defendants oppose Plaintiffs' request for jurisdictional discovery on the basis that Plaintiffs have not met their burden to establish the requisite need for such discovery. Additionally, the Stanford Defendants argue that Plaintiffs have waived their right to seek jurisdictional discovery.

I will start with the waiver argument. The Stanford Defendants insist that Plaintiffs waived the opportunity to pursue jurisdictional discovery. I concur. Although Plaintiffs certainly knew that Defendants' motions to dismiss would focus on standing and personal jurisdiction, Plaintiffs agreed to proceed with dispositive motions and "stay discovery pending the resolution of Defendants' dispositive motions." Dkt. 39 at 2; *see also* Dkt. 23 at 5 (joint case management plan explaining that the Stanford Defendants are challenging subject matter and personal jurisdiction). It would be fundamentally unfair to allow Plaintiffs to switch positions now to seek discovery they previously agreed not to pursue. *See*

---

over an agency head simply because of his oversight and supervisory responsibilities. *See e.g.*, *Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003) ("It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state."); *Nwanze v. Philip Morris, Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) ("Mere supervision over [a federal agency], the reach of which extends into every state, is insufficient to establish a basis for the exercise of personal jurisdiction."). "If a federal agency head could be sued personally in any district within his or her official authority merely for supervising acts of subordinates . . . the minimum contacts requirement would be rendered meaningless." *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1486 (E.D. Wis. 1993), *aff'd*, 35 F.3d 569 (7th Cir. 1994).

**Mayorkas:** Plaintiffs do not allege that Mayorkas has a single contact with Texas.

Thus, the Stanford Defendants, Becerra, Easterly, and Mayorkas are not subject to personal jurisdiction in Texas. This is an independent reason that dismissal of this case is appropriate as to these defendants.

*Zevoli 243 (Pty) Ltd. v. Dow Chem. Co.*, No. 1:17-cv-03059, 2018 WL 1626544, at *5 (S.D. Ind. Apr. 4, 2018) (plaintiff waived jurisdictional discovery by previously informing the district court that it would not need discovery for purposes of the motion to dismiss).

Even if Plaintiffs had not waived the opportunity to seek jurisdictional discovery, Plaintiffs fail to make an adequate showing to justify such discovery on personal jurisdiction or standing. As the Fifth Circuit has explained:

> To merit jurisdictional discovery, [Plaintiffs] must show that [they are] likely to produce the facts needed to withstand dismissal. [Plaintiffs] must make clear which specific facts [they] expect[] discovery to find. We will not authorize a jurisdictional fishing expedition based on a plaintiff's general averments that more discovery will prove our jurisdiction.

*Johnson*, 21 F.4th at 326 (quotations omitted).

With respect to personal jurisdiction, Plaintiffs argue that discovery would allow them to uncover: (1) Defendants' communications that reference Texas, including communications with or about social media companies regarding content originating from Texas; (2) records of communications between Defendants and third parties referencing "Texas-based concerns, users, or speech"; and (3) information illustrating Defendants' "geographic reach and [the] impact of Defendants' censorship activities" to determine if Texas was disproportionately targeted for content moderation. Dkt. 103 at 31. This is nothing more than a "jurisdictional fishing expedition" that the Fifth Circuit has rejected. *Johnson*, 21 F.4th at 326; *see also Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982) ("When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted."). "Discovery on matters of personal jurisdiction need not be permitted unless the motion to dismiss raises issues of fact." *Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (cleaned up). Because I have accepted Plaintiffs' allegations (and the evidence they attach to their response) as true in determining whether personal jurisdiction

exists, there are no factual issues to address. Jurisdictional discovery is unwarranted.

With respect to standing, Plaintiffs are "not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion." *Freeman v. United States*, 556 F.3d 326, 342 (5th Cir. 2009). This is because "the imposition of jurisdictional discovery places an undue and unnecessary burden on the parties when the proponent of such discovery only supports the request by conjecture, speculation, or suggestion." *NL Indus., Inc. v. OneBeacon Am. Ins. Co.*, 435 F. Supp. 2d 558, 566 (N.D. Tex. 2006). Here, Plaintiffs fail to identify what facts they believe discovery would uncover and how those facts would support standing.

Accordingly, Plaintiffs' request for leave to conduct jurisdictional discovery is denied.[9]

## CONCLUSION

For the reasons discussed above, I recommend that Defendants' motions to dismiss (Dkts. 85, 88, 89, 94, 96) be granted for lack of subject matter jurisdiction and personal jurisdiction.[10] Additionally, Plaintiffs' Motion to Strike or Disregard Portions of Defendant Slavitt's Reply (Dkt. 108) is denied as moot. I also deny Plaintiffs' request for leave to conduct jurisdictional discovery.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R.

---

[9] Plaintiffs' request for leave to conduct jurisdictional discovery is a non-dispositive pretrial matter on which a magistrate judge may rule. *See* 28 U.S.C. § 636(b)(1)(A).

[10] Even if the court had subject matter jurisdiction over this lawsuit and personal jurisdiction over the Individual and Stanford Defendants, Plaintiffs' sole claim against the Individual and Stanford Defendants under § 1985(3) would not survive the pleading stage. In their response brief, "Plaintiffs concede that under governing Fifth Circuit precedent, [the] 'only conspiracies actionable under section 1985(3) are those motivated by racial animus.'" Dkt. 103 at 53 (quoting *Cantú v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019)). Plaintiffs' failure to allege that the Individual Defendants' or the Stanford Defendants' actions were motivated by racial animus dooms their § 1985(3) claims as matter of law.

Civ. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this \_\_11th\_\_ day of December 2025.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE